JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF ALASKA
 3
      JUDY L. BERMAN,                )
 4                                   )
              Plaintiff,             )
 5                                   )
      v.                             )
 6                                   )
      ANCHORAGE POLICE DEPARTMENT,   )
 7    OFFICER R. DUTTON and          )
      SERGEANT G. DAVIS,             )
 8                                   )
              Defendants.            )   Case No. A04-227 CV (JKS)
 9    _____)
10
                   DEPOSITION OF JUDY L. BERMAN
11                     December 13, 2005
12
      APPEARANCES:
13
              FOR THE PLAINTIFF:     MR. JOHN C. PHARR
14                                   Law Offices of John C. Pharr
                                     Attorney at Law
15                                   733 West 4th Avenue
                                     Suite 308
16                                   Anchorage, Alaska  99501
                                     (907)  272-2525
17
18            FOR THE DEFENDANTS:    MS. MARY B. PINKEL
                                     Office of the Municipal
19                                    Attorney
                                     Attorney at Law
20                                   P.O. Box 96650
                                     Anchorage, Alaska  99519
21                                   (907)  343-4545
22
23                        *   *   *   *
24
25
```

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 2

1    PURSUANT TO NOTICE, the Deposition of JUDY L. BERMAN
2  was taken before Cheri Tabor, Notary Public in and for the
3  State of Alaska and reporter for Metro Court Reporting at
4  Metro Court Reporting at 745 West 4th Avenue, Suite 425,
5  Anchorage, Alaska on the 13th day of December 2005, commencing
6  at the hour of 10:45 a.m.
7                    * * * *
8
9              TABLE OF CONTENTS
10  Direct Examination by Ms. Pinkel . . . . . . . . .  4
    Cross Examination by Mr. Pharr . . . . . . . . . .
11
12
      EXHIBITS                    PAGE
13
     1 - Plaintiff's Answers to Defendants'
14       First Set of Discovery Requests . . . . . .  25
     2 - Plaintiff's Initial Disclosures . . . . . . .  25
15   3 - Complaint . . . . . . . . . . . . . . . . . .  40
     4 - Chapter 9.12 Driver's License Municipal Code .  57
16   5 - Alaska Statute 28.15.131 . . . . . . . . . .  62
     6 - Tiburon Printout . . . . . . . . . . . . . .  73
17   7 - Name Details Index . . . . . . . . . . . . .  75
18                    * * * *
19
20
21
22
23
24
25

Page 3

1              P R O C E E D I N G S
2      (On record)
3         COURT REPORTER: My name is Cheri Tabor and
4  I'm a court reporter for Metro Court Reporting, 745 West 4th
5  Avenue, Suite 425, Anchorage, Alaska. Today's date is
6  December 13th, 2005. The time is approximately 10:45 a.m.
7  We're at the offices of Metro Court Reporting for the
8  deposition of Judy Berman. This case is in the United States
9  District Court for the District of Alaska, Berman, Plaintiff
10  vs. Anchorage Police Department, et al., Defendants, Case
11  Number A04-227 Civil.
12      Ma'am would you please raise your right hand so I can
13  swear you in?
14      (Oath administered)
15         MS. BERMAN: Yes, I do.
16              JUDY L. BERMAN
17  having first been duly sworn under Oath, testified as follows
18  on examination:
19         COURT REPORTER: Thank you ma'am. Please
20  state your full name and spell your last name for the record.
21  A    Judy L. Berman, B-e-r-m-a-n.
22         COURT REPORTER: Okay.
23         MR. PHARR: Is it a L dash B-e-r-m-a-n,
24  like it's --
25  A    L period.

Page 4

1         MR. PHARR: Okay.
2  A    Are you going to crack jokes the whole time?
3         MR. PHARR: Yes.
4  A    Okay.
5         COURT REPORTER: Could I please have a mailing
6  address?
7  A    In care of John Pharr, 733 West 4th Avenue, Suite 308,
8  Anchorage, 99501.
9         COURT REPORTER: All right. Thanks. And how
10  about a daytime or a message telephone number?
11  A    272-2525.
12         COURT REPORTER: And the next thing would be
13  for counsel to identify themselves for the record and who they
14  represent.
15         MR. PHARR: John Pharr, attorney for the
16  plaintiff.
17         MS. PINKEL: Mary Pinkel, Assistant Municipal
18  Attorney, attorney for the Police Department, Robert Dutton
19  and Gil Davis.
20         COURT REPORTER: Great, thank you. You may
21  proceed.
22              DIRECT EXAMINATION
23  BY MS. PINKEL:
24  Q    Ms. Berman, may I call you Ms. Berman or would you
25      rather -- can I call you Judy?

Page 5

1  A    Whichever you prefer.
2  Q    Okay. What is your middle name?
3  A    Lea, L-e-a.
4  Q    L-e-a. Okay. And Judy what is your -- you said
5      you're in care of John Pharr. Do you have a work
6      address or a home address?
7  A    Yes.
8  Q    Okay. What is your work address?
9  A    Do I have to give out my work address? Usually people
10     are in care of their attorney.
11  Q    Well, it's customary to ask people what their address
12     is when they are deposed for the record. Do you --
13     can you -- are you willing to give me your work
14     address?
15  A    406 G Street, Suite 208.
16  Q    Okay. And that's here in Anchorage?
17  A    Yeah, it's right across the street.
18  Q    Okay. And what is your home address?
19  A    P.O. Box 112101.
20  Q    102?
21  A    No, 112101.
22  Q    112101, okay. And do you reside here in Anchorage?
23  A    I do.
24  Q    And with respect to your home address, what is that?
25  A    I'm not going to give that out.

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 6

1  Q    Okay. And how long have you worked -- lived at this
2       current home address?
3  A    Ten years.
4  Q    Ten years. Okay. And have you ever been deposed
5       before?
6  A    No.
7  Q    Okay. I don't know if you've talked to your attorney
8       but do you understand that if you don't understand a
9       question that I pose to you, that you can tell me you
10      don't understand it, and then I can explain it
11      further. Otherwise, I'll assume you understand my
12      question.
13 A    Okay. I've conducted depositions but I've never been
14      a deponent.
15 Q    Okay. And then you obviously know that if you need to
16      take a break, you just need to tell me and we can take
17      a break.
18 A    Okay.
19 Q    Now, Judy are you on any medication today?
20 A    No.
21 Q    So you're not on any medication of any type? Is that
22      correct?
23 A    I took an allergy pill last night; that's why I was
24      hesitating.
25 Q    Okay. You had an allergy pill last night but no other

Page 7

1       medications?
2  A    That's correct.
3  Q    Okay. And can you tell me what is your date of birth?
4  A    December 16th, 1955.
5  Q    Okay. And where were you born?
6  A    New York.
7  Q    And that's in Manhattan?
8  A    Correct.
9  Q    And what is your Social Security Number?
10 A    I'm not going to give that out.
11 Q    And do you mind telling my why you don't want to give
12      me your Social Security Number?
13 A    I don't think it's necessary and -- well I don't think
14      you're -- I mean, there's an issue of identity theft
15      which I don't think you're going to do but I don't
16      give out my Social Security Number unless I --
17      something that's necessary. Like --
18 Q    Okay. Now, do you take depositions very often?
19 A    (No audible response)
20 Q    Have you taken people's often?
21 A    Not very often. But I don't think I ask them their
22      Social Security Number.
23 Q    Okay. Have you attended depositions where other
24      attorneys ask for Social Security Numbers?
25 A    I don't remember anybody ever asking anyone their

Page 8

1       Social Security number?
2  Q    Okay.
3  A    But that just might be my experience.
4  Q    Okay. Judy, now in terms of your work address, you're
5       down here at 4th and G Street?
6  A    I am.
7  Q    And how long have you been at that work address?
8  A    Almost eight years.
9  Q    Okay. Now, I want to ask you a little bit about your
10      education. Where did you go to college?
11 A    Brandeis University.
12 Q    Okay. That's in Boston, right?
13 A    It's in the Boston area. The town is Waltham.
14 Q    All right. And when did you graduate from Brandeis?
15 A    1977.
16 Q    Okay. And what did you major in?
17 A    Psychology.
18 Q    Psychology. Okay. And then after you graduated from
19      Brandeis did you go to law school?
20 A    I did.
21 Q    And when did you go to law school and where?
22 A    I started in 1987, 10 years later. When you say
23      where, you mean what school?
24 Q    Yes.
25 A    Northeastern University.

Page 9

1  Q    Okay. And when did you graduate from Northeastern?
2  A    1990.
3  Q    Okay. And what did you do in between college and law
4       school?
5  A    I worked at a number of different jobs.
6  Q    Do you remember what your first job was?
7  A    My first real job quote unquote was with Social
8       Security Administration. Funny, since you made such a
9       big deal now on my Social Security Number. I was a
10      claims representative for the Social Security
11      Administration.
12 Q    Okay. And was that where -- what city was that in?
13 A    It was in Boston.
14 Q    And what years did you work there?
15 A    I believe it was '78 to '81.
16 Q    Okay. And then do you remember what your next job
17      after the Social Security Administration was?
18 A    I worked for Blue Cross and then I worked for the
19      State of Massachusetts as a social worker.
20 Q    And when you worked for Blue Cross, was that in
21      Boston?
22 A    It was.
23 Q    Okay. And what was your position at Blue Cross?
24 A    Claims examiner.
25 Q    And what years were you there?

3 (Pages 6 to 9)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 10

```
1   A    I think '83 to '84.
2   Q    Okay.  And you said you worked as a social worker for
3        the State of Massachusetts?
4   A    I did.
5   Q    And what years were those that you worked there?
6   A    '84 to '86.
7   Q    And did you get a social work degrees in between law
8        school and college?
9   A    No.
10  Q    What division in the State of Massachusetts did you
11       work for when you were a social worker?  What agency?
12  A    I worked for the Department of Social Services.
13  Q    Okay.
14  A    Basically the same -- the counterpart to what OCS is
15       up here.
16  Q    So --
17  A    I was a child protective.
18  Q    Child protective worker?
19  A    Yeah.
20  Q    All right.  After you worked for the State of
21       Massachusetts then what did you do?
22  A    I went to law school.
23  Q    Okay.  And you went to Northeastern and graduated
24       then, you said in 1990?
25  A    I did.
```

Page 11

```
1   Q    Great.  And then what did you do after you graduated
2        from Northeastern?
3   A    I moved up here and took the Bar exam.
4   Q    And then where did you go to work after you took the
5        Bar exam?
6   A    I pretty much did contract work and --
7   Q    Okay.  And that was starting in what year?
8   A    (No audible answer)
9   Q    Do you remember when you started doing contract work
10       in Alaska?
11  A    Probably '93.
12  Q    Okay.  And do you remember when you got admitted to
13       the bar in Alaska?
14  A    I remember.
15  Q    What year was that?
16  A    It was 1991.
17  Q    Okay.  And what did you do between 1991 and 1993?
18  A    I took some time off.  I did some volunteer work.  I
19       took some classes.
20  Q    Okay.  And do you remember where you volunteered?
21  A    I volunteered at Trustees for Alaska.  I did some work
22       with Amnesty International.  I can't remember what
23       else.
24  Q    Okay.
25  A    It was a long time ago.
```

Page 12

```
1   Q    So you volunteered at Trustees and Amnesty
2        International for about two years, between 1991 and
3        1993?
4   A    I think so.
5   Q    Okay.  And then you started doing contract work for
6        other lawyers here in Anchorage in 1993?
7   A    Yes.
8   Q    And what lawyers?
9   A    I feel like I'm here -- I'm like going for a job
10       interview.  I hope I get the --
11  Q    I'm just asking background information.
12  A    I hope I get the job.
13  Q    It's just sort of normal to ask for.....
14       MR. PHARR:  Are you going to joke this whole
15  time, I mean, you know.
16  A    John's finding out things about me he never knew.
17  Q    (By Ms. Pinkel)  Who did you do contract work for in
18       1993?
19  A    A number of different attorneys.  I don't think that's
20       relevant.
21  Q    Okay.  I'm just asking you for background information.
22       MR. PHARR:  Well, there's an opening at the
23  Muni, now.  Come on.  You can get Mary's job.
24  A    I'm not going to go into that kind of detail.
25  Q    (By Ms. Pinkel)  Okay.  So you don't want to tell me
```

Page 13

```
1        who you've done contract work for?
2   A    No, I don't.
3   Q    Okay.
4        MR. PHARR:  Now, if Mary doesn't win this
5   case, you know, they'll be looking for a new attorney over
6   there so --
7        MS. PINKEL:  This might be your big chance,
8   Judy.
9   A    It'll fulfill a lifelong dream of working for the
10       Municipality.
11  Q    (By Ms. Pinkel)  So Judy, are you doing contract work
12       for any firms right now?
13  A    No.
14  Q    And so, what type of practice do you have?
15  A    I'm a sole practitioner.  I don't necessarily
16       specialize in any one thing.  Lately, I've been doing
17       a lot of cases involving custody.  Children's cases,
18       guardianships.
19  Q    Okay.  And are you representing children in child
20       custody cases or parents or both?
21  A    Both.  But not in the same case obviously.
22  Q    Right.  And are you taking appointments from the
23       Office of Public Advocacy?
24  A    Yes.
25  Q    Are you licensed in any other states other than Alaska?
```

4 (Pages 10 to 13)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 14

1  A    I'm not.
2  Q    All right. I'm going to turn to -- you recently
3       answered some discovery requests that the Municipality
4       propounded to you through your attorney. Do you
5       remember that?
6  A    I remember that.
7  Q    Okay. And they were called -- your answers were
8       called Plaintiff's Answers to the Defendants' First
9       Set of Discovery Requests.
10 A    Okay.
11 Q    Do you recall those?
12 A    Uh-huh (affirmative).
13 Q    And you would have answered those just very recently
14      on December 8th, correct?
15 A    Okay.
16 Q    Okay. And I just wanted to -- you obviously had a
17      chance to look at those and you signed a verification
18      page, correct?
19 A    Uh-huh (affirmative).
20 Q    I just wanted to go over those a little bit with you
21      and I've got a copy for you to look at.
22 A    You have a copy? Oh yeah.
23      MS. PINKEL: A copy to John.
24      COURT REPORTER: May I please interject? I
25 type a lot of the transcripts and ma'am if you say yes or no

Page 15

1  instead of uh-huh.
2  A    I understand.
3       COURT REPORTER: Thank you so much.
4       MS. PINKEL: Thank you, Cheri.
5  Q    (By Ms. Pinkel) I just wanted to ask you about
6       Interrogatory number two. I asked you to describe in
7       detail all injuries, ailments, or pains which you
8       claim to have suffered as a result of the occurrence
9       alleged in your complaint, stating the severity and
10      duration of such injuries and the current prognosis.
11      Do you remember that question?
12 A    Yes.
13 Q    Interrogatory two, okay. And now the answer you gave
14      was that you objected to as not relevant to the claims
15      or defenses of any party, as the plaintiff has not
16      asserted a claim for physical injury or for medical
17      expenses. So I guess my question to you is this then,
18      am I correct in assuming that you're not making any
19      claim for physical injury in this lawsuit?
20 A    That's correct. But isn't that like a legal question
21      rather than a factual question?
22 Q    Well, if it's -- I think it's both. I'm asking if
23      you're making any kind of claim that you have physical
24      injuries and as I understand it, you're saying you
25      don't have a claim for any physical injury and I just

Page 16

1       want to confirm that that's true?
2  A    I was physically injured. But that's not the basis of
3       my claim. I'm not denying that I was -- I'm not
4       claiming pain and suffering or lost wages or medical
5       expenses. So I'm not claiming compensation. I'm
6       not -- I was injured but I'm not claiming compensation
7       for my physical injuries maybe was a better way to put
8       it.
9  Q    So you're saying -- okay. Just so I can understand
10      it, you're not making any claims that you were
11      physically injured in this lawsuit? You're not
12      claiming -- you're not asking the City.....
13 A    I was physically injured.
14 Q    You say you were physically injured?
15 A    But I'm not claiming compensation for my physical
16      injuries.
17 Q    But you're not seeking compensation for physical
18      injuries? Is that correct?
19 A    Yes.
20 Q    Okay. And so as I also understand it from
21      interrogatory number two from your response, you're
22      also not claiming medical expenses, correct?
23 A    That's correct.
24 Q    Okay. Now going to interrogatory number three, I
25      asked for the names of any physicians or medical care

Page 17

1       providers including any behavioral health providers
2       who have examined or treated you for any injury,
3       sickness or ailment during the preceding seven years.
4       And your response is objected to as irrelevant and not
5       reasonably calculated to lead to the discovery of
6       admissible evidence. And then you said please see
7       objection to interrogatory number two above. So am I
8       correct then that you're not making any claim then for
9       any kind of medical care you would have seen either
10      behavioral health or not -- or strictly physical
11      health? Is that correct? You're not seeking any
12      compensation?
13 A    You just asked me if I was seeking compensation for
14      medical expenses and I said no.
15 Q    Okay. So you're not, okay. All right. And you're
16      not seeking any kind of compensation for any kind of
17      behavioral health expenses you may have incurred? Is
18      that correct?
19 A    That's correct.
20 Q    Okay. Now, directing your attention to
21      interrogatories three, four and five. Well, let's
22      start here at -- I'm sorry, four. I asked for names
23      of physicians and medical care providers and you
24      said -- you referred me to your previous objection.
25      Is that correct?

METRO COURT REPORTING
907.276.3876         745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501         metro@gci.net

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 18

1  A    That's what it says, yes.
2  Q    Okay. All right. And then again in five I said state
3        whether you claim to have suffered mental or emotional
4        problems or impairment as a result of this incident
5        and, if so, explain and describe in detail any and all
6        changes in personality, attitude, manners, state of
7        mind or emotional state. Your response was objected
8        as not relevant. The claims or defense of any party
9        and not reasonably calculated as the plaintiff.....
10 A    Excuse me.
11 Q    Are you okay?
12 A    Yeah.
13 Q    Okay. As the plaintiff has not asserted a tort claim
14       for intentional or negligent infliction of mental or
15       emotional distress. So you're saying, you're not
16       claiming that you suffered emotional distress,
17       correct?
18 A    (No audible answer)
19 Q    You're not making that claim for emotional distress?
20       Is that right?
21 A    I'm not asser- -- asserting a tort claim for emotional
22       distress.
23 Q    Okay. So you're not -- you're not asserting a claim,
24       any type of claim for emotional distress?
25 A    I didn't say that. I said I'm not asserting a tort

Page 19

1        claim for emotional distress.
2  Q    Okay. Are you.....
3  A    I did have emotional distress as a consequence of the
4        events that happened. But I'm not asserting a tort
5        claim.
6  Q    Okay. Well, maybe you can explain that for me. You
7        said you had asserted as a consequence but you're not
8        making a claim for emotional distress?
9  A    I -- I said three times -- should I call you Mary or
10       Miss Quinn -- Ms. Pinkel?
11 Q    You can call me Mary.
12 A    I said three times, Mary, I'm not asserting a tort
13       claim.
14 Q    Okay. So you're not asserting any claim for emotional
15       distress? Is that correct? It's -- answer my
16       question. If you don't understand it, I'll try to
17       rephrase it.
18 A    I understand it. I don't think you understand me. I
19       understand you perfectly.
20 Q    So are you asserting any kind of claim for emotional
21       distress?
22 A    If you would do the research you would see that you
23       can have a claim for emotional distress arising out of
24       violation of your civil rights. It's entirely
25       different than a tort claim for negligent or

Page 20

1        intentional infliction of emotional distress.
2  Q    Okay. So you're -- so just so I'm understanding this,
3        you are making a claim for emotional distress. Is
4        that right?
5  A    I am not asserting an independent tort claim. Part of
6        the way that I was damaged as a result of the incident
7        that occurred that's the subject of my complaint was
8        that I suffered mental distress.
9  Q    Okay. So you're saying you have suffered mental
10       distress? Is that right?
11 A    I've suffered mental distress. But I'm not asserting
12       a tort claim for mental distress. Should I say it
13       three more times?
14 Q    Okay. So you're not asserting a tort claim for it.
15       Have you sought any medical care for emotional
16       distress because of this incident?
17 A    I have not.
18 Q    Have you sought any type of psychological counseling
19       for this incident?
20 A    No.
21 Q    So are you making any claim for loss of enjoyment of
22       life for this incident?
23 A    No. I'm not making a claim for emotional distress.
24       But I'm not stating that I was not emotional -- but
25       I'm -- I was. I did suffer mental distress. But I'm

Page 21

1        not making a claim for it except as it relates to the
2        violation of my civil rights in my other claims.
3  Q    Okay. So I guess I'm a little bit confused here.
4        You're not making a claim for emotional distress?
5        You're not making a claim for physical injury in this
6        lawsuit, correct?
7        MR. PHARR: I think she's explained it
8  counselor. The emotional distress claim is part of the civil
9  rights violation claim. That's the long and the short of it.
10 Q    (By Ms. Pinkel) Okay. But you're not asking for any
11       damages for emotional distress of physical injury? Is
12       that correct?
13 A    I think that's correct.
14 Q    Okay. So you've got no claim for damages for physical
15       injury and you have no claim for damages for emotional
16       injury? Is that correct? Correct?
17 A    Except as it relates to my other claims.
18 Q    Okay. Well, I'll get to.....
19 A    I'm not waiving my right to testify that I was
20       distressed by what happened. But I'm not asserting an
21       independent claim for damages as a result of the
22       mental and physical distress. But I'm not saying that
23       it didn't happen.
24 Q    But you're not asking for any damages in that regard?
25       Correct?

6 (Pages 18 to 21)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 22

| 1 | A | (No audible answer) |
| 2 | | MR. PHARR: I think she is counselor. |
| 3 | | MS. PINKEL: Well, okay. She needs to..... |
| 4 | A | I think this is just getting into the legal -- well I |
| 5 | | think you're getting into what the legal theory is. I |
| 6 | | think the point of the deposition is to get -- is not |
| 7 | | to ask somebody what their legal theory is. I think |
| 8 | | that's, you know -- |
| 9 | Q | (By Ms. Pinkel) Well, I'm trying to understand if you |
| 10 | | have any -- if you're telling us that you have any |
| 11 | | damages as a result of this incident and from what I |
| 12 | | can understand is you're telling me you don't have any |
| 13 | | damages. You're not asking the court to give you |
| 14 | | money for any physical injury or emotional distress or |
| 15 | | loss of enjoyment of life, correct? |
| 16 | A | I'm not asserting those specific damages, no. |
| 17 | Q | And you're not asking for the court to give you |
| 18 | | damages for any kind of medical problems that you may |
| 19 | | have suffered. You're not asking the court to give |
| 20 | | you damages for any mental problems you might have |
| 21 | | suffered, correct? |
| 22 | A | That's correct. |
| 23 | Q | Okay. So you're not requesting damages for those -- |
| 24 | | on those subjects? |
| 25 | A | (No audible answer) |

Page 23

| 1 | Q | And you're not making any kind of claim for damages |
| 2 | | for any type of disability as a result of this |
| 3 | | incident? Is that correct? |
| 4 | A | (No audible answer) |
| 5 | Q | Judy? |
| 6 | | MR. PHARR: Just answer the question Judy. |
| 7 | A | Isn't that redundant? |
| 8 | Q | (By Ms. Pinkel) I'm just trying to clarify what |
| 9 | | you're..... |
| 10 | A | Well, can you clarify the question? What do you mean |
| 11 | | by disability? |
| 12 | Q | You're not making any claim that you've suffered any |
| 13 | | disability as a result of this incident, correct? |
| 14 | A | Can you clarify? What kind of disability? |
| 15 | Q | Well, have you suffered any kind of -- are you making |
| 16 | | any claim that you have damages because you've |
| 17 | | suffered in some, you know, physical way because of |
| 18 | | this incident? |
| 19 | A | But you already asked me that. |
| 20 | Q | Well..... |
| 21 | A | And I answered you. It's been asked and answered. |
| 22 | Q | Okay. |
| 23 | A | I probably -- looking at my lawyer. |
| 24 | Q | Okay. It's your attorney's -- if your attorney wants |
| 25 | | to object, he can object. But I'm just asking you to |

Page 24

| 1 | | answer the question. |
| 2 | | MR. PHARR: I object. I..... |
| 3 | Q | (By Ms. Pinkel) I'm just -- I'm trying to understand |
| 4 | | why you brought the lawsuit and if you have damages |
| 5 | | that you wanted to assert. And I guess what I..... |
| 6 | A | He already objected. |
| 7 | Q | Okay. I guess what I'm understanding here Judy is |
| 8 | | that you're not asserting any damages from this |
| 9 | | incident, correct? |
| 10 | A | That's not correct. I'm not asserting damages for |
| 11 | | infliction of emotional distress or for physical |
| 12 | | injury which is what we just said. I guess I should |
| 13 | | take -- |
| 14 | Q | Okay. So you're not making any claim for mental |
| 15 | | injury or physical injury in this lawsuit? |
| 16 | A | That's right. |
| 17 | Q | Okay. Now turning to interrogatory number seven, I |
| 18 | | asked you if you were making any claims for loss of |
| 19 | | earning capacity as a result of the alleged |
| 20 | | occurrence. And your answer was plaintiff is not |
| 21 | | claiming any loss of earning capacity. And that's |
| 22 | | still your position today, correct? |
| 23 | A | Yes, it is. |
| 24 | Q | Okay. Now interrogatory number 10 I said please state |
| 25 | | each item of damage you are claiming, including the |

Page 25

| 1 | | amount you are claiming for each item and your answer |
| 2 | | was see paragraph C of Plaintiff's Initial |
| 3 | | Disclosures, correct? |
| 4 | A | Yes. |
| 5 | Q | Okay. And then going to your Initial Disclosures, |
| 6 | | paragraph C. Do you remember your Initial |
| 7 | | Disclosures? Did you help with those? |
| 8 | A | Yes. |
| 9 | Q | Okay. I'm just going to show you your copy of your |
| 10 | | initial disclosure. |
| 11 | | MS. PINKEL: And Mrs. Tabor if we could mark |
| 12 | | her answer, Plaintiff's Answers to Defendants' First Set of |
| 13 | | Discovery Requests as Exhibit 1? |
| 14 | | COURT REPORTER: Certainly. Exhibit 1 marked. |
| 15 | | (Deposition Exhibit 1 marked) |
| 16 | | MS. PINKEL: If I could just hold onto that. |
| 17 | Q | (By Ms. Pinkel) And I'm going to show you your |
| 18 | | Initial Disclosures. |
| 19 | | MS. PINKEL: Can you mark that Exhibit 2? |
| 20 | | COURT REPORTER: Certainly. Exhibit 2 marked. |
| 21 | | (Deposition Exhibit 2 marked) |
| 22 | Q | (By Ms. Pinkel) Okay. Paragraph C, I asked, or you |
| 23 | | were disclosing what your damages were, and you |
| 24 | | indicated violation of civil rights, false arrest, |
| 25 | | assault and battery, malicious prosecution, punitive |

7 (Pages 22 to 25)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 26

1    damages. Is that correct?
2  A    That sounds right.
3  Q    Is that what you think your damages were? Okay. But
4    you haven't listed any other -- you haven't listed any
5    damages there, have you?
6  A    You just read my damages.
7  Q    Well, those are really claims, aren't they?
8  A    (No audible answer)
9  Q    A claim for a violation of civil rights, a claim for
10    false arrest, a claim for assault and battery, a claim
11    for malicious prosecution? Is that correct?
12  A    I was damaged by those things.
13  Q    You were damaged by the claims? Is that what you're
14    saying?
15  A    I don't think you think that that's what I'm saying.
16    Maybe we should cut to the chase. I could get nominal
17    -- nominal damages and punitive damages.
18  Q    Okay. But you haven't -- you're not saying that you
19    have had any actual physical injuries? You're not
20    claiming physical injury and you're not.....
21  A    I'm not claiming damages for physical injury. I was
22    injured and I was mentally distressed. I am claiming
23    damages for the fact of being falsely arrested and
24    deprived of our civil rights and handcuffed in public
25    is inherently damaging. It's not something a person

Page 27

1    in a civilized society should expect to ever have to
2    undergo. It's damaging in and of itself.
3  Q    Okay. But you're not saying that you have any
4    physical -- you've suffered any physical harm?
5  A    Why are we -- with all due respect Ms. Pinkel, why are
6    we going over the same thing over and over again. I
7    think my position is clear. I mean, we're just going
8    over things that have already been filed.
9  Q    Right. I just want to understand what -- if you've
10    actually suffered any physical harm here. And what I
11    guess I'm understanding is that you're asserting some
12    claims here, correct? But you're not saying -- you're
13    not stating that you've suffered any physical damages,
14    correct?
15  A    I suffered physical damages. I'm not claiming
16    compensation for my physical damages.
17  Q    Okay.
18  A    I'm claiming compensation for the things that I
19    listed.
20  Q    Okay.
21    MR. PHARR: Can we move on to something else,
22    counselor? I think we've pretty well beaten this into the
23    ground.
24  Q    (By Ms. Pinkel) Okay. I just want to understand
25    here. Okay. So moving on, I just wanted to backtrack

Page 28

1    here a little bit. What -- have you been married
2    before?
3  A    No.
4  Q    I just forgot to ask you the background information.
5    Do you have any marital history at all?
6  A    I said I wasn't married.
7  Q    Okay.
8  A    You just asked me that. I haven't been married.
9  Q    Great. All right. Now turning to the reason why
10    we're here. You've filed a complaint in federal court
11    against two police officers and the Anchorage Police
12    for an incident that occurred in April of 2002? Is
13    that correct?
14  A    No, it's not. I filed in state court.
15  Q    Okay. You filed in state court and the case later was
16    transferred to federal court? Is that correct?
17  A    Your office removed it to federal court, that's
18    correct.
19    The Municipal Attorney removed it to federal court,
20    correct?
21  A    That's correct.
22  Q    Okay. Turning to that day, do you remember what time
23    of day this was when this incident that led to the
24    lawsuit occurred?
25  A    It was right around 10:00 at night.

Page 29

1  Q    Okay. And you were going to the grocery -- this was
2    at Carrs Grocery Store. You were going to get
3    groceries at Carrs? Is that correct?
4  A    Yes.
5  Q    Okay. And which Carrs was this?
6  A    It was on Huffman Road.
7  Q    Okay. Now where had you been before you went to Carrs
8    Huffman?
9  A    Downtown Anchorage.
10  Q    Okay. Do you remember what you'd been doing?
11  A    I was seeing a play with a friend.
12  Q    Okay. Now do you -- were you on any kind of
13    medication that night?
14  A    I don't think so. Not that I recall.
15  Q    Can you tell me what happened this night at Carrs when
16    you had the disturbance with the -- or however you
17    want to characterize it? The incident where you had a
18    confrontation with the police.
19  A    I don't know if I'd characterize it as a
20    confrontation.
21    I'm sorry. I don't mean to characterize it all. Why
22    don't you just tell me in your own words what
23    happened?
24  A    Starting with when I got to the parking lot? Starting
25    with when the police came up to me? What point do you

METRO COURT REPORTING
907.276.3876     745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501     metro@gci.net

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 30

1    want me to start at?
2  Q    How about, why don't you start when you got to the
3    parking lot?
4  A    Are you familiar with the Hart-- Huffman Carrs at
5    all?
6  Q    Not really.  John and I shop at the one in Turnagain.
7    So, you might need to tell us a little bit about the
8    Carrs Huffman.
9        MR. PHARR:  We don't shop together or
10  anything.  We're just sort of there at the same time, yeah.
11  A    I was in the parking lot.  There's -- just hang on a
12    second.  I'm just trying to get the previous
13    conversation out of -- I mean, I really, I was really
14    surprised we spent so much time on this other stuff.
15    I just want to clear that out of my mind.
16  Q    (By Ms. Pinkel)  Do you want to take a break?
17  A    What it is now?  11:15.  I put on my watch backwards.
18    Yeah, how about that?
19        MS. PINKEL:  Okay.  We can take a little
20  break.
21        (Off record)
22        (On record)
23  Q    (By Ms. Pinkel)  Okay.  Judy we were turning to the
24    events of April 6th, 2002, which is what brought us
25    here today.  Can you -- do you want to tell us a

Page 31

1    little bit about the circumstances that led to the
2    incident that led to the lawsuit?  You were saying you
3    had been downtown at a play.  And then you came to the
4    Carrs Huffman to go grocery shopping about 10:00 at
5    night?  Is that correct?
6  A    That's correct.
7  Q    And do you remember what day of the week this was?
8  A    Saturday.
9  Q    Okay.  So --
10  A    You want me to just tell you now -- the form of what
11    happened?  Is that what you're --
12  Q    Sure.  Well, why don't we -- first of all you were
13    going into the parking lot to park to go into the
14    grocery store?  Is that correct?
15  A    I was driving my car, yeah.
16  Q    And then when you got to the parking lot, what
17    happened?
18  A    Well, in terms of the layout of the parking lot, there
19    was a row of cars (sic) that's right in front of
20    Carrs.  There's a row of cars (sic) that's right in
21    front of the store.
22  Q    You mean a row of parking spaces?
23  A    Right.
24  Q    Okay.
25  A    And there was a vacant spot in front of the store in

Page 32

1    that row of spaces.  There was one vacant space that I
2    saw.  And I waited with my turn signal on for traffic
3    to clear in the other direction and a couple of cars
4    or vehicles came by, passing in the other direction
5    and then another vehicle approached and parked in the
6    space that I was waiting to park in.
7  Q    And then what happened after the car parked in the
8    space you wanted to park in?  What did you do?
9  A    I honked my horn a few times at the car to indicate
10    that I had been waiting to park there.
11  Q    And so you honked the horn and then what did you do?
12  A    Another space opened up right next to that space.  So
13    I pulled into that space.
14  Q    Now, in addition to honking the horn at the other car,
15    you also screamed at them, correct?
16  A    That's absolutely incorrect.
17  Q    Okay.
18  A    I never screamed at them.  I'm absolutely positive I
19    never screamed at them.
20  Q    So if -- do you remember who the couple was that was
21    -- or was it a couple that was in the other car?  Do
22    you remember who they were?
23  A    I don't understand the question.
24  Q    During -- well you said they.  The people driving the
25    other car.

Page 33

1  A    I remember that it was a couple.
2  Q    The couple.
3  A    I don't know what you mean by who they were?
4  Q    Do you remember their names?  Did you ever get their
5    names?
6  A    Not until after I filed the lawsuit.  I never spoke to
7    them.  I had no idea who they were.
8  Q    Okay.
9  A    But I know it was a man -- all I know is a man and a
10    woman.
11  Q    Okay.  So if the man and the woman said that you were
12    screaming at them, would they be incorrect?
13  A    Absolutely.
14  Q    Okay.  So you honked your horn at them.  How many
15    times did you honk your horn?
16  A    Four or five times.  I don't know exactly.  Obviously,
17    I wasn't counting.
18  Q    Okay.  And then you found a parking space right next
19    to them?
20  A    Yeah.
21  Q    Okay.
22  A    Well, a space opened up.  It hadn't been opened up.
23    At the time that I was originally stopped, waiting to
24    park, there was just that one space.  They pulled into
25    the space I was waiting for, then like immediately

9 (Pages 30 to 33)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 34

1    after, the car next to that pulled out and so another
2    space became available. I parked in that space.
3  Q    Okay. And then -- so then you parked in the space and
4    then what happened after you parked in the space?
5  A    A man and a woman got out of the van. That's the
6    first time I saw who had been occupying the van.
7  Q    Okay.
8  A    They passed in front of my car to go to the store and
9    I honked a couple more times.
10  Q    Okay. And did you say anything to them?
11  A    Absolutely not.
12  Q    And when you honked a couple of more times at them,
13    why were you honking a couple of more times at them?
14    Why were you honking at them?
15  A    Just to let them know that I thought it was -- what
16    they did was rude. I was really kind of surprised
17    that somebody would do that. Usually people up here,
18    I find are usually pretty polite. And I kind of, when
19    they passed by, I kind of mouthed at them -- that's --
20    I mean if they have a perception that I screamed at
21    them, I know I mouthed at them through the window. I
22    was like, in fact, I mouthed at them that was really
23    rude but I went -- I didn't use my voice at all. I
24    was like --
25  Q    So you mouthed at them that was really rude but you

Page 35

1    don't remember making it audible? Is that what you're
2    saying?
3  A    I'm sure that I did not make it audible. I honked at
4    them to get their attention and then I said that was
5    really rude without using my voice and they kind of
6    gave me a blank look and went into the store and that
7    was it.
8  Q    So you -- okay. But your purpose in honking at them
9    was to let them know you were upset with them?
10  A    No.
11  Q    Well, okay. So you wanted them to know you thought
12    they were rude? Is that correct?
13  A    I think I honked at them to get their attention so
14    they would look at me and then I mouthed at them that
15    was really rude.
16  Q    So your purpose in honking at them was for them to
17    know that you felt they were rude?
18  A    I think I just said that I think.....
19  Q    Is that right?
20  A    No. I honked at them to get them to look in my
21    direction and then when they looked in my direction I
22    mouthed at them that was really rude. The purpose in
23    honking was to get them to look at me.
24  Q    And why did you want them to look at you?
25  A    I just said, so that I could mouth to them that was

Page 36

1    really rude.
2  Q    Okay. All right. So --
3  A    But as I said, I don't know what the word -- I think
4    mouth -- I just mimed it. I didn't use my voice. I
5    mouthed it, like that was really rude.
6  Q    Are you in the habit of mouthing things to people and
7    not using your voice?
8  A    That's not a habit of mine.
9  Q    Okay. Could your -- perhaps your memory be a little
10    mistaken that in this instance that maybe you were
11    actually yelling at them?
12  A    Absolutely not. Absolutely not. I'm absolutely
13    positive I never yelled at them.
14  Q    Okay. But just so I can understand here though, you
15    honked at them four or five times after they took what
16    you believed was your parking space, correct?
17  A    I don't know the exact number of times. But I think
18    it was probably four or five.
19  Q    Okay. So then after you honked at them four or five
20    times then there was a space that opened up next to
21    them, correct?
22  A    Yes.
23  Q    Okay. And then after this space opened up you parked
24    there, correct?
25  A    Yes.

Page 37

1  Q    Okay. And then after the couple got out of their car
2    you honked at them a couple more times, correct?
3  A    Yes.
4  Q    And then you don't believe you used your voice, but
5    you mouthed at them that was really rude?
6  A    I'm positive I did not use my voice.
7  Q    Okay. And then you worked in -- you weren't honking
8    to let them know that you were in any danger were you?
9  A    No.
10  Q    No. Okay. There wasn't any danger in the situation
11    that you had encountered, correct?
12  A    I can't think of any danger.
13  Q    Okay. Now, just in terms of where you were driving
14    was -- were these spaces here, were they angled spaces
15    or was it straight spaces in front of the Carrs there?
16  A    I think they were slightly angled.
17  Q    Okay.
18      MR. PHARR: The spaces lean to the left, you
19  know. Never mind.
20  Q    (By Ms. Pinkel) Now -- so after you honked at them a
21    few more times then mouthed it was very rude, then
22    what happened?
23  A    They walked into the store and I got out of my car. I
24    was just out of my car. I think I had just closed the
25    door and Officer Dutton approached me on foot.

10 (Pages 34 to 37)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 38

1 Q   Okay. Now was he wearing a uniform?
2 A   Yes.
3 Q   And by uniform I mean a police uniform?
4 A   Yes.
5 Q   Okay. So he approached you on foot. And had he been
6      in a police car?
7 A   I didn't see a police car.
8 Q   Okay. But he was -- anyway, so he approached you.
9      And was he wearing a badge?
10 A   I don't have any recollection of it. I assume he was.
11      That's part of the uniform.
12 Q   Okay. And then what happened when he approached you?
13 A   He said is there something wrong with your car horn?
14      And I said no there's nothing wrong with my car horn.
15      I just thought it was rude for those people to park in
16      the space I was obviously waiting for.
17 Q   Okay. And did doctor -- excuse me, not doctor,
18      Officer Dutton tell you that you had been creating a
19      disturbance?
20 A   I think he said that. But he seemed a lot more
21      concerned with the fact that I had no right to pull
22      into the parking space from the left.
23 Q   Okay. So he said -- okay, I'm not asking you to
24      speculate here, but he said he thought you were
25      creating a disturbance and then he also told you that

Page 39

1      had no right to park where you had wanted to park?
2      Is that correct?
3 A   I remember very clearly that he said you have no right
4      to park into -- to pull into that space from the left.
5      I think he mentioned something about a disturbance
6      before that. But I -- his emphasis was on the fact
7      that I shouldn't have pulled into the space from the
8      left.
9 Q   Okay. Do you remember the complaint that you and
10     Mr. Pharr filed in regard to this case. When you
11     filed, I guess, you had filed it in state court first
12     in April 2002?
13 A   I recall that we said in the complaint that he said I
14     was creating a disturbance and I'm not denying that.
15     I just remember very clearly that his emphasis seemed
16     to be on the direction that I was pulling into the
17     space from.
18 Q   Okay. But he told you that you'd been creating a
19     disturbance, correct?
20 A   I think he did.
21 Q   Okay. I'm just going to show you your complaint.....
22 A   But I'm not.....
23 Q   .....that's been filed.
24 A   With all due respect, I just clarified this for you.
25 Q   No, I know. I'm just going to ask you a few questions

Page 40

1      about your complaint. I'm not going to argue with
2      you, Judy.
3 A   Good.
4      MS. PINKEL: John, I assume you grabbed
5      another copy of this complaint? I --
6      MR. PHARR: That's all right. I can just look
7      at this one.
8      MS. PINKEL: I'm sorry. I thought you had
9      one.
10     MR. PHARR: It's all right.
11     MS. PINKEL: Let's mark this as Exhibit 3.
12 A   You don't have another one, I'll see if I have one.
13     MR. PHARR: That's okay. I can look at yours.
14 A   You want to share?
15     MR. PHARR: Sure.
16     COURT REPORTER: Exhibit 3 marked.
17     (Deposition Exhibit 3 marked)
18 Q   (By Ms. Pinkel) Okay. Judy, I just wanted to ask you
19     a few questions about the complaint.
20 A   Here you can have that, I have another copy.
21 Q   Okay. Paragraph nine you indicated in your complaint,
22     which I assume you got to review before Mr. Pharr
23     filed it, that Dutton then told the plaintiff that she
24     had been disturbing the peace and that she had no
25     right to pull into the parking space from the left.

Page 41

1      Okay. So does that correctly characterize what
2      Officer Dutton told you when he first approached you?
3 A   I think I said yes three times.
4 Q   Okay. Good. I just want to clarify that. Then after
5      Officer Dutton told you that you'd been disturbing the
6      peace and that you didn't have the right to pull into
7      the parking space from the left, then what happened
8      between you and Officer Dutton?
9 A   Then he said if you do it again, I'll find it in my
10     heart to cite you.
11 Q   Okay. And did he then ask for your identification?
12 A   No.
13 Q   Okay. Did he -- what happened after he said I'll find
14     it in my heart to cite you?
15 A   We kind of -- there was a pause. We kind of stood
16     there for a couple of seconds looking at each other.
17     It was obvious -- it was obvious he had nothing else
18     to say to me and so I said have a great night and I
19     walked away.
20 Q   Now, did he tell you I have nothing else to ask you?
21 A   No.
22 Q   You just assumed that he had nothing else to say to
23     you?
24 A   I was in no hurry, Ms. Pinkel. I stood there
25     patiently. I waited to see if he had something else

11 (Pages 38 to 41)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

---

**Page 42**

1     to say and he didn't. And since he said if you do it
2     again, I'll find it in my heart to cite you, that made
3     it clear to me that he didn't intend to take any
4     action.
5  Q   Now, did he ask you why you had sounded your horn?
6  A   No. I mean other than the conversation was exactly as
7     what I -- as what I had just told you. He said is
8     there something wrong with your car horn? I said no
9     there's nothing wrong with your -- my car horn. I
10     just thought it was rude for those people to park in
11     the space that I'd been waiting for. He said
12     something about disturbing the peace and that I had no
13     right to pull into the space from the left and if you
14     do it again, I'll find it in my heart to cite you.
15  Q   And then did he again ask for your identification?
16  A   No.
17  Q   He did not ask for your identification?
18  A   Not at that point.
19  Q   Okay. When did he ask for your identification?
20  A   After he said -- if I can back up, after he said if
21     you do it again I'll find it in my heart to cite you,
22     we stood there for a couple of seconds looking at each
23     other. He didn't say anything else. It was clear to
24     me that the conversation was over. I turned and
25     walked away and then he came after me and said, hey, I

**Page 43**

1     want to see your I.D.
2  Q   Okay. And then, so as you were walking away, he asked
3     to see your identification, correct?
4  A   After I had started walking away.
5  Q   Okay. So after you had started walking away, he said,
6     I need to see your identification, correct?
7  A   I was already walking away when he said that.
8  Q   All right. And he asked to see your identification as
9     you were walking away?
10  A   He said, hey, I want to see your I.D.
11  Q   Okay. And then when he asked you, I want to see your
12     I.D., or when he told you I want to see your I.D.,
13     what was your response?
14  A   I said no, you don't have the right to stop me for no
15     reason. I thought that that was a second stop. I'm
16     not -- I'm not conceding that he would have had a
17     right to ask me before. But I know that at that point
18     it would have been a second stop. I was already
19     walking away.
20  Q   Okay. So, I'm sorry. So he asked for your
21     identification and you told him no because you didn't
22     think --
23  A   I said no, you have no right to stop and -- you have
24     no right to ask me -- to stop me and ask me for an
25     I.D. for no reason.

**Page 44**

1  Q   Okay. So you told the Officer, Dutton, that he had no
2     right to stop you for no reason? Is that correct?
3  A   To stop me and ask me for I.D. for no reason.
4  Q   Okay. And it was -- it was your assumption that he
5     didn't have the right to ask you that? Is that
6     correct -- for your identification? Correct?
7  A   It was my assumption? That's what I said to him.
8  Q   Okay. And so even though he said, I need to see your
9     identification, you told him no?
10  A   He didn't say I need to see your identification. He
11     said, hey, I want to see your I.D.
12  Q   Okay. So he said.....
13  A   It was clear to me that it was an afterthought. He
14     had plenty -- like I said I was in no rush. He came
15     up to me, you know, I was -- I was perfectly polite to
16     him. I stood there and talked to him. I would have
17     -- if he'd wanted to talk. I stood there and talked
18     to him. I was in no hur- -- rush. I said -- answered
19     his question. He said what he said. I waited to see
20     if he was going to say something else or ask me to say
21     -- or ask me anything else. He had -- he didn't. And
22     I said have a great night and walked away. And then
23     he came after me, after I was already walking and
24     said, hey, I want to see your I.D. I just thought
25     this is an afterthought designed to harass me. It was

**Page 45**

1     obvious to me that it was an afterthought. He had
2     plenty -- I was in no hurry when he came up to me and
3     questioned me, I was -- I stood there patiently
4     talking to him. He had plenty of time if it -- just
5     to ask for my I.D. then. It was obvious to me that it
6     was an afterthought.
7  Q   So it was obvious to you that it was an afterthought.
8     But he -- and this was just based on your own sense at
9     the time, correct?
10  A   It was based on what I just told you.
11  Q   Okay. So you started to walk away and then he said I
12     need to see your I.D.? Correct?
13  A   No. I was already walking away. I had already walked
14     some distance. He came after me and said, hey, I want
15     to see your I.D.
16  Q   Okay. And then.....
17  A   He said I want to see your I.D.
18  Q   And after he said he wanted to see your I.D. you said
19     you had no right? He had no right to see your
20     identification? Is that correct?
21  A   He had no right to stop me and ask me for
22     identification.
23  Q   Okay. And then you continued to walk towards the
24     store?
25  A   Towards the entrance, yes.

12 (Pages 42 to 45)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 46

1  Q    Towards the entrance, okay. Now -- so you refused to
2       show him your identification after he asked for your
3       I.D. this first time. Then -- did he then ask for
4       your identification a second time?
5  A    No.
6  Q    Okay.
7  A    I mean not -- not at that -- not until after Sergeant
8       Davis came up.
9  Q    Okay. Now didn't you -- just so I can understand it.
10      You're walking into Carrs and then you were at the
11      entrance to Carrs?
12  A   I was not -- I was never walking. I was not walking
13      into Carrs. I mean, now my intention was to walk into
14      Carrs. But I was not walking into Carrs. I never
15      made it into Carrs.
16  Q   Okay. Well, you ended up at the door to Carrs,
17      correct? At the entryway, right by the entryway?
18  A   Right outside the entrance.
19  Q   Okay. Now when you got to the entrance of Carrs he
20      asked you again for your identification, correct? And
21      he meaning Officer Dutton?
22  A   No, he just stopped me and -- and -- and grabbed onto
23      my arm.
24  Q   He did not ask for your identification a second time
25      when you got the Carrs entrance?

Page 47

1  A    I don't think so, no.
2  Q    Okay. If Officer Dutton said that he did ask you a
3       second time for your identification, you would not
4       agree with that?
5  A    He asked me for identification a second time after
6       Davis.
7  Q    I see. Okay. So maybe you can just explain what
8       happened at the store's entrance. So you already
9       answered.....
10  A   I already said -- and I already said that if you -- if
11      you.....
12  Q   Okay. Officer.....
13  A   The record will reflect that I already said that to
14      you. That he asked me a second time after Davis had
15      joined them.
16  Q   Okay.
17  A   I got to the entrance. I got to the entrance and he
18      grabbed a hold of my arm and I told him.....
19  Q   He, meaning Officer Dutton?
20  A   Right. I told him to let go of me. Then Davis came
21      up and grabbed a hold of my other arm and they just
22      held me. I mean I couldn't move. They just held me
23      very -- I mean, they're -- they're two strong men. I
24      mean, they held me very tightly. I absolutely could
25      not move at all. And I told them to let go of me.

Page 48

1       And they said you have to show us your I.D. And at
2       that point, I said fine I'll show you my I.D. but you
3       have to let go of my arm so that I can get it.
4  Q    Okay. Do you remember telling them that you didn't
5       have to your I.D. because you were an attorney and a
6       citizen of the United States?
7  A    No, I never said that. I'm sorry. I told Dutton when
8       he first asked me that I didn't have to show him I.D.
9       But I didn't say that I was -- I didn't say that I was
10      a citizen of the United States.
11  Q   Okay. And you didn't say that you were an attorney
12      and you didn't have to show your I.D.?
13  A   I didn't say it that way.
14  Q   What did you say?
15  A   I don't remember exactly. I think I might have
16      mentioned that I was an attorney at some point. But I
17      didn't say it in the way that he's characterizing, I'm
18      sure of that.
19  Q   Okay. So you made some mention that you were an
20      attorney when they were --
21  A   After they grabbed a hold on -- after they grabbed the
22      hold on me, I said, you know, I'm an attorney and I
23      know that this is police brutality or something to
24      that effect. I did not -- I think you're trying, the
25      way that you asked the question kind of characterized

Page 49

1       it that somehow the fact that I was an attorney
2       entitled me to some special privilege not to show an
3       I.D. that other people wouldn't have and that's not --
4       it wasn't because I'm an attorney that I didn't have
5       to show them I.D.
6  Q    I wasn't characterizing in any way. I'm just trying
7       to.....
8  A    Well, you said I was an attorney and I don't have to
9       show you I.D. implying that because I'm an attorney I
10      don't have to show them I.D. which is no, I didn't --
11      I didn't say that.
12  Q   Okay. So you, however, did tell them I'm an attorney
13      and I'm a United States.....
14  A   No, I never said -- I never said I was a United States
15      citizen.
16  Q   Okay.
17  A   I never said that.
18  Q   Okay.
19  A   I just think it's funny the way they're trying to
20      characterize me like I'm some nut.
21  Q   Well, let me just ask you a little bit about that. Do
22      you think that your behavior in the parking lot with
23      the couple that had parked in your parking space, do
24      you think that was reasonable behavior? And I, you
25      know, just so I can clarify you were honking. You've,

13 (Pages 46 to 49)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 50

1  you know, discussed how you honked your horn four or
2  five times at them after they took your parking space.
3  Do you think that was reasonable behavior to honk at
4  them like that?
5  A   I think everybody's done it at some point in their
6  life. I don't think it's particularly unreasonable.
7  Q   Okay. Do you think it's reasonable?
8  A   Yeah, sure.
9  Q   And then after you parked your car, you honked at them
10  two more times? Do you think that's reasonable?
11  A   Yeah, just so that they would look at me so I would
12  say that -- could say to them that thought -- so I
13  could mouth to them that they were being rude.
14  Q   Huffman is a pretty busy grocery store, isn't it?
15  A   It's very busy.
16  Q   Okay. And aren't people always jockeying for parking
17  spaces when they go to Carrs Huffman?
18  A   Are you awake, John, excuse me?
19       MR. PHARR: I'm listening, Judy. I'm
20  listening.
21  Q   (By Ms. Pinkel) Just answer the question.
22  A   I don't understand the question.
23  Q   Well, isn't it kind of routine that people are always
24  trying to find parking spaces when they go to the
25  grocery store?

Page 51

1  A   As I said, my experience is that Alaskans are usually
2  pretty polite and in fact usually if there's a kind of
3  a question about, you know -- you know, who's first in
4  line or who's first waiting for a parking space,
5  usually they defer to the other people. They're not
6  usually rude the way these people were rude. It
7  justifies me.
8  Q   Well, did you ever think that maybe, you know -- well,
9  let me just go back to what I was saying. Isn't it
10  fairly commonplace for people to have some sense of
11  confusion sometimes about whether or not the parking
12  space is their's or someone else's?
13  A   Yes, and it's also very commonplace that when somebody
14  is -- that when somebody parks in a space that the
15  other person was waiting for that the person honks
16  their horn at them. That happens every day.
17  Q   Okay. Well, isn't it more common that if someone
18  takes your parking space or maybe not yours but
19  someone else's that the other people just go find
20  another parking space?
21  A   I don't think so. I think -- I think they usually
22  make sure -- make some demonstration to let the other
23  person know that they had been waiting for it.
24  Q   Okay. And I'm not going to belabor this point with
25  you, but do you now, looking back, do you think maybe

Page 52

1  you were rude towards this couple that had supposedly
2  taken your parking space?
3  A   Well, I mean Miss Manners says that it's rude to let
4  other people -- to tell other people that they were
5  rude. So maybe in that sense but I don't think it got
6  to the extent that I was actually being rude, no.
7  Q   Okay. Now -- okay. Well if -- did you ever talk to this
8  couple afterwards?
9  A   No, never.
10  Q   And do you know what their names are?
11  A   I found out after I filed the lawsuit.
12  Q   And their names are Sharon and Chih Chen. Is that
13  correct?
14  A   I wasn't sure how to pronounce the man's name. How do
15  you pronounce it? Chih?
16  Q   I believe his name is Chih Chen.
17  A   That's what it says on the information that I got from
18  your office.
19  Q   Did you ever -- so you've never talked to this couple?
20  A   Absolutely not. Did you think I had?
21  Q   I'm just curious. Because would it surprise you that
22  they were frankly, fairly intimidated by your
23  behavior?
24  A   That would definitely surprise me and I think if they
25  said that that the idea was probably placed on them by

Page 53

1  whoever interviewed them. The police officers when
2  they first got out, you know, out of the -- out of the
3  supermarket after I was -- had already left the scene.
4  I -- it would surprise me.
5  Q   Okay. Would it surprise you that no one ever really
6  actually interviewed the Chens? For, at least, no
7  attorney from the Municipal Attorney's Office until
8  about a month ago?
9  A   That's not what the police report says.
10  Q   Well, I'm talking about attorneys. No attorneys
11  actually ever talked to them until about a month ago.
12  Is that correct?
13  A   How should I know?
14  Q   Okay. Well.....
15  A   No, it wouldn't surprise me.
16  Q   Okay. Well, you're.....
17  A   I said -- I said that the police, according to the
18  police report, the police interviewed them when they
19  left the store. I'm saying whatever the police said
20  to them might have put some ideas into their head
21  about saying that they were intimidated. But, no, I
22  would -- it would definitely surprise me to -- to, I
23  mean, this was the most mundane of situations, you
24  know. This kind of thing happens hundreds of times
25  probably in the city. Somebody took somebody's

14 (Pages 50 to 53)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 54

1      parking space, they honked their horn a couple of
2      times. No, it was nothing -- there was nothing --
3      there was absolutely no reason for them to be
4      intimidated.
5  Q   Okay. And so if they said they -- if they said that
6      they found your behavior aggressive, would that
7      surprise you?
8  A   It would surprise me.
9  Q   Okay. If they said that they were glad that the
10     police came over to see what was going on with you,
11     that they were glad for that intervention. That --
12     would that surprise you too?
13  A   Probably not. Because probably -- they probably had
14     some hostile feelings at -- at that point and they
15     would probably be happy that the police came up to me.
16  Q   Okay. Why would you think they would have had hostile
17     feelings at that point?
18  A   Because -- because I -- because they had taken my
19     space and I had honked at them.
20  Q   Okay. And so you think they had hostile feelings
21     because you'd taken their -- they'd taken your space?
22  A   Because of the situation. Because of the mildly
23     adversarial nature of jockeying for parking spaces.
24     They probably, on a scale from feeling kind and loving
25     to feeling loathing and hateful, they probably did not

Page 55

1      feel kind and loving. They probably felt a little bit
2      negative towards me and so probably didn't -- probably
3      would have made them happy. First of all, according
4      to the police they were already in the store when --
5      when the police approached me. So I don't even know
6      how they would have even known -- how they would have
7      even seen that the police approached me because that's
8      what it says in the police report. But given that
9      there was a mildly adversarial nature to the
10     interaction, I would think that they probably would be
11     happy if they knew that the police came up to me just
12     based on that.
13  Q   Do you think you created an adversarial situation by
14     your behavior?
15  A   No.
16  Q   You don't even to this day think you created an
17     adversarial situation by your behavior?
18  A   No, I don't.
19  Q   Okay. Now -- so you -- just going back to the Officer
20     asked to see your identification and you told him you
21     didn't think you had to see your identification. Is
22     that correct? That's what you said, right?
23  A   I don't think that's exactly what I said. I think
24     what I -- I don't think that's what exactly -- what I
25     said. I think you already know what I said. I don't

Page 56

1      know why you keep trying to rephrase it.
2  Q   Okay. You -- Officer Dutton.....
3  A   I said he had no right to stop me and ask me for I.D.
4     for no reason.
5  Q   Okay. Now are you familiar with the Anchorage
6     Municipal Code?
7  A   I haven't memorized it.
8  Q   Do you know what the Anchorage Municipal Code is?
9  A   I know what the Anchorage Municipal Code is.
10  Q   Okay. And it's -- what is it?
11  A   (Whispering)
12  Q   Just answer the question.
13        MR. PHARR: Just answer the question, Judy.
14  A   It's ordinances. Municipal ordinances which are
15     municipal laws.
16  Q   (By Ms. Pinkel) Okay. Have you --
17  A   Is that true?
18  Q   Well, I'm asking you the question. You're an
19     attorney, as John and I, so I assume you know what the
20     ordinances are, but I think I need to just ask you.
21  A   Do we need to change? How long ago did this run out
22     or is it still going?
23        MR. PHARR: Why don't we go off record.
24     (Off record)
25     (On record)

Page 57

1        MS. PINKEL: Okay. We're back on record and
2    the record should reflect that we just briefly went off record
3    because Ms. Berman was taping the deposition independently and
4    she ran out of tape. But we've clarified that the court
5    reporter can provide you with a copy of the tape, Ms. Berman.
6  Q   (By Ms. Pinkel) I was going to show you, Judy, the
7     Anchorage Municipal Code, AMC 9.12.030 and I'm going
8     to mark it Exhibit 3. No, I'm sorry, Exhibit 4.
9        COURT REPORTER: All right. Exhibit 4 marked.
10        (Deposition Exhibit 4 marked)
11  Q   (By Ms. Pinkel) And it is one page. And this is
12     Anchorage Municipal Code 9.12.030. If you want to
13     just focus on subsections a and b.....
14  A   That's all I have.
15  Q   Have you seen this code before?
16  A   I probably have.
17  Q   Okay. Now AMC 9.12.030 sub A says that: A licensee
18     will have his operator's license in his immediate
19     possession at all times while operating a motor
20     vehicle, correct?
21  A   (No audible answer)
22  Q   And -- is that correct?
23  A   That's what you read. That's what it says.
24  Q   Okay. So say -- can you say yes or no?
25  A   Are you asking me if what you read is what it says on

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 58

1      the paper?

2  Q   That's correct.

3  A   Yes, you read it correctly.

4  Q   Okay. And that does AMC 9.12.03 sub A further say

5      that: He or she will display the license upon demand

6      of a judge or police officer. Is that correct?

7  A   It says he will display. It doesn't say he or she.

8  Q   That's correct. But it presumes that she will also

9      display her license upon demand of a judge or police

10     officer, correct?

11  A   Ms. Pinkel, what it says is he will display the

12     license upon demand upon the demand of a judge or

13     police officer. That's what it says.

14  Q   Okay.

15  A   I have no idea what it presumes.

16  Q   Okay. And the subsection B of AMC 9.12.030, sub B

17     states that: For the purpose of this section, the

18     term display means the manual surrender of a license

19     certificate into the hands of the demanding officer

20     for his inspection, correct?

21  A   That's what it says, yes.

22  Q   Yes. Okay. Now when Officer Dutton asked for you to

23     display your license he had the authority to do so

24     under Anchorage Municipal Code 9.12.030, correct?

25  A   Incorrect.

Page 59

1  Q   Okay. You don't agree with that?

2  A   No, he asked me for my I.D., he did not ask me for my

3     license and I was not operating a motor vehicle at the

4     time.

5  Q   Okay. You had been operating a motor vehicle hadn't

6     you?

7  A   I had been.....

8  Q   Okay.

9  A   But he did ask me for my license. He asked me for my

10     I.D. There's in fact a case that says that this --

11     this section and the corresponding state statutes are

12     to be used to ask for a license not to find who a

13     person is or their identity. He specifically asked me

14     for I.D. every single time he said I.D. He never ever

15     used the word license.

16  Q   Someone's identification is usually in their driver's

17     license. Is that correct?

18  A   He asked me for my I.D.

19  Q   Does Alaska have a requirement that people carry state

20     I.D.'s?

21  A   No.

22  Q   Okay. So generally isn't it the practice in Alaska

23     when someone asks you for your I.D. when you're

24     writing a check they -- that means they want to see

25     your driver's license, correct?

Page 60

1  A   Not necessarily.

2  Q   Okay. All right. Well, he asked for your

3     identification and the identification that you would

4     have had would have been driver's license, correct?

5  A   That's.....

6  Q   Just answer yes or no. If you don't agree.....

7  A   I'm not going to answer the question unless you

8     rephrase it. That's a ridiculous question. I'm

9     sorry. You need to rephrase. You cannot -- I can't

10     -- I don't understand the question.

11  Q   My question was when the Officer was asking to see

12     your identification it was his intention that you show

13     your driver's license, correct?

14  A   I have no idea what his intentions is -- was.

15        MR. PHARR: I have.....

16  A   He asked me for I.D.

17        MR. PHARR: I have a military I.D.

18  Q   Okay. You weren't on a military base when he asked to

19     see your identification were you?

20  A   Ms. Pinkel.

21  Q   Just answer the question.

22  A   I was not on a military base. There is a state I.D.

23     Alaska does have a state I.D. He asked me for

24     identification. What are you trying.....

25  Q   I'm just trying to.....

Page 61

1  A   Why are we beating a dead horse?

2  Q   I'm asking for.....

3  A   He asked me for identification. An identif- -- he

4     might have wanted my driver's license. He might have

5     wanted my I.D. card. He might have wanted my library

6     card. I have no idea what he wanted. He asked me for

7     I.D. He said, hey, I want to see your I.D. I cannot

8     probe his mind. It's perfectly rea-- likely that he

9     was thinking driver's license. It's perfectly likely

10     that he was thinking college I.D. I have no idea what

11     he was thinking. He asked me for I.D.

12  Q   Okay. No, he didn't ask you for your library card,

13     did he?

14  A   No. And he did not ask me for my driver's license

15     either.

16  Q   And he didn't ask you for a student I.D. did he?

17  A   No.

18  Q   We're not on a college campus are we?

19  A   (No audible answer)

20  Q   Is the Carrs Huffman a college campus, Ms. Berman?

21  A   It's not a college campus.

22  Q   Okay. Just wanted to make sure.

23        MR. PHARR: He could have asked her for her

24     Social Security card.

25        MS. PINKEL: Mr. Pharr, are you testifying?

16 (Pages 58 to 61)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 62

1    MR. PHARR: I can.
2    MS. PINKEL: I'm trying to ask your client
3  some questions here and I'm trying to go as quickly as I can
4  so.
5  Q    (By Ms. Pinkel) Now are you also familiar with Alaska
6        Statute 28.15.131?
7  A    Am I familiar with it?
8  Q    That's correct.
9  A    I guess I would have to say no, not offhand.
10 Q    Okay. Because you mentioned there was a corresponding
11       state statute that was very similar to the Municipal
12       Code provision that I just read to you and I just
13       wondered if you were aware of that state provision
14       like you said you were?
15 A    I didn't know it by -- I haven't memorized the statute
16       number.
17 Q    Okay. I'm just going to show you what's been marked
18       as --
19       MS. PINKEL: Or I'm going to ask the court
20 reporter to mark Exhibit 5.
21       (Deposition Exhibit 5 marked)
22 Q    Okay. And that's Alaska Statute 28.15.131. And I'm
23       just going to ask you to look at that. It says
24       license to be carried and exhibited on demand. And it
25       says a licensee shall have the licensee's driver's

Page 63

1        license in immediate possession at all times when
2        driving a motor vehicle and shall present the license
3        for inspection upon a demand of a peace officer or
4        other authorized representative of the Department of
5        Public Safety identified as such to the licensee by
6        the officer or representative. So is this statute
7        similar to the Municipal Code provision that I just
8        provided to you?
9  A    (No audible answer)
10 Q    Would you say?
11 A    You're asking for my opinion as to whether this
12       statute is similar to the Municipal Code? Is that
13       what you're asking me, Ms. Pinkel?
14 Q    Yes, 9.12.030.
15 A    You're asking me if I -- if in my opinion this statute
16       is similar to the ordinance?
17 Q    That's correct.
18 A    In my opinion there is some similarity, yes.
19 Q    Okay. And the statute states that a person holding a
20       driver's license is to present the driver's license
21       for inspection upon the demand of a police officer,
22       correct?
23 A    It says shall present the license for inspection upon
24       demand of a peace officer.
25 Q    Okay. Thank you. Now when we were talking about how

Page 64

1        you're up at the Carrs entry, Judy, and Officer Davis
2        came and you said that the officers restrained you?
3        Is that correct?
4  A    We were outside of the entrance.
5  Q    Okay. Now you were outside the entrance and do you
6        remember asking to or demanding to see Officer
7        Dutton's I.D.?
8  A    What I remember happening is that Dutton grabbed one
9        of my arms. I told him to let go. Then Davis came up
10       and grabbed my other arm and I -- and I was really
11       shocked that they were using this kind of force over
12       an I.D. and I said let — you know, I said this is
13       police brutality, let go of me. And they said you
14       have to show us I.D. and I said okay fine I will show
15       you I.D. You have to let go of my arm so that I can
16       get my I.D. Then they didn't let go of my arms but
17       they loosened my grip -- they loosened their grip on
18       me enough so that I could reach into my purse and pull
19       out my wallet. I finally did pull out my wallet. I
20       was holding it in my hands, getting out -- looking for
21       my -- looking for my license so I could get it out and
22       all of the sudden Davis became extremely angry and
23       just grabbed it out of my hands. And then he and
24       Dutton started twisting my hands behind my back and
25       handcuffing me.

Page 65

1  Q    Now before, you said that Officer Davis grabbed your
2        purse out of your hands or your wallet out of your
3        hands?
4  A    My wallet was in my hands. He grabbed my wallet out
5        of my hands and my purse off my shoulder.
6  Q    Okay.
7  A    And there were also some bags that I was carrying with
8        me to reuse, some shopping bags and they took those.
9        It was kind of -- they took those and started to throw
10       them in the garbage. I mean there was just like this
11       absurd little interaction in the middle of this whole
12       thing where they -- they grabbed my wallet out of my
13       hands. They grabbed my purse out of my shoulders and
14       they took these bags, started throwing them out, and I
15       was like, hey I was going to reuse those and they were
16       like. And they -- well I was going to -- and they
17       said, well you want me to throw me into the recycle
18       bin? And I was like yeah, you know, well I was
19       actually going to take them and reuse them first. I
20       do recycle. There was this little interaction about
21       the shopping bags. It was this little island of
22       absurdity in the middle of all this.
23 Q    Now were these just the plastic shopping bags you can
24       get at Carrs that you carry.....
25 A    Yeah.

17 (Pages 62 to 65)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 66

1  Q    You were just carrying a bunch of them in your hand?
2  A    I wouldn't say a bunch. Probably two or three.
3  Q    Okay. So do you remember telling Officer Dutton and
4       Officer Davis that you wanted to see their I.D.'s
5       before you would show them your I.D.?
6  A    I think I asked them for their I.D. at some point but
7       I didn't -- I didn't say I wanted to see it before I
8       would show them their I.D.
9  Q    Well.....
10 A    When they said I want to show -- when I -- when they
11      said that they wanted to see their I.D. I said, well
12      I'd like to see your I.D. too.
13 Q    So you asked to see their I.D.'s before you had even
14      shown them your I.D. obviously?
15 A    Before I had found it, yeah.
16 Q    Before you had displayed your I.D. you wanted to see
17      Officer Dutton's I.D.? Correct?
18 A    No. The time that I asked -- I didn't say that their
19      showing me their I.D. was a condition of my -- that I
20      was not going to show them my I.D. until they showed
21      their I.D. but I did in fact -- I did in fact ask them
22      to see their I.D. and the time period, the sequence
23      was that I made that request before I had actually
24      displayed my I.D. I hadn't displayed my I.D. yet and
25      I never got to. But, so -- but I did not say, no I'm

Page 67

1       not going to show you my I.D. until I -- you show me
2       your I.D.
3  Q    So you didn't ask. You didn't say -- okay, I want to
4       see your I.D. first. However, the sequence was such
5       that you asked for their I.D. when in fact you had not
6       produced your I.D. yet, correct?
7  A    I would say that's accurate.
8  Q    Now Officer Davis, or Office Dutton, had placed you in
9       a sleeve guide, correct?
10 A    He called it a sleeve guide. I -- as far as I know he
11      just grabbed a hold of my shoulder really tight.
12 Q    Okay.
13 A    If he wants to call that a sleeve guide.
14 Q    Okay. He grabbed a hold of your shoulder?
15 A    I mean, that might -- my upper arm.
16 Q    Okay. So he grabbed a hold of your upper arm above
17      your elbow? Is that correct?
18 A    If it's my upper arm, it would have to be above my
19      elbow.
20 Q    Okay.
21 A    But I don't think it was, like, right at my elbow if
22      that's what you're.....
23 Q    Okay.
24 A    .....saying. And when you asked Office Dutton to see his
25 Q    Okay. And when you asked Office Dutton to see his

Page 68

1       identification, he showed it to you, didn't he?
2  A    I think he did.
3  Q    Okay. And he was wearing a police uniform on this
4       night, correct? You already said that he was wearing
5       his uniform, correct?
6  A    Right. But I don't think his name -- if -- if I didn't
7       notice his name being displayed on the uniform. I
8       asked him for -- I wasn't. Ms. Pinkel, I was not
9       questioning whether he was a police officer, I just
10      wanted, if he wanted to know my name, I wanted to know
11      his name. I wanted to know his name, that's why I
12      asked him for I.D.
13 Q    And you wanted to know his name before he got your
14      name?
15 A    No.
16 Q    Okay.
17      MR. PHARR: You wanted -- you wanted his
18      driver's license? So.
19 A    Military or college I.D.
20      MR. PHARR: Uh-hum.
21 Q    (By Ms. Pinkel) Now after Officer Dutton showed you
22      his badge, you actually pulled away and started to
23      spin, correct?
24 A    No. I did not.
25 Q    You don't remember pulling away and starting to spin?

Page 69

1  A    I don't even know what he means by that. Do you?
2       Like twirling around in a circle like a ballerina? I
3       did not. I absolutely --
4  Q    Okay.
5  A    I did not pull away and start to spin. I don't know
6       what he means by start to spin, but I know I didn't do
7       it.
8  Q    Okay. If Officer Davis remembers that you turned away
9       and started to spin, would that seem like an accurate
10      memory?
11 A    No. I just said no.
12 Q    I'm not saying you spinned like a ballerina, but that
13      you started to actually spin and turn.
14 A    I did not pull away from him and I did not start to
15      spin. These were two men that had -- each had a
16      strong hold on each of my arms. I could not move. I
17      did not pull away. I did not start to spin. Should I
18      say it again, or is that clear? I did not pull away.
19      I did not start to spin.
20 Q    So you're denying that you started to pull away after
21      Officer Davis came up? Is that correct?
22 A    Yes.
23 Q    Okay.
24 A    And if you look at his -- never mind.
25 Q    That's okay.

18 (Pages 66 to 69)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 70

1   A   You didn't ask me a question so I'll just let it go.
2   Q   Okay.  Well, if you want to continue your answer you
3       can certainly continue it.  If you have anything more
4       to say about this, please tell me.
5   A   If you look at Davis' report, Ms. Pinkel, he says I
6       took her I.D. from her.  We struggled, and then she
7       was handcuffed.  I'm denying that we struggled.
8       Nonetheless, by his account, if there was a struggle,
9       it occurred after he took my I.D., my wallet from me.
10  Q   Okay.  So you don't recall that you had already -- got
11      pulled away and started to spin before they took your
12      wallet out of your purse?
13          MR. PHARR:  I object to the form of the
14      question.  That's a when did you stop beating your wife type
15      question.  I instruct the witness not to answer that.
16          MS. PINKEL:  Well, all I'm asking her is how
17      this all occurred and I have every right to ask her what the
18      sequence of events here are, John.
19  A   He may be asking you to rephrase your question.
20          MR. PHARR:  The form of your questions is
21      improper.
22          MS. PINKEL:  Can you play back what that
23      question was?
24      (Off record)
25      (On record)

Page 71

1   Q   (By Ms. Pinkel)  Now, just -- Judy, so you have denied
2       that you tried to pull away and start to spin away
3       from these officers, correct?
4   A   Yes.  I am denying that.
5   Q   Okay.  Now after you'd been handcuffed, Officer Davis
6       took your wallet out of your purse and found your
7       identification, correct?
8   A   No.
9   Q   Would you agree with that?
10  A   I would not agree with that.
11  Q   Okay.  When did your -- when did Officer Davis get
12      your identification?
13  A   Ms. Pinkel, what I'm disagreeing with is that you said
14      he took my wallet out of my purse.  My wallet was
15      already out of my purse as I previously answered.  It
16      was holding my wallet in my hand and he took my wallet
17      of my hand.  He did not take my wallet out of my
18      purse.  I took my wallet out of my purse when I
19      told.....
20  Q   Oh, I see.  Okay.
21  A   Okay.  I have a purse, it's like a shoulder bag.
22  Q   Uh-hum.
23  A   And then I had my wallet.  Had previously been in my
24      shoulder bag -- my pocketbook so I told the -- to back
25      up when I told the Officer that I would show them the

Page 72

1       I.D. and they loosened their grip on my arms.  I
2       reached into my purse and took out my wallet.  So your
3       question to me had been after I was handcuffed Officer
4       -- what your question was to me was after I was
5       handcuffed did Davis take my wallet out of my purse.
6       He did not take my wallet out of my purse.  He took my
7       wallet out of my hand.  Then he -- then they
8       handcuffed me.  Then he took my license out of my
9       wallet.
10  Q   Okay.  And he took your license out of your wallet
11      because you had not provided the license to them,
12      correct?
13  A   That's incorrect.
14  Q   All right.  I have a few more questions here.  Now
15      just in general have you ever been convicted of a
16      crime?
17  A   No.
18  Q   Have you ever been charged with a crime?
19  A   No.
20  Q   You've never been charged with a crime?
21          MR. PHARR:  Other than this case I guess?
22  Q   (By Ms. Pinkel)  Other than this case?
23  A   I don't think so.
24  Q   Okay.  I just wanted to ask you about a few things
25      here.

Page 73

1          MS. PINKEL:  Okay.  Are we on six?
2          COURT REPORTER:  Six.
3          MS. PINKEL:  I'm going to mark Exhibit 6.
4          COURT REPORTER:  Exhibit 6 has been marked.
5          (Deposition Exhibit 6 marked)
6   Q   (By Ms. Pinkel)  And if you just want to look at
7       Exhibit 6 here.  At the bottom of the page there, and
8       this is Bates numbered 000013.  This is called, I
9       believe it's called a Tiburon printout.  But there's a
10      -- looks like in 1977 you had an incident in Port
11      Angeles, Washington for petty larceny or petit larceny
12      and possession of marijuana.  Do you recall those
13      charges?
14  A   I don't think I have to answer a question that's
15      happened 30 years ago.
16  Q   All right.  I just asked you if you'd been charged
17      with a crime and you said no.  And I'm just asking you
18      if you recall this incident in 1977?
19          MR. PHARR:  I am going to object on the basis
20      that it's not relevant or reasonably calculated to lead to
21      admissible evidence and instruct the witness not to answer
22  Q   (By Ms. Pinkel)  Okay.  Let me just ask you this:
23      Does it appear from this document that you were
24      charged with a crime in 1977?
25  A   Can I talk to my attorney for a moment?

19 (Pages 70 to 73)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 74

1      MS. PINKEL: Sure.
2    (Off record)
3    (On record)
4  Q    (By Ms. Pinkel) Okay. Judy, before we went off
5    record I had asked you if you had been convicted or
6    had been charged with any crimes and you said no. And
7    then I ask you about this Tiburon printout that said
8    you'd been charged with two crimes in 1977. Are you
9    going to answer that question now?
10  A    I'm going to make one more statement about that and
11    then I'm not going to answer any more questions.
12    First of all the printout says that I was acquitted,
13    is that correct?
14  Q    That's correct.
15  A    My attorney at the time advised me that the matter was
16    going to be wiped off my record and that I could
17    honestly answer that I'd never been charged or
18    convicted with a crime.
19  Q    Were you a minor at the time?
20      MR. PHARR: She's not going to answer any more
21    questions about that.
22      MS. PINKEL: Okay.
23      MR. PHARR: There's nothing even faintly
24    relevant or that could possibly lead to anything admissible
25    there.

Page 75

1      MS. PINKEL: Well I don't know. I'm just
2    asking. I asked her if she'd been convicted of a crime, she
3    said no. And then it looks -- or charged with a crime and it
4    looks like she was charged. I'll just move on to the next
5    question though.
6  Q    (By Ms. Pinkel) Judy, after this incident in April of
7    2002, did you have some other incidents involving the
8    police where they may have had to respond to a call of
9    some type in July of 2002?
10  A    When I saw that, Ms. Pinkel, I was racking my brain to
11    figure out what it was and --
12  Q    Okay. Let me -- just so we know what we're both
13    talking about. Because --
14  A    Does M-E-N mean mention? What does M-E-N mean in the
15    Code?
16      MS. PINKEL: Okay. Let me just mark this as
17    an exhibit so we're both on the same page and so that your
18    attorney knows what we're talking about too. I'm going to
19    mark what's been Bates number -- it looks like 000016. So we
20    would be at Exhibit 7?
21      COURT REPORTER: Is it okay if I go like this
22    for you?
23      MS. PINKEL: Yeah, that's fine.
24      COURT REPORTER: All right. Exhibit 7 marked.
25      (Deposition Exhibit 7 marked)

Page 76

1  Q    (By Ms. Pinkel) Okay. Ms. Berman, what I'm going to
2    direct you to is on -- and your attorney, is on
3    Exhibit 7, there's some summaries at the very bottom
4    of this and it looks like some type of Tiburon
5    printout, I believe and there's, it looks like there's
6    an incident that this is -- it's under summaries and
7    it's the third incident down. It says -- or the third
8    incident down, it says APD 020034804 Incident. And
9    there's a reference number 0490490 Person. Then it
10    says M-E-N and then it says reason, civil problem and
11    then the date is 7/12/02. Are you familiar with what
12    this incident would be that happened on 7/12/02?
13  A    As I said, Ms. Pinkel, when I saw that I was racking
14    my brain to think of what it could possibly be and I
15    think I have an idea of what it is. But if you pulled
16    it up and can show my what it was than that would
17    probably be more helpful to me. Have you pulled that
18    incident up? Do you have more detail about it?
19  Q    I don't because this was -- this is all I've got at
20    this point.
21  A    Well I mean if it has a rec- -- don't you have access?
22    If there was a pol- -- don't you have access to it?
23  Q    Frankly, I don't know if I have access. I thought
24    it'd probably more professional to ask you that first.
25  A    Do you know what M-E-N, does M-E-N mean mention? Do

Page 77

1    you know what these codes mean?
2  Q    I guess I don't know. I don't know what M-E-N means
3    and I'm asking you if you know what -- what this would
4    be that.....
5  A    The only thing I can of, and I actually I'm not sure
6    about how much I can tell you about it because of the
7    attorney-client privilege but the only thing that I
8    can think of that happened around that time, and my
9    understanding is M-E-N means that I was mentioned in
10    the case that I wasn't like a party. You know, I
11    wasn't -- what's the word I'm looking for? That I was
12    mentioned in the case, that I wasn't either a suspect
13    or a complainant or -- the only thing that I can think
14    of is that at the time I was guardian ad litem and I
15    was rep for a child in a guardianship of a minor case.
16    And as I said, you know, probate matters are sealed
17    and so I really don't really don't feel that
18    comfortable going into any detail whatsoever, but at
19    some point somehow the mother had gotten the idea that
20    I had actually taken the child which was absolutely
21    untrue and so the police had left a couple of messages
22    for me asking about it, but by the time I got the
23    messages they had a left a third message saying not to
24    bother calling them back because they had reached the
25    other attorneys in the matter and they had cleared the

20 (Pages 74 to 77)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 78

1     matter up. And that's the only thing I can possibly
2     think of.
3  Q    Okay. So you think it may be involving an incident
4     where you were guardian ad litem?
5  A    Yeah. Now that, I mean, I just want to clarify that I
6     -- the mother had gotten this misconception and the
7     other attorney cleared it up. But that was absolutely
8     not true by any stretch of the imagination. So the
9     third message was, you know, sorry for the messages
10     don't bother calling back.
11  Q    Do you know why a mother would have gotten the idea
12     you'd taken her child?
13  A    I'm not going to go into any more detail. This is a
14     sealed probate case.
15  Q    Okay. Then there's another. A police reference
16     number for 12/20/03. For a citation under it looks
17     like a Municipal Code 9.14.040 civil and then there's,
18     it looks there's like an incident for a collision,
19     12/20/2003. Do you know what that is about?
20  A    That is about the same incident, correct?
21  Q    Right. It looks like it. Do you remember get cited
22     for a violation of a Municipal Code on 12/20/2003?
23  A    Yeah, we -- I had an accident where I couldn't stop
24     because the roads were icy and I got -- we got into a
25     collision.

Page 79

1  Q    Okay. And you were cited for what was that, running a
2     red light?
3  A    Failure to stop and it was dismissed. I went to court
4     and it was dismissed.
5  Q    Okay. Did you -- did that go to trial?
6  A    To traffic trial.
7  Q    So it was dismissed after.....
8  A    It was a traffic citation.
9  Q    Okay. And so did you have a little court hearing
10     about it?
11  A    Yes.
12  Q    Okay.
13  A    It wasn't a criminal citation, Ms. Pinkel.
14  Q    I understand that.
15  A    It was a traffic citation.
16  Q    I understand that. Okay. Now have you ever been
17     publicly disciplined by the Alaska Bar?
18  A    I have not.
19  Q    Have you ever been privately disciplined by the Alaska
20     Bar?
21  A    I have not.
22  Q    Okay. And have you been licensed to anywhere else
23     besides, I think you've already answered this, but
24     have you been licensed in Massachusetts?
25  A    To practice law? No.

Page 80

1  Q    Okay. And this is the only state where you're
2     currently licensed?
3  A    It's the only state I've been licensed.
4  Q    Okay. Now you said that you weren't on any medication
5     today. Is that correct?
6  A    Right.
7  Q    And in April of 2002 were you taking any type of blood
8     thinners or anything like that?
9  A    No.
10  Q    For any problems?
11  A    No. Blood thinners?
12  Q    I'm just asking. And were you on any aspirin that
13     day?
14  A    Why are you asking about blood thinners?
15  Q    Just answer the question.
16  A    Blood thinners?
17        MR. PHARR: I think she just threw that out as
18  an example, Judy, you know.
19  A    Had I taken aspirin that day?
20  Q    (By Ms. Pinkel) Do you remember? Or were you taking
21     aspirin?
22  A    On April 6, 2002, I do not remember if I took aspirin.
23  Q    Okay. And you hadn't been prescribed any blood
24     thinners? Is that correct?
25  A    She's asking specifically about blood thinners.

Page 81

1  Q    Okay. You just need to answer the question.
2  A    Well I think there has to be some relevance.
3  Q    There is. I'm just asking you and you need to answer
4     it. Your lawyer hasn't objected. Relevance isn't a
5     valid objection.
6  A    Can you give me a.....
7        MR. PHARR: I think she's already answered
8  that.
9  A    Yeah.
10  Q    (By Ms. Pinkel) Okay. And what's the answer?
11        MR. PHARR: How many times can she say -- well
12  what's the answer yes or no?
13  A    Do you want to give me a prescription name?
14        MR. PHARR: Just answer yes or no, Judy.
15  A    I don't believe I was taking blood thinners.
16  Q    (By Ms. Pinkel) Okay. So the answer is no?
17  A    I do not believe I was taking blood thinners.
18  Q    All right. Now you had provided some photos with your
19     recent discovery responses. And I just wondered who
20     had taken those photos?
21  A    A person who works in my office building.
22  Q    And who is that?
23  A    Michelle Turner.
24  Q    Okay. And what's her relationship to you?
25  A    She's a person who works in my office building.

21 (Pages 78 to 81)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 82

1  Q   Is she an attorney?
2  A   She's not an attorney.
3  Q   Okay. And what does she do for a living?
4  A   She's building manager and assistant to Jim Gottstein.
5  Q   So she works in Jim Gottstein's law practice?
6  A   She works in Jim Gottstein's office.
7  Q   Okay. And Jim Gottstein's an attorney, right?
8  A   He's an attorney.
9  Q   Okay. So she works in his law office, correct?
10 A   I don't know that that's necessarily true.
11 Q   Okay. So she has an affiliation with Jim Gottstein?
12 A   Yes.
13 Q   And when did she take those photos?
14 A   A few days after April 6, 2002.
15 Q   Do you remember exactly what date?
16 A   It was Wednesday or Thursday, I don't remember which
17     day. It happened on a Saturday. It was Wednesday or
18     Thursday of the following day -- week. She thinks I
19     might bruise easily that's why she's asking.....
20 Q   Okay. Just answer the questions, you don't have to
21     internalize.
22 A   I can talk to my attorney. I guess we should go.....
23 Q   Okay. And did you have negatives of those photos that
24     you provided with your discovery responses?
25 A   Did I have negatives?

Page 83

1  Q   Correct.
2  A   I had negatives.
3  Q   And do you still have those negatives?
4  A   I'm not sure, I probably do.
5  Q   You do have them?
6  A   I'm not sure, I probably do.
7  Q   So is that a yes or a no?
8  A   It's an I'm not sure I probably do.
9  Q   Okay. Well, you're suppose to answer yes or no.
10 A   I don't know.
11     MR. PHARR: Don't -- don't. Okay.
12 Q   (By Ms. Pinkel) So you don't know. Okay. But it
13     sounds like you're 99 percent sure you have some
14     negatives?
15 A   I've answered the question.
16 Q   Now when your driver's license was reviewed on April
17     6th, 2002, it had expired hadn't it?
18 A   I believe it had.
19 Q   Okay. Is that yes?
20 A   My recollection is that it had.
21 Q   Okay. Now am I correct in assuming that maybe one of
22     the reasons you didn't want to show your license to
23     these officers was because you had an expired license?
24     MR. PHARR: I object to the form of the
25 question and instruct the witness not to answer it, it's a

Page 84

1  double question, when did you stop beating your wife. I
2  instruct the witness not to answer the question.
3      MS. PINKEL: Okay. Well I think she needs to
4  answer the question.
5      MR. PHARR: I disagree.
6  A   Could we go off record just for a minute so I can just
7      get some more water?
8      MS. PINKEL: Sure.
9  (Off record)
10 (On record)
11 Q   (By Ms. Pinkel) Okay. Judy we just took a bit of
12     break here. Now I was asking you about your driver's
13     license and the status of it in April 2002. And my
14     question to you is that driver's license had expired
15     the night of April 6, 2002, correct?
16 A   I don't think it expired that night.
17 Q   It was expired by that night. Is that correct?
18 A   I believe so.
19 Q   Is that a yes?
20 A   That's my recollection.
21 Q   Okay. Now one of the reasons you didn't want to show
22     your license to the officers that night was that it
23     was expired, correct?
24     MR. PHARR: And I'm instructing the witness
25 not to answer that question.

Page 85

1      MS. PINKEL: Okay. And.....
2      MR. PHARR: It's a compound question.
3      MS. PINKEL: It's not a compound question.
4      MR. PHARR: Yes, it is and I instruct the
5  witness not to answer.
6      MS. PINKEL: It's not a compound question.
7  Maybe if you have another objection you'll have.....
8      MR. PHARR: You'll have to make it -- you'll
9  have to make your pitch to the court because I'm instructing
10 her not to answer.
11     MS. PINKEL: So you're instructing her not to
12 answer the -- my question which is one of the reasons she
13 didn't want to show her license was it had expired.
14     MR. PHARR: Whatever your question is, if
15 that's exactly the way you said it or not, it's a compound
16 question and it's a when did you stop beating your wife
17 question and I instruct the witness not to answer it.
18 Q   (By Ms. Pinkel) Judy, were you aware on the night,
19     April 2002, you were aware that your license had
20     expired, weren't you?
21 A   I think I was.
22 Q   Okay. Now the fact that it expired was a factor in
23     your not wanting to show it to the officers, wasn't
24     it?
25     MR. PHARR: I object on the same basis. And I

22 (Pages 82 to 85)

JUDY L. BERMAN vs. ANCHORAGE POLICE DEPARTMENT, et al
A04-227 CIV (JKS)

DEPOSITION OF JUDY L. BERMAN
DECEMBER 13, 2005

Page 86

1   instruct the witness not to answer.
2       MS. PINKEL: Okay. And your basis is that
3   it's a compound question.
4       MR. PHARR: Yes.
5       MS. PINKEL: All right. I disagree with that.
6   It's not a compound question. But I understand you've
7   instructed her not to answer it and I think she should have
8   answered it.
9   A   Do you want to explain to her why it's a compound
10      question?
11      MR. PHARR: No, that's -- no.
12      MS. PINKEL: Okay. No. It's not a compound
13  question.
14  Q   (By Ms. Pinkel) Okay. Now, Judy, are you familiar
15      with the term road rage?
16  A   I've heard it, yes.
17  Q   Okay. And do you think you were showing some road
18      rage the night of this incident?
19  A   No, I don't.
20  Q   Okay. Now, you've tape recorded this deposition today
21      yourself, correct?
22  A   No, just a very small part of it.
23  Q   Okay. You've tape recorded the beginning of it,
24      correct?
25  A   I think so, yeah. I don't know how much.

Page 87

1   Q   Okay. And you've made your own tape recording even
2       though the court reporter was recording this, correct?
3   A   When we started the deposition it was.....
4   Q   Just answer the question.
5       MR. PHARR: What does this have to do with --
6   how is this relevant?
7       MS. PINKEL: I have the right to ask her why
8   she was tape recording this deposition.
9       MR. PHARR: You have the right to ask her
10  questions that are relevant or reasonably calculated to lead
11  to admissible evidence and I can't see how this is either.
12      MS. PINKEL: Well, I think it is.
13      MR. PHARR: Well, I disagree and I instruct
14  the witness not to answer.
15      MS. PINKEL: Well, can you just explain for me
16  why you were tape recording this today yourself?
17  A   Can I just talk?
18      MR. PHARR: No. Just don't answer the
19  question. Don't answer the question. Okay. Go ahead and
20  answer the question.
21  A   I was not aware that the tape would be made available
22      to me from Metro Court Reporters. Now once I -- if I
23      had known that I could get the tape from Metro Court
24      Reporters I would have not had taped my own tape.
25  Q   (By Ms. Pinkel) And you didn't want to rely on their

Page 88

1   transcript? Is that right?
2   A   That's not right.
3       MR. PHARR: Don't answer any more questions
4   about that.
5   A   That's not right.
6   Q   (By Ms. Pinkel) Okay. All right. I think that's
7   about it. Let me check my notes real quick. Judy, if
8   I told you that Officers Dutton and Davis were
9   concerned for the safety of the Chens on the night of
10  September or April 6, would that surprise you?
11  A   Yes. Very much so.
12  Q   And if I told you that.....
13  A   And I think you asked me that. Oh, maybe not. Didn't
14  she ask me that already?
15  Q   Okay. And you said that would surprise you that they
16  were concerned for the safety of the Chens?
17  A   It would surprise me very much.
18  Q   Okay. And if I told you they would have had concerns
19  about other citizens based on your behavior would that
20  surprise you?
21  A   Very much.
22      MS. PINKEL: No further questions.
23  (Off record)
24      * * * END OF PROCEEDINGS * * *
25

Page 89

1           S I G N A T U R E
2   STATE OF ALASKA        )
                           ) ss.
3   THIRD JUDICIAL DISTRICT )
4       I, JUDY L. BERMAN, have read the foregoing
5   deposition and have made corrections thereto. Any and all
6   changes, explanations, deletions and/or additions to my
7   testimony may be found on the correction sheet(s) enclosed
8   with this transcript.
9
10      _____
            JUDY L. BERMAN
11
12  STATE OF ALASKA        )
                           )ss.
13  THIRD JUDICIAL DISTRICT )
14      THIS IS TO CERTIFY that on this      day of
15  , 200__, before me appeared JUDY L. BERMAN, to me
16  known and known to be the person named in and who executed the
17  foregoing instrument, and acknowledge voluntarily signing and
18  sealing the same.
19
20      _____
            Notary Public in and for
21          State of Alaska, at Anchorage
            My Commission Expires:_____
22
23
24
25

METRO COURT REPORTING
745 West 4th Avenue, Suite 425, Anchorage, Alaska 99501
907.276.3876                                    metro@gci.net