Mary B. Pinkel
Assistant Municipal Attorney
Municipality of Anchorage Department of Law
Civil Division
P.O. Box 196650
Anchorage, Alaska  99519-6650
(907) 343-4545 (phone)
(907) 343-4550 (fax)
uslit@muni.org

Attorney for Defendants Anchorage
Police Department, Officer Robert Dutton,
And Sergeant Gil Davis

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| JUDY L. BERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT, | ) |
| OFFICER ROBERT DUTTON, and | ) |
| SGT. GIL DAVIS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

U.S. District Court Case No. 3:04-cv-227-TMB

**AFFIDAVIT OF ROBERT J. DUTTON**

Robert Dutton being duly sworn upon oath deposes and states as follows:

1.   I was employed by the Anchorage Police Department as a police officer from February, 1992 until July, 2003.  I am currently employed by the United Parcel Services ("UPS").

2.   As a patrol officer, my duties involved performing a wide range of police

services and a variety of tasks, including taking appropriate action when observing or being informed of matters requiring police attention. Anchorage Police officers maintain order, enforce codes and ordinances, and protect life and property within the Municipality of Anchorage. My specific duties included criminal investigation; report writing; radio communication; traffic enforcement; patrolling and security.

3.      My duties of criminal investigation required that I conduct all types of criminal and non-criminal investigations, and confront and interview suspects and witnesses. In regard to my traffic enforcement duties, I was required to instruct and enforce traffic laws and ordinances by warnings, citation and/or arrest. In regard to my patrolling duties, I was required to patrol residential and commercial settings to reduce the incidence of crime and criminal activity within an assigned beat or area. My security duties included conducting visual and audio surveillance in a variety of circumstances and settings. These duties also included engaging in preventive security patrol of buildings and homes, responding to emergency and security alarms, and rendering aid to those in need.

4.      On April 6, 2002, I, along with Officer Gil Davis, was assigned to an alcohol enforcement detail outside the liquor store next to the Carrs Huffman Grocery Store ("Carrs Huffman") in Anchorage. The purpose of our enforcement work was to target under-age drinking. I was working from a marked police car in uniform. Officer Davis was working "under cover." Officer Davis and I were in radio contact.

5.      At about 10:15 p.m., Officer Davis and I decided to leave the liquor store at Carrs Huffman. As I drove through the lot and towards the exit to Huffman Road, I heard a horn honking repeatedly. It was my initial impression that this sound may

have come from a car alarm. I then made a U turn at the entrance to the parking lot and told Sergeant Davis that I was going back to check on the car horn.

6.    As I returned to the parking lot, I observed that the horn sound was coming from a woman stopped in her car in front of the Carrs Huffman store. I later determined that this woman was Judy Berman, the plaintiff in this lawsuit. As I approached Ms. Berman, she made a three quarter U turn and pulled into a parking lot in front of the store. I then saw two people exit a mini-van that was parked next to her car. Ms. Berman then started honking and screaming at them again. This behavior on the part of Ms. Berman alarmed me. As a police officer, I had been trained to look for signs of road rage or domestic violence, and Ms. Berman's behavior could have fit either category. I therefore parked my vehicle behind Ms. Berman's vehicle, thereby blocking it, and approached her car and knocked on her window. The purpose of my stopping and detaining Ms. Berman was to investigate the disturbance that she had created and to make sure there were not any safety risks to the two people from the mini-van or to anyone else in the vicinity.

7.    After I knocked on Ms. Berman's window, she opened the door and stepped out. I calmly asked Ms. Berman why she had been creating a disturbance in the parking lot. Ms. Berman responded that she was upset because the other vehicle (driven by the Chens) had taken her parking space. I concluded that this explanation was illegal and irrational. Under Anchorage code, it is not acceptable to use one's horn to harass other people. In addition, Ms. Berman's behavior in honking and screaming at the couple was a violation of the Municipal Code, as it created a

disturbance. Further, it is not normal behavior to react in the manner in which she had reacted to the mere taking of a parking space by another driver. Therefore, Ms. Berman's explanation of her behavior further aroused my suspicion. I told Ms. Berman that she had created a disturbance, and that the direction in which she had been driving did not entitle her to park in that spot anyway. Ms. Berman then told me in a sarcastic tone of voice to "have a nice day" and started to walk away. This behavior of Ms. Berman's in speaking in that tone of voice and walking away from me further aroused my suspicion. I was again concerned that she could act violently towards the couple or towards other customers in the vicinity.

8.   I told Ms. Berman that I needed to see her identification. Ms. Berman told me that she did not have any identification and that she was not going to show it to me anyway. Ms. Berman's refusal to produce identification and her statement that she did not have any identification further aroused my suspicion. It has been my experience that individuals who refuse to show identification or a driver's license usually have a reason: a revoked license or other reason that they are not allowed to drive. I told Ms. Berman that I wanted to see Ms. Berman's identification because I was investigating a disturbance that she had created. In addition, because Ms. Berman had just driven a motor vehicle, she was required to have a driver's license in her possession.

9.   Almost from the beginning of my contact with her, Ms. Berman told me that she was going to "sue" me and that I had not have the right to be "harassing" her. This behavior on her part was also suspicious and troublesome. As a police officer, I

routinely questioned individuals about illegal behavior and was rarely told I would be "sued" for doing my job.

10. Ms. Berman continued to walk away from me towards the entrance to Carrs. I continued walking with Ms. Berman towards the entrance. Ms. Berman's behavior in walking away from me when I was still talking to her was also suspicious. I questioned why she was trying to avoid me and why she continued to refuse to show me her driver's license or other identification. When Berman initially started to walk away from me, I believe I had made it clear that I was not done interviewing her. However, Ms. Berman kept trying to walk away from me and to proceed towards the store, stating that she did not need to show identification to me.

11. I eventually positioned myself between Ms. Berman and the front door of Carrs so that I could gain her cooperation. She again tried to walk away from me. I then placed her in a "sleeve guide" and told her that I was investigating a disturbance that she had caused. A "sleeve guide" is one of the lowest forms of physical restraint that an officer uses on uncooperative persons. It consists of holding an individual near the elbow with some upward pressure. I then told Ms. Berman that she was required to identify herself to me. She responded that she was a citizen of the United States and an attorney, and that she was not going to identify herself to me because she had not done anything wrong. She stated that if I did not take my hand off her arm, she would "sue" me. She demanded that I show her my identification.

12. Officer Davis, my back-up, officer then arrived around this time. I showed Ms. Berman my badge on my chest and pulled out my wallet and showed her my

department identification so that she could confirm that I was an officer. Berman still did not produce her identification. Instead, she began digging in her purse and told me and Officer Davis that she wanted to write our names down. It was my impression that Ms. Berman was retrieving her wallet, a rectangular object, so that she could find something to write our names down with.

13. Officer Davis then indicated to Ms. Berman that she should get her driver's license out of her wallet as long as she had the wallet out. However, instead of producing her wallet, as directed by Officer Davis, Berman hesitated, and then made the comment: "I'm an attorney. I don't have to do this." She then tried to pull away from me and started to spin. In my view, this action by Ms. Berman indicated that she was actively resisting my commands and that she was attempting to flee.

14. After Ms. Berman pulled away and began to spin, Officer Davis and I restrained Ms. Berman by taking control of one arm each and placing both of her arms behind her back. We then placed Ms. Berman in handcuffs. It was my understanding that we had detained Ms. Berman and that she was under arrest. During this period, Officer Davis then obtained Ms. Berman's wallet, opened it and removed her license.

15. After taking Ms. Berman's license, Officer Davis returned the wallet to Ms. Berman's coat pocket. We placed Ms. Berman in my police vehicle. Ms. Berman's license had expired the year before. It is a violation of Alaska law for a person to drive a car with an expired license. I told Ms. Berman that if she did not have an extensive criminal history, I would issue her a citation and release her. I then checked Ms. Berman's criminal record and found that she did not have any significant criminal

history.

16.     Because her license had expired, I told Ms. Berman that she could not drive, and that she would have to call someone with a valid license to come and pick up her car.  Ms. Berman kept repeating that she was a citizen of the United States and that she was going to personally sue me.

17.     After discussing Ms. Berman's behavior with Officer Davis, I then hand-wrote a citation for resisting or interfering with an officer, in violation of AMC 08.30.010 A 4, and asked that Ms. Berman sign the citation.  We then released Ms. Berman.

18.     After Officer Davis and I released Ms. Berman, I interviewed Chih and Sharon Chen, the couple who Ms. Berman had been honking and screaming at.  The Chens told me that they had no idea why Ms. Berman had honked her horn and screamed at them.

19.     Throughout the entire incident, Ms. Berman was uncooperative.  Based on my experiences as a police officer, I was concerned that Ms. Berman could be under the influence of alcohol or other drugs or just have a violent temper.  In my opinion, Ms. Berman's behavior was abnormal and could possibly escalate further.

20.     Throughout my investigation of Ms. Berman, it was clear to me that my conduct towards her was absolutely lawful.  First, I believed I had a reasonable suspicion to stop her for her behavior in the parking lot in creating a disturbance.  I believed, based on her behavior, that I needed to detain her for questioning and to identify her.  Had I not taken these steps, I would have been remiss in my duties to the public.  Ms. Berman refused to cooperate with me by failing to produce identification

and by failing to stop to allow me to continue questioning her. I therefore continued to insist that she produce identification, and eventually employed the sleeve guide technique to restrain her from attempting to evade me further. The level of force that Officer Davis and I used, after Berman attempted to flee by spinning away from us, is called "soft empty handed tactics."

21.     When we eventually cited Ms. Berman for resisting an officer, in violation of AMC 08.30.010 A. 4, I believed that Ms. Berman had intentionally, recklessly, or

knowingly delayed or obstructed my active investigation of a crime by fleeing after having been told to stop. In addition, she had also violated AMC 08.30.010A. 6., by intentionally, recklessly, or knowingly disobeying my lawful orders. We could have also cited Ms. Berman for other crimes which she had committed in my presence: creating a disturbance, disorderly conduct; failing to produce her driver's license; and driving with an expired license. However, we used our officers' discretion to merely cite Ms. Berman for obstructing an officer.

22.   I was later quite surprised to learn that Ms. Berman is a licensed attorney in this state. In my experience, lawyers tend to work with the police, even if they do not always agree with us. I believe that Ms. Berman obstructed my goal as a law enforcement officer: to protect the public from dangerous behavior (in this instance, road rage type behavior) which can lead to serious injuries and often fatalities.

Dated this _____ day of March, 2006.

By: _____
Robert L. Dutton
pp J.

SUBSCRIBED AND SWORN to before me this 10th day of March, 2006.

_____
Notary Public in and for Alaska
My commission expires: 1/13/07