Mary B. Pinkel
Assistant Municipal Attorney
Municipality of Anchorage Department of Law
Civil Division
P.O. Box 196650
Anchorage, Alaska  99519-6650
(907) 343-4545 (phone)
(907) 343-4550 (fax)
uslit@muni.org

Attorney for Defendants Anchorage
Police Department, Officer Robert Dutton,
And Sergeant Gil Davis

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JUDY L. BERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT, | ) |
| OFFICER ROBERT DUTTON, and | ) |
| SGT. GIL DAVIS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

U.S. District Court Case No. 3:04-cv-227-TMB

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON QUALIFIED IMMUNITY

### I. INTRODUCTION

For the reasons outlined below, Defendants, the Anchorage Police Department, Officer

Robert Dutton and Sergeant Gil Davis ("the Municipal Defendants"), through counsel, the

Municipal Attorney, move for summary judgment under the doctrine of qualified immunity on all of

the claims alleged by the Plaintiff in her complaint.  This memorandum is supported by the attached

affidavits and exhibits.

## II.    PROCEDURAL HISTORY

In a complaint filed in Anchorage Superior Court on April 6, 2004, the Plaintiff alleged the following claims against the Anchorage Police Department, Officer Robert Dutton and Officer Gil Davis: false arrest (count 1); assault and battery (count 2 ); malicious prosecution (count 3); violation of civil rights (42 U.S.C. Sec. 1983) (count 4); and punitive damages (count 5).   On September 27, 2004, the action was removed to federal court.  On October 4, 2004, the Municipal Attorney of Anchorage filed an Answer on behalf of the Anchorage Police Department.  See, Answer filed on behalf of APD. On May 10, 2005 the Municipal Attorney filed an Answer on behalf of Defendants Robert Dutton and Gilbert ("Gil") Davis.  See, Answer filed on behalf of Officers Dutton and Davis. In its answers filed on behalf of the Municipal Defendants, the Municipal Attorney alleged  that the Plaintiff's claims were barred by the doctrines of absolute or qualified immunity, and by AS 09.65.070 (d) (2).  See Answer on behalf of APD dated October 4, 2004, Affirmative Defenses nos. 8 and 14; Answer on behalf of Officers Dutton and Davis dated May 10, 2005, Affirmative Defenses Nos. 8 and 12.

In discovery responses, Plaintiff has stated that she has no claims for physical damages and has refused to provide any information on her medical or mental health.  See, discovery responses of Plaintiff, Exhibit 1.  The Plaintiff's deposition testimony confirmed her lack of claims for any actual damages other than her constitutional claims.  Deposition Transcript of Judy Berman, Exhibit 2, pages 15-27.

## III.    FACTS

On the evening of April 6, 2002, Anchorage Police Officers Robert Dutton and Gil Davis were on duty and assigned to an alcohol enforcement detail outside the liquor store at the Carrs

Huffman Grocery Store ("Carrs Huffman") in Anchorage. Affidavit of Robert Dutton, paragraph 4. The purpose of the officers' enforcement work was to target underage drinking. Id. Officer Dutton was working from a marked police vehicle in uniform. Id. Officer Davis was acting "undercover." Id. Officer Dutton and Officer Davis were in radio contact. Id. At about 10:15 p.m., the officers decided to leave the liquor store at Carrs Huffman. Id., paragraph 5.

As he drove through the parking lot and towards the exit to Huffman Road, Officer Dutton heard a horn honking repeatedly. Affidavit of Dutton, paragraph 5. Officer Dutton's initial impression was that this sound may have come from a car alarm. Id. Officer Davis also heard a horn honk several times. Affidavit of Gilbert ("Gil") Davis, paragraph 5. The sound Officer Davis heard was not a normal "beep beep" but a loud series of loud honking. Id. It was Officer Davis's belief, based on his training and experience as a police officer, that something was going on that needed the officers' attention. Id. Officer Dutton's initial impression was that the sound may have come from a car alarm. Affidavit of Dutton, paragraph 5. Officer Dutton then made a U turn at the entrance to the parking lot and told Sergeant Davis that he was going back to check on the car horn. Id.

As Officer Dutton returned to the parking lot, he observed that the horn sound was coming from a woman stopped in her car in front of the Carrs store. Affidavit of Dutton, paragraph 6. Officer Dutton later determined that this woman was Ms. Judy Berman. Id. As he approached Ms. Berman, Ms. Berman made a three quarter "U" turn and pulled into a parking spot in front of the store. Id. Officer Dutton then saw two people exit a mini-van that was parked next to Ms. Berman's vehicle. Id. Ms. Berman then started honking and screaming at them again. Id. Deposition of Dutton, page 11. Officer Dutton later determined that these two people were Chih and Sharon Chen. Affidavit of Dutton, paragraph 18. This behavior on the part of Ms. Berman alarmed Officer

Dutton. Id., paragraph 6.  As a police officer, he had been trained to look for signs of road rage or domestic violence, and Ms. Berman's behavior could have fit either category. Id. He therefore parked his vehicle behind Ms. Berman's vehicle, thereby blocking it, and approached her car and knocked on her window. Id.

The Chens were very glad that the police officer had stopped Ms. Berman on April 6, 2002. Affidavit of Hsuehjen ("Sharon") Chen, paragraph  6.  Affidavit of Chih Chen, paragraph 5. of C Chen, paragraph 5.    Sharon Chen, an informational technology manager at the Alaska Court System, and Chih Chen, a senior tax accountant at Alaska Communications System ("A.C.S."), had stopped at the Carrs Huffman Grocery Store to purchase some groceries.  Affidavit of Sharon Chen, paragraphs 1and 2; Affidavit of Chih Chen, paragraphs 1 and 2.  Mr. Chen was at the wheel of the couple's mini-van, and parked it in an open parking space in front of the store.  Affidavit of Chih Chen, paragraph 2.  As Mr. Chen parked the mini-van, Ms. Chen heard someone honk a car horn loudly several times.  Affidavit of Sharon Chen, paragraph 3.  As they exited the car, Ms. Chen saw the woman waving her arms and screaming at them. Affidavit of Sharon Chen, paragraph 3. Affidavit of Chih Chen, paragraph 3.  The Chens had no idea why this woman was honking and screaming at them. Id.  The woman was behaving aggressively.  Affidavit of Chih Chen, paragraph 3. Her behavior was rude, abusive and intimidating.   Affidavit of Sharon Chen, paragraph 4. Affidavit of Chih Chen, paragraph 3.   Both Mr. and Ms. Chen wondered if she was under the influence of alcohol or drugs.  Id. It was their impression that this woman, whom they later learned was Ms. Judy Berman, was acting highly abnormally, and they were afraid that she would get violent with them and possibly hurt them or their car. Id.

A police officer then approached Ms. Berman and interrupted her. Affidavit of Chih Chen, paragraph 4.  After the police officer had come up to Ms. Berman, Sharon Chen heard Ms. Berman

tell him that she was going to "sue" him.  Affidavit of Sharon Chen, para. 5. Ms. Chen also heard

Ms. Berman say: "I am a U.S. citizen." Id.  All that the officer had done was approach Ms. Berman

and begin speaking to her. Id.  In contrast to Ms. Berman, who was acting extremely agitated and

abnormal, the police officer who had stopped her spoke and acted very calmly. Id.  The police

intervention at that point made the Chens feel safe. Id.  The Chens then went into the store to do the

shopping and were interviewed by the Officer later.  Affidavit of Sharon Chen, paragraph 7.

Affidavit of Chih Chen, paragraph 6.

When the Chens eventually learned that Ms. Berman had been angry at them for "taking" her

parking space, they were very surprised.  Affidavit of Sharon Chen, paragraph 8.  Affidavit of Chih

Chen, paragraph 7. There were many open parking spaces in front of the grocery store that night. Id.

In their opinion, had the police officer not intervened when he had, they do not know what would

have happened. Id.  In her work for the Alaska court system, Ms. Chen comes into daily contact with

many lawyers and judges. Affidavit of Sharon Chen, paragraph 9.  She was very surprised to learn

that Ms. Berman is an attorney.  Id.  Mr. Chen was also surprised to learn that Ms. Berman is an

attorney. Affidavit of Chih Chen, paragraph 8.   The Chens perceived Ms. Berman's behavior

towards them on April 6, 2002 as very threatening, hostile and frightening.  Affidavit of Chih Chen,

paragraph 8. Affidavit of Sharon Chen, paragraph 9.  They both found Ms. Berman's behavior

towards the police officer to be very disrespectful. Id.

After Officer Dutton had knocked on her window, Ms. Berman opened the door and stepped

out.  Affidavit of Robert Dutton, paragraph 7.  Officer Dutton calmly asked Ms. Berman why she

had been creating a disturbance in the parking lot.  Affidavit of Dutton, paragraph 7.  Ms. Berman

responded that she was upset because the other vehicle [driven by the Chens] had taken her parking

space.  Id.  Officer Dutton concluded that this explanation was illegal and irrational. Id.  Under the

Anchorage municipal code, it is not acceptable to use one's horn to harass other people. Id.  Ms. Berman's behavior in honking and screaming at the couple was a violation of the Municipal Code, as it created a disturbance. Id.  It is also not normal behavior to react in the manner in which she had reacted to the mere taking of a parking space by another driver. Id. Therefore, Ms. Berman's explanation of her behavior further aroused Officer Dutton's suspicion. Id.  He told Ms. Berman that she was creating a disturbance[1], and that the direction in which she had been driving did not entitle her to park in that spot anyway. Id.  Ms. Berman told Officer Dutton to "have a nice day" and then started to walk away.  Id.  This behavior on the part of Berman in speaking in that sarcastic tone of voice and in walking away from him further aroused Officer Dutton's suspicion.  Id.  Officer Dutton was again concerned that Berman could act violently towards the couple or towards other customers in the vicinity.  Id.

Officer Dutton told Ms. Berman that he needed to see her identification. Affidavit of Dutton, paragraph 8.  Ms. Berman told Dutton she did not have any identification and that she was not going to show him it anyway.  Id.  Ms. Berman's refusal to produce identification and her statement that she did not have any identification further aroused Officer Dutton's suspicion. Id.  It had been his experience that individuals who refuse to show identification or a driver's license usually have a reason: a revoked license or another reason that they are not allowed to drive. Id. Officer Dutton told

---

[1]  AMC 15.70.090 C. states that:

C. No person shall sound any horn…in any  motor vehicle on any public right-of-way or public space, except as a warning of danger….

AMC 8.30.120 states that:

   A.  It is unlawful for any person to:

   B.  2. Knowingly generate loud noise in a public place with the intent to disturb others or in reckless disregard of the peace and privacy of others.

In addition, AS 11.61.110 (a) states that :

(a) A person commits the crime of disorderly conduct if, (2) in  a public place…and with intent to disturb the peace and privacy of another…the person makes unreasonably loud noise.

Ms. Berman that he wanted to see her identification because he was investigating a disturbance that she had created. Id. In addition, since Ms. Berman had just driven a motor vehicle, she was required to have a driver's license in her possession. Id.

Almost from the beginning of his contact with Ms. Berman, Ms. Berman told Officer Dutton that she was going to "sue" him and that he did not have the right to be "harassing" her. Affidavit of Robert Dutton, paragraph 9. This behavior on her part was also suspicious and troublesome. Id. As a police officer, he routinely questioned individuals about illegal behavior and was rarely told that he would be "sued" for doing his job. Id. Ms. Berman continued to walk away from Officer Dutton towards the entrance. Affidavit of Dutton, paragraph 10. Officer Dutton continued to walk towards the entrance with Ms. Berman. Id. Officer Dutton found that Ms. Berman's behavior in walking away from him when he was still talking to her was suspicious. Id. He questioned why she was trying to avoid him and why she was refusing to show him her driver's license or other identification. Id. When she initially started to walk away from him, he had made it clear that he was not done interviewing her. Id. However, Ms. Berman kept trying to walk away from him and to proceed towards the store, stating that she did not need to show identification to the officer. Id.

Officer Dutton eventually positioned himself between Ms. Berman and the front door of Carrs so that he could gain her cooperation. Affidavit of Dutton, paragraph 11. She again tried to walk away from him. Id. Officer Dutton then placed Ms. Berman in a "sleeve guide" and told her that he was investigating a disturbance that she had caused. Id. A "sleeve guide" is one of the lowest forms of physical restraint that an officer uses on uncooperative persons. Id.[2] A "sleeve guide" consists of holding an individual near the elbow with some upward pressure. Id. Officer Dutton told

Ms. Berman that she was required to identify herself to him.  Id.  Ms. Berman responded that she

was a citizen of the United States and an attorney, and that she was not going to identify herself to

Officer Dutton because she had not done "anything wrong."  Id.  Ms. Berman  told Officer Dutton

that if he did not take his hand off her arm, she would "sue" him.  Id..  Ms. Berman also demanded

that Officer Dutton show her his identification.  Id.

Officer Davis then arrived as the "cover" (back-up) officer for Officer Dutton's contact with

Ms. Berman.  Affidavit of Dutton, paragraph 12.    Officer Davis had parked his car in the parking

lot some distance away due to the fact that he was working "under cover."  Affidavit of Davis, para.

6.  Officer Davis had observed Ms. Berman waving her arms and yelling, although he could not hear

her.  Affidavit of Davis, para. 6.  As he approached the store, it appeared to Officer Davis that Ms.

Berman was attempting to leave Officer Dutton, and that Officer Dutton was attempting to detain

Ms. Berman. Id.,para. 7.   He observed Officer Dutton place Ms. Berman in a "sleeve guide" and

overheard him ask for her identification. Id.  It was Davis's impression that Dutton asked for

Berman's identification and her driver's license, and that Dutton used both terms in demanding

identification. Id.

Under Alaska law, citizens are required to produce their driver's licenses to police officers

upon their request. Affidavit of Davis, paragraph 8.  In addition, in investigating crimes, traffic or

otherwise, officers must obtain identification from a suspect so that they can properly identify the

suspect. Id.

In response to Ms. Berman's request that he show her his I.D. Officer Dutton then showed

Ms. Berman the badge on his chest and even pulled out his wallet and showed her his department

---

2   A sleeve guide is "rock bottom" in the continuum of force that police officers use.
"Meaning…down here is a sleeve guide, up here is a baton, up here is deadly force."  Deposition of

identification so that she could confirm he was an officer.  Affidavit of Dutton, paragraph 12.

Affidavit of Davis, paragraph 9.  Officer Dutton produced his identification even though Berman

continued to resist him and had still not produced her identification.  Id..  Officer Davis discerned

that Dutton had a problem on his hands.  Affidavit of Davis, paragraph 9. It was Davis's duty as the

back-up to Dutton to assist him.  Id.  The problem that Davis had discerned was that Officer Dutton

had a reason to ask for the woman's identification but for some reason she was refusing to provide it.

Id.  In Davis's view, the reason that Dutton needed the identification from Berman was two-fold. Id.

First, her behavior earlier had appeared to potentially constitute disorderly conduct.  Id.  In addition,

it was Davis's belief that Berman may have engaged in a traffic violation.[3]

    Like Dutton, it was Davis's experience as a police officer that if someone does not want to

produce a driver's license or identification, it is usually because that person has something to hide.

Affidavit of Davis, paragraph 9.  In addition, Davis's previous observations  --  the series of loud

honking earlier, the yelling and screaming on the part of Ms. Berman, and her apparent evasion of

Officer Dutton --  made him believe that this woman was potentially dangerous and could pose a

threat to public health and safety.  Id.  Her refusal to provide identification further aroused Davis's

suspicions. Id.  He wondered if Berman had other problems that made her a public health and safety

threat – e.g., domestic violence, a dangerous disposition or perhaps had a concealed weapon – and

he was therefore ready and available to assist Officer Dutton in any way he could. Id.

    By this time, Ms. Berman had begun digging in her purse and told the officers she wanted to

write their names down.  Deposition of Dutton, page 16.  Deposition of Davis, page 12.  Affidavit of

---

Dutton, page 15.

3 Under AMC 9.36.360 A, "no horn or other warning device shall emit an unreasonably loud or
harsh sound or whistle."  Id.  In addition, "the driver of a motor vehicle shall, when reasonably

Dutton, paragraph 12.  It was therefore the impression of both officers that Ms. Berman was retrieving her wallet, a rectangular object, so that she could find something to write their names down with.  Davis then told Berman that as long as she had her wallet out, she needed to show the officers her license.  Affidavit of Davis, paragraph 10.  Affidavit of Dutton, paragraph 13.  Instead of producing her driver's license as directed by Davis, Berman hesitated, then made the following comment : "I'm an American citizen.  I don't have to do this."  Id.  Ms. Berman then started to pull away from Officer Dutton and started to "spin."  Id.  See, also deposition of Dutton, pages 16-17; deposition of Davis, page 13.  According to Officer Davis, this "spin" was a clockwise right-spinning turn, similar to what one sees on a basketball court when a player "goes around" a "block." Deposition of Davis, page 13; affidavit of Davis, paragraph 10.  In both officers' minds, Ms. Berman's movement signified that she had gone from non-compliance to active resistance, and that she was attempting to flee from them.  Affidavit of Dutton, paragraph 13.  Affidavit of Davis, paragraph 10.

After Ms. Berman pulled away and began to "spin," Officers Davis and Dutton then restrained Ms. Berman by taking control of one arm each and placing both of Ms. Berman's arms behind her back.  Affidavit of Davis, paragraph 11.  Affidavit of Dutton, paragraph 14.  The officers then placed Ms. Berman in handcuffs.  Id.  It was Officer Davis's and Officer Dutton's understanding that they had detained Ms. Berman and that Ms. Berman was at that time under arrest.  Id.  During this period, Officer Davis then snatched Ms. Berman's wallet out of her hand**.**  Id. See, also Deposition of Dutton, page 34.  Deposition of Davis, page13.  Officer Davis opened the wallet and removed Berman's license.  Affidavit of Davis, paragraph 11; Deposition of Davis, page 14.  At the time that

---

necessary to ensure safe operation, give audible warning with his horn, but may not otherwise use such horn upon a street."

Davis opened Ms. Berman's wallet, she had been detained and was under arrest.  See, Affidavits of

Dutton and Davis.  In addition, see Exhibit 3, page 34;    Exhibit 4, page 26.  After examining Ms.

Berman's driver's license, Officer Davis returned the wallet to Ms. Berman's coat pocket.  Affidavit

of Davis, paragraph 11.  Deposition of Davis, page 14.  Officer Davis kept the license to examine it.

Affidavit of Davis, paragraph 11.  Ms. Berman's license had expired the year before.[4]  Affidavit of

Dutton, para. 15.  Affidavit of Davis, para. 12.

The officers placed Ms. Berman in Officer Dutton's police vehicle.  Affidavit of Davis,

paragraph 11.  Affidavit of Dutton, paragraph 15.  Officer Dutton told Ms. Berman that if she did not

have an excessive criminal history, he would issue her a citation and release her.  Affidavit of

Dutton, paragraph 15.  Because Berman's license had expired the year before, Dutton told Ms.

Berman that she could not drive, and that she would have to call someone with a valid license to

come and pick up her car.  Affidavit of Dutton, para. 16.  Ms. Berman kept repeating that she was a

citizen of the United States and that she was going to personally sue Officer Dutton.  Affidavit of

Dutton, para. 16.  After consultation with Officer Davis, Officer Dutton then hand-wrote a citation

for resisting or interfering with a police officer, in violation of Anchorage Municipal Code 8.30.010

A, and asked Ms. Berman to sign the citation.  Affidavit of Dutton, para.17.  The officers then

released Berman.  Id.

Although the officers cited Ms. Berman for resisting an officer, they could have also charged

---

4  Berman was fully aware of the fact that her license had expired the year before this incident.
Deposition of Judy Berman, page 84.  When the Assistant Municipal Attorney asked Ms. Berman
whether the fact that her driver's license had expired was a factor in her not wanting to show it to the
officers, her attorney instructed her not to answer the question. Id., pages 84-86.  Because this is a
civil proceeding, an adverse inference can be drawn from Ms. Berman's refusal to answer this
question.   Therefore, it is reasonable to assume that part of Ms. Berman's refusal to produce her
identification or driver's license stemmed from the fact that her driver's license had expired, a fact of
which she was well aware.

her with other crimes, such as creating a disturbance; disorderly conduct; failing to produce her driver's license; and driving with an expired license. Affidavit of Dutton, paragraph 21; Affidavit of Davis, paragraph 12. See, also, Affidavit of John Daily.

Throughout his investigation of Ms. Berman's conduct, it was clear to Robert Dutton that his conduct was absolutely lawful. Affidavit of Dutton, paragraph 20. First, he believed that he had a reasonable suspicion to stop her for her behavior in the parking lot in creating a disturbance. Id. Based on her behavior, he believed that he needed to detain Berman for questioning and to identify her. Id. Ms. Berman refused to cooperate with him by failing to produce identification and by failing to stop to allow him to continue to question her. Id. He therefore continued to insist that she produce identification, and eventually employed the "sleeve guide" technique to restrain her from attempting to evade him further. Id. The level of force that he and Officer Davis used, after Berman attempted to flee by spinning away from them, was "soft empty handed tactics." When Officers Dutton and Davis cited Ms. Berman for resisting an officer, in violation of AMC 8.30.010, they believed that she had intentionally, recklessly or knowingly disobeyed a police officer's lawful orders. Deposition of Dutton, page 32. Deposition of Davis, page 28.[5]

Both officers were later very surprised to learn that Judy Berman was an attorney. Affidavit of Dutton, paragraph 22. Affidavit of Davis, paragraph 13. Deposition of Davis, page 27. In their experience, lawyers tend to "work with" the police, even if they do not always agree with them. Affidavit of Dutton, paragraph 22. Affidavit of Davis, paragraph 13. Through her behavior on April 6, 2002, Ms. Berman "obstructed" the law enforcement goals of the police: to investigate crimes

---

5  AMC 08.30.010 states as follows:
A. A person commits the crime of resisting or interfering with a peace officer when
4.  The person intentionally, recklessly, or knowingly delays or obstructs a police officer's active investigation of a crime by fleeing after having been told to stop.

and protect the public. Affidavit of Davis, paragraph 13.

Ms. Berman recalls that on April 6, 2002, returning from a play in downtown Anchorage, she spotted a vacant parking spot in front of the Carrs grocery store. Deposition of Berman, page 32. Another vehicle approached the store and parked in the space in which she had wanted to park. Id., page 32. Ms. Berman honked her horn to indicate to the driver of the other vehicle that she had been waiting to park in that space. Id., page 32. Ms. Berman admits she honked her horn at the other car at least four or five times. Id., page 33. She also admits that she then parked in the space right next to the other vehicle. Id., page 33. It is Ms. Berman's recollection that the space next to the space in which she had wanted to park opened up "like immediately." Id, pages 33-34. She then parked, and a man and a woman got out of the van. Id., page 34. The couple [the Chens] passed in front of Berman's car. Id., page 34. Ms. Berman admits that she then honked a "couple more times." Id., page 34. Even though Ms. Berman had found a parking spot right next to the Chens, she continued to honk at them "just to let them know that I thought it was – what they did was rude." Id., page 34.

Ms. Berman admits that she "kind of mouthed at them" (the Chens) through the window that they had been rude but states that "I didn't use my voice at all." Id., page 34. Ms. Berman maintains that she honked at the Chens "to get their attention so that they would look at me and then I mouthed at them 'that was really rude.'" Id., page 34.

Ms. Berman admits that her purpose in using her horn had nothing to do with her safety. Id., page 36. She further admits that the situation in the parking lot had become "mildly adversarial" before Officer Dutton had approached her, although she denies that her behavior was the cause of the "mildly adversarial" situation. Deposition of Berman, page 55. It is Ms. Berman's recollection that Officer Dutton asked her if there was something wrong with her car horn and that she denied that there was anything wrong with it. Id., page 38. Berman admits that Officer Dutton told her that

she had been creating a disturbance.[6] Id.  She further admits that Officer Dutton told her she had no right to pull into the parking space from the left.  Id., pages 38 and 39.  See, also, Complaint, paragraph 9.  Ms. Berman does not deny that she started to walk away from Dutton, or that when he asked to see her identification, she told him "No."  Id., page 43.  Berman admits that she told Officer Dutton that he did not have the right to stop her and ask for her identification.  According to Berman, it was her opinion that Dutton could not legitimately ask for her identification because "I thought that was a second stop…I was already walking away." Id., page 43.[7]

Berman states that she later told the officers she would produce the identification. Deposition of Berman., page 48.  However, she admits that when Officer Dutton first asked her for her identification, she told him she did not have to produce it. Id., page 48.  She further admits that she asked to see Officer Dutton's and Officer Davis's identifications before she made any attempt to provide them with her identification. Id. page 67.  Officer Dutton showed her his identification even though she had still not provided hers and even though he was in uniform. Id., page 68.  While Berman does not admit that she pulled away from the officers and started to spin after Officer Davis appeared (deposition of Berman, page 69) there is no dispute about the fact that both officers by that time perceived Berman's entire attitude, by her body language and words, as part of her continuing pattern to evade and resist Officer Dutton's active investigation of a crime.  Affidavit of Officer Dutton, paragraph 13. Affidavit of Officer Davis, paragraph 10.  See, also deposition of Dutton, page 32; deposition of Davis, page 28.

---

6  Based on Ms. Berman's own testimony that her honking at the Chens was motivated by a desire to "tell them that they were rude" and was not motivated by any warning of danger, Berman's conduct was in violation of AMC 15.70.090 C (creating a disturbance?); AMC 8.30.120(disorderly conduct) ; and AS 11.61.110 (disorderly conduct).

7  AMC 9.12.030 and AS 28.15.131 require that individuals with driver's licenses present them on demand when peace officers request them.

Senior Patrol Officer John Daily is an Anchorage police officer who is the lead instructor for the Officer Survival Teaching Cadre. Affidavit of John Daily, paragraph 4. He has been a member of this cadre since 1982. Id. As the lead instructor, he teaches officer survival skills to police officers and to police officer trainees. Id. He has also served as a field training officer ("F.T.O.") on the duties of patrol officers since 1982. Id. He has had the opportunity to review the police reports, the parties' discovery and the recent deposition transcripts of both officers and of Ms. Berman. Affidavit of John Daily, para. 5. Officer Daily has also interviewed Sharon Chen about the April 6, 2002 incident. Id. It is Officer Daily's opinion, based upon his training and experience as a senior patrol officer and based upon all of the information he has reviewed to date, that Officers Dutton and Davis behaved competently and reasonably in regard to the situation they encountered with Judy Berman on April 6, 2002. Id. Had they not responded otherwise, they would have been remiss in their duties. Id.

In his 25 years as a patrol officer, Daily has learned that police officers must be continually vigilant and must watch for signs of potential violence to others. Id. In his opinion, in the situation that these officers encountered with Ms. Berman, they were required to respond in the way that they did. Id. In his opinion, it would have been appropriate for Officer Dutton to have hand-cuffed Ms. Berman earlier, when she first began to walk away from Dutton against his orders. Affidavit of John Daily, paragraph 13. In his opinion, the process the officers used in handcuffing Ms. Berman was also appropriate. Id. Additionally, the level of force used was appropriate. Id. It is further his opinion that Sergeant Davis's act in removing Berman's wallet was appropriate. Id., paragraph 15. What is especially impressive to Officer Daily is what these officers could have done, but refrained from doing. Id., paragraph 17. While they could have "thrown the book" at Ms. Berman, they refrained from doing so. Id. In his opinion, their professionalism and restraint in dealing with Ms.

Berman should be applauded. Id.

Berman claims no physical or emotional injuries in this lawsuit. Deposition of Berman, pages 15-27, exhibit 2. Discovery responses of Berman, exhibit 1. The only injuries she claims are her injuries due to the alleged violation of her "civil rights." Exhibit 2, pages 15-27.

## V.    LEGAL STANDARD FOR SUMMARY JUDGMENT

"Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that he moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 ( c). Summary judgment is appropriate only when, viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact with respect to the claims. *Tayborn v. City and County of San Francisco,* 341 F.3d 957, 960 (9th Cir. 2003). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The moving party has the initial burden of showing the absence of a genuine issue of fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets its initial burden, the non-moving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Id. at 325; Anderson*, 477 U.S. at 248.

In addition to showing that there are no questions of material fact, the moving party must also show it is entitled to judgment as a matter of law. *Smith v. University of Washington Law School*, 233 F.3d 1188, 1193 (9th Cir. 2000). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of acclaim on which the non-moving party has the burden of proof. *Celotex*, *supra,* 477 U.S. at 323. In

the present case, no material facts are in dispute and the municipal defendants are therefore entitled to summary judgment under the doctrine of qualified immunity.

## IV.    ARGUMENT

### A.  INTRODUCTION

In her complaint, Ms. Berman alleges the following causes of action against APD and Officers Dutton and Davis for their interaction with her on April 6, 2002 after she had created a disturbance in the Carrs parking lot: 1. false arrest; 2. assault and battery; 3. malicious prosecution; 4. violation of civil rights (Section 1983) ; and 5. punitive damages. However, none of these claims have merit.  The actions of police officers Dutton and Davis in stopping, questioning, detaining and arresting Ms. Berman after her disturbing behavior are discretionary functions for which they are entitled to qualified immunity.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  "*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  "Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Randall v. City of Fairbanks,* 352 F. Supp.2d 1028, 1032, (D.Alaska 2005), citing *Saucier v. Katz,* 533 U.S. 194,200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  A ruling should be made early in the proceedings so that the cost and expenses of trial are avoided where the defense is dispositive.  *Saucier,* 533 U.S. at 200.  "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986).

"To evaluate a claim of qualified immunity, a court must first consider the threshold question of whether the facts, taken in the light most favorable to the party asserting the injury, show the

officer's conduct violated a constitutional right." *Saucier v. Katz, supra,* 533 U.S. 194, 121 S.Ct. 2151 (2001). If no constitutional right was violated, the court need not inquire further. *Id. at 2156.*

If, however, a constitutional violation occurred, the second inquiry is whether the officer could nevertheless have reasonably but mistakenly believed that his or her conduct did not violate a clearly established constitutional right. *Id.* at 2158-59. This requires an assessment of whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 2156. Thus, to survive the Defendants' motion for qualified immunity, the Plaintiff must state a violation of a constitutional right, and that right must have been clearly established at the time the Officers detained and arrested Ms. Berman on April 6, 2002.

**B.    THE COURT SHOULD DISMISS ALL OF THE PLAINTIFF'S CLAIMS AGAINST THE OFFICERS UNDER THE DOCTRINE OF QUALIFIED IMMUNITY**

**1.  <u>False Arrest (Count One)</u>**

In count one of her Complaint, Ms. Berman alleges that the officers falsely arrested her because they "intentionally arrested and confined" her "without justification, and by the invalid use of legal authority." See, complaint, paragraph 20. In order to successfully establish a defense of qualified immunity to a charge of false arrest, the police must show probable cause existed for the arrest of the plaintiff. *Saidi v. Washington Metropolitan Area Transit Authority,* 928 F. Supp. 21, 27( D.C.Cir. 1996) (court held that qualified immunity protected police from claim for false arrest where bus passenger brought suit against police officers for injuries she allegedly sustained in incident in which she was arrested for assaulting police officer). A police officer need not "show probable cause in the constitutional sense; it is sufficient that the arresting officer has a good faith, reasonable belief in the validity of the arrest and detention." *Id.* at 27 (D.C. Cir. 1996) (citations omitted).

The test for the validity of an arrest without a warrant is found in AS 12.25.030, which provides in pertinent part that:

> (a) A private person or a peace officer without a warrant may arrest a person
> (1) for a crime committed or attempted in the presence of the person making the arrest.

Under the undisputed facts of this case, Officers Dutton and Davis were justified in arresting Ms. Berman because they had probable cause to believe she had committed or attempted to commit the crime of resisting an officer in their presence. First, Ms. Berman had created a disturbance in the parking lot, which Officer Dutton attempted to investigate.[8] Second, Ms. Berman failed to produce identification when ordered to do so by Officer Dutton, in violation of AMC 9.12.030 and AS 28.15.130. Additionally, her failure to produce evidence of her identify at that point also authorized the officers to take her before the court pursuant to AS 12.25.180.[9] Third, Ms. Berman's admitted lack of cooperation and outright obstruction of Dutton's many attempts to investigate the disturbance, and her continued lack of cooperation after Officer Davis had arrived, including her attempt to flee the officers, led Officers Dutton and Davis to arrest Berman for resisting an officer, in violation of AMC 08.30.010 A.4.

There is therefore no doubt that the officers had more than probable cause to arrest Ms. Berman for the crime of resisting an officer, in violation of AMC 08.30.010 A.4. AMC 08.30.010 A. 4 states as follows:

A. A person commits the crime of resisting or interfering with a peace officer when

4. The person intentionally, recklessly, or knowingly delays or obstructs a police officer's active investigation of a crime by fleeing after having been told to stop.

---

8  See  AMC 8.30.120 (disorderly conduct) and AS 11.61.110 (disorderly conduct).

9  AS 12.25.180 states that when a person is stopped or contacted by a peace officer for the commission of a misdemeanor or the violation of a municipal ordinance, the person may, in the discretion of the contacting officer, be issued a citation instead of being taken before a judge or magistrate unless the person does not furnish satisfactory evidence of identity.

Both Officers Dutton and Davis believed that Berman had intentionally, recklessly or knowingly delayed their active investigation of a crime. Deposition of Dutton, page 32. Deposition of Davis, page 28. See, also, affidavit of Dutton, paragraph 21. Officer Dutton also believed that she had intentionally, recklessly or knowingly disobeyed his lawful orders.[10] Affidavit of Dutton, para. 21.

There was ample evidence that Ms. Berman had obstructed the officers' attempts to investigate the disturbance she had created in the parking lot. Despite Dutton's attempts to speak with her and to obtain her identification or driver's license, Berman refused to co-operate, instead telling him she was going to "sue" him. See, Affidavit of Dutton. Additionally, see affidavit of Sharon Chen. Berman walked away from Dutton after he had initiated contact with her, and refused to stop and produce identification. After Dutton had placed himself between Berman and the store, and Officer Davis had arrived to assist him, Berman demanded that the officers show identification, even though Dutton was in uniform and Davis's badge was hanging from his neck.[11]

Moreover, the Plaintiff was not entitled to resist the officers' attempts to detain her. Officer Dutton's stop of Ms. Berman was legitimate, as he had a reasonable suspicion that imminent public danger existed.[12] *State v. Moran*, 667 P.2d 734 (Alaska 1983) ( court held that standard for

---

10  AMC 08.30.010 A.6 provides that the following conduct also constitutes resisting or interfering with a police officer:
  A.  a person commits the crime of resisting or interfering with a peace officer when
  6.  The person intentionally, recklessly or knowingly disobeys the lawful orders of any public officer

11  Throughout these proceedings, Ms. Berman has maintained that she was not required to produce identification to the officers. However, AS 28.15.130 and AMC 09.12.030 provide that licensees are required to produce identification when requested to do so by an officer. See, also, *Reseckerv. State*, 721 P.2d 650, 652 (Alaska Ct.App. 1986) (court held that licensed driver is required to exhibit her license upon request of a police officer).

12  Further, even if the original stop was invalid, Ms. Berman was not entitled to resist the officers' attempts to detain her. See, *Miller v. State*, 462 P.2d 421 (Alaska 1969).

determining validity of investigatory stops was reasonable suspicion that imminent public harm danger exists or serious harm to persons or property has recently occurred.) Even if it was equally probable that Ms. Berman was innocent of any wrongdoing, "police officers must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent." *Id.* at 736 (emphasis included). As he had come closer and witnessed her behavior towards the Chens, Officer Dutton grew alarmed that Ms. Berman's behavior fit that of someone with road rage or of someone involved in domestic violence. Affidavit of Robert Dutton, paragraph 6. After she started walking away and refused to show him her driver's license or other identification, his suspicions became further aroused. Affidavit of Robert Dutton, paragraphs 7 and 8.

Therefore, Officers Dutton and Davis had a "good faith, reasonable belief in the validity of the arrest and detention" of Ms. Judy Berman. They are therefore entitled to qualified immunity for their actions in arresting her for resisting an officer. Thus, the court should dismiss count one of the Complaint.

### Assault and Battery (Count Two)

In count two of her complaint, Ms. Berman alleges that "the defendants intentionally caused harmful and offensive contacts" to her "person" and that the Municipal Defendants are "liable to the plaintiff for damages due to assault and battery in an amount to be proven at trial." Complaint, paragraphs 23 and 24. At her deposition, the Plaintiff testified that she was not alleging any damages for any physical or mental injuries in this case. Deposition of Berman, pages 15-27. Plaintiff is therefore not claiming any physical or mental damages due to the level of force used by the officers during her arrest.

In considering whether the officer's use of force in this case is entitled to qualified immunity, the court must first determine whether Ms. Berman's constitutional right to be free from excessive

force was violated. Under the Fourth Amendment, officers may only use such force as is "objectively reasonable" under the circumstances. *Graham v. O'Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865 (1989). To determine whether the force used was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396, 109 S.Ct. 1865 (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 20-22, 88 S.Ct. 1868 (1968).

The court's consideration of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 396-97, 109 S.Ct. 1865. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396, 109 S.Ct. 1865 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)).

### The quality of the intrusion

Therefore, in evaluating the nature and quality of the intrusion, the court must consider "the type and amount of force inflicted" in arresting Berman. *Chew v. Gates,* 27 F.3d 1432, 1440 (9th Circ.1994). In this case, Berman asserts that "the defendants intentionally caused harmful and offensive contacts to the plaintiff's person." See, Complaint, paragraph 23. However, assuming Berman's version of the facts is correct, the nature and quality of the alleged intrusions were minimal under the circumstances.

By her own testimony, Berman has admitted to the following scenario leading up to the use of restraint by the officers: that she became angry because the Chens "took" her parking space; that

she honked repeatedly at the Chens and "mouthed" the words "you are rude" at them even though

she was able to quickly find a space to park right next to the space they had taken; that she again

honked at the Chens after they had exited their mini-van; that she walked away from Officer Dutton

after he had come up to talk to her about her behavior; that she told Dutton he did not have the right

to see her identification after he continued to insist that she produce it; that she continued to walk

away from Dutton after he continued to demand her identification and continued to tried to speak

with her;  that she told Dutton that he did not have "the right" to stop her and ask for her

identification because he had "no reason;" that after Davis had arrived, she told both Dutton and

Davis that she "did not have to produce identification;" and that she demanded to see the officers'

identification even though Dutton was in uniform and wearing his police badge and  Davis's was

hanging from his neck.  Deposition of Berman, pages 34 through 50.

       After both officers reasonably concluded that Ms. Berman was going to continue to evade

Dutton's request that she produce identification and therefore resist efforts to further investigate her

creation of the disturbance in the parking lot, they "grabbed hold of her arms" and restrained her

from further evading these efforts.  Affidavit of Dutton, para. 13.  Affidavit of Davis, para 10.  In

Berman's own words, Officer Dutton finally "grabbed a hold" of her arm at the store entrance.

Deposition of Berman, page 47.  Berman testified to the following "intrusion:"

> I told him [Officer Dutton] to let go of me.  Then Davis came up and grabbed a hold
> of my other arm and they just held me.  I mean I couldn't move.  They just held me
> very -- I mean they're – they're two strong men.  I mean, they held me very tightly.  I
> absolutely could not move at all.  And I told them to let go of me.  And they said that
> you have to show your I.D.

Deposition of Judy Berman, page 47.  Based on the following facts, both officers reasonably

concluded that Berman was attempting to actively resist and actively flee them:  the fact that she had

continued to walk away from Officer Dutton; the fact that she had refused to show identification or a driver's license; the fact that she demanded that Dutton and Davis show her their identification so that she could write their names down; and the fact that in the officers' view, her body appeared to be "spinning away" much like a basket ball player does when going around a block.[13]

Thus, the level of "force" that was used on Ms. Berman was entirely appropriate in light of the circumstances.  Affidavit of John Daily, paragraphs 10 and 14.  The officers started with officer presence and voice commands when Berman attempted to leave.  See, affidavit of Dutton, paragraph 7.  The level of force used then graduated to soft empty hand control with the sleeve guide, then placement of her hands behind her back and handcuffing.  Affidavit of Dutton, paragraphs 11 and 14.  Affidavit of Davis, paragraphs 7 and 11.  Affidavit of Daily, paragraphs 10 and 12.  The officers in fact showed great restraint in not graduating to pain compliance or pinning technique, which could have been an appropriate reaction to her pulling and trying to spin away.  Affidavit of John Daily, paragraph 14.

**Governmental interests at stake**

Next, the court must balance Berman's alleged intrusions against the governmental interests at stake.  In evaluating the government's interests, the court must consider such factors as "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. O'Connor, supra,* 490 U.S. at 396, 109 S.Ct. 1865 (citing *Tennessee v. Garner,* 471 U.S.

---

13  According to both officers, Berman gave them the distinct impression that she pulled out her wallet, a large rectangular object, to write their names down, and never told them that she would produce identification.   See, Affidavit of Dutton; Deposition of Davis at 13.  However, even assuming, for the purposes of this motion, that she did not refuse to produce the identification or driver's license at that point, Ms. Berman's body language, combined with all the behaviors

1, 8-9, 105 S.Ct. 1694 (1985). Here, the governmental interest began with an attempt to investigate the disturbance that Ms. Berman had created in the parking lot by her behavior towards the Chens.[14] The officers were both leaving their evening alcohol detail when the loud honking alerted them to the fact that a potential emergency situation was brewing back at the parking lot. Affidavit of Davis, paragraph 5 . Affidavit of Dutton, paragraph 5. In Dutton and Davis's view, Berman's behavior was abnormal and potentially dangerous. Affidavit of Dutton, paragraph 6. Affidavit of Davis, paragraph 9. Berman's statements that her rage at the Chens was motivated by the fact that they had taken her parking spot created suspicion in Dutton's view that a road rage or other potentially explosive situation existed. Affidavit of Dutton, paragraph 6. Based on his experiences as a police officer, Dutton was concerned that Ms. Berman could be under the influence of alcohol or other drugs, or just have a violent temper. Affidavit of Dutton, paragraph 19. Based on viewing Ms. Berman's evasive behavior in the front of the store, as well as the earlier abnormal honking, Officer Davis believed that she was potentially dangerous and could pose a threat to public health and safety. Affidavit of Davis, paragraph 9.

When Ms. Berman continued to walk away and disobey Officer Dutton's orders that she produce her driver's license or identification, the safety interest in controlling her movement and stopping her non-compliance grew. After Officer Davis arrived and Berman appeared to "spin away" from them, they reasonably reacted by restraining and then handcuffing her. Affidavit of

_____

leading up to that point, led the officers to reasonably conclude that she was resisting them and was about to flee.

14  Berman denies that she audibly screamed at the Chens. For purposes of this motion, the Municipal defendants will not quibble with her as to whether her screaming at the Chens was audible or inaudible, as she states it was. Nevertheless, Ms. Berman does admit that she honked at the Chens 4 or 5 times initially and then honked at them two more times after she had parked and they had exited their car. It was the Chens' and the officers' perception, however, that Berman screamed loudly at the Chens several times.

John Daily, paragraphs 10 and 14. Berman was at that time under arrest, was un-cooperative for unknown reasons, and there was also an unknown factor of what weapons she may have and in her possession and if she was in the mindset to use a weapon. Affidavit of Daily, paragraph 13.

At the time that Berman had "spun" away from the Officers, they would also have been justified in pinning her against a wall to prevent further movement until she was handcuffed, which the officers refrained from doing. Affidavit of John Daily, paragraph 14. Instead the officers restrained her and handcuffed Ms. Berman. During this process Officer Davis removed her wallet from her hands, then removed her driver's license from her wallet to examine it. The Officers then learned that Berman had an expired driver's license. Affidavit of Davis, paragraph 12. Driving with an expired license is a violation of Alaska law and of municipal ordinances. Affidavit of Daily, paragraph 15. Affidavit of Dutton, paragraph 15. The officers then placed Ms. Berman in the police car and told her that if she did not have an excessive criminal history, that they would give her a citation and release her. Affidavit of Dutton, para. After checking her criminal history, Officer Dutton told Ms. Berman that she could not drive with an expired license, and that someone else would have to come and pick up her car. Affidavit of Dutton, paragraph 16.

On balance, applying the *Graham* analysis, the use of force was not excessive in this case. Because no Fourth Amendment violation occurred, the court should dismiss the Plaintiff's claim for assault and battery. The type and amount of force utilized -- the sleeve guide technique, then handcuffs -- was justified, in light of the governmental interest at stake: the need to protect the public from an individual who had engaged in erratic and explosive behavior.

## 3.    Malicious Prosecution (Count Three)

In count three of her complaint, the Plaintiff alleges that "the defendants intentionally instituted criminal proceedings against the plaintiff without probable cause, for an improper purpose,

and out of malice toward the plaintiff" and that "the criminal proceedings instituted by the defendants were terminated in the plaintiff's favor." [15]  See, Complaint, paragraphs 26 and 27. However, "police officers have qualified immunity when they engage in law enforcement matters." See, *Saidi v. Washington Metropolitan Area Transit Authority, supra,* 928 F. Supp. 21, 27 (D.C. Cir. 1996).   In order to successfully assert a qualified immunity defense to a claim for malicious prosecution, the police must show that they had probable cause to arrest the plaintiff. *Id.* at 27 (citations omitted).

"There is no material distinction between reasonable grounds for detention in false imprisonment and probable cause in malicious prosecution." *Saidi v. Washington Metropolitan Area Transit Authority, supra,* 928 F.Supp.at 27 (citations omitted).  "Therefore, the existence of probable cause for false arrest will 'likewise defeat a claim for malicious prosecution.'" *Id.* (citations omitted).  As argued above, the officers had probable cause to arrest Ms. Berman. (See discussion of false arrest, supra.)  Therefore, because the officers had probable cause to arrest Ms. Berman, there is no merit to Ms. Berman's claim for malicious prosecution.  The court should therefore dismiss the plaintiff's claim for malicious prosecution as well.

**3.     Violation of Civil Rights (42 U.S.C. Section 1983) (Count Four)**

In count four of her complaint, the Plaintiff states that the defendants "deprived the Plaintiff, under color of law, of her civil rights, privileges and immunities secured by the Constitution and laws." See, Complaint, para. 30.  She further states that the defendants "are liable to the plaintiff for violation of her civil rights, pursuant to 42 U.S.C. Sec. 1983, and any other applicable state or

---

15  The Anchorage Municipal Prosecutor's Office made the determination not to prosecute Ms. Berman for resisting an officer under the citation issued by Officer Dutton. Its reasons for not pursuing the charges are a matter of prosecutorial discretion and are covered by the attorney work product privilege.

federal statute or law, in an amount to be proven at trial.  See, Complaint, para. 31.  Like her first three claims, this claim also lacks merit.

A private right of action exists against police officers who, acting under color of state law, violate federal constitutional or statutory rights. 42 U.S.C. Section 1983.  The defense of qualified immunity, however, protects Section 1983 defendants from liability for civil damages when performing discretionary functions, unless such conduct violates a clearly established constitutional or statutory right of which a reasonable police officer would have known. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034 (1987).  Ms. Berman does not state which federal constitutional right may have been violated which leads her to seek protection under Section 1983.  However, assuming for purposes of this motion that the civil rights violations that Ms. Berman wishes to assert are excessive force, unlawful detention and unreasonable search and seizure, the court should dismiss her claim for 1983 relief on the basis that none of these arguments would have any merit.

## Excessive Force

As argued above, the amount of force used by Officers Dutton and Davis was reasonable in light of the degree of intrusion and governmental interests served.  See, discussion, supra.  For that reason, the officers have qualified immunity for the level of force that they utilized with respect to Ms. Berman.  Ms. Berman's claim for Section 1983 relief based on alleged excessive force should therefore be denied.

## Stop and Pre-arrest Detention

Similarly, the court should also deny Ms. Berman's claim for Section 1983 relief for Officer Dutton's stop and pre-arrest detention of her.  Officer Dutton had a reasonable suspicion to stop Ms. Berman for her behavior in the parking lot for creating a disturbance.  Under Alaska law, an officer may conduct an investigatory stop where "reasonable suspicion that imminent public danger exists

or serious harm to person or property has recently occurred." See, *Coleman v. State,* 553 P.2d 40 (Alaska 1976). In addition, "intrusive police conduct may be acceptable where there is a legitimate reason to be concerned for the welfare of a motorist….To justify conduct that would amount to an investigative stop, an officer must be aware of at least some specific circumstances supporting a reasonable belief that the occupants of a vehicle need assistance." *Marsh v. State,* 838 P.2d 819 (Alaska 1992) (citations omitted).

After Officer Dutton stopped Ms. Berman and questioned her about her conduct, he was authorized to request that she produce her driver's license or identification. See, *Marsh, supra,* at 821. ("Once [Officer] Brown contacted [defendant] Marsh, Brown was authorized by AS 28.15.131 to request Marsh's driver's license, the act that led to the discovery that Marsh's license had been revoked.")

Moreover, when a police officer stops a motorist for a traffic violation, "the officer may ask the motorist to produce routine driving documents." *Clark v. Municipality of Anchorage,* 112 P.3d 676 (Alaska Ct. App. 2005) referencing *United States v. Maldonado,* 356 F.3d 130, 134 (1st Cir. 2001). A driver's license is a "routine driving document." *Clark, supra,* n. 3 at 678 , citing *Chang v. State,* 608 S.E.2d 283, 285(2004) ("It does not unreasonably expand the scope or duration of a valid traffic stop for an officer to prolong the stop to immediately investigate and determine if the driver is entitled to continue to operate the vehicle by checking the status of the driver's license, insurance, and vehicle registration.") (citation omitted); *State v. Prince,* 101 P.3d 332, 336 ( N.M. App.2004) ( "During a traffic stop, the officer may conduct a de minimis investigatory detention to inquire about license, registration, and insurance, and to run a wants and warrants check.")*;* *Maysonet v. State,* 91 S.W.3d 365, 373 (Tex.Crim.App.2002) (during a traffic stop, an officer is permitted to ask the driver for their license, proof of registration, and insurance, and may also

inquire as to the motorist's destination and the purpose of the trip).

Despite the fact that Officer Dutton was authorized to request identification from Ms. Berman, she continued to refuse to produce it. Officer Dutton correctly insisted that she produce her identification or her driver's license so that he could investigate the incident. His investigation of her behavior was justified, for her behavior towards the Chens had alarmed him. Affidavit of Dutton. It was his responsibility, out of a concern for the safety of the Chens and of the public, to identify Berman and to determine if she posed a threat to the Chens or to the members of the public who were shopping at Carrs that night. Therefore, his pre-arrest detention of Berman for the purpose of obtaining identification and further information was fully justified. Indeed, had he not persisted in his questioning and investigation of Berman's conduct, he would have been remiss in his duties. It is quite possible that Ms. Berman could have become physically violent towards the Chens in the absence of his intervention. See, Affidavits of the Chens.

**Search and seizure**

Ms. Berman may seek to argue that Officer Davis's act of grabbing her wallet from her hands after the officers had detained and arrested her was an unlawful search. However, "under the United States Constitution, a police officer has broad authority to conduct a search of an arrestee's person and the area within his control incident to a valid arrest." *Stephens v. State,* 698 P.2d 664 (Alaska 1985) citing *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467 (1973); *Gustafson v. Florida,* 414 U.S. 260, 94 S.Ct. 488 (1973). "This authority would apparently include the authority to search for identification." *Stephens v. State, supra,* at 665. See, also, *U.S. v. Brown,* 470 F.2d 1120 (9th Cir.1972) (police may search vehicle for identifying documents where defendant fails to produce a driver's license or vehicle registration.); *State v. Susko,* 562 P.2d 720 (Ariz. 1977) (examination of appellant's wallet to determine his identity following his arrest was within permissible constitutional

limits of police action); *In Re Arturo,* 38 P.3d 433 (Cal. 2002) (statute requiring drivers to produce identification authorizes a limited search for documentation when a motorist refuses to identify himself); *People v. Branigan,* 492 N.E.2d 783, 784 (N.Y. 1986) ("the record also supports the hearing court's alternate holding that the circumstances permitted a limited search of the glove compartment for vehicle documentation"); *State v. Black,* 617 N.W.2d 210 (Wis. Ct.App. 2000) (permitting a limited search of common repositories of identification where defendant refuses to identify himself after being given ample opportunity).

In this case, Officer Dutton wanted Ms. Berman to produce identification or a driver's license so that he could identify her, as she had committed a crime in his presence, creating a public disturbance or disorderly conduct. In addition, because she had driven a car, Berman was required to produce her driver's license at his request. After Berman failed to produce identification, Officer Dutton had probable cause to arrest Berman for yet another crime: failing to produce her driver's license. However, he gave her another chance to comply with his order to produce her driver's license. After she again gave the officers the impression that she would still not comply with this request, by turning and "spinning" away from them, Officers Dutton and Davis took control of one arm each and placed both of Ms. Berman's arms behind her back. See, deposition of Dutton, page 17. See, Affidavits of Dutton and Davis, supra. It was Officer Davis's and Officer Dutton's understanding that they had detained Ms. Berman and that she was at that time under arrest. See, Affidavits of Davis and Dutton, supra. In addition, see deposition of Officer Davis, page 26; Affidavit of John Daily, supra. It was during this period that Officer Davis then removed Berman's driver's license from her wallet. Accordingly, the search of the driver's license was lawful since it was a search incident to a lawful arrest. Affidavit of Davis.

In *Stephens v. State, supra,* 698 P.2d 664, the court held that arresting officers could conduct

a search of a suspect, arrested without a warrant for two counts of assault, when he refused to answer questions concerning his identity.  In the course of the search of the defendant's pockets for identification, the officers found two packages of cocaine.  Later, the defendant moved to suppress the cocaine evidence, which the trial court denied.  In affirming the trial court's denial of the motion to suppress, the court stated as follows:

> If an arrestee cannot be identified, and, after being given a full opportunity to identify himself refuses to identify himself, the search for identification must be narrow and reasonable.  We assume that in most cases the police can identify a suspect by patting him down to see if he has a wallet or similar "common repository of identification papers" and looking inside that item only to the extent necessary to find identification.

*Id.* at 666.  In *Stephens,* the court was concerned that searches for identification could "provide a vehicle for greatly expanding the scope of those searches permitted incident to an arrest." *Id.* at 665. However, the court determined that the search was justified since the defendant had been given the opportunity to identify himself and had refused to do so. In the present case, the removal of Ms. Berman's driver's license after she had been detained and arrested was justified in light of the officer's need to know who she was.  Moreover, the *Stephens'* court's concerns about scope of such searches are not applicable here.

In *State v. Black, supra,* 617 N.W.2d 210 (Wisconsin Ct. App. 2000), the Wisconsin Court of Appeals held that the police were justified in performing a limited search for a wallet or other repository for identifying papers of a defendant who had provided oral identification to an officer during a *Terry* stop that was not confirmed by police records.  The court held that even though the defendant had orally identified himself to the police and had told them that he did not have identification on his person, the officer's act of reaching into the defendant's pants pocket and removing two containers of cocaine was justified.  The court reasoned that because the need to ascertain a suspect's identity is critical to an officer's investigation of a crime, the search was

reasonable. *Id. at* 214. The court stated: "If we were to conclude otherwise, then police would be unable to positively establish a suspect's identity when the suspect provides false or unconfirmed information." *Id.* The court therefore affirmed the lower court's denial of the defendant's motion to suppress the evidence of cocaine. Thus, the need to identify Ms. Berman justified Officer Davis's driver's license from her wallet.

Furthermore, AS 28.15.131 also provided authority for Officer Davis's removal of Berman's driver's license from her wallet. In *In Re Arturo D.,* 38 P.3d 433 (California 2002), the court held that a limited warrantless search of a vehicle for automobile registration, a driver's license and identification documentation does not violate the Fourth Amendment during a valid traffic stop when the driver fails to produce the documents. The court held that a California statute similar to AS 28.15.131, which required a licensee to produce his license at the request of a police officer, authorized the officer to enter a stopped vehicle and conduct an immediate warrantless search for the required documents. The court stated: "Within constitutional limits, such statutes authorize an officer to enter a stopped vehicle and conduct an immediate warrantless search for the required documents." *Id.* at 439.

In contrast to the fact scenario of *In Re Arturo D., supra* in which the officer removed documents from the defendant's car, in this case the officer removed the defendant's wallet out of her hands after she had been detained and arrested, then removed her driver's license. Therefore, AS 28.15.131, due to its requirement that a licensee produce a driver's license upon demand of a police officer, implicitly allowed Officer Davis to remove Ms. Berman's license from her wallet under these circumstances.

**B. Even if the court were to find that the officers had violated constitutional rights, the constitutional "rights" which the Plaintiff claims were violated were not clearly**

**established at the time of the incident.**

If the court determines that no constitutional right has been violated, then there is "no necessity for further inquiries concerning qualified immunity." *Saucier v. Katz, supra,* 533 U.S. 194, 121 S.Ct. 2151 (2001). "On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the specific right was clearly established." *Id.* "This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition; and it too serves to advance understanding of the law and to allow officers to avoid the burden of trial if qualified immunity is applicable." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he had confronted. *Id.* citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999) ("[A]s we explained in *Anderson,* the right allegedly violated must be defined at the appropriate level of specificity before a court can determine it was clearly established").

If the law did not put Officers Dutton and Davis on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *Saucier v. Katz, supra,* 533 U.S. 194 at 202. "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* at 205. "It is sometimes difficult for an officer to determine how the relevant legal doctrine…will apply to the factual situation the officer confronts." *Id.* "If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.*

In this case, Officers Dutton and Davis properly determined how the relevant legal doctrines concerning stopping, detaining, restraining and arresting citizens applied to the situation they encountered with Ms. Judy Berman. Officer Dutton's stop of her was based on a reasonable

suspicion that she had created a disturbance. He lawfully sought to detain her for questioning and to identify her. After she refused to produce identification or to stop to be further questioned, he continued to insist that she produce the identification and employed the sleeve guide technique.

Finally, after the officers perceived that Berman was attempting to flee by "spinning" away from them, they both each grabbed one of her arms and placed her in handcuffs, thereby arresting her. After Ms. Berman had been detained and arrested, Officer Davis then removed her driver's license from her wallet. See, affidavits of Dutton and Davis; and deposition transcript of Davis, pages 13-14 and pages 26-29, of exhibit 4. After Davis and Dutton had examined her license and had determined it had expired, they appropriately placed her in the police vehicle so that they could then write her a citation for resisting an officer. All of these actions on the part of the officers were respectful of Ms. Berman's constitutional rights. However, even if the Officers were mistaken as to what action they should take, their mistakes were reasonable. Accordingly, the Officers are entitled to qualified immunity on all four claims raised by the Plaintiff.

**D. The court should dismiss the Plaintiff's "claims" against the APD.**

In her complaint, the Plaintiff has not alleged any separate cause of action on the part of the Anchorage Police Department. Thus, she has failed to state a claim against the Department and the Department should be dismissed on that basis. See, *Siegert v. Gilley,* 500 U.S. 226, 231-232 (1991).

Moreover, "neither a municipality nor a supervisor" can be held liable for violations of constitutional rights "where no injury or constitutional violation has occurred." *Jackson v. City of Bremerton,* 268 F.3d 646 (9th Cir.2001), *referencing City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571 (1986) (holding "[i]f a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.");*Grossman v. City of Portland,* 33

F.3d 1200, 1203 (9th Cir. 1994) (same). Accordingly, because Officers Dutton and Davis did not violate any of Ms. Berman's constitutional rights, there is no basis upon which to find the A.P.D. liable for any of the plaintiff's claims. The court should therefore dismiss this action as to the A.P.D., as well as to Robert Dutton and Gil Davis.

**E. Even if the court were to hold that qualified immunity did not apply to this case, the Plaintiff is only entitled to nominal damages.**

At her deposition, Berman testified that she is not requesting that the court award her any money for any physical injury, emotional distress, loss of enjoyment of life. Deposition of Berman, page 22. She further testified that she is not asking the court to give her any damages for any medical or mental problems. Id. She is not asserting any claim for mental or physical injury. Id., pages 24 and 27. In addition, she is not asserting any claim for loss of earnings. Id. at page 24. Ms. Berman's only claimed damages are the fact that she believes her "civil rights" were violated. Id., page 26.[16] Even if the court fails to grant this motion for summary judgment, because the Plaintiff has not alleged any physical or emotional damages and has indeed failed to provide proof of such damages, other than her perceived "civil rights" violations, she is only entitled to "nominal damages" in this matter. *Memphis Community School District v. Stachura,* 477 U.S. 299, 307, 308, n. 11, 106 S.Ct. 2537(1986), referencing *Carey v. Piphus, supra,* 435 U.S.247, 264, 98 S.Ct. 1042 (where no injury was present, court would only award "nominal" damages.)

**F. The court should dismiss the claim for punitive damages.**

Because the Plaintiff's main claims for false arrest, assault and battery, malicious prosecution

---

16  In addition, in response to the Municipal Defendants requests for medical and psychological records, Ms. Berman refused to provide any such records. See, Plaintiff's Responses to Defendants' First Set of Discovery, exhibit 1.

and violation of civil rights have no merit, it therefore follows that the Plaintiff's claim for punitive

damages should be dismissed as well.[17]

## V.    CONCLUSION

For the reasons outlined above, Robert Dutton , Gil Davis and the Anchorage Police Department are entitled to summary judgment on all of the Plaintiff's claims under the doctrine of qualified immunity.  The Officers did not violate any of Ms. Judy Berman's constitutional rights in the incidents which occurred on April 6, 2002 and which led to the filing of this lawsuit.  On the contrary, the Officers took appropriate action based on what they perceived as unlawful and potentially dangerous behavior on the part of Ms. Berman.  Further, even if the Officers had violated Ms. Berman's constitutional rights, their understanding of what the law allowed them to do with respect to Ms. Berman's alarming and potentially dangerous behavior was reasonable.  Accordingly, the Municipal Defendants are entitled to qualified immunity on all of the Plaintiff's claims and the complaint against them should be dismissed.

Respectfully submitted this 13th day of March, 2006.

FREDERICK H. BONESS
Municipal Attorney


By:   s/ Mary B. Pinkel
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
Phone: (907) 343-4545
Fax: (907) 343-4550
E-mail: uslit@muni.org
Alaska Bar No. 8505030

---

17  In the event that the court does not grant this motion for summary judgment based on qualified immunity, the Defendants would respectfully request that the court entertain a motion for summary judgment on the issue of punitive damages at a later date.