Karen E. Bretz
Attorney at Law
P.O. Box 91457
Anchorage, AK 99509
(907)277-5847 Voice
(907)277-5848 Facsimile

Attorney for Judy L. Berman


              IN THE UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF ALASKA

JUDY L. BERMAN,            )
                           )
      Plaintiff,           )
                           )
vs.                        )
                           )
ANCHORAGE POLICE DEPT.,    )
OFC. ROBERT DUTTON, and    )
SGT. GIL DAVIS,            )
                           )
      Defendants.          )
_____)
Case No.  A04-0227 CV (TMB)

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

     The plaintiff has moved for summary judgment on her claims
of violation of civil rights, false arrest, and assault and
battery.  As discussed below, the plaintiff should be granted
summary judgment because even if the defendants' version of facts
is accepted, the plaintiff is entitled to judgment on these
claims as a matter of law.

**1. The plaintiff should be granted partial summary judgment
pursuant to FRCP 56(a) and (c).**

     Rule 56(c) of the Federal Rules of Civil Procedure provides
that summary judgment shall be granted when "there is no genuine

issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Therefore, when reviewing a motion for summary judgment, the court views all evidence in the light most favorable to the non-moving party. For the purposes of granting summary judgment, all factual disputes must be resolved in favor of the non-moving party. *See e.g. Bishop v. Wood,* 42 US 341, 347 (1976)(citing FRCP 56(c) and *Arnett v. Kennedy,* 416 US 134, 139-140 (1974)).

In this case, even if Ofc. Dutton and Sgt. Davis' version of events is accepted, the plaintiff is nonetheless entitled to judgment as a matter of law on several of her claims.

**2.  Factual Summary.**

On April 6, 2002, at approximately 10:00 p.m. the plaintiff stopped by the Carrs grocery store on Huffman Road. There was a vacant parking space in front of the store, and she waited, with her left turn signal on, for traffic to clear in the other direction, so that she could park her vehicle. After several vehicles passed, a vehicle approached and parked in the space the plaintiff was obviously waiting to pull into. It is undisputed that the plaintiff sounded her vehicle horn a few times at the occupants of the other vehicle.

Defendant Robert Dutton was employed as a police officer for the Municipality at that time, and was on duty on the night in question. He was about to leave the parking lot and end his shift when he heard the car horn sounding and made a U-turn at

the exit to the parking lot to check on the car horn. Dutton claims that at some point he also heard the plaintiff "screaming", which she denies, but did not hear the content of what she was screaming.[1]

It is undisputed that by the time the plaintiff had parked her vehicle, and was approached by Dutton, the occupants of the other vehicle had already entered the store without incident. (Dutton police report; Dutton deposition p. 12). It did not appear to Dutton that the occupants of the other vehicle were nervous or afraid. (Dutton deposition, p.11). The plaintiff states that Dutton approached her just after she had emerged from her car. According to Dutton, she was still sitting in her car, with the windows rolled up, and he knocked on the driver-side window, at which time she got out of the car to talk to him. (Police report; deposition p.12).

It is undisputed that the plaintiff stopped and spoke briefly with Dutton, though the content of the conversation is somewhat in dispute. The plaintiff maintains that when Dutton approached her, he asked her if there was something wrong with her car horn. She replied that there was nothing wrong with her

---

[1] Dutton's account of the alleged "screaming" is inconsistent. In his police report he makes no mention of the content. In his answer to interrogatories he says he heard "something about a parking space", and in his deposition, several days later, he states that he did not hear the content. (See Dutton police report; Dutton deposition p.10; Dutton's response to discovery requests. (The plaintiff also notes that the defendants claim that "these are really the second set of discovery requests" to the officers. However, the first discovery requests were propounded to the Anchorage Police Department, not the officers.))

horn, but she had thought that it was rude of the driver of the other vehicle to park in a space that she was obviously about to park in. He then stated that she had caused a disturbance and that she should not have pulled into the parking space from the left. He ended by saying, "If you do it again, I'll find it in my heart to cite you." The plaintiff then said, "Have a great night," and began to walk away. (Plaintiff's complaint).

According to Dutton, he asked the plaintiff why she was creating a disturbance, and she replied that those people had parked in her spot. His account of what he said next is similar to the plaintiff's account, except that he does not recall saying "If you do it again, I'll find it in my heart to cite you."[2] He states that the plaintiff then said, "Have a nice day," and began to walk away.

It is undisputed that the plaintiff was already walking away when Dutton decided to ask her for identification. (Police report; Dutton deposition p.13).

It is also undisputed that the plaintiff initially refused to provide identification, stating that Dutton did not have the right to ask her for identification under the circumstances, and continued to walk toward the store entrance.

The plaintiff states that when she reached the store entrance, Dutton was joined by another police officer, later

---

[2] In his answer to interrogatories, Dutton stated that he does not remember saying that. In his deposition, he stated that it does not sound like something he would say. (Dutton discovery answers; Deposition p. 27-28)

identified as Gil Davis, and they took hold of the plaintiff's arms which such force that they left bruises on both of her arms.[3]  The plaintiff was shocked that the police were actually using physical force under the circumstances, and told them to take their hands off her, stating that their behavior amounted to police brutality.  The police officers refused to let go of the plaintiff, and continued to demand identification.  The plaintiff then stated that she would produce identification, but that the officers needed to let go of her arms so that she could do so. Dutton and Davis did not let go of her arms, but they did loosen their grip somewhat, so that the plaintiff was able to reach into her purse and retrieve her wallet. (Plaintiff's Complaint).

The plaintiff maintains that she was holding her wallet in her hands, looking for her driver's license, when Davis suddenly grabbed it out of her hands.  Both officers then proceeded to twist her arms behind her back with such force that she was actually shrieking in pain.  The officers proceeded to handcuff the plaintiff, and placed her in the patrol vehicle, which was parked at the entrance to the store. (See Plaintiff's Complaint).

The officers' versions of the events leading to the plaintiff's arrest are inconsistent and confusing.  Their accounts are so different, it is hard to believe they are describing the same events.  The officers deny that the plaintiff

---

[3] The plaintiff has provided the defendants photographs showing the bruises inflicted by the police officers.

was attempting to produce identification when they arrested her, even though Davis admits that the plaintiff was holding her wallet in her hands and that he took it away from her.(See Davis' Police Report.) Dutton claims that she "had her purse open" and removed her wallet in order to write down the officers' names. He then claims that she "tried to put it (the wallet) down" and dropped it, then pulled away from him and "started to spin", at which time she was handcuffed by the officers. (Dutton's Police Report.)  Davis, however, maintains in his deposition that Dutton had let go of the plaintiff and was not holding her at the time that she "executed a clockwise turn" and was promptly handcuffed. (Deposition  of Gil Davis p.11, 26.)  Dutton says he saw Davis pick up the dropped wallet and search through it and remove the plaintiff's driver's license, which directly contradicts Davis' own admission that the wallet was removed from her hands.(Dutton Police Report; deposition p.20).  He also maintains that he detained the plaintiff by seizing her by the arm, but that Davis never made physical contact with her until he and Dutton handcuffed her. (Dutton deposition p.17).

According to Davis, however, both he and Dutton had physical contact with the plaintiff throughout the incident.  He describes the incident as something that "would look more like the layouts of a dance", in which the plaintiff repeatedly broke free and tried to run into the store, and in which he and Dutton then took hold of the plaintiff by the arms, and "we were walking her--

we're pushing a little bit and she's walking" back out of the store. He states that the three of them were never in one spot for very long; "We were all over the place." (Davis deposition p. 15-17, 25.) He admits that the plaintiff was holding her wallet in her hands when he took it from her. In his police report he makes it clear that he took the wallet in order to obtain the plaintiff's identification, and that this led to a struggle which led to her being handcuffed.[4] ("She had her purse in her hands. She indicated that her ID was in it but would not open it. I took it away from her, she struggled and we handcuffed her." Davis Police Report.) In his deposition, he changes his story somewhat, alleging that the plaintiff was holding her wallet in her hands, then for some reason started to turn away from the officers in a clockwise direction, at which time he removed the wallet from her hands, handcuffed her, and removed the license from the wallet.(Davis deposition p. 23.) Nonetheless, he also states several times in his deposition that it was his taking the wallet from the plaintiff that led to the struggle which led to her being handcuffed. (Davis deposition p. 13-14, 23, 26; e.g. at p. 26: "The aspect of her needing to be handcuffed was the result of the fact of I took the wallet from her, she struggled, we handcuffed her.")

---

[4] This account of the events leading up to the arrest is also accepted by the defendants' proposed expert, John Daily. (See Report of Officer John Daily p.3: "Sgt. Davis says in his report that he took her purse from her then to get her ID/OL and she then tried to pull away from Ofc. Dutton. At this time both officers took hold of her . . . and placed her in cuffs . . .)

It is undisputed that Davis looked through the plaintiff's wallet without her consent, found her drivers license, and removed it from the wallet. (Davis deposition p. 14, 18.) There is also agreement that the plaintiff was led in handcuffs to the patrol car, which was parked at the store entrance, and was forced to sit in the vehicle with her hands still cuffed behind her back for approximately twenty minutes. The plaintiff recalls that the officers had decided to cite and release her before they placed her in the vehicle in handcuffs. The officers are apparently unsure of when the decision to cite and release was made.

Dutton finally issued a citation for "Resisting or Interfering with a Police Officer," (AMC 8.30.010A)and released the plaintiff. There is no dispute about the fact that the Municipal Prosecutor's Office declined prosecution of the case.

### 3.  The investigatory stop of the plaintiff was unlawful.

When Dutton approached the plaintiff in the parking lot and began to question her, he in fact unlawfully seized the plaintiff. Dutton was initiating an "investigative stop" also known as a "Terry stop", which is the seizure of an individual, without arrest and without a warrant. *Terry v. Ohio,* 392 U.S. 1, 16 (1968). An investigative stop is only permissible in very narrow circumstances, which were not present in this case.

The Fourth Amendment to the United States Constitution, and Article 1 Section 14 of the Alaska Constitution, protect

individuals against unreasonable searches and seizures. Article 1 Section 14 of the Alaska Constitution states: "The right of the people to be secure in their persons, houses and other property, papers, and effects, against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*Terry v. Ohio* 392 U.S. 1 (1968) discussed the issue of when investigative stops are permissible under the Fourth Amendment. Alaska courts have also developed rules for when a stop is permissible under the Alaska Constitution, which as noted below, are more narrow than those under federal law.

In *Coleman v. State,* 553 P.2d 40 (Alaska 1976) the court reaffirmed the principle that it had recognized in two previous cases, "that a police officer with a reasonable suspicion that imminent public danger exists, or serious harm that has recently occurred was caused by a particular person, may stop that person." *Id*. at 43. Similarly, in *Ebona v. State,* 577 P.2d 698

(Alaska 1978) the court noted that the rule on investigatory stops in Alaska permitted "a temporary stop when the officer has a reasonable suspicion that imminent public danger exists, or serious harm to persons or property has recently occurred", and that when those criteria are met, the stop does not violate the Alaska or Federal Constitutions. *Id.* at 700.  In *Ebona* the court also noted that, "the Alaska rule authorizing a temporary stop is more restrictive that the rule articulated by the Supreme Court in *Terry.*" *Id.* at 700.

The rule that a police officer may stop a person only if the officer has reasonable suspicion that imminent public danger exists, or that a serious crime has recently occurred has been reaffirmed by the court many times.

In 2004, the Alaska Court of Appeals, in *Reichel v. State,* 101 P.3d 197 (Alaska App. 2004) noted that:

> Under Alaska law, police officers' authority to conduct investigative stops is more restricted than under federal law.  In *Coleman v. State,* 553 P.2d 40, 46 (Alaska 1976) and *Ebona v. State*, 577 P.2d 698,700 (Alaska 1978) our supreme court held that police officers can conduct an investigative stop only if they have "reasonable suspicion that imminent public danger exists or [that] serious harm to persons or property has recently occurred." *Coleman,* 553 P.2d at 46.

*Id.* at 199.

The court concluded that the investigative stop of Reichel was unlawful, when police officers stopped him just after he had left a bar, even though they knew that he had a history of

driving while intoxicated, and even though they knew that under his conditions of parole he was prohibited from consuming alcohol or being on the premises where alcohol is served.  The court reasoned that in order to satisfy the *Coleman-Ebona* test of imminent public danger, the police would have to have a reasonable basis for believing that Reichel was both actually intoxicated, and in fact about to drive.

In *Jones v. State,* 11 P.3d 998 (Alaska App., 2000), police officers responded to a 911 call reporting a disturbance between a landlord and a tenant.  The police separated the landlord and the tenant, Jones, and questioned them individually about the dispute. When Jones "attempted to walk away from the officers, they restrained him.   When Jones began to resist, he was handcuffed." *Id.* at 999.  Citing *Coleman, Supra,* the court found that there was no justification for the investigative stop because "although the police knew that Jones was involved in a dispute with his landlord, they had no indication that Jones had assaulted the landlord or had committed any illegal act. Accordingly, there was no basis for Officer McNamara to require Jones to stay at the scene and talk to him . . ." *Id.* at 1000.

In *Young v. State*, 72 P.3d 1250 (Alaska App. 2003), officers responded to a disturbance at a local motel.  As they were finishing their investigation, one of the officers noticed Young poke his head around the corner of the building, look surprised when he saw the police, and duck back out of sight.  The officer

decided to investigate, and when he followed Young down the stairs he saw him "crouching down on his knees, using both hands to 'shov[e] . . . something white under a doorway'. [The officer] believed that Young 'was trying to hide something' from him. [The Officer] walked up to Young and immediately handcuffed him." *Id.* at 1251.

The Court agreed with the superior court's determination that there was no reasonable suspicion to justify an investigative detention.

> At the time that [the officer] handcuffed Young, all he knew was that Young was present at a motel that had a reputation as a place where illegal drug activity occurred . . ., that Young was apparently attempting to avoid contact with the police, and that Young had apparently slipped something under the door. The superior court expressly concluded that these facts, standing alone, did not support an investigative stop.

*Id.* at 1255.

*Metzker v. State,* 658 P.2d 147 (Alaska App. 1983) also recognized that the "*Coleman* rule for the authorization of investigatory stops is more restrictive than the federal rule under *Terry.*" *Id.* at 149 n. 5 (Citations omitted). In that case a State Trooper was investigating a report of an injured moose on the Glenn Highway. Approximately two miles away from where the

injured moose was reportedly located, and on the opposite side of the road, he spotted a pickup truck parked with its lights on and a moose standing fifty feet off the road.  The pickup began to move away when the Trooper drew even with it.  The Trooper turned around to investigate, and caught up with and stopped the vehicle.  There were no signs of erratic driving prior to the stop.

The Court found that the stop was not permissible under the *Coleman* or *Ebona* tests: "Nothing at the scene of the arrest indicated the existence of an imminent public danger, and there was no sign of recent serious injury to person or property." *Id.* at 149.

In this case, it is clear that the investigatory stop of the plaintiff did not meet the requirements articulated in *Coleman, Ebona,* and their progeny, even if the defendants' version of events is accepted. At the time that he approached the plaintiff, Officer Dutton had no reasonable basis to suspect that serious harm to persons or property had occurred, or that imminent public danger existed.  According to Dutton, he had heard a vehicle horn sound several times; when he turned his vehicle around to investigate he saw the plaintiff's car pull into a diagonal parking space from the left; and he also heard the plaintiff "screaming".  Depending on which account of Dutton's is relied on, either he did not hear the content of the alleged screaming, or he heard the plaintiff say "something about a parking space."

Also according to Dutton, when he approached the plaintiff, she was sitting in her vehicle with the windows rolled up, and the occupants of the other vehicle had already entered the store.

On these facts, it is impossible to find that Dutton reasonably suspected that serious harm, or any harm to persons or property had recently occurred. It is also impossible to find that he reasonably suspected that there was imminent public danger. All that Dutton had observed was a minor dispute over a parking space, which had already concluded without incident prior to his investigatory stop of the plaintiff.

It is also clear that Dutton did not believe that a serious crime had been committed, or that imminent public danger existed, because at the time he asked for identification, he intended to release the plaintiff without further action once she produced identification. In his deposition, in response to the question, "What did you plan to do after she showed you her ID?", Dutton stated, "Had she been cooperative, showed me her ID, I could have resolved the whole issue of the parking space I'm sure, which she kind of did on her own anyway, parking next to the space she initially wanted, I guess. I don't know that we would have done anything." (Dutton deposition, p. 24.) In addition, if the officers had actually suspected that the plaintiff might pose a danger to the occupants of the other vehicle, they would not have released her and allowed her to enter the store, while the other party was still in the store. (See Dutton's police report

indicating the other party left the store after the plaintiff had been released.)

Thus, even accepting the defendants' version of events, there was no reasonable basis to believe serious harm had occurred or that imminent public danger existed. Therefore, the investigatory stop of the plaintiff was improper as a matter of law.

**4.    Since the investigatory stop of the plaintiff was unlawful as a matter of law, she is entitled to summary judgment on her claim of false arrest.**

The elements of a claim of false arrest are: (1) a restraint upon the plaintiff's freedom (2) without proper legal authority. *Waskey v. Municipality of Anchorage,* 909 P.2d 342, 345 (Alaska 1996).

In this case, even if the facts are viewed in the light most favorable to the defendants, the plaintiff is nonetheless entitled to judgment as a matter of law on her claim of false arrest.

There is no dispute that the police officers restrained the plaintiff's freedom when they placed her in handcuffs and arrested her, and when they placed her in a police vehicle in handcuffs. Although the police officers' accounts of the events leading to the arrest are inconsistent and conflicting, and are disputed by the plaintiff, even under the most favorable interpretation of their accounts it is clear that they acted without proper legal authority.

According to Dutton's police report, the plaintiff was arrested because she "tried to pull away from [him] and began to spin," after he had restrained her by taking hold of her arm, because she had refused to show identification.  According to Davis' police report, the plaintiff was holding her wallet in her hands; "She indicated that her ID was in it but would not open it.  I took it away from her, she struggled and we handcuffed her."[5]  At his deposition, Davis changed his story and stated that the plaintiff had pulled away from him and Dutton before he took her wallet.  According to the plaintiff, she was in fact holding her wallet in her hands and looking for her license, in order to comply with the request for identification, when Davis grabbed the wallet out of her hand, and both officers handcuffed her.

Thus the version of events that is most favorable to the defendants is that the police officers arrested her because she either tried to pull away from them or did in fact pull away from them.  But even if this account is accepted, the police did not have proper authority for their actions.  As discussed above, the investigatory stop of the plaintiff was improper as a matter of law.  Since Officer Dutton did not have the right to stop the plaintiff, he did not have the right to demand her identification, or to use physical force to stop her from walking

---

[5] According to Dutton, however, the plaintiff dropped her wallet and Davis picked it up and "started checking in the wallet she had dropped for her ID."

away.  Since Dutton had no authority to detain her, she had every right to pull away (although she denies that she did). Since the plaintiff had the right to pull away from the officers, the officers had no legal authority to arrest her, and she is therefore entitled to summary judgment on the claim of false arrest.

As Superior Court Judge Wolverton noted in *Young v. State,* 72 P.3d 1250 (Alaska App. 2003), unless an investigatory stop is proper under the Alaska Constitution, a person stopped by a police officer has a perfect right to decline to talk to the police and to walk away: "Officer Paiz could not have gone up [to Young] and frisked him based on what he'd seen, couldn't have cuffed him, couldn't have questioned him if Mr. Young had simply said, 'I don't want to talk to you'". *Id.* at 1255 n.9.

**5.    Since the investigatory stop of the plaintiff was illegal as matter of law, she entitled to summary judgment on her claim of assault and battery.**

A person is liable for assault and battery if he acts intending to cause a harmful or offensive contact with the person of another.  Malice, hostility, or intent to cause physical injury are not required. *Lowdermilk v. Lowdermilk,* 825 P.2d 874, 879 (Alaska 1992); *Merrill v. Faltin,* 430 P.2d 913, 917 (Alaska 1967).

It is undisputed in this case that the defendant officers grabbed the plaintiff by the arms as she was walking toward the entrance of a grocery store, and that shortly thereafter they

handcuffed her arms behind her back.  For two men to grab the plaintiff by the arms and subsequently handcuff her is certainly a harmful and offensive contact.  Since the men in question were in fact police officers, however, their actions would not amount to assault if they had the legal authority to seize the plaintiff.  As discussed above, the officers did not have the right to conduct an investigatory stop under the circumstances, as a matter of law.  Therefore the plaintiff is entitled to summary judgment on her claim of assault and battery.

**6.  The plaintiff is entitled to summary judgment on her claim for violation of her civil rights pursuant to 42 U.S.C. § 1983, because the investigatory stop, detention and arrest violated her Constitutional right to be free of unreasonable searches and seizures.**

As discussed above, an investigatory stop is a seizure of the person, and under the *Coleman/Ebona* standard, is only constitutional under Alaska law if there is a reasonable suspicion that a serious crime has just been committed, or that imminent danger to persons or property exists.  As further discussed above, since neither prong of *Coleman/Ebona* was satisfied in this case, the investigatory stop was illegal as a matter of law.

42 U.S.C. § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or  the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof    to    the    deprivation    of    any    rights, privileges, or immunities secured by the Constitution

and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

It is undisputed that the defendants were acting "under color of state law." Since the seizure of the plaintiff was illegal under state law, it violated the plaintiff's Fourth Amendment right to be free of unreasonable search and seizure as a matter of law, as did her subsequent arrest and the search of her wallet. *Brown v. Ely,* 14 P.3d 257, 261 (Alaska 2000), citing *Cole v. Nebraska State Bd. of Parole,* 997 F.2d 442, 444 (8th Cir. 1993) ("An arrest by a state actor that is not authorized by state law is actionable under § 1983 as a seizure contrary to the Fourth Amendment."); *Bissonette v. Haig,* 800 F.2d 812, 816 (8th Cir. 1986) (en banc), *aff'd by operation of law,* 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988)("[A] search unauthorized by state law would ipso facto violate the Fourth Amendment.")[6] Therefore, the plaintiff is entitled to summary judgment on her claim of violation of her constitutional rights pursuant to 42 U.S.C.§ 1983.

**7. The search of the plaintiff's wallet was unconstitional as a matter of law, regardless of the propriety of the investigatory stop.**

It is undisputed that Sgt. Davis searched through the plaintiff's wallet without her permission and removed her

---

[6] It is likely that the investigatory stop was also illegal under federal law. However it is not necessary to reach that issue since the fact that the stop was illegal under state law renders it an illegal seizure under the Fourth Amendment, as discussed above.

driver's license.  Davis admits that he took the wallet away from her after she refused to produce identification, while Ofc. Dutton claims that Davis picked it up after the plaintiff had dropped it.  The plaintiff maintains that she was attempting to comply with the officers' request when Davis grabbed the wallet from her.  In either case, the search the plaintiff's wallet violated her Fourth Amendment right to be free of unreasonable search and seizure as a matter of law.

As a general rule, the police may not conduct a search without first obtaining a warrant.  Warrantless searches are per se unreasonable unless they fall within one of the "well-delineated exceptions" to the warrant requirement. *State v. Blank,* 90 P.3d 156, 160 (Alaska 2004).  Since the search of the plaintiff's wallet does not fall into any exception to the warrant requirement, it was unlawful as a matter of law.[7]

---

[7] The defendants may attempt to argue that the search of the plaintiff's wallet may have  permissible as a search incident to arrest, even though Davis' report clearly states that he seized the wallet prior to the alleged struggle that led to plaintiff's arrest.  However, even upon the "lawful, non-pretextual" arrest of an individual, containers cannot be opened if "under the circumstances, it could not reasonably be believed that the container would yield a weapon or evidence of the crime for which the arrest was made." *Dunn v. State,* 653 P.2d 1071, 1082 (Alaska App. 1982). *See also Snider v. State,* 958 P.2d 1114 (Alaska App. 1998): "A law enforcement officer acting without a warrant may search a suspect incident to arrest if: the arrest is valid, the search is carried out roughly contemporaneously with the arrest, the arrest is not a pretext for the warrantless search, and the arrest is for a crime, evidence of which could be concealed on a person." (Citations omitted); *Johnson v. State,* 88 P.3d 1137, 1139 (Alaska App. 2004): "Under Alaska law, an officer may conduct a limited search for weapons.  Beyond this, the officer may only search for evidence related to crimes for which the police have probable cause to arrest."(Citations omitted). Here there was no reasonable basis to believe that the wallet could contain a weapon or evidence of the "crime" for which the plaintiff was arrested.  Thus even accepting Davis' revised account of events, in which the wallet was removed from the

Thus, even assuming for the sake of argument that the investigatory stop was *not* improper as a matter of law, the plaintiff is nonetheless entitled to summary judgment on her claim pursuant to 42 U.S.C. § 1983, since the search of her wallet violated her Fourth Amendment rights as a matter of law, even if the evidence is viewed in the light most favorable to the defendants, and even if one assumes that the arrest of the plaintiff was valid, which the plaintiff, of course, disputes.

## 8. Conclusion

Based upon the foregoing, the plaintiff respectfully requests that the Court grant her motion for summary judgment on her claims of false arrest, assault and battery, and violation of her civil rights (42 U.S.C. § 1983).

DATED this 3rd day of July, 2006.

s/ Karen E. Bretz_____
Karen E. Bretz
Attorney at Law
P.O. Box 91457
Anchorage, AK 99509
(907)277-5847 Voice
(907)277-5848 Facsimile
e-mail: kbretz@alaska.net
Alaska Bar No. 9911058

---

plaintiff's hands for the purpose of handcuffing her, there was no justification for opening the wallet without a warrant.

<u>Certificate of  Service</u>

 I certify that on the 3rd day
of  July, 2006 a true and
correct copy of the foregoing
document was served electronically
on:

Mary Pinkel
Assistant Municipal Attorney

 s/ Karen E. Bretz_____
   Karen E. Bretz