Karen E. Bretz
Attorney at Law
P.O. Box 91457
Anchorage, AK 99509
(907) 277-5847 Voice
(907) 277-5848 Facsimile

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JUDY L. BERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPT., | ) |
| OFC. ROBERT DUTTON, and | ) |
| SGT. GIL DAVIS, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

Case No. A04-0227 CV (JKS)

### AFFIDAVIT OF JUDY L. BERMAN

| | |
|---|---|
| STATE OF ALASKA | ) |
| | )ss: |
| THIRD JUDICIAL DISTRICT | ) |

JUDY L. BERMAN, being first duly sworn, deposes and states as follows:

1. I am the plaintiff in the above-entitled action.

2. On the evening of April 6, 2002, I attended a play in downtown Anchorage with a friend. On my way home, I stopped by the Carrs store on Huffman Road, with the intention of picking up some groceries.

3. There was a parking space available in the row of spaces at the front of the store. I

waited, with my left turn signal on, for traffic to clear in opposite direction, so that I could park my vehicle.

4. After a few vehicles passed by, another vehicle approached and pulled into the space I was obviously waiting to park in. I sounded my vehicle horn several times.

5. I was not concerned that the other person had taken "my" space, or that I would have to find somewhere else to park. I was just really surprised that someone would be so thoughtless and inconsiderate as to completely disregard the fact that there was a car right in front of them, with its turn signal on, obviously waiting to park.

6. Almost immediately thereafter, another space opened to the right of the space that had just become occupied, and I parked my vehicle in that space.

7. As the occupants of the other vehicle passed in front of my car on their way into the store I mouthed to them, "That was really rude." My affect was not upset or angry, but more along the lines of, "Hey guys, why did you do that?" At no time did I "scream" at them, or even speak to them. I never even rolled down my window. In fact, the car I was driving had a broken mechanism is the driver's side window, so that the window could not be rolled down. I had no intention of opening my window or screaming at them, even if the window had not been broken.

8. By the time I emerged from my car, a few seconds later, I don't think that I was even thinking about the "incident" that had just occurred. The entire event could not have lasted much more than a minute, and probably even less (from the time the other party pulled into the space, to when they went into the store). The idea that I was acting in a threatening manner is absurd, and not even supported by Dutton's own account of his observations prior to stopping me. He clearly stated in his deposition that he did not observe the occupants of the other vehicle acting nervous or frightened. I was not "upset" and I never told Dutton that I was upset. This kind of minor

dispute or misunderstanding in a parking lot probably happens on a daily basis in Anchorage. Were it not for the officers' inappropriate and malicious conduct that followed, I know I would have forgotten about it long ago.

9. The Chens (the occupants of the other vehicle) are incorrect when they state in their affidavits that there were many open parking spaces. There were in fact no other parking spaces available at the front of the store, other than those reserved for handicapped parking, and those reserved for parents with infants. They also fail to explain why they would choose to park in a space that someone else was waiting for, with their turn signal on, if they thought there were many other spaces available.

10. As soon as I got out of my vehicle, Officer Dutton came up to me on foot. His patrol vehicle was <u>not</u> parked behind my car. I did not see him until after I emerged from my car.

11. Dutton immediately asked me if there was something wrong with my car horn. I calmly and politely told him that there was nothing wrong with the horn, but that I had thought it was rude for the other party to park in the space I was obviously waiting to park in. Dutton then said that I had caused a disturbance, and that I should not have pulled into the space from the left. He concluded by saying, "If you do it again, I'll find it in my heart to cite you." There was a brief pause while we stood there looking at each other, and I waited to see if he had anything further to say. I then said, "Have a great night" and began to walk away. He made no attempt, verbally or physically, to prevent me from walking away.

12. The preceding paragraph is a full account of the entire conversation between myself and officer Dutton when he first approached me. I did not tell Dutton, as Sharon Chen claims in her affidavit, that I was going to sue him when he first approached me, nor did I ever state, "I am a U.S. citizen". Dutton himself does not claim in his police report or his deposition that I made

either of those statements when he first approached me. Furthermore, I don't see how Ms. Chen could have heard anything that was said by me or by the officer, or how either of the Chens could have formed the opinion that my "behavior toward the police officer was highly disrespectful," since Dutton himself maintains (in his police report, and in his deposition) that the Chens had entered the store while I was still sitting in my car. The Chens are probably very nice people, but it is apparent that their desire to be helpful to the police has caused them to "recall" things that never actually occurred.

13. Dutton stated in his deposition that the reason he thinks I may have been sarcastic when I said (according to him) "Have a nice day," is the fact that he had put the phrase in quotation marks in his report. However, it is much more likely that he used quotation marks because he was directly quoting what he had heard me say.

14. After I had walked some distance towards the store entrance, Dutton came after me and said, "Hey, I want to see your I.D." I don't know why he suddenly decided that he wanted my I.D., after he had already informed me that he was not going to take any action, and did not protest when I walked away. I think that after I began walking away he started to feel dissatisfied with what had just transpired; I believe he may have expected me either to argue with him or to apologize, and that it annoyed him that I did neither, and just politely said good night and walked away.

15. I told Dutton that he did not have the right to stop me and ask me for identification for no reason, and I continued to walk toward the store entrance. I never said "This is the United States of America" or words to that effect. I did state that this is not a police state (wherein the police can stop an individual at any time and for no reason, and ask for identification). I certainly did not say that anything about suing Dutton at that point.

16. It never occurred to me that Dutton would actually use physical force to get me to show identification, especially since he had already made it clear to me that he did not intend to "cite" me, and that I was free to go. But when I reached the store entrance, Dutton was joined by another police officer, Sergeant Davis, and they surrounded me and took hold of my arms with such force that they left large bruises on both arms.

17. I was very alarmed by the officers' conduct, and I told them to get their hands off me. I did say that they were engaging in police brutality. They would not let go of me, and stated that I had to show them identification. I realized that I had no choice but to show them I.D. They had made it clear that they would not let me go until I showed identification.

18. I told them that I would produce identification, but that they had to let go of my arms so that I could do so. They loosened their grip on me slightly, so that I was able to reach into the purse I was carrying, and get my wallet out.

19. While I was looking through my wallet for my driver's license, I expressed my outrage at how they were treating me. It was in that context that I mentioned that I am an attorney, that I knew they had no right to do what they were doing to me, and that I would sue them. Sergeant Davis suddenly became visibly angry, and grabbed the wallet out of my hands, before I had a chance to find my license and show it to the officers. He also grabbed my purse off my shoulder, and both he and Dutton began twisting my arms behind my back (in order to handcuff me) with such force that I actually began shrieking in pain. The officers never told me that I was under arrest, and never asked me to place my arms behind my back; they just started violently twisting my arms and would not stop even after I told them they were hurting me.

20. It was clear to me that the officers became enraged at my comment about suing them, and because they thought I was disrespecting them by questioning the propriety of their conduct.

I do not believe I was being disrespectful, but they are entitled to their opinion.  They are not, however, entitled to abuse their authority as police officers for the purpose of venting their anger and hostile feelings toward me.

21. In his police report, Davis clearly says that he took my wallet away from me <u>prior to</u> the alleged struggle that led to my being handcuffed.  At his deposition, he changed his story and said that I spun away from him and Dutton before he took the wallet.  Dutton, on the other hand, claims that I tried to put my wallet down and dropped it.  There are many other inconsistencies in the officers' versions of what happened, such as the fact that Davis has me repeatedly running into the store and being marched back out by Dutton and him, while Dutton claims that Davis was just standing by as a back-up and had no physical contact with me until the two of them handcuffed me.

22. I don't know why the officers have made such a big deal about my asking for their identification.  I did mention that I wanted to see their identification.  I did not say that I wanted to write their names down.  As I said, I clearly told them that I would show them my identification, which is when they loosened their grip on my arms somewhat, so that I could do so.  Both officers observed me holding my wallet in my hands and looking for my identification, but Davis grabbed my wallet away from my before I had found it.

23. I never in any way resisted the police officers, or tried to pull away from them.  I never made the statement, "I'm an attorney.  I don't have to do this." or any statement like that.  I noticed that John Daily, in his report, makes the observation that he would not be surprised that someone who had resisted the police would have bruises on their body, but that he found it unusual that I had two almost identical bruises in the same location on both arms and nothing else.  In fact, the fact that I only sustained those two bruises shows that the officers grabbed a hold of

me with enormous strength, and that I did <u>not</u> resist.

24. While I was crying out in pain, and the officers were handcuffing me, people were walking right by us on their way in and out of the store, but no one stopped to assist me. If I was being assaulted by a stranger or acquaintance, I'm pretty sure someone would have tried to help me. But since the people hurting me were police officers, it was naturally assumed that their actions were lawful, and that I must have done something to "deserve" this kind of treatment.

25. After the officers handcuffed me, Davis searched through my wallet without my consent, and located my driver's license. I heard the officers discuss the fact that they would do a "cite and release". They left the handcuffs on, however, and led me to Dutton's patrol car, which was parked in front of the entrance to the store. While all this was happening, I was expressing shock and disbelief that this was actually occurring.

26. I was then forced to sit in the back of Dutton's patrol vehicle, with my hands still handcuffed behind my back, for about twenty minutes, while he leafed through his manual, trying to figure out what to charge me with. Store customers walked right by the vehicle, and observed me sitting in the back seat with my hands handcuffed behind my back. Dutton finally issued a citation for "resisting or interfering with a police officer," and released me. The citation required me to appear in court on May 7.

27. I never accused the police of "stealing" my wallet (as Dutton claimed in his police report), but I did tell Dutton that I didn't think they'd returned it to me yet. I then found that one of the officers had stuck it in my jacket after I had been handcuffed. I was wearing a leather jacket that had a rip in the leather on the side. I found that my wallet had been wedged in between the leather and the lining.

28. If Dutton had really believed that I posed some kind of danger to the Chens, he would

not have released me and allowed me to enter the store while they were still in the store. I was too upset to proceed with my original plan of shopping for groceries, but I did enter the store to use the telephone. My driver's license had expired in December, and I hadn't renewed it yet, so Dutton told me not to drive.

29. My reasons for initially declining to produce identification were not related to the fact that my license had expired. When the Municipal Attorney questioned me on this issue at my deposition, my attorney objected based on the fact that she had asked an improper compound question, akin to "When did you stop beating your wife?" When Ms. Pinkel persisted, my attorney told her that she would have to "make her pitch to the court" (i.e. file a motion to compel), if she disagreed with the objection. I had also already testified as to my reasons for initially declining to produce identification, earlier in the deposition.

30. Several weeks after the April 6 incident, my attorney called the Municipal Prosecutor's office, and was informed that the Prosecutor's office had declined prosecution. The prosecutor that he spoke to told him that it would be prudent for me to show up for court anyway. I did go to court on May 7, 2002, and confirmed that no charges had been filed against me.

FURTHER AFFIANT SAYETH NAUGHT

DATED this _____ day of July, 2006

_____
Judy L. Berman

SUBSCRIBED AND SWORN to before me this \_\_\_\_\_ day of July, 2006

_____

                    NOTARY PUBLIC IN FOR ALASKA
                    My commission expires_____

Certificate of Service

I certify that on the 3rd day of July, 2006 a true and correct copy of the foregoing document was served electronically on:

Mary Pinkel
Assistant Municipal Attorney

s/ Karen E. Bretz_____
  Karen E. Bretz

SIGNATURE PAGE TO BE SCANNED ON 7/5/06