1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF ALASKA

3  JUDY L. BERMAN,                    )
                                      )
4               Plaintiff,            )
                                      )
5        vs.                          )
                                      )
6  ANCHORAGE POLICE DEPARTMENT,       )
   OFFICER ROBERT DUTTON and          )
7  SGT. GIL DAVIS,                    )
                                      )
8               Defendants.           )
   _____   )
9  Case No. A04-0227 CV (JKS)

10              __DEPOSITION OF ROBERT DUTTON__

11 APPEARANCES:

12         **FOR THE PLAINTIFF:**      **MR. JOHN C. PHARR**
                                       Attorney at Law
13                                     733 West 4th Avenue, Suite 308
                                       Anchorage, Alaska  99501
14                                     (907) 272-2525

15         **FOR THE DEFENDANTS:**     **MS. MARY B. PINKEL**
                                       Municipality of Anchorage
16                                     Assistant Municipal Attorney
                                       632 West 6th Avenue, Suite 730
17                                     Anchorage, Alaska  99501-6650
                                       (9070 343-4545

18         **ALSO PRESENT:**           **MS. JUDY L. BERMAN**

19                    *  *  *  *  *  *

20

21

22

23

24

25

Exhibit 1

1  Q    Sure.

2  A    .....you know, five parking spaces up from the end of

3       the building is where this occurred.

4  Q    Right.

5  A    I'll say after I turned around and proceeded back

6       towards here is when I could see her vehicle sitting

7       here and I could see that her screaming and honking was

8       directed at two people that exited from another car

9       that had parked here, or was parked.  Like I said, they

10      were already out.  And to me it appeared that that was

11      directed towards those two people.

12 Q    You had your window down?

13 A    I don't know.

14 Q    Okay.  If your window was up could you have heard

15      anything like that?

16 A    I think so.  I won't guarantee that I did that night,

17      but it's kind of a -- it was a practice of mine to

18      always leave my back two windows down a little bit just

19      so you can hear.....

20 Q    Okay.

21 A    .....inside the car.  I don't know that that happened

22      that night.

23 Q    What was she screaming?

24 A    That I could not tell you.

25 Q    On a scale of one to 10 how loud was the screaming?

1  A    It was loud enough that I could hear it as -- as I was

2       approaching.

3  Q    Okay.  Did -- what were the two people doing from the C

4       car here?

5  A    At the time walking towards the front of the store to

6       where the front doors are.

7  Q    Were they looking back at her or were -- you know, were

8       they looking around or acting nervous?  What were they

9       doing?

10 A    I don't know how they were acting.  It was just from my

11      vantage point that the conduct was directed towards

12      them just from their proximity.  That's all I could

13      say.

14 Q    Okay.  What happened next?

15 A    What happened next is the car marked B pulled into a

16      parking space next to C and then I pulled up and parked

17      behind Ms. Berman's car.

18 Q    Can you.....

19 A    So you want me to do that again?

20 Q    .....kind of sketch that out and maybe use -- well,

21      however you want to do it.

22          MS. BERMAN:  Oh.....

23          MS. PINKEL:  I'm going to object to Ms. Berman

24 asking questions or making comments here.  Mr. Pharr is taking

25 the depositions and Mr. Dutton is answering the questions.

1  A      I'll just mark it with arrows that she pulled into this

2         space next to the car marked C and then I pulled in

3         behind her.

4  Q      Okay.  She was to the right then of the C car?

5  A      Yes.

6  Q      Okay.  All right.  And what happened next?

7  A      The two people went ahead and walked in the store.  I

8         got out of my patrol car and I approached Ms. Berman's

9         car.

10 Q      Okay.  And what happened next?

11 A      She was still seated in the car, her window was up.  I

12        knocked on her window and at that point she opened the

13        door and stepped out.

14 Q      Okay.  And do you think she had raised the window or --

15        I mean how could you hear her screaming through a

16        closed window?

17             MS. PINKEL:  Object.  She said -- her window

18 was down.

19             MR. PHARR:  Pardon me?

20             MS. PINKEL:  I think you're mischaracterizing

21 what his answer was.

22 Q      Was her window down or up when you knocked?

23 A      When I got to the car her window was up because I

24        actually tapped on it.....

25 Q      Okay.

1  A    .....in order to get her attention.

2  Q    But when -- you said she was screaming.  Do you think

3       her window would have had been down at that point?

4  A    I would assume so.

5  Q    Okay.  Did it sound muffled like it came through a

6       window or did it sound -- well.....

7  A    I think it was loud enough that I would assume it came

8       from an open window but I wasn't in a position where I

9       could see her driver side window as I approached.  So I

10      don't know.

11 Q    Okay.  Did you see her roll it up or down or anything?

12 A    I did not.

13 Q    Okay.  Okay.  What happened next?

14 A    She stepped out of the vehicle.  I asked her why she'd

15      been creating a disturbance in the parking lot.  She

16      told me she was upset because the other vehicle had

17      taken her parking space.  Or words to that effect.

18      That they had taken her parking space is why she was

19      upset.

20 Q    Okay.

21 A    That's initially what happened.  Then she told me

22      something to the effect of have a nice day and began

23      walking away.  At that point I told her I needed to see

24      some identification.  And she continued walking away

25      saying she didn't need to show me any identification.

14

1        I continued walking with her towards the front entrance

2        of Carrs and eventually got between her and the front

3        door of Carrs.

4 Q   So you walked a little bit faster than her then?

5 A   Well, I just positioned myself in front of the door so

6        she couldn't get into the store.

7 Q   Okay.

8 A   Because I was trying to contact her, making contact.  I

9        needed to see her identification at that point.

10 Q   All right.  Why did you want her ID?

11 A   Well, I was identifying her because I was there

12        investigating, now, a disturbance that she had created.

13        She had also driven into the parking lot in her

14        vehicle, so I told her she should have a license in her

15        possession.

16 Q   All right.  And what happened next?

17 A   At some point I must have radioed Sgt. Davis and asked

18        him to start coming back.  I don't know exactly where

19        that occurred, but I -- it obviously occurred because

20        he did come back.  She kept trying to walk away from me

21        and go into the store saying that I did not need to see

22        her identification.  And at some point through this

23        conversation I put her in what we call a sleeve guide.

24 Q   Well, did she say anything else other than -- well,

25        what were her exact words as best you can recall them?

1    something happened and she began trying to pull away

2    from me and spin away from me, at which time Sgt. Davis

3    and I both took control of one arm each placed behind

4    her back and I placed her in the handcuffs.

5   Q    Okay.  Now when you say spin, what do you mean spin?

6   A    I mean if I had her in a sleeve guide, if she's

7    starting to spin away from me in order to get away from

8    my control over her, that's what I would mean by

9    spinning away.

10  Q    And -- okay.  And then Sgt. -- Officer Davis stepped in

11    and.....

12  A    And assisted me.

13  Q    Okay.  Did you and Officer Davis each have one arm?

14  A    I believe so.

15  Q    All right.  And did you handcuff her like immediately?

16  A    I'm sure we did.

17  Q    Okay.  And what happened next?

18  A    I'm sure I took her out to my vehicle and placed her in

19    my vehicle.

20  Q    Okay.  Did you and Officer Davis each have one arm

21    before she pulled away, or after?

22  A    No.  Sgt. Davis didn't even have any physical contact

23    with her until it was time to handcuff her.

24          MS. PINKEL:  Okay.  I'm going to object to Ms.

25 Berman's laughing.  This is inappropriate behavior for a

1    deposition.

2                    MS. BERMAN:   It's inappropriate for you to

3    object.   I'm allowed to react.

4                    MS. PINKEL:   No, you're not.   And it seems to

5    me that you're doing this to harass the deponent and I'm going

6    to object and ask Mr. Pharr to instruct you to please stay

7    silent during this deposition.

8                    MS. BERMAN:   I didn't say anything.   You're the

9    one who said something.   I didn't say a word.

10                   MS. PINKEL:   I'm objecting to your behavior.

11                   MR. PHARR:   Just -- might have to use a sleeve

12   guide here in a moment.

13                   MS. PINKEL:   Did you want to repeat your

14   question, John?   I think the question had to do with Officer

15   Davis, whether or not he'd made any physical contact with Ms.

16   Berman before the handcuffs.   Was that the question?

17                   MR. PHARR:   Right.   I got an answer to it.

18   So.....

19                   MS. PINKEL:   And the answer was?

20   A       My answer was to the best of my recollection until she

21           began spinning away and we had to handcuff her Officer

22           Davis had no con- -- physical contact with her.   He was

23           just there as a -- as a cover officer in a cover

24           position.

25   Q       Okay.   And then you took her out to your car?   Do you

1     have an independent recollection of that?

2   A   I do have an independent recollection of taking her out

3     to the vehicle, yes.

4   Q   Okay.  What was her attitude while you were doing that?

5   A   Her attitude?  Well, I would describe her attitude

6     throughout the whole incident as uncooperative.  Once

7     we got in the -- in the vehicle and I ran a criminal

8     history check on her, I told her that if she was

9     willing to, you know, sign the citation and promised to

10    appear in court I would go ahead and just give her a

11    citation and release her from there instead of taking

12    her before a magistrate.  So she was cooperative in

13    that aspect.  But other than that I guess my -- my

14    description would be uncooperative throughout the

15    incident as far as not producing ID, somewhat

16    struggling with us once we -- you know, we're dealing

17    with those issues.  That's probably how I would best

18    describe it.

19  Q   Okay.  Did she produce a license at any point or an ID?

20  A   She didn't produce it ever, no.  We eventually obtained

21    one.

22  Q   How did you do that?

23  A   I know Sgt. Davis -- somehow, to my recollection, when

24    she pulled her -- her wallet out to write our names

25    down and then she began spinning away from us her

20

```
 1        wallet fell to the floor.  Sgt. Davis went into there

 2        and retrieved her license, according to my report.

 3   Q    Okay.  The -- going back to when you first approached

 4        her what was the primary reason you approached her?

 5   A    To see why she was creating a disturbance in the

 6        parking lot.

 7   Q    Was one of your reasons to see if she needed

 8        assistance?

 9   A    Maybe from just hearing the initial horn honking.  But

10        as I got closer and I saw that the conduct was directed

11        towards the two people, then it became a different

12        reason.

13   Q    Let me show you the answer to the complaint filed on

14        your behalf by the Muni.  Paragraph eight.  And how

15        about taking a look at paragraph eight?  Is that

16        correct that you approached her because she needed

17        assistance?

18   A    Well, I'll say I initially made my approach, meaning I

19        made my U-turn to see if there was assistance needed,

20        sure.  But what I'm saying is as I got closer and I

21        could see the conduct that was occurring then my

22        response became different.

23   Q    Did you say anything to her about pull -- about her

24        pulling into the parking space from the left?

25   A    I recall having -- I should say I recall from my police
```

1      report primarily, but I do remember telling -- when she

2      was complaining about the parking space that parking in

3      an angled space from the opposite direction, that's not

4      a proper way to park.  Now it's in a parking lot -- if

5      it was in a business district I know there's -- there's

6      traffic codes that prohibit that specifically.  In a

7      parking lot, I don't know if it's specifically

8      prohibited.  But it's just one of the rules of the road

9      that I learned from the time I began driving.

10  Q    Did you ever hear her say have a nice day?

11  A    According to my police report, yes.

12  Q    Did you and Officer Davis agree to do a cite and

13      release before placing her in your vehicle, or after?

14  A    I don't recall.  I don't know when that was made.

15  Q    Did you look through your manual prior to writing out

16      the citation to make sure -- well, to try to figure out

17      what to cite her with?

18  A    I'm sure I looked through the statute book just to get

19      the correct statute on the citation.

20  Q    How long was she sitting in your vehicle?

21  A    To tell you from recollection at this point I couldn't

22      tell you.  I know I read somewhere through everything,

23      about 20 minutes.

24  Q    Did you make contact with the people that were in the

25      car that marked C here?

22

1  A       I did make contact with them, yes.

2  Q       When did that happen?

3  A       According to my police report it was after Ms. Berman

4          had been cited, released, is when they came out of the

5          store.

6  Q       Do you remember what they said?

7  A       They said they didn't know why she had been screaming

8          at them.  That they had just parked their car and were

9          going into the grocery store.

10 Q       Did you ever suggest to them that she had been

11         screaming at them?

12 A       I never suggested anything to them.

13              MS. PINKEL: You know. I'm going to object to

14 that question.  It's a delayed objection, but that's

15 argumentative.

16              MR. PHARR:  It's a discovery deposition,

17 counselor.

18              MS. PINKEL:  Still argumentative.  And no

19 testimony that there's ever been any suggestion to the Chens

20 (ph) that she was screaming at them.  That's been their

21 statement all along.

22 Q       Do you remember what you asked them?

23 A       At this point not specifically, no.  I know I obtained

24         their information as witnesses.

25 Q       Did she ever wave her arms around during her contact

23

```
 1            with you?

 2                  MS. PINKEL:  By her, you're referring to Ms.

 3    Berman, John?

 4                  MR. PHARR:  Correct.  Um-hum.

 5                  MS. PINKEL:  Okay.

 6    A    I would have to say no, because I don't think -- you

 7         know, other than when she began spinning away from me I

 8         don't recall anything going on with her arms.

 9    Q    Was she ever removed from inside the store to outside

10         the store?

11    A    Well, we never actually made it inside the store.  The

12         furtherest we made it was inside the foyer area.

13    Q    When she had her purse in her hands did she ever say

14         her ID was in it but she wouldn't open it?

15    A    I don't believe she ever said that she had an ID.  She

16         just wouldn't produce one.

17    Q    Do you ever recall her saying anything about this being

18         the United States of America, anything along those

19         lines?

20    A    Well, from reading over my police report I know there

21         was some mention of being a citizen of the United

22         States and the word sue.

23    Q    Do you remem- -- do you have any independent

24         recollection of that?

25    A    Like I said, this has been so long ago I don't have a
```

24

1      lot of recollection of, you know, what was said between

2      party A and party B.  I really don't.

3   Q  Okay.  All right.  What did you plan to do after she

4      showed you her ID?

5   A  What did I plan to do?  Well, I was investigating a

6      disturbance.  Had she been cooperative, showed me her

7      ID, I could have resolved the whole issue of the

8      parking space I'm sure, which she kind of did on her

9      own anyway, parking next to the space she initially

10     wanted, I guess.  I don't know that we would have done

11     anything.  I have a certain leeway as a police office,

12     you know, to warn people.  I don't have to cite

13     everyone or arrest everyone.  I'm not sure that

14     anything would have happened.  I know I probably would

15     have told her, just like we did at the end, she's not

16     licensed, she cannot drive away from the store and find

17     a licensed driver to drive her way from there when she

18     was done.  And that probably would have been the end of

19     it had things gone differently.

20  Q  When she refused to produce an ID, as you say, why

21     didn't you just let her go on her way?

22  A  Because I was investigating a disturbance at that

23     point.

24  Q  Okay.  As the last area, is your -- are you still

25     working for the police department in any capacity?

1  A      No, I'm not.

2  Q      And your attorney's leaning forward here and she's

3         getting ready to object.  But can you give me -- I mean

4         I guess why aren't you working for the police

5         department any more?

6              MS. PINKEL:  I'm going to object under AMC

7  3.90.040(b).  You're asking for confidential personnel

8  information and also this violates his privacy rights that

9  you're asking these questions.  So you cannot ask those

10 questions.  And I'm instructing him not to answer.

11             MR. PHARR:  Well, I can ask them, he's just not

12 going to answer.

13             MS. PINKEL:  Well, under Federal Rule 30 you

14 shouldn't even be asking questions like this.  And under the

15 Anchorage Municipal Code.  But if you're going to ask them then

16 I'm going to instruct him not to answer.

17             MR. PHARR:  Okay.  All right.  Let's go off the

18 record.

19        (Off record)

20        (On record)

21             MR. PHARR:  Okay.  Are we back on record?

22             COURT REPORTER:  We're on record.

23 Q      Okay.  Mr. Dutton, at the time of your encounter with

24        Ms. Berman was your state of mind upset for any reason?

25             MS. PINKEL:  I'm going to object to the form of

```
 1    this question, and there's been no evidence that he'd been

 2    upset by anything.

 3                    MR. PHARR:  It's a discovery deposition,

 4    counselor.

 5                    MS. PINKEL:  Okay.  Well, ask the question but

 6    I'm objecting to it.

 7    Q        Okay.

 8    A        To my knowledge, no, I was not upset.

 9    Q        Okay.  What were your dates of employment with APD?

10    A        February 10th of 1992 to July 7th of 2003.

11    Q        And you're working for UPS now?

12    A        Yes.

13    Q        Okay.  When you pulled up behind her were you blocking

14             traffic?

15                    MS. PINKEL:  Objection as to relevance.  This

16    was like 10:00 o'clock at night or something.

17                    MR. PHARR:  It doesn't have to be relevant.

18    Q        But, you know, were you blocking traffic?

19    A        I would have to say no.  The entrance there to Carrs

20             has a very wide driveway.  I'm sure I was not.

21    Q        When she started walking away from you did you say

22             wait, I'm not done with you?

23    A        No, I did not say those words.

24    Q        Okay.  Let's see here.  Okay.  Report says Sgt. Davis

25             told her to get her ID out of the wallet while she had
```

1       it out.  She began putting it down -- okay.  She began

2       putting it down.  Do you remember her trying to put the

3       wallet down?

4   A   Do I remember that?  No.  I remember reading that in my

5       police report but to say I remember that now, no, I

6       don't.

7   Q   Do you know the outcome of the citation?

8   A   As far as the disposition?  I know it was dismissed by

9       the municipal prosecutors office.

10  Q   Okay.  Do you know why you would have written in your

11      report that she was putting her wallet down?

12  A   I would guess because she was putting her wallet -- I

13      just said I -- I didn't have a recollection of it.

14      I.....

15  Q   Okay.

16  A   .....just had read that in my police report.

17  Q   You don't remember her putting it down or anything

18      along those lines?

19  A   I -- I don't remember specifically what was happening

20      with all that.  I just recall what I read in that

21      police report.  But I just don't have an independent

22      recollection of it.

23  Q   Did you say if you do it again I'll find it in my heart

24      to cite you?

25  A   No.  I -- I had read that in the -- the discovery

1    request and to me that just does not sound like

2    anything I would have ever said.  That's just something

3    I would have never said.

4  Q    Okay.  Okay.  If she was putting her wallet down, where

5    would she have put it down since you were standing

6    outside?

7  A    If she were putting it down.....

8            MS. PINKEL:  I'm going to object.  You're

9  asking for speculation.

10 Q    Would she have been putting it down on the sidewalk

11    or.....

12 A    I don't know.

13 Q    Okay.

14 A    Could have been on the sidewalk.  There's those trash

15    cans right outside the doors to Carrs that have a solid

16    top and, you know, the swinging door type.  It could

17    have been there.  I don't know.

18 Q    Okay.

19            MR. PHARR:  I have no further questions.

20            MS. PINKEL:  Okay.  I just have a few for

21  clarification purposes.

22            MR. PHARR:  Don't write on it.

23            **CROSS EXAMINATION**

24  BY MS. PINKEL:

25 Q    Rob, Mr. Pharr had asked you what had Ms. Berman done

1       they may not want to show it to the police officer,

2       yes.

3   Q   Okay.  When Ms. Berman said to you, have a nice day,

4       what was the tone she used when she said have a nice

5       day?

6   A   The way I put it in my police report with the

7       quotations, I believe it was in somewhat of a sarcastic

8       tone.

9   Q   Your report indicates she -- she, meaning Ms. Berman,

10      kept saying she was a citizen of the United States and

11      she was going to personally sue me.  Is that correct?

12  A   That's what's in the report, yes.

13  Q   All right.  And your report indicates she said that to

14      you more than once, is that correct?

15  A   The way I -- the way I phrased that she kept saying is

16      that she said it at least twice if not more.

17          MR. PHARR:  Can we go off record for a second?

18  I've got to make a phone call.

19          MS. PINKEL:  Well, it's just going to take me a

20  minute.

21          MR. PHARR:  I don't have a minute.  I have to

22  make a call right now.

23      (Off record)

24      (On record)

25  Q   Okay.  I think I was just finishing up with Rob here

1          MS. PINKEL:  I have no further questions.

2                    **REDIRECT EXAMINATION**

3  **BY MR. PHARR:**

4  Q    Just -- when you asked her for identification, were you

5       after her driver's license or were you after simply who

6       she was?

7  A    Well, identification purposes, not necessarily a

8       license.  But that's what we typically ask for, license

9       or ID card.

10 Q    Okay.  So she could have produced a social security

11      card or.....

12 A    Well.....

13 Q    .....military ID or just about anything that identified

14      who she was?

15 A    Picture ID is preferable.  You know, social security

16      card identifies a name and a number, but without the

17      picture to corroborate, you know, it's -- it's always

18      preferable to have picture ID.

19 Q    But you weren't trying to ascertain whether she was

20      licensed to drive, correct?  You just wanted.....

21 A    No.  I was just trying to identify her.

22 Q    Okay.  Okay.  You arrested her -- okay.  She was

23      resisting because she didn't produce ID, correct?

24          MS. PINKEL:  I think you're mischaracterizing

25 the testimony.  I'm going to object.

34

1    Q       Okay.   You and Officer Davis had her ID in hand when

2            you arrested her, correct?

3    A       No.   The ID was obtained after she was arrested.

4                    MR. PHARR:   Okay.   I have no further questions.

5                    MS. BERMAN:   But.....

6                    MR. PHARR:   I have no further questions.

7                    MS. PINKEL:   I have no further questions

8    either.   Thank you.

9                    (Off record)

10                           **(END OF PROCEEDINGS)**

11   MEMO:   Signature waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

