1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF ALASKA

3  JUDY L. BERMAN,                    )
                                      )
4           Plaintiff,                )
                                      )
5        vs.                          )
                                      )
6  ANCHORAGE POLICE DEPARTMENT,       )
   OFFICER ROBERT DUTTON and          )
7  SGT. GIL DAVIS,                    )
                                      )
8           Defendants.              )
   _____)
9  Case No. A04-0227 CV (JKS)

10    <u>**DEPOSITION OF SGT. GILBERT M. DAVIS**</u>

11  **APPEARANCES:**

12       **FOR THE PLAINTIFF:**    **MR. JOHN C. PHARR**
                                   Attorney at Law
13                                 733 West 4th Avenue, Suite 308
                                   Anchorage, Alaska  99501
14                                 (907) 272-2525

15       **FOR THE DEFENDANTS:**   **MS. MARY B. PINKEL**
                                   Municipality of Anchorage
16                                 Assistant Municipal Attorney
                                   632 West 6th Avenue, Suite 730
17                                 Anchorage, Alaska  99501-6650
                                   (9070 343-4545
18
         **ALSO PRESENT:**         **MS. JUDY L. BERMAN**
19
                         * * * * * *
20

21

22

23

24

25

Exhibit 2

9

1      When I reapproached the cars, this would be an east

2      bound track, I saw Ms. Berman and Officer Dutton in a

3      conversation.  It was very animated.  It was loud.  I

4      couldn't exactly hear what was happening.  I was

5      walking.  There was no physical contact or any kind of

6      disturbance.

7  Q    Well -- and let me stop you here.  When you heard the

8      horn sounding did you hear anything else?

9  A    I don't recall that.  I just.....

10  Q    Okay.

11  A    .....recall hearing the horn.

12  Q    All right.

13  A    When I approached the building Ms. Berman, I believe,

14      headed into the foyer.  To describe, there's a set of

15      doors -- if I'm remembering this correctly, there's a

16      foyer where.....

17  Q    Actually can you draw it?  I don't have a blank piece

18      of paper here actually.

19  A    And none of this is going to be to scale or encompass

20      all details.

21  Q    That's fine.

22  A    And briefly I'm going to demonstrate doors.  They're

23      sliding doors.  I'm going to draw just a symbol here

24      for a door.  But all doors are sliding.  This being the

25      store interior and this being the sidewalk out here.

10

| | | |
|---|---|---|
| 1 | | What I observed was the two -- Ms. Berman leave into |
| 2 | | the foyer. |
| 3 | Q | Why don't you like draw an arrow or something? |
| 4 | A | Okay.  Well, both of them entered in this |
| 5 | | direction..... |
| 6 | Q | Okay.  All right. |
| 7 | A | .....Berman and Dutton.  They both then came back out |
| 8 | | and at this point in time I arrived.  There was a bit |
| 9 | | of a tussle.  Ms. Berman I believe went back inside |
| 10 | | again and that's when I started running because now |
| 11 | | Officer Dutton was charging after her and he grabbed |
| 12 | | her by the arm in what we call a sleeve guide.  And I |
| 13 | | arrived, they were back out I believe towards the door |
| 14 | | of the store when I got there. |
| 15 | Q | Okay. |
| 16 | A | And it appeared to me that Ms. Berman was attempting to |
| 17 | | leave Officer Dutton and he was attempting to detain |
| 18 | | her. |
| 19 | Q | Did you see any occupants of another vehicle that might |
| 20 | | have been involved in this? |
| 21 | A | No, I did not. |
| 22 | Q | So the first time you saw Ms. Berman she was outside |
| 23 | | her vehicle? |
| 24 | A | No, she was -- oh, yes, she was outside her vehicle.  I |
| 25 | | -- her vehicle was somewhere down in this general area. |

1       Where I observed her was on the sidewalk with Officer

2       Dutton proba- -- approximately in this general area

3       here from the door heading in this direction.

4   Q   Okay.  All right.  And he had her in a sleeve guide.

5       What happened next?

6   A   They went in, they came out, they went back in and at

7       this point in time he had her in a sleeve guide, they

8       walked back to the door.  I now arrived and there's --

9       he lets go of her and there's a conversation.  And Ms.

10      Berman's very upset and there are -- you know, I don't

11      remember all the things she said.....

12  Q   Um-hum.

13  A   .....but he was asking for her driver's license and she

14      was telling him that she did not need to give it to

15      him, that she was a lawyer, that she was an American

16      citizen, and she wasn't going to give it to him.  Then

17      at some point in time, I forget exactly what was said,

18      but he pulled out his wallet and goes here's my ID

19      card, now you show me yours.  At this point there's

20      some more conversation.  I think I pitched in.  I've

21      listened enough to know what the problem is now because

22      I didn't observe everything but I'm -- I'm picking up

23      from the two conversations an understanding of what's

24      going on.

25  Q   What did you think the problem was?

1   A   The problem was that Officer Dutton had -- had a reason

2       to ask for her identification and she was refusing.

3   Q   Okay.  Was he asking for identification or.....

4   A   For her driver's license.

5   Q   Well, was he asking for a driver's license or

6       identification?

7   A   I'm not sure.  I think he probably used the words

8       both -- or used both terms.

9   Q   Okay.  All right.  So you.....

10  A   But I -- I'm not absolutely sure.

11  Q   Okay.  You ran up to them and what happened then?

12  A   Well, from what I -- I recall, I also pitched in, I

13      think.  Usually one of our techniques is if a second

14      officer shows up and the first one's having an

15      uncooperative individual, usually that's person's angry

16      at that officer and the second officer will be able to

17      get this person calmed down a little bit.  I made

18      attempts with Ms. Berman.  I don't recall what I said.

19      Probably please just show us your license, I don't

20      know.  Something to that effect.  And we didn't get --

21      I didn't get any more result than Officer Dutton did.

22      (Indiscernible) Berman had a purse of some sort I think

23      on her left arm.  And she made the comment I'm going to

24      write your names down.

25      She reached in her purse, or pocketbook, and brought

1   out her wallet.  It was a long rectangular object I
2   believe.  She held it in her hands and I made the
3   comment well, as long as you've got that out why don't
4   you get your driver's license out.  She hesitated, she
5   was standing directly in front of Officer Dutton.
6   I'm -- I -- well, she's at an angle.  If you'd be
7   Officer Dutton, the window would be me.  She made the
8   comment I'm an American citizen, I don't have to do
9   this.  And she executed a clockwise right-hand spinning
10  turn, similar to what you see on a basketball court
11  when the player goes around the block.  We reacted
12  immediately -- sorry -- matter of fact, as long as
13  we're doing that I made a cardinal error and did not
14  turn off my cell phone.  I will do that at this time.  I
15  seen -- somehow we restrained her by taking -- grasping
16  her arms.  I believe the way it worked out I was -- I
17  had her left arm.  I'm not a hundred percent sure.
18  At that point her -- her mood, in my mind, passed from
19  what we call passive defense, where a person is just
20  not complying, to more of an active defense where she's
21  trying to get away from us.  The purse was in the hand
22  I believe that I had.  I grabbed the purse -- or the
23  wallet, I'm sorry.  Grabbed the wallet out of her hand.
24  I don't know what happened to the actual pocketbook.
25  It may have hit the floor, I'm not sure.  At that point

14

1    the struggle got significant and into what we call

2    aggressive resistance.  Ms. Berman was trying to break

3    free of us.  We put her hands behind her back and we

4    handcuffed her.

5    At that point she calmed down physically, however she

6    was still pretty -- during this whole time there's a

7    verbal diatribe of we're violating her rights, she's an

8    American citizen, this is all wrong, something to those

9    -- I don't recall the exact wording.  But she was

10   vocalizing her displeasure with what was happening.  At

11   that point I had her -- her wallet in her (sic) hand --

12   in my hand.  I opened the wallet, removed her license.

13   I believe I put the wallet back in her pocket -- jacket

14   pocket and I kept the license.  I -- once we got the

15   situation under control, I'm not sure whether I -- I

16   checked her driver's license status before or after we

17   put her in the police car.  I don't recall that.  But I

18   do recall her license came back as expired.  From there

19   Rob and I had a bit of discussion as to how we're going

20   to proceed from here.  I believe he talked to the -- to

21   some other folks that were there.  I did not.  We

22   elected to issue a cite and release on the charge of

23   resisting and we took Ms. Berman out of the car,

24   unhooked her and let her go on her way.

25   Q    Okay.  Were you in radio contact with Officer Dutton

1        during this incident?

2    A   No.

3    Q   Was Officer Dutton's car blocking traffic?

4    A   I don't know.  I believe his position behind her car,

5        and her car was parked in front of the store, but

6        whether it was blocking traffic I don't know.

7    Q   Have you seen any photos showing bruises on both of

8        Berman's upper arms?

9    A   Have I seen photos?

10   Q   Correct.  Um-hum.

11   A   I have seen a photocopy of what appears to be a

12       photograph.  And it appears to be Ms. Berman and there

13       are two black dots on her arms.  Correct.

14   Q   Did she tell you that she needed -- you needed to let

15       go of her arm so she could show you her ID?

16   A   No.

17   Q   Let's see.  Your report says you decided to take her

18       out of the store.  Do you remember you deciding to take

19       her out of the store?

20   A   I think a couple times because of the way we were

21       positioned in here, and there were people walking back

22       and forth, we tried to get this back out on the

23       sidewalk.  They had had continually flowed back in.  I

24       think at one point it got as far as this point

25       here.....

1  Q      Um-hum.

2  A      .....just inside these doors and I think that's where

3         actually handcuffs were placed on.....

4  Q      Can you mark that with an A where you just -- okay.

5  A      Okay.

6  Q      That's fine.

7  A      And again, I -- you know, for the record, I'm not a

8         hundred percent sure.  I recall that -- the spinning

9         action.  This is only a few feet, and that we were

10        attempting to get back out here on to the sidewalk.

11 Q      The point -- now this is the point where you were and

12        then you.....

13 A      No.  This is the point where I saw them.

14 Q      All right.

15 A      The two of them are here.

16 Q      Okay.

17 A      I join right here.

18 Q      Can you mark the first point with a B and then the

19        other point with a C?  That's where you were, was C,

20        and that's where they were, was B?

21 A      Correct.  This was a constant dynamic environment.

22 Q      Um-hum.

23 A      We were -- we were not for any amount of time ever

24        standing in one spot.

25 Q      Okay.

```
 1   A      It would look more like the layouts of a dance.  We

 2          were all over the place.

 3   Q      Did she take her wallet out of her purse?

 4   A      Yes, she did.

 5   Q      Was that -- do you know if that was for the purpose of

 6          retrieving her ID?

 7   A      No.  She reached in her purse -- her pocketbook with

 8          the right hand, placed the wallet in her left hand, had

 9          her right hand back in her purse and was saying I'm

10          going to write your names down.  So I -- I assume from

11          what I observed is that there must have been a note pad

12          or something available that she was going to write on.

13   Q      What was the purpose of Officer Dutton asking for her

14          ID?

15   A      Well, from -- from the conversation that I gleaned

16          between the two of them, her behavior of honking the

17          horn and apparently arguing with people was broaching

18          on disorderly conduct and there was a traffic

19          violation.  Something about a U-turn, is what I picked

20          up when I subsequently read the report.  But at the

21          time standing there, that is the two topics I heard, is

22          the traffic violation and a disorderly conduct

23          investigation.

24   Q      Okay.  You took her wallet without her permission?

25   A      Correct.  I removed it from her hand.
```

```
 1   Q     Okay.  Have you described everything about the struggle
 2         that you recall?
 3   A     Yes.
 4   Q     You looked through her wallet and removed her ID
 5         without permission?
 6   A     Correct.
 7   Q     Did you and Davis (sic) agree to -- no, you and Officer
 8         Dutton agree to do a cite and release before placing
 9         her in your vehicle?
10   A     I thought she was in the police car before we made that
11         decision.
12   Q     And after Officer Dutton placed Berman in his vehicle
13         you left the scene?
14   A     I think I was still there when he unhandcuffed her.
15   Q     Okay.  Are you aware of the outcome of the case?
16   A     Yes.
17   Q     Okay.  Declined prosecution, right?
18   A     That's my understanding.
19   Q     Okay.  Did you talk to the people named Chen at all?
20   A     I did not.
21   Q     Prior to the incident with Ms. Berman we just covered,
22         did you arrest anyone else that night?  You don't have
23         to name them.
24              MS. PINKEL:  Objection, relevance.  Also you're
25   asking about her police investigations and that violates
```

```
 1    A      Yes.

 2    Q      Did she seem to be disturbing the store?

 3    A      I believe so, yes.  That's the reason we tried to get

 4           her back out on to the sidewalk.

 5    Q      Did you hear her say anything about the location of her

 6           ID?

 7    A      She indicated that it was in the wallet, but I don't

 8           remember exact words that were spoken.

 9    Q      Did she say she wouldn't open it?

10    A      No.  She just refused to give us the ID.

11    Q      Did she say anything about suing you?

12    A      Absolutely.

13    Q      What did she say about that?

14    A      I remember -- at two points in time I remember hearing

15           I'm a lawyer and I'm going to sue you.

16    Q      Okay.  Your report says you took her purse away from

17           her, or wallet away from her?

18    A      Yes.  I removed the wallet from her hand.

19    Q      Okay.  She struggled?

20    A      Yes.

21    Q      Okay.  And we handcuffed her?

22    A      Yes.  What's in my report, yes.

23                 MR. PHARR:  Okay.  Let's go off record for a

24    second.

25           (Off record)
```

22

1                          **(Deposition Exhibit 1 marked)**

2           (On record)

3                          COURT REPORTER:  We're back on record and I

4    have marked this sketch by Officer Davis as Exhibit 1.

5    Q      Okay.  Officer Davis, I just want to make sure I have

6           the sequence correctly.  Your police report says we

7           indicated that -- she indicated that her ID was in it,

8           i.e., her wallet, but would not open it.  I took it

9           away from her, she struggled and we handcuffed her.  So

10          the sequence was you took her wallet away from her and

11          then you struggled?

12   A      Well, it's -- again, like I.....

13                         MS. PINKEL:  I'm going to object because I

14   think you're mischaracterizing what he's testified to as to

15   what occurred before.

16                         MR. PHARR:  Well, then he can straighten it

17   out.

18                         MS. PINKEL:  Okay.

19   A      Okay.  What I was saying earlier is this thing was a

20          breathing entity.  It's constantly in motion.  What I

21          recall is her purse on her arm, her wallet in her left

22          hand, her right hand digging for something to write.

23          Her having refused to produce the ID that I just asked

24          again for.  Her wanting to write our names down.  When

25          she suddenly stops and says I'm an American citizen, I

23

1    don't have to do this, executes the clockwise spin and

2    starts to go around Officer Dutton and into the store.

3    We go after her, we take her by the arms.  At this

4    point in time I pull the wallet out of her hand because

5    I believe I have her left hand -- left arm and that's

6    where the wallet was.  Then she starts struggling a

7    lot.  Before it was passive resistance.  She's just not

8    moving.  She's going to walk -- she went into defense

9    in an approaching aggressive resistance when she

10   started flailing.  At that point in time we handcuffed

11   her.  My report is a synopsis, not a verbatim blow by

12   blow of the events that happened.

13 Q   Okay.  Now the -- are you sure there was a foyer there?

14 A   From what I recall there was.  I haven't gone by the

15   store to check.

16 Q   Okay.  I'm given to understand that the store was

17   remodeled since 2002 and there was no foyer there at

18   that time?

19 A   Best of my recollection there was an entryway of some

20   sort there.

21 Q   Okay.  And can you again describe -- it says in your

22   report disturbing the store so we decided to take her

23   outside the store.  Can you go through that again?

24       MS. PINKEL:  Why are you asking him to -- he's

25 already testified to this.....

24

1          MR. PHARR:  I know.

2          MS. PINKEL:  .....sequence of events.

3          MR. PHARR:  And I'm asking him to.....

4          MS. PINKEL:  Asked and answered.

5          MR. PHARR:  With all due respect, counsel, you

6    asked the same question at least six to 10 different ways

7    yesterday.  So I think that I can ask him to go through it

8    again.

9          MS. PINKEL:  Well, that was a different matter.

10   That was the issue of the fact that your client is not claiming

11   any physical, mental or emotional damages in the case.  This

12   is.....

13         MR. PHARR:  I know.  We spent an hour beating

14   that into the ground so I.....

15         MS. PINKEL:  No.

16         MR. PHARR:  .....think I can ask him to.....

17         MS. PINKEL:  He's already answered.....

18         MR. PHARR:  Okay.

19         MS. PINKEL:  .....this question.

20   Q     Let me ask you this.  Did they -- did you drag them out

21         of the store?  Did you drag her out of the store?

22   A     No, we didn't drag.  Well, define drag.

23   Q     How.....

24         MS. BERMAN:  Can we just go off record for a

25   moment, please?

1            COURT REPORTER:  Counsel has to ask, I guess.

2            MR. PHARR:  Okay.  Let's go off record.

3        (Off record)

4        (On record)

5   Q    Okay.  Can you describe how you removed her from the

6        store?

7            MS. PINKEL:  Object.  I believe he already

8   answered this question.

9   Q    I'd just ask you to go through it again.  How did you

10       take her out of the store?

11  A    With the sleeve guide.  We had our arms -- I think it

12       was probably demonstrated to you.  You know, part of

13       the arm and we were walking her -- we're pushing a

14       little bit gently and she's walking.

15  Q    Okay.

16           MS. PINKEL:  I'm going to close the door.

17  Excuse me.

18           COURT REPORTER:  Thank you.

19           MR. PHARR:  It don't really close, Mary.  So

20  I -- I'm almost done here.  So.....

21  Q    Okay.  It says nothing in your report about spinning.

22       Can you explain that?

23  A    Just omitted it.  I believe I covered the elements of

24       the crime which she was arrested for.

25  Q    Okay.  So when it says I took it away from her, she

1    struggled and we handcuffed her, that was meant to --

2    you were describing a process -- you described as kind

3    of a fluid process?

4  A    It's a summation.  You know, there's consistent verbal,

5    there's consistent physical.  Her trying to leave, us

6    restraining her.  The aspect of her needing to be

7    handcuffed was the result of the fact of I took the

8    wallet from her, she struggled, we handcuffed her.

9    It's just a summation.  It's not a narrative of exact

10    events.

11         MR. PHARR:  Okay.  Thank you.  No further

12  questions.

13         MS. PINKEL:  Okay.  I just have a few, just to

14  follow up on for clarification.

15                    CROSS EXAMINATION

16  BY MS. PINKEL:

17  Q    I just want to clarify something with you, Officer

18    Davis.  At the time you removed Ms. Berman's wallet,

19    was it your understanding that you had already detained

20    her, is that correct?

21  A    Yes.

22  Q    Okay.  Now, you -- your report says that you ran her ID

23    and her license had expired, is that correct?

24  A    Yes, that's correct.

25  Q    And what did you tell her to do based on the fact that

| | | |
|---|---|---|
| 1 | | her license had expired, if you remember? |
| 2 | A | I don't specifically recall. |
| 3 | Q | Okay.  Do you think that the fact that ms. Berman had |
| 4 | | an expired license played a role in her resistance to |
| 5 | | producing her identification to you and Officer Dutton? |
| 6 | | MR. PHARR:  Objection, calls for speculation. |
| 7 | Q | You can answer the question. |
| 8 | A | Okay.  Yes, I -- yes, I do. |
| 9 | Q | Okay.  Have you been -- how long have you been a police |
| 10 | | officer? |
| 11 | A | Just past 11 years now. |
| 12 | Q | Have you ever had any contact with lawyers in your work |
| 13 | | as a police officer? |
| 14 | A | Yes, I have. |
| 15 | Q | Were you surprised when you found out Ms. Berman was a |
| 16 | | lawyer? |
| 17 | A | Shocked. |
| 18 | Q | And why were you shocked? |
| 19 | A | Normally I find attorneys very professional, very |
| 20 | | knowledgeable of the law.  And while they may not agree |
| 21 | | with what we're doing they have a strong sense of |
| 22 | | working with us and working through the problem as |
| 23 | | opposed to bluntly opposing us. |
| 24 | Q | Okay.  And in this instance was it your impression, |
| 25 | | based on this incident, that she was bluntly opposed to |

1    what you and Officer Dutton were there to do?

2  A    Yes.

3  Q    Okay.  Now, Officer Dutton cited her for resisting an

4       officer?

5  A    Yes.

6  Q    Okay.  Did you agree with that citation?

7  A    At the time, yes.

8  Q    Okay.  And did you believe she had intentionally,

9       knowingly or recklessly delayed or obstructed Officer

10       Dutton's active investigation of a crime?

11  A    Yes.

12  Q    Okay.

13            MS. PINKEL:  I have no further questions.

14  Okay.  I'm done.

15            MR. PHARR:  Wait, wait.

16            **REDIRECT EXAMINATION**

17  BY MR. PHARR:

18  Q    Did you tell her she was under arrest before you took

19       her wallet?

20  A    No.

21  Q    Did you ever tell her that if she didn't show ID she

22       would be arrested?

23  A    I don't -- I know I didn't say that.

24  Q    Did you hear Dutton say it?

25  A    I don't recall that.  It may have been said but I don't

29

1    recall it specifically.

2        MR. PHARR:  Okay.  Thank you.

3        COURT REPORTER:  All right.  We'll go off

4  record?

5        MS. PINKEL:  One other question just to follow

6  upon what John just asked you.

7                    **RECROSS EXAMINATION**

8  BY MS. PINKEL:

9  Q    In your training is it true you don't have to tell

10       someone they're under arrest.....

11 A    That's correct.

12 Q    .....to -- for them to be under arrest?

13 A    That's correct.

14 Q    Okay.  Thank you.

15        MR. PHARR:  Okay.  That's it.

16       (Off record)

17                  **(END OF PROCEEDINGS)**

18

19

20

21

22

23

24

25

