Mary B. Pinkel
Assistant Municipal Attorney
Municipality of Anchorage Department of Law
Civil Division
P.O. Box 196650
Anchorage, Alaska  99519-6650
(907) 343-4545 (phone)
(907) 343-4550 (fax)
uslit@muni.org

Attorney for Defendants Anchorage
Police Department, Officer Robert Dutton,
And Sergeant Gil Davis

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JUDY L. BERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT, | ) |
| OFFICER ROBERT DUTTON, and | ) |
| SGT. GIL DAVIS, | ) |
| | ) |
| Defendants. | ) |
| | ) |

U.S. District Court Case No. 3:04-cv-227-TMB

## THE MUNICIPAL DEFENDANTS' OPPOSITION TO
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.    INTRODUCTION

For the reasons stated below, the Anchorage Police Department, Officer Robert

Dutton and Sergeant Gil Davis ("the Municipal Defendants"), by and through the Office

of the Municipal Attorney, request that the court deny the plaintiff's motion for partial

summary judgment.  This opposition is supported by the attached affidavits of Robert

Dutton, Gil Davis, Chih Chen, Sharon Chen and John Daily, and by the deposition

transcripts of Robert Dutton, Gil Davis and Ms. Judy Berman.[1]

## II.     <u>**THE FACTS**</u>

On April 6, 2002 at about 10:00 p.m., Judy Berman entered the Carrs' Huffman

parking lot so that she could buy groceries. Deposition of Judy Berman, Exhibit A,

("Exhibit A"), page 32.  Another vehicle approached the store and parked in the space in

which she had wanted to park. *Id*., page 32.  Ms. Berman honked her horn to indicate to

the driver of the other vehicle that she had been waiting to park in that space. *Id*., page

32.  Ms. Berman admits that she honked her horn at the other car at least four or five

times. Exhibit A, page 33.  She also admits that she then parked in the space right next to

the other vehicle. *Id*., page 33.  It is Ms. Berman's recollection that the space next to the

space in which she had wanted to park opened up "like immediately." Exhibit A, pages

33-34.  She then parked, and a man and a woman got out of the van. *Id*., page 34.  The

couple, Chih and Sharon Chen, passed in front of Ms. Berman's car. *Id*., page 34.  Ms.

Berman admits that she honked at the Chens "a couple more times." *Id.*, page 34.  Even

though Ms. Berman had found a parking spot right next to the Chens, she continued to

honk at them "just to let them know that I thought it was – what they did was rude." *Id*.,

page 34.

---

[1]   Because the issues raised in the Plaintiff's motion for partial summary judgment are almost identical to many of
the issues raised in the Defendants' Motion for Summary Judgment on Qualified Immunity, the arguments made
below are very similar to the arguments raised in the Defendants' Memorandum in Support of Motion for Judgment
on Qualified Immunity and in their Reply Brief.

The MOA's Opposition to Plaintiff's Motion for Partial Summary Judgment
Case No. 3:04-cv-227-TMB
Page 2 of 30

Ms. Berman admits that she "kind of mouthed at them [the Chens]" that they had been rude, but states that "I did not use my voice at all." *Id*., page 34. Ms. Berman maintains that she honked at the Chens "to get their attention so that they would look at me and then I mouthed at them 'that was really rude.'" *Id*., page 34.

Officer Robert Dutton and Sergeant Gil Davis were on duty and assigned to alcohol enforcement detail outside the liquor store at the Carrs Huffman Grocery Store ("Carrs Huffman") in Anchorage on the evening of April 6, 2002. Affidavit of Robert Dutton, Exhibit D, ("Exhibit D"), paragraph 4. The purpose of the officers' enforcement work was to target under-age drinking. *Id.* Officer Dutton was working from a marked police vehicle in uniform. *Id.* Officer Davis was acting "undercover." *Id.* At about 10:15 p.m., the officers decided to leave the liquor store at Carrs Huffman. Exhibit D., paragraph 5.

As he drove through the parking lot and towards the exit to Huffman Road, Officer Dutton heard a horn honking repeatedly. Exhibit D, paragraph 5. Officer Dutton's initial impression was that this sound may have come from a car alarm. *Id.* Officer Davis also heard a horn honk several times. Affidavit of Sergeant Gilbert "Gil" Davis, Exhibit E, ("Exhibit E"), paragraph 5. The sound Officer Davis heard was not a normal "beep beep" but a loud series of loud honking. *Id.* It was Officer Davis's belief, based upon his training and experience as an officer, that something was going on that needed the officers' attention. *Id.* Officer Dutton's initial impression was that the sound may have come from a car alarm. Exhibit D, paragraph 5. Officer Dutton then made a

"U" turn at the entrance to the Carrs Huffman parking lot and told Sergeant Davis that he was going back to check on the car horn. *Id*.

As he returned to the parking lot, Officer Dutton observed that the horn sound was coming from a woman stopped in her car in front of the Carrs store. Exhibit D, paragraph 6. Officer Dutton later determined that this woman was Judy Berman. *Id*. As Officer Dutton approached Ms. Berman, she made a three quarter "U" turn and pulled into a parking spot in front of the store. *Id*. Officer Dutton then saw two people exit a mini-van that was parked next to Ms. Berman's vehicle. *Id*. Ms. Berman then started honking and screaming at them again. *Id*. Deposition of Robert Dutton, Exhibit B, ("Exhibit B"), page 11. Officer Dutton later determined that these two people were Chih and Sharon Chen. Exhibit D, paragraph 18. This behavior on the part of Ms. Berman alarmed Officer Dutton. *Id*., paragraph 6. As a police officer, Dutton had been trained to look for signs of road rage or domestic violence, and Ms. Berman's behavior could have fit either category. *Id*. He therefore parked his vehicle behind Ms. Berman's vehicle, thereby blocking it, and approached her car and knocked on her window. *Id*.

Ms. Berman admits that her purpose in honking her horn had nothing to do with her safety. Exhibit A, page 36. She further admits that the situation in the parking lot had become "mildly adversarial" before Officer Dutton approached her. Exhibit A, page 55. She denies that her behavior was the cause of the "mildly adversarial" situation. *Id*., page 55.

The Chens were very glad that the police officer had stopped Ms. Berman on April

6, 2002.  Affidavit of Hsuehjen ("Sharon") Chen, Exhibit F ("Exhibit F"), paragraph 6.

Affidavit of Chih Chen, Exhibit G ("Exhibit G"), paragraph 5.  Sharon Chen, an

informational technology manager at the Alaska Court System, and Chih Chen, a senior

tax accountant at Alaska Communications System ("A.C.S."), had stopped at the Carrs

Huffman Store to purchase some groceries.  Exhibit F, paragraphs 1 and 2.  Exhibit G,

paragraphs 1 and 2.  Mr. Chen was at the wheel of the couple's mini-van, and parked it in

an open parking space in front of the store.  Exhibit G, paragraph 2.

As Mr. Chen parked the mini-van, Ms. Chen heard someone honk a car horn

loudly several times.  Exhibit F, paragraph 3.  As the Chens exited the car, they saw the

woman waving her arms and screaming at them.  *Id*., paragraph 3.  Exhibit G, paragraph

3. The Chens had no idea why this woman was honking and screaming at them. *Id*.  The

woman was behaving aggressively.  Exhibit G, paragraph 3.  Her behavior was rude,

abusive and intimidating.  Exhibit F, paragraph 4.  Exhibit G, paragraph 3.  Both Mr. and

Ms. Chen wondered if the woman was under the influence of alcohol or drugs. *Id*.  It was

their impression that this woman, whom they later learned was Ms. Judy Berman, was

acting highly abnormally, and they were afraid that she would get violent with them and

possibly hurt them or their car. *Id*.

A police officer then approached Ms. Berman and interrupted her.  Exhibit G,

paragraph 4.  After the police officer had come up to Ms. Berman, Sharon Chen heard

Ms. Berman tell him that she was going to "sue" him.  Exhibit F, paragraph 5.  Ms. Chen

also heard Ms. Berman say: "I am a U.S. citizen." *Id*.  All that the officer had done was

approach Ms. Berman and begin speaking to her. *Id.* In contrast to Ms. Berman, who was acting extremely agitated and abnormal, the police officer who had stopped her spoke and acted very calmly. *Id.* The police intervention at that point made the Chens feel safe. *Id.* The Chens then went into the store to do the shopping and were interviewed by the officer later. Exhibit F, paragraph 7. Exhibit G, paragraph 6.

When the Chens eventually learned that Ms. Berman had been angry at them for "taking" her parking space, they were very surprised. Exhibit F, paragraph 8. Exhibit G, paragraph 7. There were many open parking spaces in front of the grocery store that night. *Id.* Had the police officer not intervened when he had, they do not know what would have happened. *Id.* In her work for the Alaska court system, Ms. Chen comes into daily contact with many lawyers and judges. Exhibit F, paragraph 9. She was very surprised to learn that Ms. Berman is an attorney. *Id.* Mr. Chen was also surprised to learn that Ms. Berman is an attorney. Exhibit G, paragraph 8. The Chens perceived Ms. Berman's behavior towards them on April 6, 2002 as very threatening, hostile and frightening. Exhibit F, paragraph 9. Exhibit G, paragraph 8. They found Ms. Berman's behavior towards the police to be very disrespectful. *Id.*

After Officer Dutton had knocked on her window, Ms. Berman opened the door and stepped out. Exhibit D, paragraph 7. Officer Dutton calmly asked Ms. Berman why she had been creating a disturbance in the parking lot. Exhibit D, paragraph 7. Ms. Berman responded that she was upset because the other vehicle [the mini-van driven by the Chens] had taken her parking space. *Id.* Officer Dutton concluded that this

explanation was illegal and irrational. *Id*.  Under the Anchorage Municipal Code, it is not acceptable to use one's horn to harass other people. *Id.* [2]  It is also not normal behavior to react in the manner in which she had reacted to the mere taking of a parking space by another driver. *Id*.  Therefore, Ms. Berman's explanation of her behavior further aroused Officer Dutton's suspicion. *Id*.  He told Ms. Berman that she was creating a disturbance, and that the direction in which she had been driving did not entitle her to park in that spot anyway. *Id*.  Ms. Berman told Officer Dutton to "have a nice day" and then started to walk away. *Id*.  This behavior on the part of Ms. Berman in speaking in that sarcastic tone of voice and in walking away from him further aroused Officer Dutton's suspicion. *Id*. Officer Dutton was again concerned that Ms. Berman could act violently towards the couple or towards other customers in the vicinity. *Id.*

According to Ms. Berman, Officer Dutton asked her if there was something wrong with her car horn. *Id.*, page 38.  She recalls that she denied that there was anything wrong with it. *Id.*  Ms. Berman further admits that Officer Dutton told her that she had been creating a disturbance. *Id.*

Based on Ms. Berman's own testimony that her honking at the Chens was motivated by a desire to "tell them that they were rude" and was not motivated by any warning of danger, Berman's conduct in honking at the Chens was in violation of Anchorage Municipal Code Section 15.70.090 C (wrongful use of horn); AMC 08.30.120

---

[2]  AMC 15.70.090 prohibits the sounding of a horn in any motor vehicle on any public space except as a warning of danger. See, AMC 15.70.090 (C).  AMC 8.30.120 states that it is unlawful for any person to knowingly generate loud noise in a public place with the intent to disturb others or in reckless disregard of the peace and privacy of others.  See, AMC 8.30.120 A. and B.  In addition, AS 11.61.110 states that it is disorderly conduct to make an unreasonable loud noise in a public place with the intent to disturb the peace and privacy of another. AS 11.61.110(a)(2).

(disturbing the peace); and AS 11.61.110 (disorderly conduct)[3].

Ms. Berman has also admitted that Officer Dutton told her that she had no right to pull into the parking space from the left. Exhibit A, pages 38-39. Ms. Berman does not deny that she had started to walk away from Dutton. *Id*., page 43. Officer Dutton told Ms. Berman that he needed to see her identification. Exhibit D, paragraph 8. According to Officer Dutton, Ms. Berman told him that she did not have any identification and that she was not going to show it to him anyway. *Id.* Ms. Berman admits that she told Officer Dutton "No" when he asked to see her identification. Exhibit A, page 43. It was Berman's opinion that Officer Dutton could not legitimately ask for her identification because "I thought that was a second stop…I was already walking away." *Id.*, page 43. However, AMC 9.12.030 and AS 28.15.131 require that individuals with driver's licenses present them on demand when peace officers request them. See, AMC 9.12.030 and AS 28.15.131.

Ms. Berman's refusal to produce identification and her statement that she did not have any identification further aroused Officer Dutton's suspicion. Exhibit D, paragraph 8. It had been his experience that individuals who refuse to show identification or a driver's license usually have a reason: a revoked license or another reason that they are not allowed to drive. *Id.*[4] Officer Dutton told Ms. Berman that he wanted to see her identification because he was investigating a disturbance that she had created. *Id.* In addition, since Ms. Berman had just driven a motor vehicle, she was required to have a

---

[3] See, n. 2. Infra.
[4] After reading Ms. Berman's driver's license later, the officers learned that she had an expired license.
The MOA's Opposition to Plaintiff's Motion for Partial Summary Judgment
Case No. 3:04-cv-227-TMB
Page 8 of 30

driver's license in her possession.  *Id.*

Almost from the beginning of Officer Dutton's contact with her, Ms. Berman told Officer Dutton that she was going to "sue" him and that he did not have the right to be "harassing" her.  Exhibit D, paragraph 9.  This behavior on her part was also suspicious and troublesome. *Id.*  As a police officer, he routinely questioned individuals about illegal behavior and was rarely told that he would be "sued" for doing his job. *Id.*

Ms. Berman continued to walk away from Officer Dutton towards the entrance to Carrs.  Exhibit D, paragraph 10.  Officer Dutton continued to walk towards the entrance with Ms. Berman. *Id.*  Officer Dutton found that Ms. Berman's behavior in walking away from him when he was still talking to her suspicious. *Id.*  He questioned why she was trying to avoid him and why she was refusing to show him her driver's license or other identification. *Id.*  Berman kept trying to walk away from him and to proceed towards the store, stating that she did not need to show identification to the officer. *Id.*

Officer Dutton eventually positioned himself between Ms. Berman and the front door of Carrs so that he could gain her cooperation.  Exhibit D, paragraph 11.  Ms. Berman again tried to walk away from him. *Id.*  Officer Dutton then placed  Ms. Berman in a "sleeve guide" and told her that he was investigating a disturbance she had caused. *Id.*  A "sleeve guide" is one of the lowest forms of physical restraint that an officer uses on uncooperative persons. Id.[5]  A "sleeve guide" consists of holding an individual near the elbow with some upward pressure. *Id.*  Ms. Berman responded that she was a citizen

---

[5]  A sleeve guide is "rock bottom" in the continuum of force that police officers use, "meaning…down here is a sleeve guide, up here is a baton, up here is deadly force."  Deposition of Dutton, page 15.

of the United States and an attorney, and that she was not going to identify herself to Officer Dutton because she had not done "anything wrong." *Id*. Ms. Berman told Officer Dutton that if he did not take his hand off her arm, she would "sue" him. *Id*. Ms. Berman also demanded that Officer Dutton show her his identification. *Id*.

Sergeant Davis arrived as the "cover" (back-up) officer for Officer Dutton's contact with Ms. Berman. Exhibit D, paragraph 12. Sergeant Davis had parked his car in the parking lot some distance away due to the fact that he was working "under cover." Exhibit E, paragraph 6. Sergeant Davis had observed Ms. Berman waving her arms and yelling, although he could not hear her. *Id*. As he approached the store, it appeared to Sergeant Davis that Ms. Berman was attempting to leave Officer Dutton, and that Officer Dutton was attempting to detain Ms. Berman. Exhibit E, paragraph 7. He observed Officer Dutton place Ms. Berman in a "sleeve guide" and overheard him ask for her identification. *Id*. It was Davis's impression that Dutton asked for Berman's identification and her driver's license, and that Dutton used both terms in demanding identification. *Id*.

Under Alaska law, citizens are required to produce their driver's licenses to police officers upon their request. Exhibit E, paragraph 8. In addition, in investigating crimes, traffic or otherwise, officers must obtain identification from a suspect so that they can properly identify the suspect. *Id*.

In response to Ms. Berman's request that he show her his I.D., Officer Dutton showed Ms. Berman the badge on his chest and even pulled out his wallet and showed

her his department identification so that she could confirm he was an officer. Exhibit D, paragraph 12. Exhibit E, paragraph 9. Officer Dutton produced his identification even though Berman continued to resist him and had still not produced her identification. *Id*. Officer Davis's badge was hanging from his neck. Exhibit A, page 67. Officer Davis discerned that Dutton had a problem on his hands. Exhibit E, paragraph 9. It was Davis's duty as the back-up to Dutton to assist him. *Id.* The problem that Davis had discerned was that Officer Dutton had a reason to ask for the woman's identification but for some reason she was refusing to provide it. *Id*. In Davis's view, the reason that Dutton needed the identification from Berman was two-fold. *Id.* First, her behavior earlier had appeared to potentially constitute disorderly conduct. *Id*. In addition, it was Davis's belief that Berman may have engaged in a traffic violation.[6]

Like Officer Dutton, it was Sergeant Davis's experience as a police officer that if someone does not want to produce a driver's license or identification, it is usually because that person has something to hide. Exhibit E, paragraph 9. In addition, Davis's previous observations -- the series of loud honking earlier, the yelling and screaming on the part of Ms. Berman, and her apparent evasion of Officer Dutton -- made him believe that this woman was potentially dangerous and could pose a threat to public health and safety. *Id.* Her refusal to provide identification further aroused Davis's suspicions. *Id*. He wondered if Berman had other problems that made her a public health and safety threat – e.g., domestic violence, a dangerous disposition or perhaps had a concealed

---

[6]  Under AMC 9.36.360 A, "no horn or other warning device shall emit an unreasonably loud or harsh sound or whistle." In addition, "the driver of a motor vehicle shall, when reasonably necessary to ensure safe operation, give audible warning with his horn, but may not otherwise use such horn upon a street." *Id.*

weapon – and he was therefore ready and available to assist Officer Dutton in any way he could. *Id.*

By this time, Ms. Berman had begun digging in her purse and told the officers she wanted to write their names down. Exhibit B, page 16. Exhibit C, page 12. Exhibit D, paragraph 12. It was therefore the impression of both officers that Ms. Berman was retrieving her wallet, a rectangular object, so that she could find something to write their names down with. Davis then told Berman that as long as she had her wallet out, she needed to show the officers her license. Exhibit C, page 13. Exhibit E, paragraph 10. Exhibit D, paragraph 13. Instead of producing her driver's license as directed by Davis, Berman hesitated, then made the following comment: "I'm an American citizen. I don't have to do this." Exhibit C, page 13. Ms. Berman then started to pull away from Officer Dutton and started to "spin." Exhibit D, paragraph 13. See, also Exhibit B, pages 16-17; Exhibit C, page 13. According to Officer Davis, this "spin" was a clockwise right-spinning turn, similar to what one sees on a basketball court when a player "goes around" a "block." Exhibit C, page 13; Exhibit E, paragraph 10. In both officers' minds, Ms. Berman's movement signified that she had gone from non-compliance to active resistance, and that she was attempting to flee from them. Exhibit D, paragraph 13. Exhibit E, paragraph 10.

After Ms. Berman pulled away and began to "spin," Officers Davis and Dutton then restrained Ms. Berman by taking control of one arm each and placing both of Ms. Berman's arms behind her back. Exhibit E, paragraph 11. Exhibit D, paragraph 14. The

officers then placed Ms. Berman in handcuffs. *Id.*  It was Officer Davis's and Officer Dutton's understanding that they had detained Ms. Berman and that Ms. Berman was at that time under arrest. *Id*.  During this period, Officer Davis then took Ms. Berman's wallet out of her hand.  *Id.*  See, also Exhibit B, page 34.  Exhibit C, page 13.  Officer Davis opened the wallet and removed Berman's license.  Exhibit E, paragraph 11; Exhibit C, page 14.

At the time that Davis opened Ms. Berman's wallet, Berman had already been detained and was under arrest.  Exhibit D, paragraph 14.  Exhibit E, paragraph 11.  After examining Ms. Berman's driver's license, Officer Davis returned the wallet to Ms. Berman's coat pocket.  Exhibit E, paragraph 11. Exhibit C, page 14.  Officer Davis kept the license to examine it.  Exhibit E, paragraph 11.  Ms. Berman's license had expired the year before.[7]  Exhibit D, para. 15.  Exhibit E, para. 12.

Ms. Berman has a different version of events from the officers at the point that she took out her wallet (a rectangular object).  In her brief, she states that she had taken out her wallet and was looking for her driver's license.  Memorandum of Points and Authorities in Support of Motion for Summary Judgment, page 5.  However, there is no dispute that up to that point Ms. Berman had shown a continuing pattern of fleeing and of non-compliance with Officer Dutton.  A reasonable officer would conclude that this

---

[7]  Berman was fully aware of the fact that her license had expired the year before this incident.  Deposition of Judy Berman, page 84.  When the Assistant Municipal Attorney asked Ms. Berman whether the fact that her driver's license had expired was a factor in her not wanting to show it to the officers, her attorney instructed her not to answer the question. Id., pages 84-86.  Because this is a civil proceeding, an adverse inference can be drawn from Ms. Berman's refusal to answer this question.   Therefore, it is reasonable to assume that part of Ms. Berman's refusal to produce her identification or driver's license stemmed from the fact that her driver's license had expired, a fact of which she was well aware.

explosive and irrational woman would not finally comply with the officers' commands.

In her memorandum, the Plaintiff incorrectly references Officer Dutton's deposition testimony. She states that "it did not appear to Officer Dutton that the occupants of the other vehicle were nervous or afraid." Plaintiff's Memorandum, page 3. On the contrary, Officer Dutton testified at his deposition that he did not know how they [the Chens] were acting. Exhibit B, page 11, line 10. Dutton also testified that Berman's screaming was loud enough that he could hear it as he was approaching. *Id.*, pages 10-11.

The Plaintiff also incorrectly states that Officer Dutton made the comment that "if you do it again, I'll find it in my heart to cite you." Plaintiff's memorandum, page 4. On the contrary, Officer Dutton has testified that "that just does not sound like anything I would have ever said." Exhibit B, pages 27-28.

The Plaintiff also incorrectly states that the officers "took hold of the plaintiff's arms which [with] such force that they left bruises on both of her arms." Plaintiff's Memorandum, page 5. On the contrary, the Plaintiff has not established that the Officers bruised her arms. Further, it should be noted that the plaintiff has not alleged any physical or emotional injuries in this case. Exhibit A, pages 15 to 27. She vaguely only claims injuries due to the alleged violation of her civil rights. *Id.*

The Plaintiff references the Officers' police reports rather than their affidavit testimony or depositions as support for her arguments. Federal Rule of Civil Procedure 56 requires that motions for summary judgment be supported by Affidavits. See, Federal Rule of Civil Procedure 56 (a) and (c). Therefore, the court should disregard the

Plaintiff's reliance on the Officers' police reports over their affidavit and deposition testimony. Not only are the police reports hearsay documents[8] and thus not a basis for a motion for summary judgment, they are also synopses of what occurred, and thus do not tell the whole story of what occurred from the Officers' viewpoint. For example, at his deposition, Sergeant Davis testified that: "My report is a synopsis, not a verbatim blow by blow account of the events that happened." Exhibit C, page 23, lines 11-12. Moreover, at the time that he removed Ms. Berman's wallet, it was Sergeant Davis's understanding that he and Dutton had already detained Ms. Berman. *Id.*, page 26, lines 17-21.

Further, contrary to the Plaintiff's rendition of the facts, Officers Davis and Dutton did not "change" their accounts of the arrest and removal of Ms. Berman's driver's license from her wallet. Plaintiff's Memorandum at pages 5-8. There is no dispute about the fact that Ms. Berman had "declined" to produce identification after having been stopped by Officer Dutton for creating a disturbance. Exhibit A, page 48. Ms. Berman does not dispute that she had continued to walk towards the entrance of the store after being stopped by Officer Dutton. Exhibit A, page 43. She does not dispute that Officer Davis searched her wallet after the officers had handcuffed her. Affidavit of Berman in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment on Qualified Immunity, paragraph 25. In addition, there is no dispute about the fact that AS 28.15.131 requires licensees to carry and exhibit their drivers' licenses upon the demand of a police officer.

---

[8] See, Federal Rule of Evidence 803 (8).

III.    **ARGUMENT**

   **A.  Ms. Berman was lawfully stopped by Officer Dutton.**

      The Plaintiff argues that Officer Dutton's stopping of her in the Carrs' parking lot after he had observed her honking repeatedly at the Chens and after he had heard her screaming at them was an "unlawful seizure of an individual, without arrest and without a warrant," in violation of *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868 (1968).  However, Officer Dutton's conduct in stopping and questioning Ms. Berman in the parking lot was lawful and appropriate.

      An officer may conduct an investigatory stop where "reasonable suspicion that imminent public danger exists or serious harm to person or property has recently occurred."  *Coleman v. State,* 553 P.2d 40 (Alaska 1976) (relying on and referencing *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1880 (1968) ("a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.")  In addition, "intrusive police conduct may be acceptable where there is a legitimate reason to be concerned for the welfare of a motorist….To justify conduct that would amount to an investigative stop, an officer must be aware of at least some specific circumstances supporting a reasonable belief that the occupants of a vehicle need assistance.  *Marsh v. State,* 838 P.2d 819 (Alaska 1992) (citations omitted).

      In the present case, Ms. Berman's behavior led both officers to conclude that there was a potentially explosive situation, and that Ms. Berman presented a danger to the

Chens or to other members of the public. Both officers had witnessed a crime being committed, as Ms. Berman had created a disturbance, in violation of AMC 8.30.120 A and B; had mis-used her horn, in violation of AMC 15.70.090 (C); and had engaged in disorderly conduct, in violation of AS 11.61.110. Moreover, they had legitimate concerns about the safety of the Chens and other members of the public. The fact that the Chens found Berman's behavior to be very frightening and made them afraid that she would get violent with them shows the wisdom of the officer's decision to stop and question Ms. Berman.

Neither *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868 (1968) nor any of the other cases discussed by the Plaintiff support her position. In this case, Ms. Berman's behavior led both officers to believe that something was occurring that needed their immediate attention. Dutton was concerned about the possibility of road rage or domestic violence, and Ms. Berman's behavior could have fit either category. Exhibit D, paragraph 6. It was Davis's impression, based on his training and experience as a police officer, that something was occurring which required his and Officer Dutton's attention. Exhibit E, paragraph 5. Therefore, Officer Dutton's conduct in stopping and questioning Ms. Berman was not precluded by *Terry, supra.* On the contrary, *Terry* supports the notion that police officers have the duty to investigate dangerous situations. The police conduct in such situations is limited in the following manner:

> …the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion….And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available

to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

*Id.,* 392 U.S. at 21-22.  In this case, Officer Dutton had articulable facts which alarmed him: Berman's repeated honking and screaming at the Chens. These facts taken together with rational inferences from those facts --  that Ms. Berman may be the perpetrator of a "road rage" or domestic violence situation -- reasonably warranted his decision to stop Ms. Berman and question her.

## B.  Ms. Berman was lawfully arrested.

Contrary to the Plaintiff's contentions, she was lawfully arrested by Officer Dutton and Sergeant Davis.  Under the undisputed facts of this case, Officers Dutton and Davis were justified in arresting Ms. Berman because they had probable cause to believe she had committed or attempted to commit the crime of resisting an officer, in violation of AMC 08.30.010A.4 and 6.  In addition, they had probable cause to believe she had engaged in disorderly conduct, in violation of AS 11.61.110 (a) (2); had created a disturbance, in violation of AMC 8.30.120; and had mis-used her horn in violation of AMC 15.70.090 (C).

Because Officers Dutton and Davis had probable cause to arrest Ms. Berman for resisting an officer, Ms. Berman's false arrest claim necessarily fails.  *Hart v. Parks,* 450 F.3d 1059, 1069 (9th Cir.2006) citing *Carbrera v. City of Huntington Park,* 159 F.3d 374, 380 (9th Cir.1998) (per curiam) ("To prevail on his Section 1983 claim for false arrest…[the plaintiff] would have to demonstrate that there was no probable cause to arrest him.")  "Probable cause exists when 'the facts and circumstances within [the

officers' knowledge] and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" *Hart v. Parks, supra,* 450 F.3d 1059, 1065-1066 (citations omitted). "Police must only show that, 'under the totality of the circumstances, 'a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.'" *Id.* (citations omitted).

In this case, under the totality of circumstances, not only because of (1) the unlawful use of a horn; (2) disorderly conduct, as discussed above; but also (3) resisting an officer, a prudent person would have concluded that there was a fair probability that Ms. Berman had committed the crime of resisting an officer, in violation of AMC 08.30.010A.4. or in violation of AMC 08.30.010A.6. By her own testimony, both at her deposition and in her affidavit, Ms. Berman was non-compliant with the officers, and attempted to obstruct Officer Dutton's investigation of her crime (of disorderly conduct in the parking lot). She fled (or continued to walk away) after he had indicated he needed further information from her. In addition, she repeatedly refused to comply with his request that she show him identification, as required by Alaska law.

## C.    Ms. Berman was not assaulted and battered.

Contrary to her contentions, Ms. Berman was not assaulted and battered by the officers. After Officer Dutton had observed Ms. Berman's threatening behavior towards the Chens in the parking lot, he was alarmed. Exhibit D, paragraph 6. Dutton parked his vehicle behind Ms. Berman's vehicle, thereby stopping and detaining her. *Id.* He calmly

asked her why she had been creating a disturbance. Exhibit D, paragraph 7.  He concluded that her explanation was illegal and irrational. *Id*.  Officer Dutton told Ms. Berman that he needed to see her identification. Exhibit D, paragraph 8.  Berman told Officer Dutton that she did not have identification and that she would not show it anyway. *Id*.  Berman walked away from him. Exhibit D, paragraph 10.

Officer Dutton eventually positioned himself between Ms. Berman and the front door of Carrs so that he could gain her cooperation.  Exhibit D, paragraph 11.  Berman again tried to walk away from Officer Dutton. *Id*.  He then placed her in a "sleeve guide" and told her that he was investigating a disturbance she had caused. *Id*.  Berman again refused to comply with Officer Dutton. *Id*.  She demanded that he and Sergeant Davis show identification, even though Dutton was in full uniform and Davis had his identification badge hanging from his neck. *Id*.  Ms. Berman still did not produce identification. Exhibit D, paragraphs 11 and 12.  Instead, she began to dig into her purse, giving the officers the impression that she was searching for something to write the officers names down with. Exhibit D, paragraph 12.  Davis told Ms. Berman that she should get her driver's license out of her wallet as long as she had the wallet out. Exhibit D, paragraph 13.  However, instead of following Davis's instructions, Berman hesitated, then made the comment, "I don't have to do this." *Id*. See, also Exhibit E, paragraph 10. She then tried to pull away from the officers and started to spin. *Id*.  In the officers' view, this action by Berman indicated that she was actively resisting their commands, and that she was attempting to flee. *Id.*

The officers restrained Ms. Berman by taking control of one arm each. Exhibit E, paragraph 11. They placed her arms behind her back. *Id*. They then placed her in handcuffs. It was their understanding that they had detained her and that she was under arrest. *Id*. Officer Davis took her wallet out of her hands and removed her driver's license. *Id*. He returned her wallet to her coat pocket and kept the license to examine.

These actions on the part of the officers do not constitute assault and battery. Even assuming Ms. Berman's version of events was correct (that she was in fact attempting to comply with the officers at the point that she reached into her purse and did not in fact "spin" away from them), both officers by that point in time had reasonably concluded that Ms. Berman was going to continue to evade Officer Dutton's request that she produce identification.

To determine whether force used was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. O'Connor,* 490 U.S. 386, 396, 109 S.Ct. 1865 (1989) (citations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 20-22, 88 S.Ct. 1868 (1968).) The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested (citations omitted), nor by the mistaken execution of a valid search warrant on the wrong premises *Id.* (citations omitted). With respect to a claim of excessive force, the same standard of reasonableness

at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers (citations omitted), violates the Fourth Amendment." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 397.

Contrary to Plaintiff's contentions, the police had the authority to stop, detain and question Ms. Berman for her illegal conduct in using her horn, disturbing the police, and for disorderly conduct, which the officers had witnessed. Applying the *Graham* analysis, the use of force was not at all excessive in this case. After Ms. Berman had continued to evade the officers, they had the authority to detain and arrest her and to use the level of force -- sleeve guide, then restraint through placement of arms behind her back, then handcuffs -- which they used.

The Plaintiff erroneously relies on *Young v. State,* 72 P.3d 1250 (Alaska App. 2003) as support for her authority. However, unlike the suspect in the *Young* case, Ms. Berman, by her illegal behavior, had created reasonable suspicion by her behavior towards the Chens and by the fact that she had committed several crimes in the presence of the officers. Had Officer Dutton and Sergeant Davis not responded to Ms. Berman, they would have been remiss in their duties, which included protecting the public from individuals who engage in dangerous behavior. Exhibit D, paragraph 20. The officers also had the discretion to charge her for the other crimes they had witnessed, such as

creating a disturbance; disorderly conduct; and failing to produce her driver's license. Exhibit E, paragraph 12.  Exhibit D, paragraph 21.  See, also, affidavit of Officer John Daily, Exhibit H, ("Exhibit H"), paragraph 8.  The officers could have also cited Ms. Berman for driving with an expired license.  Exhibit H, paragraph 15.  However, Officers Dutton and Davis used their officers' discretion to merely cite Ms. Berman for resisting or interfering with an officer.  Exhibit E, paragraph 12.  Exhibit D, paragraph 20.

The officers' decision to restrain and handcuff Ms. Berman was appropriate under the circumstances.  Exhibit H, paragraph 13.  In fact, it would have been appropriate for Officer Dutton to handcuff her earlier when she first began to walk away from him against his orders. *Id*.  Therefore, the Plaintiff has failed to establish that she has a viable claim for assault and battery.

**D. Ms. Berman's civil rights under 42 U.S.C. Sec. 1983 were not violated because the stop, detention and arrest did not violate her constitutional right to be free of unreasonable searches.**

Contrary to Ms. Berman's contentions, her civil rights were not violated by the officers' stop, detention and arrest of her.  First, Officer Dutton's conduct in initially stopping and questioning Ms. Berman in the parking lot was lawful and appropriate.  An officer may conduct an investigatory stop where "reasonable suspicion that imminent public danger exists or serious harm to person or property has recently occurred." *Coleman v. State,* 553 P.2d 40 (Alaska 1976).  "Intrusive police conduct may be acceptable where there is a legitimate reason to be concerned for the welfare of a motorist." *Marsh v. State,* 838 P.2d 819 (Alaska 1992).

The Officers had ample reason to be concerned about Ms. Berman.  The repeated honking by Ms. Berman at the Chens was not a normal "beep beep."  Exhibit E, paragraph 5.  Her screaming at the couple was also not normal.  After the couple had exited the van, she had honked at them again.  The couple feared Ms. Berman was under the influence of alcohol or drugs.  Exhibit F, paragraph 4.  Exhibit G, paragraph 3.  They thought she was acting abnormally, and were afraid that she would get violent with them and possibly hurt them or damage their car. *Id*.  Hsuehjen (Sharon) Chen very clearly heard Ms. Berman tell Dutton that she would "sue him" and that she [Berman] was "a U.S. citizen."  Exhibit F, paragraph 5.   The Chens were glad that Dutton had stopped Ms. Berman.  Exhibit F, paragraph 6.  Exhibit G, paragraph 5.  The police intervention made the Chens feel safe. *Id.*   The Chens will always be grateful that the police intervened when they did.  Exhibit F, paragraph 8.

The detention and arrest of Ms. Berman were also lawful and appropriate.  "Police officers must be permitted to act *before* their reasonable belief is verified by escape or fruition of the harm it was their duty to prevent." *State v. Moran,* 667 P.2d 734, 736 (Alaska 1983) (emphasis included).  Despite her arguments to the contrary, Ms. Berman was not entitled to resist the Officer's attempts to detain her.  Further, the officers had probable cause to arrest Ms. Berman for resisting an officer, in violation of AMC 8.30.010 A.4 and 6.  Both officers believed that at the point that they restrained and arrested her, Berman had "intentionally, recklessly, or knowingly delayed or obstructed their active investigation of a crime by fleeing after having been told to stop.  Exhibit D,

paragraph 21.  Exhibit E, paragraph 10.  Dutton and Davis could have also cited Ms. Berman for other crimes committed in their presence: creating a disturbance; disorderly conduct; failing to produce her driver's license; and driving with an expired license. Exhibit D, paragraph 21.  Exhibit E, paragraph 12.

### E.  The search of Ms. Berman's wallet was constitutional as a matter of law.

After Ms. Berman continued to evade them, Officer Dutton and Sergeant Davis restrained Ms. Berman by taking control of one arm each.  Exhibit E, paragraph 11.  They placed her arms behind her back.  *Id.*  It was Davis's understanding that he and Dutton had detained Berman and that she was under arrest.  *Id.*  Sergeant Davis then removed her wallet out of her hands and took out her driver's license.  He returned her wallet to her coat pocket and kept the license to examine.  *Id.*

Sergeant Davis had the authority to search the wallet for Ms. Berman's identification.  A police officer has broad authority to conduct a search of an arrestee's person and the area within his control incident to a valid arrest.  *U.S. v. Robinson,* 414 U.S. 218, 235, 94 S.Ct. 467, 477 (1973). ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.")  See, also, *Crawford v. State,* 138 P.3d 254 (Alaska 2006). ("Warrantless searches of items immediately associated with the person are justified even after the arrestee is in police custody because, by their nature, they do not involve "any greater reduction in the arrestee's expectations of privacy than that caused by the arrest itself.")

Moreover, the search of the wallet for the limited purpose of locating Ms. Berman's driver's license was warranted under AS 28.15.131 and was not prohibited by the Fourth Amendment. Although it is well established that motorists have a cognizable privacy interest against unreasonable searches and seizures, the United States Supreme Court has frequently observed that, in light of the pervasive regulation of vehicles capable of traveling on the public highways, individuals generally have a reduced expectation of privacy while driving a vehicle on public thoroughfares. *New York v. Class,* 475 U.S. 106, 112-113, 106 S.Ct. 960 (1986). (upholding warrantless search of automobile to discover its vehicle identification number.) Moreover, the Ninth Circuit has held that police may search a vehicle for identifying documents where a defendant fails to produce a driver's license or vehicle registration. *U.S. v. Brown,* 470 F.2d 1120 (9th Cir.1972). See, also, *In Re Arturo D.,* 38 P.3d 433 (California 2002). (A limited warrantless search of a vehicle for automobile registration, a driver's license and identification documentation does not violate the Fourth Amendment during a valid traffic stop when the driver fails to produce the documents.) Accordingly, Officer Davis' search of Ms. Berman's wallet for her identification was lawful. Contrary to the Plaintiff's contentions, Officer Davis was not required to obtain a warrant to open her

wallet and remove the driver's license.[9]

In *New York v. Class, supra,* 475 U.S. 106, 106 S.Ct. 960 (1986), the court examined the conduct of police officers who had stopped a defendant for two traffic violations and had reached into the interior of the defendant's automobile to remove papers from the dashboard which had obstructed the vehicle identification number ("VIN"). The court held that the officers' conduct constituted a search within the meaning of the Fourth Amendment. However, the court held that the search was sufficiently unintrusive to be constitutionally permissible, thus justifying the officers' seizure of a weapon that they had found protruding from underneath the driver's seat. The court therefore reversed and remanded the decision of the New York Court of Appeals which had reversed the defendant's weapons conviction on the ground that the gun was illegally seized from the defendant's automobile. The court stated as follows:

> We hold that this search was sufficiently unintrusive to be constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations. Any other conclusion would expose police officers to potentially grave risks without significantly reducing the intrusiveness of the ultimate conduct – viewing the VIN – which, as we have said, the officers were entitled to do as part of an undoubtedly justified traffic stop.

*Id.* at 119. Like the officers' action in C*lass* in reaching inside the defendant's automobile so that they could discover the VIN, Officer Davis's action in removing Ms. Berman's driver's license from her wallet was constitutionally permissible. He and

---

[9]  Ms. Berman does not dispute the fact that the Officer Davis searched her wallet after the officers had handcuffed her. Affidavit of Judy Berman, filed in support of Plaintiff's Opposition to Defendants' Motion for Summary judgment on Qualified Immunity, paragraph 25. Therefore, there is no dispute about the fact that the search of Berman's wallet occurred after she had been taken into custody and arrested. However, even if she had not yet been arrested, AS 28.15.131 gave the officers the authority to search her wallet for identification.

Officer Dutton had observed Ms. Berman commit at least three traffic violations –
disturbing the peace, disorderly conduct, and mis-use of her horn – and the crime of
resisting an officer. She was required by Alaska law to produce identification to peace
officers. AS 28.15.131. Accordingly, his action in removing the identification from her
wallet was justified.

In *United States v. Brown,* 470 F.2d 1120 (9th Cir.1972), police officers stopped a
vehicle for making an illegal left-hand turn. The defendant failed to produce a driver's
license as required by state law; responded vaguely to a question by the officers about the
vehicle registration; failed to produce the vehicle registration as required by state law;
and was found in illegal possession of mace. The court held that the officers had the right
to inspect the vehicle for the limited purpose of ascertaining vehicle registration. The
court therefore affirmed the lower court's ruling that introduction into evidence of a
sawed-off shotgun was therefore proper under the "plain view" doctrine. The court
rejected the appellant defendant's argument that the failure of the police officers to obtain
a search warrant prior to their attempt to check the vehicle registration was violative of
his Fourth Amendment rights, stating:

> The police officers in the instant case were faced with a situation in which Brown
> [the defendant] failed to produce a driver's license as required by state law, and
> was found in the illegal possession of chemical mace. We conclude that these
> facts were amply sufficient to establish a police right to inspect the vehicle for the
> limited purpose of ascertaining the vehicle registration.

*Id.* at 1122. Like the defendant in *Brown,* Ms. Berman failed to produce a driver's
license as required by Alaska state law. In addition, she had broken at least four laws in

the officers' presence, by mis-using her horn, creating a disturbance, disorderly conduct, and resisting an officer. Accordingly, Officer Davis had ample justification for removing Berman's wallet from her hands and taking out her driver's license.

**F. Even if the officers did violate Ms. Berman's constitutional rights, which the defendants dispute, the defendants are entitled to qualified immunity on Ms. Berman's claims.**

Even if the court were to rule in Plaintiff's favor on her motion for partial summary judgment, the court would have to determine the remaining question of whether those rights she claims were violated were clearly established on April 6, 2002. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he had encountered." *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001) (citations omitted). The officers, in stopping, detaining and arresting Ms. Berman acted as reasonable officers. It would not be clear to a reasonable officer that Officer Dutton's and Sergeant Davis's conduct on April 6, 2002 was anything but reasonable. Accordingly, even if in the unlikely event that the court finds that the defendants violated Ms. Berman's rights, the defendants are entitled to qualified immunity on the Defendants' claims. See, Defendants' Motion for Summary Judgment on Qualified Immunity.

## IV.    <u>CONCLUSION</u>

For the reasons stated above, the Municipal Defendants respectfully request that the court deny the Plaintiff Judy L. Berman's motion for partial summary judgment dated

July 3, 2006.  The Plaintiff has failed to show that she is entitled to partial judgment as a matter of law on her claims of violation of civil rights, false arrest, and assault and battery.  Therefore, the court should deny the Plaintiff's Motion for Partial Summary Judgment.  The court should instead grant the Defendants' Motion for Summary Judgment on Qualified Immunity.

Respectfully submitted this 24th day of August, 2006.

FREDERICK H. BONESS
Municipal Attorney


By:  s/ Mary B. Pinkel_____
     Municipal Attorney's Office
     P.O. Box 196650
     Anchorage, Alaska 99519-6650
     Phone: (907) 343-4545
     Fax: (907) 343-4550
     E-mail: uslit@muni.org
     Alaska Bar No. 8505030


The undersigned hereby certifies that on 08/24/06 a true and correct copy of the *Municipality's Opposition to Plaintiff's Motion for Partial Summary Judgment* was served on:

-   Karen Bretz

by first class regular mail, if noted above, or by electronic means through the ECF system as indicated on the Notice of Electronic Filing.

s/ Sheri Curro_____
Sheri Curro, Legal Secretary
Municipal Attorney's Office