IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JUDY L. BERMAN,                      )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )
                                     )
ANCHORAGE POLICE DEPARTMENT,         )
OFFICER R. DUTTON and                )
SERGEANT G. DAVIS,                   )
                                     )
          Defendants.                )    Case No. A04-227 CV (JKS)
                                     )

## DEPOSITION OF JUDY L. BERMAN
### December 13, 2005

APPEARANCES:

          FOR THE PLAINTIFF:    **MR. JOHN C. PHARR**
                                Law Offices of John C. Pharr
                                Attorney at Law
                                733 West 4th Avenue
                                Suite 308
                                Anchorage, Alaska  99501
                                (907)  272-2525


          FOR THE DEFENDANTS:   **MS. MARY B. PINKEL**
                                Office of the Municipal
                                 Attorney
                                Attorney at Law
                                P.O. Box 96650
                                Anchorage, Alaska  99519
                                (907)  343-4545


                    *  *  *  *



1    PURSUANT TO NOTICE, the Deposition of **JUDY L. BERMAN**

2  was taken before Cheri Tabor, Notary Public in and for the

3  State of Alaska and reporter for Metro Court Reporting at

4  Metro Court Reporting at 745 West 4th Avenue, Suite 425,

5  Anchorage, Alaska on the 13th day of December 2005, commencing

6  at the hour of 10:45 a.m.

7                              *  *  *  *

8

9                    **TABLE OF CONTENTS**

10 Direct Examination by Ms. Pinkel  . . . . . . . . .  4
Cross Examination by Mr. Pharr  . . . . . . . . . .

11

12                                                    **PAGE**

13 **EXHIBITS**

14 1 - Plaintiff's Answers to Defendants'
             First Set of Discovery Requests . . . . . .  25
15 2 - Plaintiff's Initial Disclosures . . . . . . . .  25
   3 - Complaint . . . . . . . . . . . . . . . . . . .  40
16 4 - Chapter 9.12 Driver's License Municipal Code  .  57
   5 - Alaska Statute 28.15.131  . . . . . . . . . . .  62
17 6 - Tiburon Printout  . . . . . . . . . . . . . . .  73
   7 - Name Details Index  . . . . . . . . . . . . . .  75

                              *  *  *  *

18

19

20

21

22

23

24

25

# P R O C E E D I N G S

1

2      (On record)

3                COURT REPORTER:  My name is Cheri Tabor and

4  I'm a court reporter for Metro Court Reporting, 745 West 4th

5  Avenue, Suite 425, Anchorage, Alaska.  Today's date is

6  December 13th, 2005.  The time is approximately 10:45 a.m.

7  We're at the offices of Metro Court Reporting for the

8  deposition of Judy Berman.  This case is in the United States

9  District Court for the District of Alaska, <u>Berman, Plaintiff</u>

10  <u>vs. Anchorage Police Department, et al., Defendants</u>, Case

11  Number A04-227 Civil.

12      Ma'am would you please raise your right hand so I can

13  swear you in?

14      (Oath administered)

15                MS. BERMAN:  Yes, I do.

16                <u>**JUDY L. BERMAN**</u>

17  having first been duly sworn under Oath, testified as follows

18  on examination:

19                COURT REPORTER:  Thank you ma'am.  Please

20  state your full name and spell your last name for the record.

21  A      Judy L. Berman, B-e-r-m-a-n.

22                COURT REPORTER:  Okay.

23                MR. PHARR:  Is it a L dash B-e-r-m-a-n,

24  like it's --

25  A      L period.

1          MR. PHARR:  Okay.

2  A      Are you going to crack jokes the whole time?

3          MR. PHARR:  Yes.

4  A      Okay.

5          COURT REPORTER:  Could I please have a mailing

6  address?

7  A      In care of John Pharr, 733 West 4th Avenue, Suite 308,

8         Anchorage, 99501.

9          COURT REPORTER:  All right.  Thanks.  And how

10  about a daytime or a message telephone number?

11  A      272-2525.

12          COURT REPORTER:  And the next thing would be

13  for counsel to identify themselves for the record and who they

14  represent.

15          MR. PHARR:  John Pharr, attorney for the

16  plaintiff.

17          MS. PINKEL:  Mary Pinkel, Assistant Municipal

18  Attorney, attorney for the Police Department, Robert Dutton

19  and Gil Davis.

20          COURT REPORTER:  Great, thank you.  You may

21  proceed.

22                    **DIRECT EXAMINATION**

23  BY MS. PINKEL:

24  Q      Ms. Berman, may I call you Ms. Berman or would you

25         rather -- can I call you Judy?

1  A    Whichever you prefer.

2  Q    Okay.  What is your middle name?

3  A    Lea, L-e-a.

4  Q    L-e-a.  Okay.  And Judy what is your -- you said

5       you're in care of John Pharr.  Do you have a work

6       address or a home address?

7  A    Yes.

8  Q    Okay.  What is your work address?

9  A    Do I have to give out my work address?  Usually people

10      are in care of their attorney.

11 Q    Well, it's customary to ask people what their address

12      is when they are deposed for the record.  Do you --

13      can you -- are you willing to give me your work

14      address?

15 A    406 G Street, Suite 208.

16 Q    Okay.  And that's here in Anchorage?

17 A    Yeah, it's right across the street.

18 Q    Okay.  And what is your home address?

19 A    P.O. Box 112101.

20 Q    102?

21 A    No, 112101.

22 Q    112101, okay.  And do you reside here in Anchorage?

23 A    I do.

24 Q    And with respect to your home address, what is that?

25 A    I'm not going to give that out.

1  Q    Okay.  And how long have you worked -- lived at this
2       current home address?

3  A    Ten years.

4  Q    Ten years.  Okay.  And have you ever been deposed
5       before?

6  A    No.

7  Q    Okay.  I don't know if you've talked to your attorney
8       but do you understand that if you don't understand a
9       question that I pose to you, that you can tell me you
10      don't understand it, and then I can explain it
11      further.  Otherwise, I'll assume you understand my
12      question.

13 A    Okay.  I've conducted depositions but I've never been
14      a deponent.

15 Q    Okay.  And then you obviously know that if you need to
16      take a break, you just need to tell me and we can take
17      a break.

18 A    Okay.

19 Q    Now, Judy are you on any medication today?

20 A    No.

21 Q    So you're not on any medication of any type?  Is that
22      correct?

23 A    I took an allergy pill last night; that's why I was
24      hesitating.

25 Q    Okay.  You had an allergy pill last night but no other

1          medications?

2    A     That's correct.

3    Q     Okay.  And can you tell me what is your date of birth?

4    A     December 16th, 1955.

5    Q     Okay.  And where were you born?

6    A     New York.

7    Q     And that's in Manhattan?

8    A     Correct.

9    Q     And what is your Social Security Number?

10   A     I'm not going to give that out.

11   Q     And do you mind telling my why you don't want to give

12         me your Social Security Number?

13   A     I don't think it's necessary and -- well I don't think

14         you're -- I mean, there's an issue of identity theft

15         which I don't think you're going to do but I don't

16         give out my Social Security Number unless I --

17         something that's necessary.  Like --

18   Q     Okay.  Now, do you take depositions very often?

19   A     (No audible response)

20   Q     Have you taken people's often?

21   A     Not very often.  But I don't think I ask them their

22         Social Security Number.

23   Q     Okay.  Have you attended depositions where other

24         attorneys ask for Social Security Numbers?

25   A     I don't remember anybody ever asking anyone their

1         Social Security number?

2    Q    Okay.

3    A    But that just might be my experience.

4    Q    Okay.  Judy, now in terms of your work address, you're

5    down here at 4th and G Street?

6    A    I am.

7    Q    And how long have you been at that work address?

8    A    Almost eight years.

9    Q    Okay.  Now, I want to ask you a little bit about your

10    education.  Where did you go to college?

11    A    Brandeis University.

12    Q    Okay.  That's in Boston, right?

13    A    It's in the Boston area.  The town is Waltham.

14    Q    All right.  And when did you graduate from Brandeis?

15    A    1977.

16    Q    Okay.  And what did you major in?

17    A    Psychology.

18    Q    Psychology.  Okay.  And then after you graduated from

19    Brandeis did you go to law school?

20    A    I did.

21    Q    And when did you go to law school and where?

22    A    I started in 1987, 10 years later.  When you say

23    where, you mean what school?

24    Q    Yes.

25    A    Northeastern University.

1  Q    Okay.  And when did you graduate from Northeastern?

2  A    1990.

3  Q    Okay.  And what did you do in between college and law

4       school?

5  A    I worked at a number of different jobs.

6  Q    Do you remember what your first job was?

7  A    My first real job quote unquote was with Social

8       Security Administration.  Funny, since you made such a

9       big deal now on my Social Security Number.  I was a

10      claims representative for the Social Security

11      Administration.

12  Q   Okay.  And was that where -- what city was that in?

13  A   It was in Boston.

14  Q   And what years did you work there?

15  A   I believe it was '78 to '81.

16  Q   Okay.  And then do you remember what your next job

17      after the Social Security Administration was?

18  A   I worked for Blue Cross and then I worked for the

19      State of Massachusetts as a social worker.

20  Q   And when you worked for Blue Cross, was that in

21      Boston?

22  A   It was.

23  Q   Okay.  And what was your position at Blue Cross?

24  A   Claims examiner.

25  Q   And what years were you there?

1  A    I think '83 to '84.

2  Q    Okay.  And you said you worked as a social worker for

3       the State of Massachusetts?

4  A    I did.

5  Q    And what years were those that you worked there?

6  A    '84 to '86.

7  Q    And did you get a social work degrees in between law

8       school and college?

9  A    No.

10  Q   What division in the State of Massachusetts did you

11      work for when you were a social worker?  What agency?

12  A   I worked for the Department of Social Services.

13  Q   Okay.

14  A   Basically the same -- the counterpart to what OCS is

15      up here.

16  Q   So --

17  A   I was a child protective.

18  Q   Child protective worker?

19  A   Yeah.

20  Q   All right.  After you worked for the State of

21      Massachusetts then what did you do?

22  A   I went to law school.

23  Q   Okay.  And you went to Northeastern and graduated

24      then, you said in 1990?

25  A   I did.

1  Q    Great.  And then what did you do after you graduated
2       from Northeastern?
3  A    I moved up here and took the Bar exam.
4  Q    And then where did you go to work after you took the
5       Bar exam?
6  A    I pretty much did contract work and --
7  Q    Okay.  And that was starting in what year?
8  A    (No audible answer)
9  Q    Do you remember when you started doing contract work
10      in Alaska?
11 A    Probably '93.
12 Q    Okay.  And do you remember when you got admitted to
13      the bar in Alaska?
14 A    I remember.
15 Q    What year was that?
16 A    It was 1991.
17 Q    Okay.  And what did you do between 1991 and 1993?
18 A    I took some time off.  I did some volunteer work.  I
19      took some classes.
20 Q    Okay.  And do you remember where you volunteered?
21 A    I volunteered at Trustees for Alaska.  I did some work
22      with Amnesty International.  I can't remember what
23      else.
24 Q    Okay.
25 A    It was a long time ago.

1  Q    So you volunteered at Trustees and Amnesty

2       International for about two years, between 1991 and

3       1993?

4  A    I think so.

5  Q    Okay.  And then you started doing contract work for

6       other lawyers here in Anchorage in 1993?

7  A    Yes.

8  Q    And what lawyers?

9  A    I feel like I'm here -- I'm like going for a job

10      interview.  I hope I get the --

11 Q    I'm just asking background information.

12 A    I hope I get the job.

13 Q    It's just sort of normal to ask for.....

14           MR. PHARR:  Are you going to joke this whole

15 time, I mean, you know.

16 A    John's finding out things about me he never knew.

17 Q    (By Ms. Pinkel)  Who did you do contract work for in

18      1993?

19 A    A number of different attorneys.  I don't think that's

20      relevant.

21 Q    Okay.  I'm just asking you for background information.

22           MR. PHARR:  Well, there's an opening at the

23 Muni, now.  Come on.  You can get Mary's job.

24 A    I'm not going to go into that kind of detail.

25 Q    (By Ms. Pinkel)  Okay.  So you don't want to tell me

1         who you've done contract work for?

2    A    No, I don't.

3    Q    Okay.

4              MR. PHARR:  Now, if Mary doesn't win this

5    case, you know, they'll be looking for a new attorney over

6    there so --

7              MS. PINKEL:  This might be your big chance,

8    Judy.

9    A    It'll fulfill a lifelong dream of working for the

10        Municipality.

11   Q    (By Ms. Pinkel)  So Judy, are you doing contract work

12        for any firms right now?

13   A    No.

14   Q    And so, what type of practice do you have?

15   A    I'm a sole practitioner.  I don't necessarily

16        specialize in any one thing.  Lately, I've been doing

17        a lot of cases involving custody.  Children's cases,

18        guardianships.

19   Q    Okay.  And are you representing children in child

20        custody cases or parents or both?

21   A    Both.  But not in the same case obviously.

22   Q    Right.  And are you taking appointments from the

23        Office of Public Advocacy?

24   A    Yes.

25   Q    Are you licensed in any other states other than Alaska?

1   A       I'm not.

2   Q       All right.  I'm going to turn to -- you recently

3           answered some discovery requests that the Municipality

4           propounded to you through your attorney.  Do you

5           remember that?

6   A       I remember that.

7   Q       Okay.  And they were called -- your answers were

8           called Plaintiff's Answers to the Defendants' First

9           Set of Discovery Requests.

10  A       Okay.

11  Q       Do you recall those?

12  A       Uh-huh (affirmative).

13  Q       And you would have answered those just very recently

14          on December 8th, correct?

15  A       Okay.

16  Q       Okay.  And I just wanted to -- you obviously had a

17          chance to look at those and you signed a verification

18          page, correct?

19  A       Uh-huh (affirmative).

20  Q       I just wanted to go over those a little bit with you

21          and I've got a copy for you to look at.

22  A       You have a copy?  Oh yeah.

23              MS. PINKEL:  A copy to John.

24              COURT REPORTER:  May I please interject?  I

25  type a lot of the transcripts and ma'am if you say yes or no

1    instead of uh-huh.

2    A        I understand.

3                    COURT REPORTER:  Thank you so much.

4                    MS. PINKEL:  Thank you, Cheri.

5    Q        (By Ms. Pinkel)  I just wanted to ask you about

6    Interrogatory number two.  I asked you to describe in

7    detail all injuries, ailments, or pains which you

8    claim to have suffered as a result of the occurrence

9    alleged in your complaint, stating the severity and

10   duration of such injuries and the current prognosis.

11   Do you remember that question?

12   A        Yes.

13   Q        Interrogatory two, okay.  And now the answer you gave

14   was that you objected to as not relevant to the claims

15   or defenses of any party, as the plaintiff has not

16   asserted a claim for physical injury or for medical

17   expenses.  So I guess my question to you is this then,

18   am I correct in assuming that you're not making any

19   claim for physical injury in this lawsuit?

20   A        That's correct.  But isn't that like a legal question

21   rather than a factual question?

22   Q        Well, if it's -- I think it's both.  I'm asking if

23   you're making any kind of claim that you have physical

24   injuries and as I understand it, you're saying you

25   don't have a claim for any physical injury and I just

1       want to confirm that that's true?

2   A   I was physically injured.  But that's not the basis of

3       my claim.  I'm not denying that I was -- I'm not

4       claiming pain and suffering or lost wages or medical

5       expenses.  So I'm not claiming compensation.  I'm

6       not -- I was injured but I'm not claiming compensation

7       for my physical injuries maybe was a better way to put

8       it.

9   Q   So you're saying -- okay.  Just so I can understand

10      it, you're not making any claims that you were

11      physically injured in this lawsuit?  You're not

12      claiming -- you're not asking the City.....

13  A   I was physically injured.

14  Q   You say you were physically injured?

15  A   But I'm not claiming compensation for my physical

16      injuries.

17  Q   But you're not seeking compensation for physical

18      injuries?  Is that correct?

19  A   Yes.

20  Q   Okay.  And so as I also understand it from

21      interrogatory number two from your response, you're

22      also not claiming medical expenses, correct?

23  A   That's correct.

24  Q   Okay.  Now going to interrogatory number three, I

25      asked for the names of any physicians or medical care

1  providers including any behavioral health providers
2  who have examined or treated you for any injury,
3  sickness or ailment during the preceding seven years.
4  And your response is objected to as irrelevant and not
5  reasonably calculated to lead to the discovery of
6  admissible evidence.  And then you said please see
7  objection to interrogatory number two above.  So am I
8  correct then that you're not making any claim then for
9  any kind of medical care you would have seen either
10 behavioral health or not -- or strictly physical
11 health?  Is that correct?  You're not seeking any
12 compensation?
13 A  You just asked me if I was seeking compensation for
14 medical expenses and I said no.
15 Q  Okay.  So you're not, okay.  All right.  And you're
16 not seeking any kind of compensation for any kind of
17 behavioral health expenses you may have incurred?  Is
18 that correct?
19 A  That's correct.
20 Q  Okay.  Now, directing your attention to
21 interrogatories three, four and five.  Well, let's
22 start here at -- I'm sorry, four.  I asked for names
23 of physicians and medical care providers and you
24 said -- you referred me to your previous objection.
25 Is that correct?

1   A    That's what it says, yes.

2   Q    Okay.  All right.  And then again in five I said state

3        whether you claim to have suffered mental or emotional

4        problems or impairment as a result of this incident

5        and, if so, explain and describe in detail any and all

6        changes in personality, attitude, manners, state of

7        mind or emotional state.  Your response was objected

8        as not relevant.  The claims or defense of any party

9        and not reasonably calculated as the plaintiff.....

10  A    Excuse me.

11  Q    Are you okay?

12  A    Yeah.

13  Q    Okay.  As the plaintiff has not asserted a tort claim

14       for intentional or negligent infliction of mental or

15       emotional distress.  So you're saying, you're not

16       claiming that you suffered emotional distress,

17       correct?

18  A    (No audible answer)

19  Q    You're not making that claim for emotional distress?

20       Is that right?

21  A    I'm not asser- -- asserting a tort claim for emotional

22       distress.

23  Q    Okay.  So you're not -- you're not asserting a claim,

24       any type of claim for emotional distress?

25  A    I didn't say that.  I said I'm not asserting a tort

1      claim for emotional distress.

2  Q   Okay.  Are you.....

3  A   I did have emotional distress as a consequence of the
4      events that happened.  But I'm not asserting a tort
5      claim.

6  Q   Okay.  Well, maybe you can explain that for me.  You
7      said you had asserted as a consequence but you're not
8      making a claim for emotional distress?

9  A   I -- I said three times -- should I call you Mary or
10     Miss Quinn -- Ms. Pinkel?

11 Q   You can call me Mary.

12 A   I said three times, Mary, I'm not asserting a tort
13     claim.

14 Q   Okay.  So you're not asserting any claim for emotional
15     distress?  Is that correct?  It's -- answer my
16     question.  If you don't understand it, I'll try to
17     rephrase it.

18 A   I understand it.  I don't think you understand me.  I
19     understand you perfectly.

20 Q   So are you asserting any kind of claim for emotional
21     distress?

22 A   If you would do the research you would see that you
23     can have a claim for emotional distress arising out of
24     violation of your civil rights.  It's entirely
25     different than a tort claim for negligent or

1       intentional infliction of emotional distress.

2    Q    Okay.  So you're -- so just so I'm understanding this,

3       you are making a claim for emotional distress.  Is

4       that right?

5    A    I am not asserting an independent tort claim.  Part of

6       the way that I was damaged as a result of the incident

7       that occurred that's the subject of my complaint was

8       that I suffered mental distress.

9    Q    Okay.  So you're saying you have suffered mental

10      distress?  Is that right?

11   A    I've suffered mental distress.  But I'm not asserting

12      a tort claim for mental distress.  Should I say it

13      three more times?

14   Q    Okay.  So you're not asserting a tort claim for it.

15      Have you sought any medical care for emotional

16      distress because of this incident?

17   A    I have not.

18   Q    Have you sought any type of psychological counseling

19      for this incident?

20   A    No.

21   Q    So are you making any claim for loss of enjoyment of

22      life for this incident?

23   A    No.  I'm not making a claim for emotional distress.

24      But I'm not stating that I was not emotional -- but

25      I'm -- I was.  I did suffer mental distress.  But I'm

1       not making a claim for it except as it relates to the

2       violation of my civil rights in my other claims.

3   Q    Okay. So I guess I'm a little bit confused here.

4       You're not making a claim for emotional distress?

5       You're not making a claim for physical injury in this

6       lawsuit, correct?

7          MR. PHARR:  I think she's explained it

8   counselor.  The emotional distress claim is part of the civil

9   rights violation claim.  That's the long and the short of it.

10  Q    (By Ms. Pinkel)  Okay. But you're not asking for any

11      damages for emotional distress of physical injury?  Is

12      that correct?

13  A    I think that's correct.

14  Q    Okay. So you've got no claim for damages for physical

15      injury and you have no claim for damages for emotional

16      injury?  Is that correct?  Correct?

17  A    Except as it relates to my other claims.

18  Q    Okay. Well, I'll get to.....

19  A    I'm not waiving my right to testify that I was

20      distressed by what happened.  But I'm not asserting an

21      independent claim for damages as a result of the

22      mental and physical distress.  But I'm not saying that

23      it didn't happen.

24  Q    But you're not asking for any damages in that regard?

25      Correct?

1  A    (No audible answer)

2         MR. PHARR:  I think she is counselor.

3         MS. PINKEL:  Well, okay.  She needs to.....

4  A    I think this is just getting into the legal -- well I

5      think you're getting into what the legal theory is.  I

6      think the point of the deposition is to get -- is not

7      to ask somebody what their legal theory is.  I think

8      that's, you know --

9  Q    (By Ms. Pinkel)  Well, I'm trying to understand if you

10     have any -- if you're telling us that you have any

11     damages as a result of this incident and from what I

12     can understand is you're telling me you don't have any

13     damages.  You're not asking the court to give you

14     money for any physical injury or emotional distress or

15     loss of enjoyment of life, correct?

16  A    I'm not asserting those specific damages, no.

17  Q    And you're not asking for the court to give you

18     damages for any kind of medical problems that you may

19     have suffered.  You're not asking the court to give

20     you damages for any mental problems you might have

21     suffered, correct?

22  A    That's correct.

23  Q    Okay.  So you're not requesting damages for those --

24     on those subjects?

25  A    (No audible answer)

1  Q    And you're not making any kind of claim for damages
2       for any type of disability as a result of this
3       incident?  Is that correct?
4  A    (No audible answer)
5  Q    Judy?
6              MR. PHARR:  Just answer the question Judy.
7  A    Isn't that redundant?
8  Q    (By Ms. Pinkel)  I'm just trying to clarify what
9       you're.....
10 A    Well, can you clarify the question?  What do you mean
11      by disability?
12 Q    You're not making any claim that you've suffered any
13      disability as a result of this incident, correct?
14 A    Can you clarify?  What kind of disability?
15 Q    Well, have you suffered any kind of -- are you making
16      any claim that you have damages because you've
17      suffered in some, you know, physical way because of
18      this incident?
19 A    But you already asked me that.
20 Q    Well.....
21 A    And I answered you.  It's been asked and answered.
22 Q    Okay.
23 A    I probably -- looking at my lawyer.
24 Q    Okay.  It's your attorney's -- if your attorney wants
25      to object, he can object.  But I'm just asking you to

1    answer the question.

2         MR. PHARR:  I object.  I.....

3  Q  (By Ms. Pinkel)  I'm just -- I'm trying to understand

4    why you brought the lawsuit and if you have damages

5    that you wanted to assert.  And I guess what I.....

6  A  He already objected.

7  Q  Okay.  I guess what I'm understanding here Judy is

8    that you're not asserting any damages from this

9    incident, correct?

10  A  That's not correct.  I'm not asserting damages for

11    infliction of emotional distress or for physical

12    injury which is what we just said.  I guess I should

13    take --

14  Q  Okay.  So you're not making any claim for mental

15    injury or physical injury in this lawsuit?

16  A  That's right.

17  Q  Okay.  Now turning to interrogatory number seven, I

18    asked you if you were making any claims for loss of

19    earning capacity as a result of the alleged

20    occurrence.  And your answer was plaintiff is not

21    claiming any loss of earning capacity.  And that's

22    still your position today, correct?

23  A  Yes, it is.

24  Q  Okay.  Now interrogatory number 10 I said please state

25    each item of damage you are claiming, including the

1    amount you are claiming for each item and your answer

2    was see paragraph C of Plaintiff's Initial

3    Disclosures, correct?

4  A    Yes.

5  Q    Okay.  And then going to your Initial Disclosures,

6       paragraph C.  Do you remember your Initial

7       Disclosures?  Did you help with those?

8  A    Yes.

9  Q    Okay.  I'm just going to show you your copy of your

10      initial disclosure.

11           MS. PINKEL:  And Mrs. Tabor if we could mark

12   her answer, Plaintiff's Answers to Defendants' First Set of

13   Discovery Requests as Exhibit 1?

14           COURT REPORTER:  Certainly.  Exhibit 1 marked.

15                     **(Deposition Exhibit 1 marked)**

16           MS. PINKEL:  If I could just hold onto that.

17  Q    (By Ms. Pinkel)  And I'm going to show you your

18      Initial Disclosures.

19           MS. PINKEL:  Can you mark that Exhibit 2?

20           COURT REPORTER:  Certainly.  Exhibit 2 marked.

21                     **(Deposition Exhibit 2 marked)**

22  Q    (By Ms. Pinkel)  Okay.  Paragraph C, I asked, or you

23      were disclosing what your damages were, and you

24      indicated violation of civil rights, false arrest,

25      assault and battery, malicious prosecution, punitive

| | | |
|---|---|---|
| 1 | | damages. Is that correct? |
| 2 | A | That sounds right. |
| 3 | Q | Is that what you think your damages were? Okay. But |
| 4 | | you haven't listed any other -- you haven't listed any |
| 5 | | damages there, have you? |
| 6 | A | You just read my damages. |
| 7 | Q | Well, those are really claims, aren't they? |
| 8 | A | (No audible answer) |
| 9 | Q | A claim for a violation of civil rights, a claim for |
| 10 | | false arrest, a claim for assault and battery, a claim |
| 11 | | for malicious prosecution? Is that correct? |
| 12 | A | I was damaged by those things. |
| 13 | Q | You were damaged by the claims? Is that what you're |
| 14 | | saying? |
| 15 | A | I don't think you think that that's what I'm saying. |
| 16 | | Maybe we should cut to the chase. I could get nominal |
| 17 | | -- nominal damages and punitive damages. |
| 18 | Q | Okay. But you haven't -- you're not saying that you |
| 19 | | have had any actual physical injuries? You're not |
| 20 | | claiming physical injury and you're not..... |
| 21 | A | I'm not claiming damages for physical injury. I was |
| 22 | | injured and I was mentally distressed. I am claiming |
| 23 | | damages for the fact of being falsely arrested and |
| 24 | | deprived of our civil rights and handcuffed in public |
| 25 | | is inherently damaging. It's not something a person |

*METRO COURT REPORTING*

745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit A
Page 26

1       in a civilized society should expect to ever have to

2       undergo.  It's damaging in and of itself.

3   Q   Okay.  But you're not saying that you have any

4       physical -- you've suffered any physical harm?

5   A   Why are we -- with all due respect Ms. Pinkel, why are

6       we going over the same thing over and over again.  I

7       think my position is clear.  I mean, we're just going

8       over things that have already been filed.

9   Q   Right.  I just want to understand what -- if you've

10      actually suffered any physical harm here.  And what I

11      guess I'm understanding is that you're asserting some

12      claims here, correct?  But you're not saying -- you're

13      not stating that you've suffered any physical damages,

14      correct?

15  A   I suffered physical damages.  I'm not claiming

16      compensation for my physical damages.

17  Q   Okay.

18  A   I'm claiming compensation for the things that I

19      listed.

20  Q   Okay.

21          MR. PHARR:  Can we move on to something else,

22  counselor?  I think we've pretty well beaten this into the

23  ground.

24  Q   (By Ms. Pinkel)  Okay.  I just want to understand

25      here.  Okay.  So moving on, I just wanted to backtrack

1  |    here a little bit.  What -- have you been married

2  |    before?

3  A    No.

4  Q    I just forgot to ask you the background information.

5  |    Do you have any marital history at all?

6  A    I said I wasn't married.

7  Q    Okay.

8  A    You just asked me that.  I haven't been married.

9  Q    Great.  All right.  Now turning to the reason why

10 |    we're here.  You've filed a complaint in federal court

11 |    against two police officers and the Anchorage Police

12 |    for an incident that occurred in April of 2002?  Is

13 |    that correct?

14 A    No, it's not.  I filed in state court.

15 Q    Okay.  You filed in state court and the case later was

16 |    transferred to federal court?  Is that correct?

17 A    Your office removed it to federal court, that's

18 |    correct.

19 Q    The Municipal Attorney removed it to federal court,

20 |    correct?

21 A    That's correct.

22 Q    Okay.  Turning to that day, do you remember what time

23 |    of day this was when this incident that led to the

24 |    lawsuit occurred?

25 A    It was right around 10:00 at night.

*METRO COURT REPORTING*
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit A
Page 28

1  Q    Okay.  And you were going to the grocery -- this was

2       at Carrs Grocery Store.  You were going to get

3       groceries at Carrs?  Is that correct?

4  A    Yes.

5  Q    Okay.  And which Carrs was this?

6  A    It was on Huffman Road.

7  Q    Okay.  Now where had you been before you went to Carrs

8       Huffman?

9  A    Downtown Anchorage.

10  Q    Okay.  Do you remember what you'd been doing?

11  A    I was seeing a play with a friend.

12  Q    Okay.  Now do you -- were you on any kind of

13       medication that night?

14  A    I don't think so.  Not that I recall.

15  Q    Can you tell me what happened this night at Carrs when

16       you had the disturbance with the -- or however you

17       want to characterize it?  The incident where you had a

18       confrontation with the police.

19  A    I don't know if I'd characterize it as a

20       confrontation.

21  Q    I'm sorry.  I don't mean to characterize it all.  Why

22       don't you just tell me in your own words what

23       happened?

24  A    Starting with when I got to the parking lot?  Starting

25       with when the police came up to me?  What point do you

1      want me to start at?

2   Q    How about, why don't you start when you got to the

3        parking lot?

4   A    Are you familiar with the Hart- -- Huffman Carrs at

5        all?

6   Q    Not really.  John and I shop at the one in Turnagain.

7        So, you might need to tell us a little bit about the

8        Carrs Huffman.

9             MR. PHARR:  We don't shop together or

10  anything.  We're just sort of there at the same time, yeah.

11  A    I was in the parking lot.  There's -- just hang on a

12       second.  I'm just trying to get the previous

13       conversation out of -- I mean, I really, I was really

14       surprised we spent so much time on this other stuff.

15       I just want to clear that out of my mind.

16  Q    (By Ms. Pinkel)  Do you want to take a break?

17  A    What it is now?  11:15.  I put on my watch backwards.

18       Yeah, how about that?

19            MS. PINKEL:  Okay.  We can take a little

20  break.

21       (Off record)

22       (On record)

23  Q    (By Ms. Pinkel)  Okay.  Judy we were turning to the

24       events of April 6th, 2002, which is what brought us

25       here today.  Can you -- do you want to tell us a

1    little bit about the circumstances that led to the

2    incident that led to the lawsuit?  You were saying you

3    had been downtown at a play.  And then you came to the

4    Carrs Huffman to go grocery shopping about 10:00 at

5    night?  Is that correct?

6  A    That's correct.

7  Q    And do you remember what day of the week this was?

8  A    Saturday.

9  Q    Okay.  So --

10  A    You want me to just tell you now -- the form of what

11    happened?  Is that what you're --

12  Q    Sure.  Well, why don't we -- first of all you were

13    going into the parking lot to park to go into the

14    grocery store?  Is that correct?

15  A    I was driving my car, yeah.

16  Q    And then when you got to the parking lot, what

17    happened?

18  A    Well, in terms of the layout of the parking lot, there

19    was a row of cars (sic) that's right in front of

20    Carrs.  There's a row of cars (sic) that's right in

21    front of the store.

22  Q    You mean a row of parking spaces?

23  A    Right.

24  Q    Okay.

25  A    And there was a vacant spot in front of the store in

1  that row of spaces.  There was one vacant space that I

2  saw.  And I waited with my turn signal on for traffic

3  to clear in the other direction and a couple of cars

4  or vehicles came by, passing in the other direction

5  and then another vehicle approached and parked in the

6  space that I was waiting to park in.

7  Q  And then what happened after the car parked in the

8  space you wanted to park in?  What did you do?

9  A  I honked my horn a few times at the car to indicate

10  that I had been waiting to park there.

11  Q  And so you honked the horn and then what did you do?

12  A  Another space opened up right next to that space.  So

13  I pulled into that space.

14  Q  Now, in addition to honking the horn at the other car,

15  you also screamed at them, correct?

16  A  That's absolutely incorrect.

17  Q  Okay.

18  A  I never screamed at them.  I'm absolutely positive I

19  never screamed at them.

20  Q  So if -- do you remember who the couple was that was

21  -- or was it a couple that was in the other car?  Do

22  you remember who they were?

23  A  I don't understand the question.

24  Q  During -- well you said they.  The people driving the

25  other car.

1  A    I remember that it was a couple.

2  Q    The couple.

3  A    I don't know what you mean by who they were?

4  Q    Do you remember their names?  Did you ever get their

5       names?

6  A    Not until after I filed the lawsuit.  I never spoke to

7       them.  I had no idea who they were.

8  Q    Okay.

9  A    But I know it was a man -- all I know is a man and a

10      woman.

11 Q    Okay.  So if the man and the woman said that you were

12      screaming at them, would they be incorrect?

13 A    Absolutely.

14 Q    Okay.  So you honked your horn at them.  How many

15      times did you honk your horn?

16 A    Four or five times.  I don't know exactly.  Obviously,

17      I wasn't counting.

18 Q    Okay.  And then you found a parking space right next

19      to them?

20 A    Yeah.

21 Q    Okay.

22 A    Well, a space opened up.  It hadn't been opened up.

23      At the time that I was originally stopped, waiting to

24      park, there was just that one space.  They pulled into

25      the space I was waiting for, then like immediately

METRO COURT REPORTING
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit A
Page 33

1     after, the car next to that pulled out and so another

2     space became available.  I parked in that space.

3  Q  Okay.  And then -- so then you parked in the space and

4     then what happened after you parked in the space?

5  A  A man and a woman got out of the van.  That's the

6     first time I saw who had been occupying the van.

7  Q  Okay.

8  A  They passed in front of my car to go to the store and

9     I honked a couple more times.

10  Q  Okay.  And did you say anything to them?

11  A  Absolutely not.

12  Q  And when you honked a couple of more times at them,

13     why were you honking a couple of more times at them?

14     Why were you honking at them?

15  A  Just to let them know that I thought it was -- what

16     they did was rude.  I was really kind of surprised

17     that somebody would do that.  Usually people up here,

18     I find are usually pretty polite.  And I kind of, when

19     they passed by, I kind of mouthed at them -- that's --

20     I mean if they have a perception that I screamed at

21     them, I know I mouthed at them through the window.  I

22     was like, in fact, I mouthed at them that was really

23     rude but I went -- I didn't use my voice at all.  I

24     was like --

25  Q  So you mouthed at them that was really rude but you

| | | |
|---|---|---|
| 1 | | don't remember making it audible?  Is that what you're |
| 2 | | saying? |
| 3 | A | I'm sure that I did not make it audible.  I honked at |
| 4 | | them to get their attention and then I said that was |
| 5 | | really rude without using my voice and they kind of |
| 6 | | gave me a blank look and went into the store and that |
| 7 | | was it. |
| 8 | Q | So you -- okay.  But your purpose in honking at them |
| 9 | | was to let them know you were upset with them? |
| 10 | A | No. |
| 11 | Q | Well, okay.  So you wanted them to know you thought |
| 12 | | they were rude?  Is that correct? |
| 13 | A | I think I honked at them to get their attention so |
| 14 | | they would look at me and then I mouthed at them that |
| 15 | | was really rude. |
| 16 | Q | So your purpose in honking at them was for them to |
| 17 | | know that you felt they were rude? |
| 18 | A | I think I just said that I think..... |
| 19 | Q | Is that right? |
| 20 | A | No.  I honked at them to get them to look in my |
| 21 | | direction and then when they looked in my direction I |
| 22 | | mouthed at them that was really rude.  The purpose in |
| 23 | | honking was to get them to look at me. |
| 24 | Q | And why did you want them to look at you? |
| 25 | A | I just said, so that I could mouth to them that was |

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

**Exhibit A**
**Page 35**

1    really rude.

2  Q  Okay.  All right.  So --

3  A  But as I said, I don't know what the word -- I think

4     mouth -- I just mimed it.  I didn't use my voice.  I

5     mouthed it, like that was really rude.

6  Q  Are you in the habit of mouthing things to people and

7     not using your voice?

8  A  That's not a habit of mine.

9  Q  Okay.  Could your -- perhaps your memory be a little

10    mistaken that in this instance that maybe you were

11    actually yelling at them?

12 A  Absolutely not.  Absolutely not.  I'm absolutely

13    positive I never yelled at them.

14 Q  Okay.  But just so I can understand here though, you

15    honked at them four or five times after they took what

16    you believed was your parking space, correct?

17 A  I don't know the exact number of times.  But I think

18    it was probably four or five.

19 Q  Okay.  So then after you honked at them four or five

20    times then there was a space that opened up next to

21    them, correct?

22 A  Yes.

23 Q  Okay.  And then after this space opened up you parked

24    there, correct?

25 A  Yes.

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*            **Exhibit A**
                           **Page 36**

1  Q    Okay.  And then after the couple got out of their car
2       you honked at them a couple more times, correct?

3  A    Yes.

4  Q    And then you don't believe you used your voice, but
5       you mouthed at them that was really rude?

6  A    I'm positive I did not use my voice.

7  Q    Okay.  And then you worked in -- you weren't honking
8       to let them know that you were in any danger were you?

9  A    No.

10 Q    No.  Okay.  There wasn't any danger in the situation
11      that you had encountered, correct?

12 A    I can't think of any danger.

13 Q    Okay.  Now, just in terms of where you were driving
14      was -- were these spaces here, were they angled spaces
15      or was it straight spaces in front of the Carrs there?

16 A    I think they were slightly angled.

17 Q    Okay.

18         MR. PHARR:  The spaces lean to the left, you
19 know.  Never mind.

20 Q    (By Ms. Pinkel)  Now -- so after you honked at them a
21      few more times then mouthed it was very rude, then
22      what happened?

23 A    They walked into the store and I got out of my car.  I
24      was just out of my car.  I think I had just closed the
25      door and Officer Dutton approached me on foot.

1    Q    Okay.  Now was he wearing a uniform?

2    A    Yes.

3    Q    And by uniform I mean a police uniform?

4    A    Yes.

5    Q    Okay.  So he approached you on foot.  And had he been

6         in a police car?

7    A    I didn't see a police car.

8    Q    Okay.  But he was -- anyway, so he approached you.

9         And was he wearing a badge?

10   A    I don't have any recollection of it.  I assume he was.

11        That's part of the uniform.

12   Q    Okay.  And then what happened when he approached you?

13   A    He said is there something wrong with your car horn?

14        And I said no there's nothing wrong with my car horn.

15        I just thought it was rude for those people to park in

16        the space I was obviously waiting for.

17   Q    Okay.  And did doctor -- excuse me, not doctor,

18        Officer Dutton tell you that you had been creating a

19        disturbance?

20   A    I think he said that.  But he seemed a lot more

21        concerned with the fact that I had no right to pull

22        into the parking space from the left.

23   Q    Okay.  So he said -- okay, I'm not asking you to

24        speculate here, but he said he thought you were

25        creating a disturbance and then he also told you you

1    had no right to park where you had wanted to park?

2    Is that correct?

3  A  I remember very clearly that he said you have no right

4    to park into -- to pull into that space from the left.

5    I think he mentioned something about a disturbance

6    before that.  But I -- his emphasis was on the fact

7    that I shouldn't have pulled into the space from the

8    left.

9  Q  Okay.  Do you remember the complaint that you and

10    Mr. Pharr filed in regard to this case.  When you

11    filed, I guess, you had filed it in state court first

12    in April 2002?

13  A  I recall that we said in the complaint that he said I

14    was creating a disturbance and I'm not denying that.

15    I just remember very clearly that his emphasis seemed

16    to be on the direction that I was pulling into the

17    space from.

18  Q  Okay.  But he told you that you'd been creating a

19    disturbance, correct?

20  A  I think he did.

21  Q  Okay.  I'm just going to show you your complaint.....

22  A  But I'm not.....

23  Q  .....that's been filed.

24  A  With all due respect, I just clarified this for you.

25  Q  No, I know.  I'm just going to ask you a few questions

1      about your complaint.   I'm not going to argue with

2      you, Judy.

3  A      Good.

4              MS. PINKEL:   John, I assume you grabbed

5  another copy of this complaint?   I --

6              MR. PHARR:   That's all right.   I can just look

7  at this one.

8              MS. PINKEL:   I'm sorry.   I thought you had

9  one.

10             MR. PHARR:   It's all right.

11             MS. PINKEL:   Let's mark this as Exhibit 3.

12 A      You don't have another one, I'll see if I have one.

13             MR. PHARR:   That's okay.   I can look at yours.

14 A      You want to share?

15             MR. PHARR:   Sure.

16             COURT REPORTER:   Exhibit 3 marked.

17                          **(Deposition Exhibit 3 marked)**

18 Q      (By Ms. Pinkel)   Okay.   Judy, I just wanted to ask you

19      a few questions about the complaint.

20 A      Here you can have that, I have another copy.

21 Q      Okay.   Paragraph nine you indicated in your complaint,

22      which I assume you got to review before Mr. Pharr

23      filed it, that Dutton then told the plaintiff that she

24      had been disturbing the peace and that she had no

25      right to pull into the parking space from the left.

1       Okay.  So does that correctly characterize what

2       Officer Dutton told you when he first approached you?

3  A   I think I said yes three times.

4  Q   Okay.  Good.  I just want to clarify that.  Then after

5       Officer Dutton told you that you'd been disturbing the

6       peace and that you didn't have the right to pull into

7       the parking space from the left, then what happened

8       between you and Officer Dutton?

9  A   Then he said if you do it again, I'll find it in my

10      heart to cite you.

11  Q   Okay.  And did he then ask for your identification?

12  A   No.

13  Q   Okay.  Did he -- what happened after he said I'll find

14      it in my heart to cite you?

15  A   We kind of -- there was a pause.  We kind of stood

16      there for a couple of seconds looking at each other.

17      It was obvious -- it was obvious he had nothing else

18      to say to me and so I said have a great night and I

19      walked away.

20  Q   Now, did he tell you I have nothing else to ask you?

21  A   No.

22  Q   You just assumed that he had nothing else to say to

23      you?

24  A   I was in no hurry, Ms. Pinkel.  I stood there

25      patiently.  I waited to see if he had something else

1    to say and he didn't.  And since he said if you do it

2    again, I'll find it in my heart to cite you, that made

3    it clear to me that he didn't intend to take any

4    action.

5    Q    Now, did he ask you why you had sounded your horn?

6    A    No.  I mean other than the conversation was exactly as

7         what I -- as what I had just told you.  He said is

8         there something wrong with your car horn?  I said no

9         there's nothing wrong with your -- my car horn.  I

10        just thought it was rude for those people to park in

11        the space that I'd been waiting for.  He said

12        something about disturbing the peace and that I had no

13        right to pull into the space from the left and if you

14        do it again, I'll find it in my heart to cite you.

15   Q    And then did he again ask for your identification?

16   A    No.

17   Q    He did not ask for your identification?

18   A    Not at that point.

19   Q    Okay.  When did he ask for your identification?

20   A    After he said -- if I can back up, after he said if

21        you do it again I'll find it in my heart to cite you,

22        we stood there for a couple of seconds looking at each

23        other.  He didn't say anything else.  It was clear to

24        me that the conversation was over.  I turned and

25        walked away and then he came after me and said, hey, I

1       want to see your I.D.

2   Q   Okay.  And then, so as you were walking away, he asked

3       to see your identification, correct?

4   A   After I had started walking away.

5   Q   Okay.  So after you had started walking away, he said,

6       I need to see your identification, correct?

7   A   I was already walking away when he said that.

8   Q   All right.  And he asked to see your identification as

9       you were walking away?

10  A   He said, hey, I want to see your I.D.

11  Q   Okay.  And then when he asked you, I want to see your

12      I.D., or when he told you I want to see your I.D.,

13      what was your response?

14  A   I said no, you don't have the right to stop me for no

15      reason.  I thought that that was a second stop.  I'm

16      not -- I'm not conceding that he would have had a

17      right to ask me before.  But I know that at that point

18      it would have been a second stop.  I was already

19      walking away.

20  Q   Okay.  So, I'm sorry.  So he asked for your

21      identification and you told him no because you didn't

22      think --

23  A   I said no, you have no right to stop and -- you have

24      no right to ask me -- to stop me and ask me for an

25      I.D. for no reason.

1   Q   Okay.  So you told the Officer, Dutton, that he had no

2       right to stop you for no reason?  Is that correct?

3   A   To stop me and ask me for I.D. for no reason.

4   Q   Okay.  And it was -- it was your assumption that he

5       didn't have the right to ask you that?  Is that

6       correct -- for your identification?  Correct?

7   A   It was my assumption?  That's what I said to him.

8   Q   Okay.  And so even though he said, I need to see your

9       identification, you told him no?

10  A   He didn't say I need to see your identification.  He

11      said, hey, I want to see your I.D.

12  Q   Okay.  So he said.....

13  A   It was clear to me that it was an afterthought.  He

14      had plenty -- like I said I was in no rush.  He came

15      up to me, you know, I was -- I was perfectly polite to

16      him.  I stood there and talked to him.  I would have

17      -- if he'd wanted to talk.  I stood there and talked

18      to him.  I was in no hur- -- rush.  I said -- answered

19      his question.  He said what he said.  I waited to see

20      if he was going to say something else or ask me to say

21      -- or ask me anything else.  He had -- he didn't.  And

22      I said have a great night and walked away.  And then

23      he came after me, after I was already walking and

24      said, hey, I want to see your I.D.  I just thought

25      this is an afterthought designed to harass me.  It was

1    obvious to me that it was an afterthought.  He had

2    plenty -- I was in no hurry when he came up to me and

3    questioned me, I was -- I stood there patiently

4    talking to him.  He had plenty of time if it -- just

5    to ask for my I.D. then.  It was obvious to me that it

6    was an afterthought.

7  Q  So it was obvious to you that it was an afterthought.

8    But he -- and this was just based on your own sense at

9    the time, correct?

10 A  It was based on what I just told you.

11 Q  Okay.  So you started to walk away and then he said I

12    need to see your I.D.?  Correct?

13 A  No.  I was already walking away.  I had already walked

14    some distance.  He came after me and said, hey, I want

15    to see your I.D.

16 Q  Okay.  And then.....

17 A  He said I want to see your I.D.

18 Q  And after he said he wanted to see your I.D. you said

19    you had no right?  He had no right to see your

20    identification?  Is that correct?

21 A  He had no right to stop me and ask me for

22    identification.

23 Q  Okay.  And then you continued to walk towards the

24    store?

25 A  Towards the entrance, yes.

1  Q    Towards the entrance, okay. Now -- so you refused to
2       show him your identification after he asked for your
3       I.D. this first time. Then -- did he then ask for
4       your identification a second time?

5  A    No.

6  Q    Okay.

7  A    I mean not -- not at that -- not until after Sergeant
8       Davis came up.

9  Q    Okay. Now didn't you -- just so I can understand it.
10      You're walking into Carrs and then you were at the
11      entrance to Carrs?

12 A    I was not -- I was never walking. I was not walking
13      into Carrs. I mean, now my intention was to walk into
14      Carrs. But I was not walking into Carrs. I never
15      made it into Carrs.

16 Q    Okay. Well, you ended up at the door to Carrs,
17      correct? At the entryway, right by the entryway?

18 A    Right outside the entrance.

19 Q    Okay. Now when you got to the entrance of Carrs he
20      asked you again for your identification, correct? And
21      he meaning Officer Dutton?

22 A    No, he just stopped me and -- and -- and grabbed onto
23      my arm.

24 Q    He did not ask for your identification a second time
25      when you got the Carrs entrance?