1    A    I don't think so, no.

2    Q    Okay.  If Officer Dutton said that he did ask you a
3         second time for your identification, you would not
4         agree with that?

5    A    He asked me for identification a second time after
6         Davis.

7    Q    I see.  Okay.  So maybe you can just explain what
8         happened at the store's entrance.  So you already
9         answered.....

10   A    I already said -- and I already said that if you -- if
11        you.....

12   Q    Okay.  Officer.....

13   A    The record will reflect that I already said that to
14        you.  That he asked me a second time after Davis had
15        joined them.

16   Q    Okay.

17   A    I got to the entrance.  I got to the entrance and he
18        grabbed a hold of my arm and I told him.....

19   Q    He, meaning Officer Dutton?

20   A    Right.  I told him to let go of me.  Then Davis came
21        up and grabbed a hold of my other arm and they just
22        held me.  I mean I couldn't move.  They just held me
23        very -- I mean, they're -- they're two strong men.  I
24        mean, they held me very tightly.  I absolutely could
25        not move at all.  And I told them to let go of me.

1      And they said you have to show us your I.D.  And at

2      that point, I said fine I'll show you my I.D. but you

3      have to let go of my arm so that I can get it.

4    Q   Okay.  Do you remember telling them that you didn't

5      have to your I.D. because you were an attorney and a

6      citizen of the United States?

7    A   No, I never said that.  I'm sorry.  I told Dutton when

8      he first asked me that I didn't have to show him I.D.

9      But I didn't say that I was -- I didn't say that I was

10     a citizen of the United States.

11   Q   Okay.  And you didn't say that you were an attorney

12     and you didn't have to show your I.D.?

13   A   I didn't say it that way.

14   Q   What did you say?

15   A   I don't remember exactly.  I think I might have

16     mentioned that I was an attorney at some point.  But I

17     didn't say it in the way that he's characterizing, I'm

18     sure of that.

19   Q   Okay.  So you made some mention that you were an

20     attorney when they were --

21   A   After they grabbed a hold on -- after they grabbed the

22     hold on me, I said, you know, I'm an attorney and I

23     know that this is police brutality or something to

24     that effect.  I did not -- I think you're trying, the

25     way that you asked the question kind of characterized

1    it that somehow the fact that I was an attorney

2    entitled me to some special privilege not to show an

3    I.D. that other people wouldn't have and that's not --

4    it wasn't because I'm an attorney that I didn't have

5    to show them I.D.

6  Q  I wasn't characterizing in any way.  I'm just trying

7    to.....

8  A  Well, you said I was an attorney and I don't have to

9    show you I.D. implying that because I'm an attorney I

10    don't have to show them I.D. which is no, I didn't --

11    I didn't say that.

12  Q  Okay.  So you, however, did tell them I'm an attorney

13    and I'm a United States.....

14  A  No, I never said -- I never said I was a United States

15    citizen.

16  Q  Okay.

17  A  I never said that.

18  Q  Okay.

19  A  I just think it's funny the way they're trying to

20    characterize me like I'm some nut.

21  Q  Well, let me just ask you a little bit about that.  Do

22    you think that your behavior in the parking lot with

23    the couple that had parked in your parking space, do

24    you think that was reasonable behavior?  And I, you

25    know, just so I can clarify you were honking.  You've,

1  you know, discussed how you honked your horn four or

2  five times at them after they took your parking space.

3  Do you think that was reasonable behavior to honk at

4  them like that?

5 A I think everybody's done it at some point in their

6  life.  I don't think it's particularly unreasonable.

7 Q Okay.  Do you think it's reasonable?

8 A Yeah, sure.

9 Q And then after you parked your car, you honked at them

10  two more times?  Do you think that's reasonable?

11 A Yeah, just so that they would look at me so I would

12  say that -- could say to them that thought -- so I

13  could mouth to them that they were being rude.

14 Q Huffman is a pretty busy grocery store, isn't it?

15 A It's very busy.

16 Q Okay.  And aren't people always jockeying for parking

17  spaces when they go to Carrs Huffman?

18 A Are you awake, John, excuse me?

19    MR. PHARR:  I'm listening, Judy.  I'm

20 listening.

21 Q (By Ms. Pinkel)  Just answer the question.

22 A I don't understand the question.

23 Q Well, isn't it kind of routine that people are always

24  trying to find parking spaces when they go to the

25  grocery store?

1  A    As I said, my experience is that Alaskans are usually

2       pretty polite and in fact usually if there's a kind of

3       a question about, you know -- you know, who's first in

4       line or who's first waiting for a parking space,

5       usually they defer to the other people.  They're not

6       usually rude the way these people were rude.  It

7       justifies me.

8  Q    Well, did you ever think that maybe, you know -- well,

9       let me just go back to what I was saying.  Isn't it

10      fairly commonplace for people to have some sense of

11      confusion sometimes about whether or not the parking

12      space is their's or someone else's?

13 A    Yes, and it's also very commonplace that when somebody

14      is -- that when somebody parks in a space that the

15      other person was waiting for that the person honks

16      their horn at them.  That happens every day.

17 Q    Okay.  Well, isn't it more common that if someone

18      takes your parking space or maybe not yours but

19      someone else's that the other people just go find

20      another parking space?

21 A    I don't think so.  I think -- I think they usually

22      make some -- make some demonstration to let the other

23      person know that they had been waiting for it.

24 Q    Okay.  And I'm not going to belabor this point with

25      you, but do you now, looking back, do you think maybe

1        you were rude towards this couple that had supposedly

2        taken your parking space?

3 A    Well, I mean Miss Manners says that it's rude to let

4        other people -- to tell other people that they were

5        rude.  So maybe in that sense but I don't think it got

6        to the extent that I was actually being rude, no.

7 Q    Okay.  Now -- okay.  Well if -- did you ever talk to

8        this couple afterwards?

9 A    No, never.

10 Q    And do you know what their names are?

11 A    I found out after I filed the lawsuit.

12 Q    And their names are Sharon and Chih Chen.  Is that

13        correct?

14 A    I wasn't sure how to pronounce the man's name.  How do

15        you pronounce it?  Chih?

16 Q    I believe his name is Chih Chen.

17 A    That's what it says on the information that I got from

18        your office.

19 Q    Did you ever -- so you've never talked to this couple?

20 A    Absolutely not.  Did you think I had?

21 Q    I'm just curious.  Because would it surprise you that

22        they were frankly, fairly intimidated by your

23        behavior?

24 A    That would definitely surprise me and I think if they

25        said that that the idea was probably placed on them by

1     whoever interviewed them. The police officers when

2     they first got out, you know, out of the -- out of the

3     supermarket after I was -- had already left the scene.

4     I -- it would surprise me.

5  Q  Okay. Would it surprise you that no one ever really

6     actually interviewed the Chens? For, at least, no

7     attorney from the Municipal Attorney's Office until

8     about a month ago?

9  A  That's not what the police report says.

10  Q  Well, I'm talking about attorneys. No attorneys

11     actually ever talked to them until about a month ago.

12     Is that correct?

13  A  How should I know?

14  Q  Okay. Well.....

15  A  No, it wouldn't surprise me.

16  Q  Okay. Well, you're.....

17  A  I said -- I said that the police, according to the

18     police report, the police interviewed them when they

19     left the store. I'm saying whatever the police said

20     to them might have put some ideas into their head

21     about saying that they were intimidated. But, no, I

22     would -- it would definitely surprise me to -- to, I

23     mean, this was the most mundane of situations, you

24     know. This kind of thing happens hundreds of times

25     probably in the city. Somebody took somebody's

1    parking space, they honked their horn a couple of

2    times.  No, it was nothing -- there was nothing --

3    there was absolutely no reason for them to be

4    intimidated.

5  Q    Okay.  And so if they said they -- if they said that

6    they found your behavior aggressive, would that

7    surprise you?

8  A    It would surprise me.

9  Q    Okay.  If they said that they were glad that the

10    police came over to see what was going on with you,

11    that they were glad for that intervention.  That --

12    would that surprise you too?

13  A    Probably not.  Because probably -- they probably had

14    some hostile feelings at -- at that point and they

15    would probably be happy that the police came up to me.

16  Q    Okay.  Why would you think they would have had hostile

17    feelings at that point?

18  A    Because -- because I -- because they had taken my

19    space and I had honked at them.

20  Q    Okay.  And so you think they had hostile feelings

21    because you'd taken their -- they'd taken your space?

22  A    Because of the situation.  Because of the mildly

23    adversarial nature of jockeying for parking spaces.

24    They probably, on a scale from feeling kind and loving

25    to feeling loathing and hateful, they probably did not

1    feel kind and loving.  They probably felt a little bit

2    negative towards me and so probably didn't -- probably

3    would have made them happy.  First of all, according

4    to the police they were already in the store when --

5    when the police approached me.  So I don't even know

6    how they would have even known -- how they would have

7    even seen that the police approached me because that's

8    what it says in the police report.  But given that

9    there was a mildly adversarial nature to the

10   interaction, I would think that they probably would be

11   happy if they knew that the police came up to me just

12   based on that.

13  Q   Do you think you created an adversarial situation by

14      your behavior?

15  A   No.

16  Q   You don't even to this day think you created an

17      adversarial situation by your behavior?

18  A   No, I don't.

19  Q   Okay.  Now -- so you -- just going back to the Officer

20      asked to see your identification and you told him you

21      didn't think you had to see your identification.  Is

22      that correct?  That's what you said, right?

23  A   I don't think that's exactly what I said.  I think

24      what I -- I don't think that's what exactly -- what I

25      said.  I think you already know what I said.  I don't

1      know why you keep trying to rephrase it.

2  Q   Okay.  You -- Officer Dutton.....

3  A   I said he had no right to stop me and ask me for I.D.

4      for no reason.

5  Q   Okay.  Now are you familiar with the Anchorage

6      Municipal Code?

7  A   I haven't memorized it.

8  Q   Do you know what the Anchorage Municipal Code is?

9  A   I know what the Anchorage Municipal Code is.

10 Q   Okay.  And it's -- what is it?

11 A   (Whispering)

12 Q   Just answer the question.

13         MR. PHARR:  Just answer the question, Judy.

14 A   It's ordinances.  Municipal ordinances which are

15     municipal laws.

16 Q   (By Ms. Pinkel)  Okay.  Have you --

17 A   Is that true?

18 Q   Well, I'm asking you the question.  You're an

19     attorney, as John and I, so I assume you know what the

20     ordinances are, but I think I need to just ask you.

21 A   Do we need to change?  How long ago did this run out

22     or is it still going?

23         MR. PHARR:  Why don't we go off record.

24 (Off record)

25 (On record)

1    MS. PINKEL: Okay. We're back on record and

2    the record should reflect that we just briefly went off record

3    because Ms. Berman was taping the deposition independently and

4    she ran out of tape. But we've clarified that the court

5    reporter can provide you with a copy of the tape, Ms. Berman.

6    Q    (By Ms. Pinkel) I was going to show you, Judy, the

7         Anchorage Municipal Code, AMC 9.12.030 and I'm going

8         to mark it Exhibit 3. No, I'm sorry, Exhibit 4.

9    COURT REPORTER: All right. Exhibit 4 marked.

10   **(Deposition Exhibit 4 marked)**

11   Q    (By Ms. Pinkel) And it is one page. And this is

12        Anchorage Municipal Code 9.12.030. If you want to

13        just focus on subsections a and b.....

14   A    That's all I have.

15   Q    Have you seen this code before?

16   A    I probably have.

17   Q    Okay. Now AMC 9.12.030 sub A says that: A licensee

18        will have his operator's license in his immediate

19        possession at all times while operating a motor

20        vehicle, correct?

21   A    (No audible answer)

22   Q    And -- is that correct?

23   A    That's what you read. That's what it says.

24   Q    Okay. So say -- can you say yes or no?

25   A    Are you asking me if what you read is what it says on

1    the paper?

2  Q    That's correct.

3  A    Yes, you read it correctly.

4  Q    Okay.  And that does AMC 9.12.03 sub A further say

5    that:  He or she will display the license upon demand

6    of a judge or police officer.  Is that correct?

7  A    It says he will display.  It doesn't say he or she.

8  Q    That's correct.  But it presumes that she will also

9    display her license upon demand of a judge or police

10    officer, correct?

11  A    Ms. Pinkel, what it says is he will display the

12    license upon demand upon the demand of a judge or

13    police officer.  That's what it says.

14  Q    Okay.

15  A    I have no idea what it presumes.

16  Q    Okay.  And the subsection B of AMC 9.12.030, sub B

17    states that:  For the purpose of this section, the

18    term display means the manual surrender of a license

19    certificate into the hands of the demanding officer

20    for his inspection, correct?

21  A    That's what it says, yes.

22  Q    Yes.  Okay.  Now when Officer Dutton asked for you to

23    display your license he had the authority to do so

24    under Anchorage Municipal Code 9.12.030, correct?

25  A    Incorrect.

1  Q    Okay.  You don't agree with that?

2  A    No, he asked me for my I.D., he did not ask me for my

3       license and I was not operating a motor vehicle at the

4       time.

5  Q    Okay.  You had been operating a motor vehicle hadn't

6       you?

7  A    I had been.....

8  Q    Okay.

9  A    But he did ask me for my license.  He asked me for my

10      I.D.  There's in fact a case that says that this --

11      this section and the corresponding state statutes are

12      to be used to ask for a license not to find who a

13      person is or their identity.  He specifically asked me

14      for I.D. every single time he said I.D.  He never ever

15      used the word license.

16 Q    Someone's identification is usually in their driver's

17      license.  Is that correct?

18 A    He asked me for my I.D.

19 Q    Does Alaska have a requirement that people carry state

20      I.D.'s?

21 A    No.

22 Q    Okay.  So generally isn't it the practice in Alaska

23      when someone asks you for your I.D. when you're

24      writing a check they -- that means they want to see

25      your driver's license, correct?

1  A    Not necessarily.

2  Q    Okay.  All right.  Well, he asked for your

3       identification and the identification that you would

4       have had would have been driver's license, correct?

5  A    That's.....

6  Q    Just answer yes or no.  If you don't agree.....

7  A    I'm not going to answer the question unless you

8       rephrase it.  That's a ridiculous question.  I'm

9       sorry.  You need to rephrase.  You cannot -- I can't

10      -- I don't understand the question.

11 Q    My question was when the Officer was asking to see

12      your identification it was his intention that you show

13      your driver's license, correct?

14 A    I have no idea what his intentions is -- was.

15            MR. PHARR:  I have.....

16 A    He asked me for I.D.

17            MR. PHARR:  I have a military I.D.

18 Q    Okay.  You weren't on a military base when he asked to

19      see your identification were you?

20 A    Ms. Pinkel.

21 Q    Just answer the question.

22 A    I was not on a military base.  There is a state I.D.

23      Alaska does have a state I.D.  He asked me for

24      identification.  What are you trying.....

25 Q    I'm just trying to.....

1    A    Why are we beating a dead horse?

2    Q    I'm asking for.....

3    A    He asked me for identification.  An identif- -- he

4         might have wanted my driver's license.  He might have

5         wanted my I.D. card.  He might have wanted my library

6         card.  I have no idea what he wanted.  He asked me for

7         I.D.  He said, hey, I want to see your I.D.  I cannot

8         probe his mind.  It's perfectly rea- -- likely that he

9         was thinking driver's license.  It's perfectly likely

10        that he was thinking college I.D. I have no idea what

11        he was thinking.  He asked me for I.D.

12    Q    Okay.  No, he didn't ask you for your library card,

13        did he?

14    A    No.  And he did not ask me for my driver's license

15        either.

16    Q    And he didn't ask you for a student I.D. did he?

17    A    No.

18    Q    We're not on a college campus are we?

19    A    (No audible answer)

20    Q    Is the Carrs Huffman a college campus, Ms. Berman?

21    A    It's not a college campus.

22    Q    Okay.  Just wanted to make sure.

23             MR. PHARR:  He could have asked her for her

24    Social Security card.

25             MS. PINKEL:  Mr. Pharr, are you testifying?

1            MR. PHARR:  I can.

2            MS. PINKEL:  I'm trying to ask your client

3    some questions here and I'm trying to go as quickly as I can

4    so.

5    Q       (By Ms. Pinkel)  Now are you also familiar with Alaska

6            Statute 28.15.131?

7    A       Am I familiar with it?

8    Q       That's correct.

9    A       I guess I would have to say no, not offhand.

10   Q       Okay.  Because you mentioned there was a corresponding

11           state statute that was very similar to the Municipal

12           Code provision that I just read to you and I just

13           wondered if you were aware of that state provision

14           like you said you were?

15   A       I didn't know it by -- I haven't memorized the statute

16           number.

17   Q       Okay.  I'm just going to show you what's been marked

18           as --

19            MS. PINKEL:  Or I'm going to ask the court

20   reporter to mark Exhibit 5.

21                    **(Deposition Exhibit 5 marked)**

22   Q       Okay.  And that's Alaska Statute 28.15.131.  And I'm

23           just going to ask you to look at that.  It says

24           license to be carried and exhibited on demand.  And it

25           says a licensee shall have the licensee's driver's

|    |   |                                                                             |
|----|---|-----------------------------------------------------------------------------|
| 1  |   | license in immediate possession at all times when                           |
| 2  |   | driving a motor vehicle and shall present the license                       |
| 3  |   | for inspection upon a demand of a peace officer or                          |
| 4  |   | other authorized representative of the Department of                        |
| 5  |   | Public Safety identified as such to the licensee by                         |
| 6  |   | the officer or representative.  So is this statute                          |
| 7  |   | similar to the Municipal Code provision that I just                         |
| 8  |   | provided to you?                                                            |
| 9  | A | (No audible answer)                                                         |
| 10 | Q | Would you say?                                                              |
| 11 | A | You're asking for my opinion as to whether this                             |
| 12 |   | statute is similar to the Municipal Code?  Is that                          |
| 13 |   | what you're asking me, Ms. Pinkel?                                          |
| 14 | Q | Yes, 9.12.030.                                                              |
| 15 | A | You're asking me if I -- if in my opinion this statute                      |
| 16 |   | is similar to the ordinance?                                                |
| 17 | Q | That's correct.                                                            |
| 18 | A | In my opinion there is some similarity, yes.                                |
| 19 | Q | Okay.  And the statute states that a person holding a                       |
| 20 |   | driver's license is to present the driver's license                         |
| 21 |   | for inspection upon the demand of a police officer,                         |
| 22 |   | correct?                                                                    |
| 23 | A | It says shall present the license for inspection upon                       |
| 24 |   | demand of a peace officer.                                                  |
| 25 | Q | Okay.  Thank you.  Now when we were talking about how                       |

1    you're up at the Carrs entry, Judy, and Officer Davis

2    came and you said that the officers restrained you?

3    Is that correct?

4  A  We were outside of the entrance.

5  Q  Okay.  Now you were outside the entrance and do you

6    remember asking to or demanding to see Officer

7    Dutton's I.D.?

8  A  What I remember happening is that Dutton grabbed one

9    of my arms.  I told him to let go.  Then Davis came up

10   and grabbed my other arm and I -- and I was really

11   shocked that they were using this kind of force over

12   an I.D. and I said let -- you know, I said this is

13   police brutality, let go of me.  And they said you

14   have to show us I.D. and I said okay fine I will show

15   you I.D.  You have to let go of my arm so that I can

16   get my I.D.  Then they didn't let go of my arms but

17   they loosened my grip -- they loosened their grip on

18   me enough so that I could reach into my purse and pull

19   out my wallet.  I finally did pull out my wallet.  I

20   was holding it in my hands, getting out -- looking for

21   my -- looking for my license so I could get it out and

22   all of the sudden Davis became extremely angry and

23   just grabbed it out of my hands.  And then he and

24   Dutton started twisting my hands behind my back and

25   handcuffing me.

Q    Now before, you said that Officer Davis grabbed your
     purse out of your hands or your wallet out of your
     hands?

A    My wallet was in my hands.  He grabbed my wallet out
     of my hands and my purse off my shoulder.

Q    Okay.

A    And there were also some bags that I was carrying with
     me to reuse, some shopping bags and they took those.
     It was kind of -- they took those and started to throw
     them in the garbage.  I mean there was just like this
     absurd little interaction in the middle of this whole
     thing where they -- they grabbed my wallet out of my
     hands.  They grabbed my purse out of my shoulders and
     they took these bags, started throwing them out, and I
     was like, hey I was going to reuse those and they were
     like.  And they -- well I was going to -- and they
     said, well you want me to throw me into the recycle
     bin?  And I was like yeah, you know, well I was
     actually going to take them and reuse them first.  I
     do recycle.  There was this little interaction about
     the shopping bags.  It was this little island of
     absurdity in the middle of all this.

Q    Now were these just the plastic shopping bags you can
     get at Carrs that you carry.....

A    Yeah.

1    Q    You were just carrying a bunch of them in your hand?

2    A    I wouldn't say a bunch.  Probably two or three.

3    Q    Okay.  So do you remember telling Officer Dutton and

4        Officer Davis that you wanted to see their I.D.'s

5        before you would show them your I.D.?

6    A    I think I asked them for their I.D. at some point but

7        I didn't -- I didn't say I wanted to see it before I

8        would show them their I.D.

9    Q    Well.....

10    A    When they said I want to show -- when I -- when they

11        said that they wanted to see their I.D. I said, well

12        I'd like to see your I.D. too.

13    Q    So you asked to see their I.D.'s before you had even

14        shown them your I.D. obviously?

15    A    Before I had found it, yeah.

16    Q    Before you had displayed your I.D. you wanted to see

17        Officer Dutton's I.D.?  Correct?

18    A    No.  The time that I asked -- I didn't say that their

19        showing me their I.D. was a condition of my -- that I

20        was not going to show them my I.D. until they showed

21        their I.D. but I did in fact -- I did in fact ask them

22        to see their I.D. and the time period, the sequence

23        was that I made that request before I had actually

24        displayed my I.D.  I hadn't displayed my I.D. yet and

25        I never got to.  But, so -- but I did not say, no I'm

*METRO COURT REPORTING*

*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit A
Page 66

1        not going to show you my I.D. until I -- you show me

2        your I.D.

3  Q    So you didn't ask.  You didn't say -- okay, I want to

4        see your I.D. first.  However, the sequence was such

5        that you asked for their I.D. when in fact you had not

6        produced your I.D. yet, correct?

7  A    I would say that's accurate.

8  Q    Now Officer Davis, or Office Dutton, had placed you in

9        a sleeve guide, correct?

10  A    He called it a sleeve guide.  I -- as far as I know he

11        just grabbed a hold of my shoulder really tight.

12  Q    Okay.

13  A    If he wants to call that a sleeve guide.

14  Q    Okay.  He grabbed a hold of your shoulder?

15  A    I mean, that might -- my upper arm.

16  Q    Okay.  So he grabbed a hold of your upper arm above

17        your elbow?  Is that correct?

18  A    If it's my upper arm, it would have to be above my

19        elbow.

20  Q    Okay.

21  A    But I don't think it was, like, right at my elbow if

22        that's what you're.....

23  Q    Okay.

24  A    .....saying.

25  Q    Okay.  And when you asked Office Dutton to see his

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*
Exhibit A
Page 67

1        identification, he showed it to you, didn't he?

2    A   I think he did.

3    Q   Okay.  And he was wearing a police uniform on this

4        night, correct?  You already said that he was wearing

5        his uniform, correct?

6    A   Right.  But I don't think his name -- if -- I didn't

7        notice his name being displayed on the uniform.  I

8        asked him for -- I wasn't.  Ms. Pinkel, I was not

9        questioning whether he was a police officer, I just

10       wanted, if he wanted to know my name, I wanted to know

11       his name.  I wanted to know his name, that's why I

12       asked him for I.D.

13   Q   And you wanted to know his name before he got your

14       name?

15   A   No.

16   Q   Okay.

17           MR. PHARR:  You wanted -- you wanted his

18   driver's license?  So.

19   A   Military or college I.D.

20           MR. PHARR:  Uh-hum.

21   Q   (By Ms. Pinkel)  Now after Officer Dutton showed you

22       his badge, you actually pulled away and started to

23       spin, correct?

24   A   No.  I did not.

25   Q   You don't remember pulling away and starting to spin?

1   A   I don't even know what he means by that.  Do you?

2       Like twirling around in a circle like a ballerina?   I

3       did not.  I absolutely --

4   Q   Okay.

5   A   I did not pull away and start to spin.  I don't know

6       what he means by start to spin, but I know I didn't do

7       it.

8   Q   Okay.  If Officer Davis remembers that you turned away

9       and started to spin, would that seem like an accurate

10      memory?

11  A   No.  I just said no.

12  Q   I'm not saying you spinned like a ballerina, but that

13      you started to actually spin and turn.

14  A   I did not pull away from him and I did not start to

15      spin.  These were two men that had -- each had a

16      strong hold on each of my arms.  I could not move.  I

17      did not pull away.  I did not start to spin.  Should I

18      say it again, or is that clear?  I did not pull away.

19      I did not start to spin.

20  Q   So you're denying that you started to pull away after

21      Officer Davis came up?  Is that correct?

22  A   Yes.

23  Q   Okay.

24  A   And if you look at his -- never mind.

25  Q   That's okay.

1    A      You didn't ask me a question so I'll just let it go.

2    Q      Okay.  Well, if you want to continue your answer you

3         can certainly continue it.  If you have anything more

4         to say about this, please tell me.

5    A      If you look at Davis' report, Ms. Pinkel, he says I

6         took her I.D. from her.  We struggled, and then she

7         was handcuffed.  I'm denying that we struggled.

8         Nonetheless, by his account, if there was a struggle,

9         it occurred after he took my I.D., my wallet from me.

10   Q      Okay.  So you don't recall that you had already -- got

11        pulled away and started to spin before they took your

12        wallet out of your purse?

13           MR. PHARR:  I object to the form of the

14 question.  That's a when did you stop beating your wife type

15 question.  I instruct the witness not to answer that.

16           MS. PINKEL:  Well, all I'm asking her is how

17 this all occurred and I have every right to ask her what the

18 sequence of events here are, John.

19   A      He may be asking you to rephrase your question.

20           MR. PHARR:  The form of your questions is

21 improper.

22           MS. PINKEL:  Can you play back what that

23 question was?

24       (Off record)

25       (On record)

1  Q     (By Ms. Pinkel)   Now, just -- Judy, so you have denied

2        that you tried to pull away and start to spin away

3        from these officers, correct?

4  A     Yes.   I am denying that.

5  Q     Okay.   Now after you'd been handcuffed, Officer Davis

6        took your wallet out of your purse and found your

7        identification, correct?

8  A     No.

9  Q     Would you agree with that?

10 A     I would not agree with that.

11 Q     Okay.   When did your -- when did Officer Davis get

12       your identification?

13 A     Ms. Pinkel, what I'm disagreeing with is that you said

14       he took my wallet out of my purse.   My wallet was

15       already out of my purse as I previously answered.   I

16       was holding my wallet in my hand and he took my wallet

17       of my hand.   He did not take my wallet out of my

18       purse.   I took my wallet out of my purse when I

19       told.....

20 Q     Oh, I see.   Okay.

21 A     Okay.   I have a purse, it's like a shoulder bag.

22 Q     Uh-hum.

23 A     And then I had my wallet.   Had previously been in my

24       shoulder bag -- my pocketbook so I told the -- to back

25       up when I told the Officer that I would show them the

1    I.D. and they loosened their grip on my arms.   I

2    reached into my purse and took out my wallet.   So your

3    question to me had been after I was handcuffed Officer

4    -- what your question was to me was after I was

5    handcuffed did Davis take my wallet out of my purse.

6    He did not take my wallet out of my purse.   He took my

7    wallet out of my hand.   Then he -- then they

8    handcuffed me.   Then he took my license out of my

9    wallet.

10   Q    Okay.   And he took your license out of your wallet

11        because you had not provided the license to them,

12        correct?

13   A    That's incorrect.

14   Q    All right.   I have a few more questions here.   Now

15        just in general have you ever been convicted of a

16        crime?

17   A    No.

18   Q    Have you ever been charged with a crime?

19   A    No.

20   Q    You've never been charged with a crime?

21              MR. PHARR:   Other than this case I guess?

22   Q    (By Ms. Pinkel)   Other than this case?

23   A    I don't think so.

24   Q    Okay.   I just wanted to ask you about a few things

25        here.

1      MS. PINKEL:  Okay.  Are we on six?

2      COURT REPORTER:  Six.

3      MS. PINKEL:  I'm going to mark Exhibit 6.

4      COURT REPORTER:  Exhibit 6 has been marked.

5            **(Deposition Exhibit 6 marked)**

6  Q    (By Ms. Pinkel)  And if you just want to look at

7      Exhibit 6 here.  At the bottom of the page there, and

8      this is Bates numbered 000013.  This is called, I

9      believe it's called a Tiburon printout.  But there's a

10     -- looks like in 1977 you had an incident in Port

11     Angeles, Washington for petty larceny or petit larceny

12     and possession of marijuana.  Do you recall those

13     charges?

14  A    I don't think I have to answer a question that's

15     happened 30 years ago.

16  Q    All right.  I just asked you if you'd been charged

17     with a crime and you said no.  And I'm just asking you

18     if you recall this incident in 1977?

19      MR. PHARR:  I am going to object on the basis

20  that it's not relevant or reasonably calculated to lead to

21  admissible evidence and instruct the witness not to answer.

22  Q    (By Ms. Pinkel)  Okay.  Let me just ask you this:

23     Does it appear from this document that you were

24     charged with a crime in 1977?

25  A    Can I talk to my attorney for a moment?

1          MS. PINKEL:  Sure.

2     (Off record)

3     (On record)

4  Q     (By Ms. Pinkel)  Okay.  Judy, before we went off

5          record I had asked you if you had been convicted or

6          had been charged with any crimes and you said no.  And

7          then I ask you about this Tiburon printout that said

8          you'd been charged with two crimes in 1977.  Are you

9          going to answer that question now?

10 A     I'm going to make one more statement about that and

11         then I'm not going to answer any more questions.

12         First of all the printout says that I was acquitted,

13         is that correct?

14 Q     That's correct.

15 A     My attorney at the time advised me that the matter was

16         going to be wiped off my record and that I could

17         honestly answer that I'd never been charged or

18         convicted with a crime.

19 Q     Were you a minor at the time?

20         MR. PHARR:  She's not going to answer any more

21    questions about that.

22         MS. PINKEL:  Okay.

23         MR. PHARR:  There's nothing even faintly

24    relevant or that could possibly lead to anything admissible

25    there.

1       MS. PINKEL: Well I don't know. I'm just

2 asking. I asked her if she'd been convicted of a crime, she

3 said no. And then it looks -- or charged with a crime and it

4 looks like she was charged. I'll just move on to the next

5 question though.

6   Q       (By Ms. Pinkel) Judy, after this incident in April of

7           2002, did you have some other incidents involving the

8           police where they may have had to respond to a call of

9           some type in July of 2002?

10  A       When I saw that, Ms. Pinkel, I was racking my brain to

11          figure out what it was and --

12  Q       Okay. Let me -- just so we know what we're both

13          talking about. Because --

14  A       Does M-E-N mean mention? What does M-E-N mean in the

15          Code?

16          MS. PINKEL: Okay. Let me just mark this as

17 an exhibit so we're both on the same page and so that your

18 attorney knows what we're talking about too. I'm going to

19 mark what's been Bates number -- it looks like 000016. So we

20 would be at Exhibit 7?

21          COURT REPORTER: Is it okay if I go like this

22 for you?

23          MS. PINKEL: Yeah, that's fine.

24          COURT REPORTER: All right. Exhibit 7 marked.

25          **(Deposition Exhibit 7 marked)**

1  Q   (By Ms. Pinkel)  Okay.  Ms. Berman, what I'm going to

2      direct you to is on -- and your attorney, is on

3      Exhibit 7, there's some summaries at the very bottom

4      of this and it looks like some type of Tiburon

5      printout, I believe and there's, it looks like there's

6      an incident that this is -- it's under summaries and

7      it's the third incident down.  It says -- or the third

8      incident down, it says APD 020034804 Incident.  And

9      there's a reference number 0490490 Person.  Then it

10     says M-E-N and then it says reason, civil problem and

11     then the date is 7/12/02.  Are you familiar with what

12     this incident would be that happened on 7/12/02?

13 A   As I said, Ms. Pinkel, when I saw that I was racking

14     my brain to think of what it could possibly be and I

15     think I have an idea of what it is.  But if you pulled

16     it up and can show my what it was than that would

17     probably be more helpful to me.  Have you pulled that

18     incident up?  Do you have more detail about it?

19 Q   I don't because this was -- this is all I've got at

20     this point.

21 A   Well I mean if it has a rec- -- don't you have access?

22     If there was a pol- -- don't you have access to it?

23 Q   Frankly, I don't know if I have access.  I thought

24     it'd probably more professional to ask you that first.

25 A   Do you know what M-E-N, does M-E-N mean mention?  Do

1        you know what these codes mean?

2  Q    I guess I don't know.  I don't know what M-E-N means

3        and I'm asking you if you know what -- what this would

4        be that.....

5  A    The only thing I can of, and I actually I'm not sure

6        about how much I can tell you about it because of the

7        attorney-client privilege but the only thing that I

8        can think of that happened around that time, and my

9        understanding is M-E-N means I that I was mentioned in

10       the case that I wasn't like a party.  You know, I

11       wasn't -- what's the word I'm looking for?  That I was

12       mentioned in the case, that I wasn't either a suspect

13       or a complainant or -- the only thing that I can think

14       of is that at the time I was guardian ad litem and I

15       was rep for a child in a guardianship of a minor case.

16       And as I said, you know, probate matters are sealed

17       and so I really don't really don't feel that

18       comfortable going into any detail whatsoever, but at

19       some point somehow the mother had gotten the idea that

20       I had actually taken the child which was absolutely

21       untrue and so the police had left a couple of messages

22       for me asking about it, but by the time I got the

23       messages they had a left a third message saying not to

24       bother calling them back because they had reached the

25       other attorneys in the matter and they had cleared the

*METRO COURT REPORTING*
745 West Fourth Avenue, Suite 425
Anchorage, Alaska 99501
(907) 276-3876

Exhibit A
Page 77

1      matter up.  And that's the only thing I can possibly

2      think of.

3  Q    Okay.  So you think it may be involving an incident

4      where you were guardian ad litem?

5  A    Yeah.  Now that, I mean, I just want to clarify that I

6      -- the mother had gotten this misconception and the

7      other attorney cleared it up.  But that was absolutely

8      not true by any stretch of the imagination.  So the

9      third message was, you know, sorry for the messages

10     don't bother calling back.

11  Q    Do you know why a mother would have gotten the idea

12     you'd taken her child?

13  A    I'm not going to go into any more detail.  This is a

14     sealed probate case.

15  Q    Okay.  Then there's another.  A police reference

16     number for 12/20/03.  For a citation under it looks

17     like a Municipal Code 9.14.040 civil and then there's,

18     it looks there's like an incident for a collision,

19     12/20/2003.  Do you know what that is about?

20  A    That is about the same incident, correct?

21  Q    Right.  It looks like it.  Do you remember get cited

22     for a violation of a Municipal Code on 12/20/2003?

23  A    Yeah, we -- I had an accident where I couldn't stop

24     because the roads were icy and I got -- we got into a

25     collision.

1  Q    Okay.  And you were cited for what was that, running a
2       red light?
3  A    Failure to stop and it was dismissed.  I went to court
4       and it was dismissed.
5  Q    Okay.  Did you -- did that go to trial?
6  A    To traffic trial.
7  Q    So it was dismissed after.....
8  A    It was a traffic citation.
9  Q    Okay.  And so did you have a little court hearing
10      about it?
11 A    Yes.
12 Q    Okay.
13 A    It wasn't a criminal citation, Ms. Pinkel.
14 Q    I understand that.
15 A    It was a traffic citation.
16 Q    I understand that.  Okay.  Now have you ever been
17      publicly disciplined by the Alaska Bar?
18 A    I have not.
19 Q    Have you ever been privately disciplined by the Alaska
20      Bar?
21 A    I have not.
22 Q    Okay.  And have you been licensed to anywhere else
23      besides, I think you've already answered this, but
24      have you been licensed in Massachusetts?
25 A    To practice law?  No.

1  Q    Okay.  And this is the only state where you're

2       currently licensed?

3  A    It's the only state I've been licensed.

4  Q    Okay.  Now you said that you weren't on any medication

5       today.  Is that correct?

6  A    Right.

7  Q    And in April of 2002 were you taking any type of blood

8       thinners or anything like that?

9  A    No.

10  Q    For any problems?

11  A    No.  Blood thinners?

12  Q    I'm just asking.  And were you on any aspirin that

13       day?

14  A    Why are you asking about blood thinners?

15  Q    Just answer the question.

16  A    Blood thinners?

17            MR. PHARR:  I think she just threw that out as

18  an example, Judy, you know.

19  A    Had I taken aspirin that day?

20  Q    (By Ms. Pinkel)  Do you remember?  Or were you taking

21       aspirin?

22  A    On April 6, 2002, I do not remember if I took aspirin.

23  Q    Okay.  And you hadn't been prescribed any blood

24       thinners?  Is that correct?

25  A    She's asking specifically about blood thinners.

1  Q    Okay.  You just need to answer the question.

2  A    Well I think there has to be some relevance.

3  Q    There is.  I'm just asking you and you need to answer

4       it.  Your lawyer hasn't objected.  Relevance isn't a

5       valid objection.

6  A    Can you give me a.....

7            MR. PHARR:  I think she's already answered

8  that.

9  A    Yeah.

10  Q    (By Ms. Pinkel)  Okay.  And what's the answer?

11            MR. PHARR:  How many times can she say -- well

12  what's the answer yes or no?

13  A    Do you want to give me a prescription name?

14            MR. PHARR:  Just answer yes or no, Judy.

15  A    I don't believe I was taking blood thinners.

16  Q    (By Ms. Pinkel)  Okay.  So the answer is no?

17  A    I do not believe I was taking blood thinners.

18  Q    All right.  Now you had provided some photos with your

19       recent discovery responses.  And I just wondered who

20       had taken those photos?

21  A    A person who works in my office building.

22  Q    And who is that?

23  A    Michelle Turner.

24  Q    Okay.  And what's her relationship to you?

25  A    She's a person who works in my office building.

1  Q    Is she an attorney?

2  A    She's not an attorney.

3  Q    Okay.  And what does she do for a living?

4  A    She's building manager and assistant to Jim Gottstein.

5  Q    So she works in Jim Gottstein's law practice?

6  A    She works in Jim Gottstein's office.

7  Q    Okay.  And Jim Gottstein's an attorney, right?

8  A    He's an attorney.

9  Q    Okay.  So she works in his law office, correct?

10 A    I don't know that that's necessarily true.

11 Q    Okay.  So she has an affiliation with Jim Gottstein?

12 A    Yes.

13 Q    And when did she take those photos?

14 A    A few days after April 6, 2002.

15 Q    Do you remember exactly what date?

16 A    It was Wednesday or Thursday, I don't remember which

17      day.  It happened on a Saturday.  It was Wednesday or

18      Thursday of the following day -- week.  She thinks I

19      might bruise easily that's why she's asking.....

20 Q    Okay. Just answer the questions, you don't have to

21      internalize.

22 A    I can talk to my attorney.  I guess we should go.....

23 Q    Okay.  And did you have negatives of those photos that

24      you provided with your discovery responses?

25 A    Did I have negatives?

1  Q    Correct.

2  A    I had negatives.

3  Q    And do you still have those negatives?

4  A    I'm not sure, I probably do.

5  Q    You do have them?

6  A    I'm not sure, I probably do.

7  Q    So is that a yes or a no?

8  A    It's an I'm not sure I probably do.

9  Q    Okay. Well, you're suppose to answer yes or no.

10 A    I don't know.

11        MR. PHARR: Don't -- don't. Okay.

12 Q    (By Ms. Pinkel) So you don't know. Okay. But it

13     sounds like you're 99 percent sure you have some

14     negatives?

15 A    I've answered the question.

16 Q    Now when your driver's license was reviewed on April

17     6th, 2002, it had expired hadn't it?

18 A    I believe it had.

19 Q    Okay. Is that yes?

20 A    My recollection is that it had.

21 Q    Okay. Now am I correct in assuming that maybe one of

22     the reasons you didn't want to show your license to

23     these officers was because you had an expired license?

24        MR. PHARR: I object to the form of the

25 question and instruct the witness not to answer it, it's a

1    double question, when did you stop beating your wife.    I

2    instruct the witness not to answer the question.

3                MS. PINKEL:   Okay.   Well I think she needs to

4    answer the question.

5                MR. PHARR:   I disagree.

6    A        Could we go off record just for a minute so I can just

7             get some more water?

8                MS. PINKEL:   Sure.

9             (Off record)

10            (On record)

11   Q        (By Ms. Pinkel)   Okay. Judy we just took a bit of

12            break here.   Now I was asking you about your driver's

13            license and the status of it in April 2002.   And my

14            question to you is that driver's license had expired

15            the night of April 6, 2002, correct?

16   A        I don't think it expired that night.

17   Q        It was expired by that night.   Is that correct?

18   A        I believe so.

19   Q        Is that a yes?

20   A        That's my recollection.

21   Q        Okay.   Now one of the reasons you didn't want to show

22            your license to the officers that night was that it

23            was expired, correct?

24                MR. PHARR:   And I'm instructing the witness

25   not to answer that question.

*METRO COURT REPORTING*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

**Exhibit A**
**Page 84**

1              MS. PINKEL:  Okay.  And.....

2              MR. PHARR:  It's a compound question.

3              MS. PINKEL:  It's not a compound question.

4              MR. PHARR:  Yes, it is and I instruct the

5    witness not to answer.

6              MS. PINKEL:  It's not a compound question.

7    Maybe if you have another objection you'll have.....

8              MR. PHARR:  You'll have to make it -- you'll

9    have to make your pitch to the court because I'm instructing

10   her not to answer.

11             MS. PINKEL:  So you're instructing her not to

12   answer to the -- my question which is one of the reasons she

13   didn't want to show her license was it had expired.

14             MR. PHARR:  Whatever your question is, if

15   that's exactly the way you said it or not, it's a compound

16   question and it's a when did you stop beating your wife

17   question and I instruct the witness not to answer it.

18   Q     (By Ms. Pinkel)  Judy, were you aware on the night,

19         April 2002, you were aware that your license had

20         expired, weren't you?

21   A     I think I was.

22   Q     Okay.  Now the fact that it expired was a factor in

23         your not wanting to show it to the officers, wasn't

24         it?

25             MR. PHARR:  I object on the same basis.  And I

1  instruct the witness not to answer.

2          MS. PINKEL:  Okay.  And your basis is that

3  it's a compound question.

4          MR. PHARR:  Yes.

5          MS. PINKEL:  All right.  I disagree with that.

6  It's not a compound question.  But I understand you've

7  instructed her not to answer it and I think she should have

8  answered it.

9  A      Do you want to explain to her why it's a compound

10         question?

11         MR. PHARR:  No, that's -- no.

12         MS. PINKEL:  Okay.  No.  It's not a compound

13  question.

14  Q      (By Ms. Pinkel)  Okay.  Now, Judy, are you familiar

15         with the term road rage?

16  A      I've heard it, yes.

17  Q      Okay.  And do you think you were showing some road

18         rage the night of this incident?

19  A      No, I don't.

20  Q      Okay.  Now, you've tape recorded this deposition today

21         yourself, correct?

22  A      No, just a very small part of it.

23  Q      Okay.  You've tape recorded the beginning of it,

24         correct?

25  A      I think so, yeah.  I don't know how much.

1  Q        Okay.  And you've made your own tape recording even
2           though the court reporter was recording this, correct?
3  A        When we started the deposition it was.....
4  Q        Just answer the question.
5                MR. PHARR:  What does this have to do with --
6  how is this relevant?
7                MS. PINKEL:  I have the right to ask her why
8  she was tape recording this deposition.
9                MR. PHARR:  You have the right to ask her
10 questions that are relevant or reasonably calculated to lead
11 to admissible evidence and I can't see how this is either.
12               MS. PINKEL:  Well, I think it is.
13               MR. PHARR:  Well, I disagree and I instruct
14 the witness not to answer.
15               MS. PINKEL:  Well, can you just explain for me
16 why you were tape recording this today yourself?
17 A        Can I just talk?
18               MR. PHARR:  No.  Just don't answer the
19 question.  Don't answer the question.  Okay.  Go ahead and
20 answer the question.
21 A        I was not aware that the tape would be made available
22          to me from Metro Court Reporters.  Now once I -- if I
23          had known that I could get the tape from Metro Court
24          Reporters I would have not had taped my own tape.
25 Q        (By Ms. Pinkel)  And you didn't want to rely on their

1           transcript?  Is that right?

2    A      That's not right.

3                 MR. PHARR:  Don't answer any more questions

4    about that.

5    A      That's not right.

6    Q      (By Ms. Pinkel)  Okay.  All right.  I think that's

7           about it.  Let me check my notes real quick.  Judy, if

8           I told you that Officers Dutton and Davis were

9           concerned for the safety of the Chens on the night of

10          September or April 6, would that surprise you?

11   A      Yes.  Very much so.

12   Q      And if I told you that.....

13   A      And I think you asked me that.  Oh, maybe not.  Didn't

14          she ask me that already?

15   Q      Okay.  And you said that would surprise you that they

16          were concerned for the safety of the Chens?

17   A      It would surprise me very much.

18   Q      Okay.  And if I told you they would have had concerns

19          about other citizens based on your behavior would that

20          surprise you?

21   A      Very much.

22                MS. PINKEL:  No further questions.

23          (Off record)

24                * * *  END OF PROCEEDINGS  * * *

25

**S I G N A T U R E**

STATE OF ALASKA            )
                          ) ss.
THIRD JUDICIAL DISTRICT )

         I, **JUDY L. BERMAN**, have read the foregoing deposition and have made corrections thereto.  Any and all changes, explanations, deletions and/or additions to my testimony may be found on the correction sheet(s) enclosed with this transcript.


              _____
              **JUDY L. BERMAN**


STATE OF ALASKA            )
                          )ss.
THIRD JUDICIAL DISTRICT )

        THIS IS TO CERTIFY that on this _____ day of _____, 200__, before me appeared **JUDY L. BERMAN**, to me known and known to be the person named in and who executed the foregoing instrument, and acknowledge voluntarily signing and sealing the same.


              _____
              Notary Public in and for
              State of Alaska, at Anchorage
              My Commission Expires:_____

**C E R T I F I C A T E**

1

2   UNITED STATES OF AMERICA    )
                               ) ss.
3   STATE OF ALASKA            )

4            I, Jerri Young, Notary Public in and for the State of
    Alaska and Reporter with Metro Court Reporting, do hereby
5   certify:

6            THAT the annexed and foregoing Deposition of **JUDY L.**
    **BERMAN** was taken before Cheri Tabor on the 13th day of
7   December 2005, commencing at the hour of 10:45 o'clock a.m.,
    at the offices of Metro Court Reporting, Anchorage, Alaska,
8   pursuant to Notice to take said Deposition of said Witness on
    behalf of the Defendants:

9
             THAT the above-named Witness before examination, was
10  duly sworn to testify to the truth, the whole truth, and
    nothing but the truth;

11
             THAT this Deposition, as heretofore annexed, is a true
12  and correct transcription of the testimony of said Witness
    taken by Cheri Tabor and hereafter transcribed by Cheri Tabor;

13
             THAT the original of the Deposition transcript will be
14  lodged in a sealed envelope with the attorney requesting
    transcription of same, as required by Civil Rule 30(f)(1)
15  amended, that attorney being:

16            **MS. MARY L. PINKEL**, Office of the Municipal Attorney,
             Attorneys at Law, P.O. Box 196650, Anchorage, Alaska
17           99519-6650;

18            THAT I am not a relative, employee or attorney of any
    of the parties, nor am I financially interested in this
19  action.

20            IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal this 28th day of December 2005.

21

22

23                            Jerri L. Young
                              Notary Public in and for Alaska
24                            My Commission Expires: 11/03/07

25

*M E T R O   C O U R T   R E P O R T I N G*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*                    **Exhibit A**
                                     **Page 90**

*received*
*4-25-06*

## S I G N A T U R E

STATE OF ALASKA            )
                           ) ss.
THIRD JUDICIAL DISTRICT )

        I, **JUDY L. BERMAN**, have read the foregoing deposition and have made corrections thereto.  Any and all changes, explanations, deletions and/or additions to my testimony may be found on the correction sheet(s) enclosed with this transcript.

                                 _____
                                  JUDY L. BERMAN

STATE OF ALASKA            )
                           ) ss.
THIRD JUDICIAL DISTRICT )

        THIS IS TO CERTIFY that on this _22nd_ day of _March_, 200 6, before me appeared **JUDY L. BERMAN**, to me known and known to be the person named in and who executed the foregoing instrument, and acknowledge voluntarily signing and sealing the same.



        Notary Public in and for
        State of Alaska, at Anchorage
        My Commission Expires: **03-09-2010**

OFFICIAL SEAL
NOTARY PUBLIC STATE OF ALASKA
MARY HEATH
MY COMMISSION EXPIRES: 03/09/2010

*M E T R O   C O U R T   R E P O R T I N G*
*745 West Fourth Avenue, Suite 425*
*Anchorage, Alaska 99501*
*(907) 276-3876*

Exhibit A
Page 91

**Deposition**
## CORRECTION SHEET

| Page # | Line # | Says: | Should say: |
|--------|--------|-------|-------------|
| 31 | 10-11 | just tell you ~~that~~ now -- the form of what happened | just tell you in narrative form what happened |
| 51 | 6-7 | It justifies me. | It just surprised me. |
| 71 | 16 | hand | hands |
| 71 | 17 | hand | hands |
| 77 | 14-15 | guardian ad litem and I was rep for a child | guardian ad litem for a child |
| 82 | 21 | internalize | editorialize |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Exhibit A
Page 92