1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ALASKA

3   JUDY L. BERMAN,                    )
                                       )
4                    Plaintiff,        )
                                       )
5           vs.                        )
                                       )
6   ANCHORAGE POLICE DEPARTMENT,       )
    OFFICER ROBERT DUTTON and          )
7   SGT. GIL DAVIS,                    )
                                       )
8                    Defendants.       )
    _____)
9   Case No. A04-0227 CV (JKS)

10                 **DEPOSITION OF ROBERT DUTTON**

11  **APPEARANCES:**

12          **FOR THE PLAINTIFF:**      **MR. JOHN C. PHARR**
                                        Attorney at Law
13                                      733 West 4th Avenue, Suite 308
                                        Anchorage, Alaska  99501
14                                      (907) 272-2525

15          **FOR THE DEFENDANTS:**     **MS. MARY B. PINKEL**
                                        Municipality of Anchorage
16                                      Assistant Municipal Attorney
                                        632 West 6th Avenue, Suite 730
17                                      Anchorage, Alaska  99501-6650
                                        (9070 343-4545

18
            **ALSO PRESENT:**          **MS. JUDY L. BERMAN**
19
                              *  *  *  *  *  *
20

21

22

23

24

25

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit B
Page 1

1                    PURSUANT TO NOTICE, the Deposition of

2    **ROBERT DUTTON**, was taken on behalf of the plaintiff before

3    Wanda Ventres, Notary Public in and for the State of Alaska,

4    and Reporter for R & R Court Reporters, Inc., at the offices of

5    John C. Pharr, 733 West 4th Avenue, Suite 308, Anchorage,

6    Alaska, on the 14th day of December, 2005, commencing at the

7    hour of 11:15 o'clock a.m.

8                         *   *   *   *   *   *

9                         **TABLE OF CONTENTS**

10   Direct Examination by Mr. Pharr                              04
     Cross Examination by Ms. Pinkel                              28
11   Redirect Examination by Mr. Pharr                            33

12   **EXHIBITS**

13   1        (Sketch of parking area incident)                   08

14                        *   *   *   *   *   *

15

16

17

18

19

20

21

22

23

24

25

Exhibit B
Page 2

1               **P R O C E E D I N G S**

2               COURT REPORTER:  My name is Wanda Ventres.  I'm

3    a notary public in and for the State of Alaska, representing R

4    & R Court Reporters at 810 N Street in Anchorage, Alaska.

5    Today's date is December 14th, 2005, the time is 11:15 a.m.  We

6    are at the offices of John C. Pharr at 733 West 4th Avenue,

7    Suite 308 in Anchorage to take the deposition of Robert Dutton

8    in a United States District Court case for the District of

9    Alaska.  Judy L. Berman, plaintiff, versus Anchorage Police

10   Department, Officer Robert Dutton and Sgt. Gil Davis,

11   defendant.  Case number A04-0227 CV (JKS).

12               Counselors, if you would identify yourselves

13   for the record, please?

14               MR. PHARR:  John Pharr, attorney for the

15   plaintiff.

16               MS. PINKEL:  Mary Pinkel, attorney for the

17   Anchorage Municipal Police Department, Robert Dutton and Gil

18   Davis.

19               COURT REPORTER:  Thank you.  And Mr. Dutton,

20   would you raise your right hand, please?

21               (Oath administered)

22               MR. DUTTON:  Yes, I do.

23               **ROBERT DUTTON**

24   having first been duly sworn under oath, testified as follows

25   on:

<table>
<tr><td>1</td><td colspan="2" align="center"><b><u>DIRECT EXAMINATION</u></b></td></tr>
<tr><td>2</td><td></td><td>COURT REPORTER:  You may lower your hand.  For</td></tr>
<tr><td>3</td><td colspan="2">the record state your full name, spelling your last, please?</td></tr>
<tr><td>4</td><td>A</td><td>It's Robert Dutton.  D-u-dt-t-o-n.</td></tr>
<tr><td>5</td><td></td><td>COURT REPORTER:  And your mailing address?</td></tr>
<tr><td>6</td><td>A</td><td>6200 Lockheed Avenue, Anchorage.  That's 99502.</td></tr>
<tr><td>7</td><td></td><td>COURT REPORTER:  And a daytime telephone</td></tr>
<tr><td>8</td><td colspan="2">number?</td></tr>
<tr><td>9</td><td>A</td><td>249-6282.</td></tr>
<tr><td>10</td><td></td><td>COURT REPORTER:  Thank you.  You may proceed.</td></tr>
<tr><td>11</td><td colspan="2"><b>BY MR. PHARR:</b></td></tr>
<tr><td>12</td><td>Q</td><td>Mr. Dutton, you were with APD back on April 6th, 2002?</td></tr>
<tr><td>13</td><td>A</td><td>Yes, I was.</td></tr>
<tr><td>14</td><td>Q</td><td>Okay.  Were you on duty that night?</td></tr>
<tr><td>15</td><td>A</td><td>Yes, I was.</td></tr>
<tr><td>16</td><td>Q</td><td>What time did you shift begin?</td></tr>
<tr><td>17</td><td>A</td><td>I was working a -- an alcohol enforcement grant detail</td></tr>
<tr><td>18</td><td></td><td>which was not my normal scheduled shift.  So at this</td></tr>
<tr><td>19</td><td></td><td>point I don't remember what time we started that night.</td></tr>
<tr><td>20</td><td>Q</td><td>Did you -- okay.  Now, you were -- you and an Officer</td></tr>
<tr><td>21</td><td></td><td>Davis were stationed outside the -- well, you stationed</td></tr>
<tr><td>22</td><td></td><td>yourselves outside the liquor store in the Huffman --</td></tr>
<tr><td>23</td><td></td><td>Carrs Huffman there, correct?</td></tr>
<tr><td>24</td><td>A</td><td>That is correct.</td></tr>
<tr><td>25</td><td>Q</td><td>Is this something you were assigned to or you just kind</td></tr>
</table>

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit B
Page 4

1            of chose it as a good vantage point?

2  A     No.  That was just part of alcohol enforcement detail

3            we were on.  It was a detail designed to.....

4           MS. BERMAN:  I apologize.  I'm sorry, John.

5  A     .....to target underage drinking, selling alcohol to

6            minors, that type of issues.

7  Q     Okay.

8           COURT REPORTER:  Could the person who just

9  entered the room be identified, please?

10          MR. PHARR:  It's Judy Berman, the plaintiff.

11          COURT REPORTER:  Thank you.

12  Q    Where did you and Officer Davis -- Officer Davis

13           station yourselves exactly?  I mean in relation to the

14           liquor store?

15  A    To say exactly where Sgt. Davis is, I don't know,

16           because I only had radio contact with him.  I didn't

17           actually know where he was at.

18  Q    Oh, you weren't together?

19  A    I was -- no.  Because I was in a marked police vehicle

20           in uniform.  I was staying back out of sight while he

21           was undercover watching for any kind of the infractions

22           we were there to enforce such as minors trying to get

23           adults to buy them alcohol, selling alcohol to minors,

24           things of that nature.  So I was actually out of sight.

25  Q    Were you in the police car?

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit B
Page 5

1   A      I was.

2   Q      Okay.  Did you have any contacts with any juveniles or

3          anything of that nature that night?

4                 MS. PINKEL:  I'm going to object as to

5   relevance here.  I'm also going to object under AMC 3.90.040(c)

6   as to the fact that other investigations are considered

7   confidential and not subject to disclosure.

8                 MR. PHARR:  Does that mean he's not going to

9   answer the question?

10                 MS. PINKEL:  You don't have the right to ask

11  the question and I'm going to instruct him not to answer the

12  question.

13  Q      All right.  Well, let's fast forward to any contact you

14         may have had with the woman seated to my right.  Can

15         you tell me what you remember about that?

16  A      That's pretty vague.  But.....

17  Q      I'm kind of leaving it open -- open ended.

18  A      Okay.  Well, initially I was making a final trip

19         through the parking lot.  We had decided to leave that

20         particular liquor store.  So I was driving through the

21         parking lot and out towards the exit which exits on to

22         Huffman.  As I got near the exit I heard a horn honking

23         repeatedly.  I know I had went -- I had made a U-turn

24         and went back to see if it was a car alarm, you know,

25         things of that nature.  As I got closer I saw that it

7

1            was Ms. Berman's vehicle and that she was repeatedly

2            honking the horn and she was screaming out her window.

3  Q      Was the window up or down?

4  A      Well, it had to be down because I could hear her.  I

5            would assume it was down.....

6  Q      All right.  And.....

7  A      .....in order for me to hear her.

8  Q      Can you take a piece of paper and kind of sketch out

9            the scene?

10           MS. PINKEL:  John, just for clarification, you

11 said the woman to your right.  You're meaning Judy Berman?

12           MR. PHARR:  Well, actually I was referring to

13 the court reporter.

14           MS. PINKEL:  Okay.  Just clarifying for the

15 record.

16           MR. PHARR:  Okay.

17           MS. BERMAN:  I think he stated my name.  I'm

18 pretty sure he did.

19           MS. PINKEL:  Rob, would it help if you were

20 sitting across from John?  I could just move over one if you

21 want.

22  A      I'm not having any -- any trouble hearing him.....

23           MS. PINKEL:  Okay.

24  A      .....or anything of that nature.  That's the general

25            basic idea of where we were at.

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

**Exhibit B**
**Page 7**

ANCHORAGE, ALASKA  99501

8

1   Q       Okay.  P is the patrol car?

2   A       P would be the patrol car.  And B would be Ms. Berman's

3           car.

4   Q       All right.

5                   MR. PHARR:  Let's mark this as an exhibit.

6                   MS. PINKEL:  Can I just see that real quick?

7   If you're going to mark it as an exhibit it might help if we

8   make copies of it, John, so that I can have a copy for my file.

9                   MR. PHARR:  Well, I'm sure he's going -- well,

10  sure.  That's no problem.  Excuse me.  I'm sure he's going to

11  add some arrows and stuff.  So, I mean I'm going to ask him to

12  so.....

13                  MS. PINKEL:  Okay.

14                  MR. PHARR:  .....we're not quite done with it

15  yet.

16                          **(Deposition Exhibit 1 marked)**

17  Q       Okay.  Were you sitting there like -- I think there's a

18          stop sign there?

19  A       Well, at the time -- now on Huffman there you can't

20          make a left turn out of Carrs any more because they've

21          put a couple of medians up.  At the time it was open to

22          where you could go left out of there and that's

23          probably the direction I was heading since I was going

24          back to the police station.

25  Q       Okay.  Do you know where Officer Davis was at this

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 8**

1          point?

2  A       No.  Because again, I had radio contact with him.  I'm

3          not sure.....

4  Q       Okay.

5  A       .....exactly where he was at.

6  Q       How would you have -- how would he have gotten back to

7          the police station?  Did he have his own car?

8  A       He was in a separate unmarked car, yes.

9  Q       Okay.  Did you have anyone with you?

10 A       No.

11 Q       All right.  So at this point B here, the -- on Exhibit

12         1 -- let's see, you heard a horn honking and then you

13         turned around and came back?

14 A       Yes.

15 Q       Okay.  Could you kind of draw arrows and indicate where

16         you ended up when you heard the -- what you described

17         as screaming?

18 A       Where I ended up?

19 Q       Yeah.  Kind of like where you -- did your patrol car

20         stop and then you heard it?

21 A       Okay.  Well, what I'll need to do is kind of alter

22         the -- the picture a little bit.

23 Q       Okay.

24 A       And of course this is not to scale and -- and I can't

25         say that.....

1    Q    Sure.

2    A    .....you know, five parking spaces up from the end of

3         the building is where this occurred.

4    Q    Right.

5    A    I'll say after I turned around and proceeded back

6         towards here is when I could see her vehicle sitting

7         here and I could see that her screaming and honking was

8         directed at two people that exited from another car

9         that had parked here, or was parked.  Like I said, they

10        were already out.  And to me it appeared that that was

11        directed towards those two people.

12   Q    You had your window down?

13   A    I don't know.

14   Q    Okay.  If your window was up could you have heard

15        anything like that?

16   A    I think so.  I won't guarantee that I did that night,

17        but it's kind of a -- it was a practice of mine to

18        always leave my back two windows down a little bit just

19        so you can hear.....

20   Q    Okay.

21   A    .....inside the car.  I don't know that that happened

22        that night.

23   Q    What was she screaming?

24   A    That I could not tell you.

25   Q    On a scale of one to 10 how loud was the screaming?

1   A      It was loud enough that I could hear it as -- as I was

2           approaching.

3   Q      Okay.  Did -- what were the two people doing from the C

4           car here?

5   A      At the time walking towards the front of the store to

6           where the front doors are.

7   Q      Were they looking back at her or were -- you know, were

8           they looking around or acting nervous?  What were they

9           doing?

10  A      I don't know how they were acting.  It was just from my

11          vantage point that the conduct was directed towards

12          them just from their proximity.  That's all I could

13          say.

14  Q      Okay.  What happened next?

15  A      What happened next is the car marked B pulled into a

16          parking space next to C and then I pulled up and parked

17          behind Ms. Berman's car.

18  Q      Can you.....

19  A      So you want me to do that again?

20  Q      .....kind of sketch that out and maybe use -- well,

21          however you want to do it.

22              MS. BERMAN:  Oh.....

23              MS. PINKEL:  I'm going to object to Ms. Berman

24 asking questions or making comments here.  Mr. Pharr is taking

25 the depositions and Mr. Dutton is answering the questions.

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 11**

1  A    I'll just mark it with arrows that she pulled into this
2       space next to the car marked C and then I pulled in
3       behind her.
4  Q    Okay.  She was to the right then of the C car?
5  A    Yes.
6  Q    Okay.  All right.  And what happened next?
7  A    The two people went ahead and walked in the store.  I
8       got out of my patrol car and I approached Ms. Berman's
9       car.
10 Q    Okay.  And what happened next?
11 A    She was still seated in the car, her window was up.  I
12      knocked on her window and at that point she opened the
13      door and stepped out.
14 Q    Okay.  And do you think she had raised the window or --
15      I mean how could you hear her screaming through a
16      closed window?
17              MS. PINKEL:  Object.  She said -- her window
18 was down.
19              MR. PHARR:  Pardon me?
20              MS. PINKEL:  I think you're mischaracterizing
21 what his answer was.
22 Q    Was her window down or up when you knocked?
23 A    When I got to the car her window was up because I
24      actually tapped on it.....
25 Q    Okay.

| | | |
|---|---|---|
| 1 | A | .....in order to get her attention. |
| 2 | Q | But when -- you said she was screaming.  Do you think |
| 3 | | her window would have had been down at that point? |
| 4 | A | I would assume so. |
| 5 | Q | Okay.  Did it sound muffled like it came through a |
| 6 | | window or did it sound -- well..... |
| 7 | A | I think it was loud enough that I would assume it came |
| 8 | | from an open window but I wasn't in a position where I |
| 9 | | could see her driver side window as I approached.  So I |
| 10 | | don't know. |
| 11 | Q | Okay.  Did you see her roll it up or down or anything? |
| 12 | A | I did not. |
| 13 | Q | Okay.  Okay.  What happened next? |
| 14 | A | She stepped out of the vehicle.  I asked her why she'd |
| 15 | | been creating a disturbance in the parking lot.  She |
| 16 | | told me she was upset because the other vehicle had |
| 17 | | taken her parking space.  Or words to that effect. |
| 18 | | That they had taken her parking space is why she was |
| 19 | | upset. |
| 20 | Q | Okay. |
| 21 | A | That's initially what happened.  Then she told me |
| 22 | | something to the effect of have a nice day and began |
| 23 | | walking away.  At that point I told her I needed to see |
| 24 | | some identification.  And she continued walking away |
| 25 | | saying she didn't need to show me any identification. |

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 13**

14

1          I continued walking with her towards the front entrance

2          of Carrs and eventually got between her and the front

3          door of Carrs.

4     Q    So you walked a little bit faster than her then?

5     A    Well, I just positioned myself in front of the door so

6          she couldn't get into the store.

7     Q    Okay.

8     A    Because I was trying to contact her, making contact.  I

9          needed to see her identification at that point.

10    Q    All right.  Why did you want her ID?

11    A    Well, I was identifying her because I was there

12         investigating, now, a disturbance that she had created.

13         She had also driven into the parking lot in her

14         vehicle, so I told her she should have a license in her

15         possession.

16    Q    All right.  And what happened next?

17    A    At some point I must have radioed Sgt. Davis and asked

18         him to start coming back.  I don't know exactly where

19         that occurred, but I -- it obviously occurred because

20         he did come back.  She kept trying to walk away from me

21         and go into the store saying that I did not need to see

22         her identification.  And at some point through this

23         conversation I put her in what we call a sleeve guide.

24    Q    Well, did she say anything else other than -- well,

25         what were her exact words as best you can recall them?

| | | |
|---|---|---|
| 1 | A | Well, other than what I had written in my report was |
| 2 | | that she had told me to have a nice day and began |
| 3 | | walking off. |
| 4 | Q | Do you have an independent recollection of that? |
| 5 | A | I have an independent recollection of the incident and |
| 6 | | Carrs, but as far as being able to recall exactly what |
| 7 | | was said between two parties almost three years ago, |
| 8 | | no, I -- or over three years ago, I don't.  I know |
| 9 | | almost from the git-go she told me she was going to sue |
| 10 | | me, I didn't have the right to be harassing her, |
| 11 | | contacting her and things of that nature.  I -- that I |
| 12 | | do recall.  But like I said, at one point when she |
| 13 | | started trying to go into the store again without |
| 14 | | ID'ing herself, I did place her in what we call a |
| 15 | | sleeve guide. |
| 16 | Q | What is a sleeve guide? |
| 17 | A | A sleeve guide is one of the lowest forms of physical |
| 18 | | control that you use on an uncooperative person. |
| 19 | | Meaning lowest measures would be, you know, down here |
| 20 | | is a sleeve guide, up here is a baton, up here is |
| 21 | | deadly force.  I mean it's rock bottom basically. |
| 22 | Q | Okay.  How do you do a sleeve guide? |
| 23 | A | Just simply by having a person by their elbow..... |
| 24 | Q | Um-hum. |
| 25 | A | .....and holding their hand and then just simply |

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 15**

1        guiding them where you want them to go.

2  Q    Okay.  And you say you did a sleeve guide?

3  A    I did.

4  Q    Okay.  Which arm did you do the sleeve guide on?

5  A    I have no recollection of that but typically I would

6        always do it away from my gun side.  So probably my

7        left hand on her right arm.

8  Q    All right.

9  A    But I can't guarantee that at this time.

10  Q    Okay.  What happened at that point?

11  A    She demanded to see my identification, so I showed her

12        the badge that was pinned on my chest and I pulled my

13        wallet out and showed her my department ID so that she

14        could confirm that I was in fact a police officer.

15        Sgt. Davis came in probably close to now and he

16        basically stood as what I would call a cover officer

17        for my contact.  Just watching my back basically, in

18        layman's terms.  Eventually she began digging in her

19        purse because she wanted to write our names down.

20  Q    How do you know she wanted to write your names down?

21  A    She told me.

22  Q    Okay.

23  A    She said I want to write your names down and that's

24        when she began digging in her purse.  She wanted to

25        write both of our names down.  Somewhere upcoming here

1      something happened and she began trying to pull away

2      from me and spin away from me, at which time Sgt. Davis

3      and I both took control of one arm each placed behind

4      her back and I placed her in the handcuffs.

5   Q   Okay.  Now when you say spin, what do you mean spin?

6   A   I mean if I had her in a sleeve guide, if she's

7      starting to spin away from me in order to get away from

8      my control over her, that's what I would mean by

9      spinning away.

10  Q   And -- okay.  And then Sgt. -- Officer Davis stepped in

11     and.....

12  A   And assisted me.

13  Q   Okay.  Did you and Officer Davis each have one arm?

14  A   I believe so.

15  Q   All right.  And did you handcuff her like immediately?

16  A   I'm sure we did.

17  Q   Okay.  And what happened next?

18  A   I'm sure I took her out to my vehicle and placed her in

19     my vehicle.

20  Q   Okay.  Did you and Officer Davis each have one arm

21     before she pulled away, or after?

22  A   No.  Sgt. Davis didn't even have any physical contact

23     with her until it was time to handcuff her.

24          MS. PINKEL:  Okay.  I'm going to object to Ms.

25  Berman's laughing.  This is inappropriate behavior for a

1 | deposition.

2 |         MS. BERMAN:  It's inappropriate for you to
3 | object.  I'm allowed to react.

4 |         MS. PINKEL:  No, you're not.  And it seems to
5 | me that you're doing this to harass the deponent and I'm going
6 | to object and ask Mr. Pharr to instruct you to please stay
7 | silent during this deposition.

8 |         MS. BERMAN:  I didn't say anything.  You're the
9 | one who said something.  I didn't say a word.

10 |         MS. PINKEL:  I'm objecting to your behavior.

11 |         MR. PHARR:  Just -- might have to use a sleeve
12 | guide here in a moment.

13 |         MS. PINKEL:  Did you want to repeat your
14 | question, John?  I think the question had to do with Officer
15 | Davis, whether or not he'd made any physical contact with Ms.
16 | Berman before the handcuffs.  Was that the question?

17 |         MR. PHARR:  Right.  I got an answer to it.
18 | So.....

19 |         MS. PINKEL:  And the answer was?

20 | A      My answer was to the best of my recollection until she
21 |        began spinning away and we had to handcuff her Officer
22 |        Davis had no con- -- physical contact with her.  He was
23 |        just there as a -- as a cover officer in a cover
24 |        position.

25 | Q      Okay.  And then you took her out to your car?  Do you

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit B
Page 18

1          have an independent recollection of that?

2    A     I do have an independent recollection of taking her out

3          to the vehicle, yes.

4    Q     Okay.  What was her attitude while you were doing that?

5    A     Her attitude?  Well, I would describe her attitude

6          throughout the whole incident as uncooperative.  Once

7          we got in the -- in the vehicle and I ran a criminal

8          history check on her, I told her that if she was

9          willing to, you know, sign the citation and promised to

10         appear in court I would go ahead and just give her a

11         citation and release her from there instead of taking

12         her before a magistrate.  So she was cooperative in

13         that aspect.  But other than that I guess my -- my

14         description would be uncooperative throughout the

15         incident as far as not producing ID, somewhat

16         struggling with us once we -- you know, we're dealing

17         with those issues.  That's probably how I would best

18         describe it.

19   Q     Okay.  Did she produce a license at any point or an ID?

20   A     She didn't produce it ever, no.  We eventually obtained

21         one.

22   Q     How did you do that?

23   A     I know Sgt. Davis -- somehow, to my recollection, when

24         she pulled her -- her wallet out to write our names

25         down and then she began spinning away from us her

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 19**

1    wallet fell to the floor.  Sgt. Davis went into there

2    and retrieved her license, according to my report.

3  Q    Okay.  The -- going back to when you first approached

4    her what was the primary reason you approached her?

5  A    To see why she was creating a disturbance in the

6    parking lot.

7  Q    Was one of your reasons to see if she needed

8    assistance?

9  A    Maybe from just hearing the initial horn honking.  But

10    as I got closer and I saw that the conduct was directed

11    towards the two people, then it became a different

12    reason.

13  Q    Let me show you the answer to the complaint filed on

14    your behalf by the Muni.  Paragraph eight.  And how

15    about taking a look at paragraph eight?  Is that

16    correct that you approached her because she needed

17    assistance?

18  A    Well, I'll say I initially made my approach, meaning I

19    made my U-turn to see if there was assistance needed,

20    sure.  But what I'm saying is as I got closer and I

21    could see the conduct that was occurring then my

22    response became different.

23  Q    Did you say anything to her about pull -- about her

24    pulling into the parking space from the left?

25  A    I recall having -- I should say I recall from my police

1    report primarily, but I do remember telling -- when she

2    was complaining about the parking space that parking in

3    an angled space from the opposite direction, that's not

4    a proper way to park.  Now it's in a parking lot -- if

5    it was in a business district I know there's -- there's

6    traffic codes that prohibit that specifically.  In a

7    parking lot, I don't know if it's specifically

8    prohibited.  But it's just one of the rules of the road

9    that I learned from the time I began driving.

10   Q    Did you ever hear her say have a nice day?

11   A    According to my police report, yes.

12   Q    Did you and Officer Davis agree to do a cite and

13   release before placing her in your vehicle, or after?

14   A    I don't recall.  I don't know when that was made.

15   Q    Did you look through your manual prior to writing out

16   the citation to make sure -- well, to try to figure out

17   what to cite her with?

18   A    I'm sure I looked through the statute book just to get

19   the correct statute on the citation.

20   Q    How long was she sitting in your vehicle?

21   A    To tell you from recollection at this point I couldn't

22   tell you.  I know I read somewhere through everything,

23   about 20 minutes.

24   Q    Did you make contact with the people that were in the

25   car that marked C here?

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 21**

1   A       I did make contact with them, yes.

2   Q       When did that happen?

3   A       According to my police report it was after Ms. Berman

4           had been cited, released, is when they came out of the

5           store.

6   Q       Do you remember what they said?

7   A       They said they didn't know why she had been screaming

8           at them.  That they had just parked their car and were

9           going into the grocery store.

10  Q       Did you ever suggest to them that she had been

11          screaming at them?

12  A       I never suggested anything to them.

13              MS. PINKEL: You know. I'm going to object to

14  that question.  It's a delayed objection, but that's

15  argumentative.

16              MR. PHARR:  It's a discovery deposition,

17  counselor.

18              MS. PINKEL:  Still argumentative.  And no

19  testimony that there's ever been any suggestion to the Chens

20  (ph) that she was screaming at them.  That's been their

21  statement all along.

22  Q       Do you remember what you asked them?

23  A       At this point not specifically, no.  I know I obtained

24          their information as witnesses.

25  Q       Did she ever wave her arms around during her contact

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit B
Page 22

1          with you?

2                    MS. PINKEL:  By her, you're referring to Ms.

3    Berman, John?

4                    MR. PHARR:  Correct.  Um-hum.

5                    MS. PINKEL:  Okay.

6    A    I would have to say no, because I don't think -- you

7         know, other than when she began spinning away from me I

8         don't recall anything going on with her arms.

9    Q    Was she ever removed from inside the store to outside

10        the store?

11   A    Well, we never actually made it inside the store.  The

12        furtherest we made it was inside the foyer area.

13   Q    When she had her purse in her hands did she ever say

14        her ID was in it but she wouldn't open it?

15   A    I don't believe she ever said that she had an ID.  She

16        just wouldn't produce one.

17   Q    Do you ever recall her saying anything about this being

18        the United States of America, anything along those

19        lines?

20   A    Well, from reading over my police report I know there

21        was some mention of being a citizen of the United

22        States and the word sue.

23   Q    Do you remem- -- do you have any independent

24        recollection of that?

25   A    Like I said, this has been so long ago I don't have a

1       lot of recollection of, you know, what was said between

2       party A and party B.  I really don't.

3   Q   Okay.  All right.  What did you plan to do after she

4       showed you her ID?

5   A   What did I plan to do?  Well, I was investigating a

6       disturbance.  Had she been cooperative, showed me her

7       ID, I could have resolved the whole issue of the

8       parking space I'm sure, which she kind of did on her

9       own anyway, parking next to the space she initially

10      wanted, I guess.  I don't know that we would have done

11      anything.  I have a certain leeway as a police office,

12      you know, to warn people.  I don't have to cite

13      everyone or arrest everyone.  I'm not sure that

14      anything would have happened.  I know I probably would

15      have told her, just like we did at the end, she's not

16      licensed, she cannot drive away from the store and find

17      a licensed driver to drive her way from there when she

18      was done.  And that probably would have been the end of

19      it had things gone differently.

20  Q   When she refused to produce an ID, as you say, why

21      didn't you just let her go on her way?

22  A   Because I was investigating a disturbance at that

23      point.

24  Q   Okay.  As the last area, is your -- are you still

25      working for the police department in any capacity?

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA 99501

Exhibit B
Page 24

1    A        No, I'm not.

2    Q        And your attorney's leaning forward here and she's

3             getting ready to object.  But can you give me -- I mean

4             I guess why aren't you working for the police

5             department any more?

6                      MS. PINKEL:  I'm going to object under AMC

7    3.90.040(b).  You're asking for confidential personnel

8    information and also this violates his privacy rights that

9    you're asking these questions.  So you cannot ask those

10   questions.  And I'm instructing him not to answer.

11                     MR. PHARR:  Well, I can ask them, he's just not

12   going to answer.

13                     MS. PINKEL:  Well, under Federal Rule 30 you

14   shouldn't even be asking questions like this.  And under the

15   Anchorage Municipal Code.  But if you're going to ask them then

16   I'm going to instruct him not to answer.

17                     MR. PHARR:  Okay.  All right.  Let's go off the

18   record.

19           (Off record)

20           (On record)

21                     MR. PHARR:  Okay.  Are we back on record?

22                     COURT REPORTER:  We're on record.

23   Q        Okay.  Mr. Dutton, at the time of your encounter with

24             Ms. Berman was your state of mind upset for any reason?

25                     MS. PINKEL:  I'm going to object to the form of

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

**Exhibit B**
**Page 25**

ANCHORAGE, ALASKA  99501

1    this question, and there's been no evidence that he'd been

2    upset by anything.

3                    MR. PHARR:  It's a discovery deposition,

4    counselor.

5                    MS. PINKEL:  Okay.  Well, ask the question but

6    I'm objecting to it.

7    Q        Okay.

8    A        To my knowledge, no, I was not upset.

9    Q        Okay.  What were your dates of employment with APD?

10   A        February 10th of 1992 to July 7th of 2003.

11   Q        And you're working for UPS now?

12   A        Yes.

13   Q        Okay.  When you pulled up behind her were you blocking

14            traffic?

15                    MS. PINKEL:  Objection as to relevance.  This

16   was like 10:00 o'clock at night or something.

17                    MR. PHARR:  It doesn't have to be relevant.

18   Q        But, you know, were you blocking traffic?

19   A        I would have to say no.  The entrance there to Carrs

20            has a very wide driveway.  I'm sure I was not.

21   Q        When she started walking away from you did you say

22            wait, I'm not done with you?

23   A        No, I did not say those words.

24   Q        Okay.  Let's see here.  Okay.  Report says Sgt. Davis

25            told her to get her ID out of the wallet while she had

| | | |
|---|---|---|
| 1 | | it out.  She began putting it down -- okay.  She began |
| 2 | | putting it down.  Do you remember her trying to put the |
| 3 | | wallet down? |
| 4 | A | Do I remember that?  No.  I remember reading that in my |
| 5 | | police report but to say I remember that now, no, I |
| 6 | | don't. |
| 7 | Q | Do you know the outcome of the citation? |
| 8 | A | As far as the disposition?  I know it was dismissed by |
| 9 | | the municipal prosecutors office. |
| 10 | Q | Okay.  Do you know why you would have written in your |
| 11 | | report that she was putting her wallet down? |
| 12 | A | I would guess because she was putting her wallet -- I |
| 13 | | just said I -- I didn't have a recollection of it. |
| 14 | | I..... |
| 15 | Q | Okay. |
| 16 | A | .....just had read that in my police report. |
| 17 | Q | You don't remember her putting it down or anything |
| 18 | | along those lines? |
| 19 | A | I -- I don't remember specifically what was happening |
| 20 | | with all that.  I just recall what I read in that |
| 21 | | police report.  But I just don't have an independent |
| 22 | | recollection of it. |
| 23 | Q | Did you say if you do it again I'll find it in my heart |
| 24 | | to cite you? |
| 25 | A | No.  I -- I had read that in the -- the discovery |

28

1       request and to me that just does not sound like

2       anything I would have ever said.  That's just something

3       I would have never said.

4  Q     Okay.  Okay.  If she was putting her wallet down, where

5       would she have put it down since you were standing

6       outside?

7  A     If she were putting it down.....

8           MS. PINKEL:  I'm going to object.  You're

9  asking for speculation.

10  Q     Would she have been putting it down on the sidewalk

11       or.....

12  A     I don't know.

13  Q     Okay.

14  A     Could have been on the sidewalk.  There's those trash

15       cans right outside the doors to Carrs that have a solid

16       top and, you know, the swinging door type.  It could

17       have been there.  I don't know.

18  Q     Okay.

19           MR. PHARR:  I have no further questions.

20           MS. PINKEL:  Okay.  I just have a few for

21  clarification purposes.

22           MR. PHARR:  Don't write on it.

23                **CROSS EXAMINATION**

24  **BY MS. PINKEL:**

25  Q     Rob, Mr. Pharr had asked you what had Ms. Berman done

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 28**

| | | |
|---|---|---|
| 1 | | that hadn't been cooperative.  And you said she hadn't |
| 2 | | produced her ID and that she had struggled.  Was it |
| 3 | | also true that she had not obeyed your commands? |
| 4 | A | Right.  I would -- I would say yes.  But the only |
| 5 | | command I had really given her at that point was, you |
| 6 | | know, to produce an ID.  But yes, that's -- that would |
| 7 | | be correct. |
| 8 | Q | Okay.  And then according to your police report you |
| 9 | | explained to her that you wanted to see her driver's |
| 10 | | license, is that correct? |
| 11 | A | That's correct. |
| 12 | Q | And you did later look at her driver's license, was |
| 13 | | that correct? |
| 14 | A | Eventually, yes. |
| 15 | Q | And what was the status of her driver's license when |
| 16 | | you looked at it? |
| 17 | A | It had expired the calendar year before the incident. |
| 18 | Q | Okay.  And in your opinion had the fact that her |
| 19 | | driver's license had expired, could that have been a |
| 20 | | factor as to why she didn't want you to see it? |
| 21 | | MR. PHARR:  Object, calls for speculation. |
| 22 | Q | You can answer the question. |
| 23 | A | Okay.  Well, I think, gauging on my past experiences as |
| 24 | | a police officer, I think a reasonable person would be |
| 25 | | led to believe that if someone has an expired license |

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

**Exhibit B**
**Page 29**

ANCHORAGE, ALASKA  99501

1        they may not want to show it to the police officer,

2        yes.

3  Q    Okay.  When Ms. Berman said to you, have a nice day,

4        what was the tone she used when she said have a nice

5        day?

6  A    The way I put it in my police report with the

7        quotations, I believe it was in somewhat of a sarcastic

8        tone.

9  Q    Your report indicates she -- she, meaning Ms. Berman,

10       kept saying she was a citizen of the United States and

11       she was going to personally sue me.  Is that correct?

12  A   That's what's in the report, yes.

13  Q   All right.  And your report indicates she said that to

14      you more than once, is that correct?

15  A   The way I -- the way I phrased that she kept saying is

16      that she said it at least twice if not more.

17          MR. PHARR:  Can we go off record for a second?

18 I've got to make a phone call.

19          MS. PINKEL:  Well, it's just going to take me a

20 minute.

21          MR. PHARR:  I don't have a minute.  I have to

22 make a call right now.

23     (Off record)

24     (On record)

25  Q    Okay.  I think I was just finishing up with Rob here

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

**Exhibit B**
**Page 30**

1    for clarification.  Rob, when Mr. Pharr asked you about

2    whether you stated to Ms. Berman, did you tell her

3    wait, I'm not done with you and you indicated no, you

4    hadn't said that.  But I guess my question to you is

5    did you -- do you feel you made it clear that you

6    weren't done with her when you.....

7  A    I -- I know I made it clear that I was not finished

8    with my contact there.  I just answered no because I

9    did not have knowledge that I used those -- those

10    words.  And again, those don't sound like words that I

11    would have typically used.

12  Q    When you released Ms. Berman you told her not to drive,

13    is that correct?

14  A    Yes.

15  Q    Okay.  Did you -- you said you cited her for

16    obstruction of an officer, is that correct?  Something

17    like that?

18  A    Under the resisting ordinance, yes.....

19  Q    Okay.

20  A    .....for obstructing or delaying.

21  Q    Okay.  And that was a code that -- it's the Anchorage

22    Municipal Code 8.30.010, is that right?

23  A    If I could just look at the first page here I can tell

24    you.  It was 8.30.010(a).....

25  Q    Okay.

1   A        .....which I cite earlier.

2   Q        When you cited Ms. Berman, did you believe she had

3            intentionally, knowingly, or recklessly delayed or

4            obstructed your active investigation of a crime?

5   A        I did.   That's why we issued that citation, yes.

6   Q        Okay.   And did you also believe that she had

7            intentionally, recklessly or knowingly disobeyed your

8            lawful orders?

9   A        Well, this doesn't extend to, but it's all under the

10           same title of the statute for resisting.   So, yes.

11  Q        Okay.   And throughout this incident with Ms. Berman,

12           was it clear to you that what you were doing -- with

13           regard to her in your investigation, that what you were

14           doing was lawful?

15  A        Oh, absolutely.

16  Q        Okay.   And you explained that the level of force, and I

17           use force in quotes, that you used with Ms. Berman was

18           the lowest possible force that you could have used.....

19  A        Yes, it was.

20  Q        .....under the circumstances?

21  A        It was all what we call soft empty handed tactics.

22           Meaning there's, you know, no batons or anything like

23           that involved.   It's the lowest level of force there

24           is.

25  Q        Okay.   Thank you.

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit B
Page 32

33

1          MS. PINKEL:   I have no further questions.

2                    **REDIRECT EXAMINATION**

3  **BY MR. PHARR:**

4  Q     Just -- when you asked her for identification, were you

5        after her driver's license or were you after simply who

6        she was?

7  A     Well, identification purposes, not necessarily a

8        license.  But that's what we typically ask for, license

9        or ID card.

10  Q    Okay.  So she could have produced a social security

11        card or.....

12  A     Well.....

13  Q     .....military ID or just about anything that identified

14        who she was?

15  A     Picture ID is preferable.  You know, social security

16        card identifies a name and a number, but without the

17        picture to corroborate, you know, it's -- it's always

18        preferable to have picture ID.

19  Q     But you weren't trying to ascertain whether she was

20        licensed to drive, correct?  You just wanted.....

21  A     No.  I was just trying to identify her.

22  Q     Okay.  Okay.  You arrested her -- okay.  She was

23        resisting because she didn't produce ID, correct?

24          MS. PINKEL:   I think you're mischaracterizing

25  the testimony.  I'm going to object.

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

**Exhibit B**
**Page 33**

ANCHORAGE, ALASKA  99501

1  Q      Okay.  You and Officer Davis had her ID in hand when

2         you arrested her, correct?

3  A      No.  The ID was obtained after she was arrested.

4               MR. PHARR:  Okay.  I have no further questions.

5               MS. BERMAN:  But.....

6               MR. PHARR:  I have no further questions.

7               MS. PINKEL:  I have no further questions

8  either.  Thank you.

9         (Off record)

10                    **(END OF PROCEEDINGS)**

11 MEMO:  Signature waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **C E R T I F I C A T E**

2   STATE OF ALASKA                    )
                                       ) ss.
3   THIRD JUDICIAL DISTRICT            )

4          I, Wanda Ventres, Notary Public in and for the State of
    Alaska, and court reporter for R & R Court Reporters,
5   Incorporated, do hereby certify:

6          THAT the annexed and foregoing deposition transcript of
    **ROBERT DUTTON** was taken before Wanda Ventres on behalf of the
7   plaintiff at the offices of John C. Pharr, 733 West 4th Avenue,
    Suite 308, Anchorage, Alaska, on the 14th day of December,
8   2005, commencing at the hour of 10:15 o'clock a.m.

9          THAT the above-named Witness, before examination, was
    duly sworn under oath to testify to the truth, the whole truth,
10  and nothing but the truth.

11         THAT this Deposition, as heretofore annexed, is a true
    and correct transcription of the testimony of said Witness,
12  taken by Wanda Ventres and thereafter transcribed by Wanda
    Ventres.
13
           THAT the Original DEPOSITION transcript will be lodged
14  in a sealed envelope with the attorney requesting transcription
    of same, that attorney being:  <u>MS. MARY B. PINKEL, Assistant</u>
15  <u>Municipal Attorney, 632 West 6th Avenue, Suite 730, Anchorage,</u>
    <u>Alaska  99510-6650</u>.
16
           THAT I am not a relative, employee or attorney of any
17  of the parties, nor am I financially interested in this action.

18         IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal this 18th day of December, 2005.
19

20

21                          Wanda Ventres
                            Notary Public in and for Alaska
22                          My commission expires: 09/20/07

23

24

25