1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF ALASKA

3   JUDY L. BERMAN,                    )
                                       )
4               Plaintiff,             )
                                       )
5         vs.                          )
                                       )
6   ANCHORAGE POLICE DEPARTMENT,       )
    OFFICER ROBERT DUTTON and          )
7   SGT. GIL DAVIS,                    )
                                       )
8               Defendants.            )
    _____)

9   Case No. A04-0227 CV (JKS)

10            **DEPOSITION OF SGT. GILBERT M. DAVIS**

11  **APPEARANCES:**

12          **FOR THE PLAINTIFF:**      **MR. JOHN C. PHARR**
                                        Attorney at Law
13                                      733 West 4th Avenue, Suite 308
                                        Anchorage, Alaska  99501
14                                      (907) 272-2525

15          **FOR THE DEFENDANTS:**     **MS. MARY B. PINKEL**
                                        Municipality of Anchorage
16                                      Assistant Municipal Attorney
                                        632 West 6th Avenue, Suite 730
17                                      Anchorage, Alaska  99501-6650
                                        (9070 343-4545

18          **ALSO PRESENT:**          **MS. JUDY L. BERMAN**
19
                              *  *  *  *  *  *
20

21

22

23

24

25

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 1

1          PURSUANT TO NOTICE, the Deposition of

2  **SGT. GILBERT M. DAVIS**, was taken on behalf of the plaintiff

3  before Wanda Ventres, Notary Public in and for the State of

4  Alaska, and Reporter for R & R Court Reporters, Inc., at the

5  offices of John C. Pharr, 733 West 4th Avenue, Suite 308,

6  Anchorage, Alaska, on the 14th day of December, 2005,

7  commencing at the hour of 2:13 o'clock P.m.

8                    * * * * * *

9  Direct Examination by Mr. Pharr                          04
   Cross Examination by Ms. Pinkel                          26
10 Redirect Examination by Mr. Pharr                        28
   Recross Examination by Ms. Pinkel                        29

11

12 **EXHIBITS**

   1       (Sketch of parking area incident)                22
13
                        * * * * * *
14

15

16

17

18

19

20

21

22

23

24

25

Exhibit C
Page 2

1                    **P R O C E E D I N G S**

2                    COURT REPORTER:  My name is Wanda Ventres.   I'm

3    a notary public in and for the State of Alaska, representing

4    R & R Court Reporters at 810 N Street in Anchorage, Alaska.

5    Today's date is December 14th, 2005, the time is 2:13 p.m.   We

6    are at the offices of John C. Pharr at 733 West 4th Avenue,

7    Suite 308 in Anchorage to take the deposition of Sgt. Gil Davis

8    in a United States District Court case for the District of

9    Alaska.   Judy L. Berman, plaintiff, versus Anchorage Police

10   Department, Officer Robert Dutton and Sgt. Gil Davis,

11   defendant.   Case number A04-0227 CV (JKS).

12                    Counselors, if you would identify yourselves

13   for the record, please?

14                    MR. PHARR:  John Pharr, for the plaintiff.

15                    MS. PINKEL:   Mary Pinkel, attorney for the

16   defendant Gil Davis and Anchorage Police Department and Robert

17   Dutton.

18                    COURT REPORTER:  Thank you.  And if the also

19   present could be identified, please?

20                    MS. BERMAN:  Who goes first?

21                    COURT REPORTER:  You are the also present.

22                    MS. BERMAN:  Oh, I thought -- I'm sorry.   I

23   thought you said (indiscernible).  Judy Berman, plaintiff.

24                    COURT REPORTER:  Thank you.  And sir, if you

25   would raise your right hand?

4

1          (Oath administered)

2          SGT. DAVIS:  I do.

3              **DIRECT EXAMINATION**

4          COURT REPORTER:  You may lower your hand.  And

5    for the record state your full name, spelling your last name,

6    please?

7    A     Gilbert M. Davis.  D-a-v-i-s.

8          COURT REPORTER:  And a mailing address, please?

9    A     Post -- I guess we'll use the department.  It's 4501

10         South Bragaw, 99507.

11         COURT REPORTER:  And a daytime telephone

12   number?

13   A     786-8750.

14         COURT REPORTER:  Thank you.  You may proceed.

15   **BY MR. PHARR:**

16   Q     Officer Davis, are you currently employed by the

17         Anchorage Police Department?

18   A     Yes.

19   Q     Were you on duty on April 6th, 2002?

20   A     Yes, I was.

21   Q     What time did your shift begin?

22   A     I don't specifically recall.  It wasn't a normal shift.

23         It was what we call a detail special operation.  It

24         started somewhere around I think between 6:00 or 8:00

25         o'clock at night.

1    Q    Were -- was it an alcohol compliance detail?

2    A    Yes.

3    Q    Was it specifically for the Oaken Keg on Huffman or

4         just that area?

5    A    I think there were other areas but I don't recall which

6         ones.  This one was the last one we were going to do

7         that evening.

8    Q    Okay.  Was Mr. Dutton your partner at that time?

9         Regular partner?

10   A    No.  He -- without getting into a lot of detail,

11        there's a rotating number of people and a certain set

12        of us show up, or are scheduled, and it varies.

13   Q    What does that -- what does an alcohol compliance

14        detail involve?

15   A    For the most part is observing the liquor stores in the

16        area and looking for liquor violations.

17   Q    Was anyone else working with you and Officer Dutton?

18   A    There were other people working that detail.

19   Q    Okay.  Was there anybody in this particular parking lot

20        with you at that time of the incident we're.....

21             MS. PINKEL:  I'm going to object to the extent

22   this may be calling for confidential law enforcement techniques

23   under Alaska Municipal Code 3.90.040(c).  To the extent you're

24   asking for confidential law enforcement techniques I'm going to

25   instruct him not to answer the question.

1              MR. PHARR:  I'm just asking for any who might

2  have been a witness.

3  Q     Was -- we're talking about an incident in the Carrs

4        Huffman parking lot, correct?

5  A     Correct.

6  Q     Okay.  Was anyone else there with you and Officer

7        Dutton?

8  A     I was unaware of anyone else involved in our alcohol

9        compliance checks.  I was unaware any of them were --

10       were there, or am unaware, except myself and Officer

11       Dutton.

12 Q     Okay.  Why were you in an unmarked car and Officer

13       Dutton in a police car?

14             MS. PINKEL:  Again I'm going to object that

15 this is asking for confidential law enforcement techniques.

16 A     That would be the technique.

17 Q     Did you read over your reports to prepare for this

18       deposition?

19 A     I did.

20 Q     Do you recall -- do you have an independent

21       recollection of what happened that night or are you

22       relying on your report?

23 A     I have some recall of what happened.

24 Q     Where were you parked during your shift?  Or -- let's

25       direct it to about 10:00 o'clock at night when this

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA 99501

**Exhibit C**
**Page 6**

1       incident happened, where were you parked?

2  A   Well, when I first -- when this -- when the incident

3       involving Ms. Berman's began?

4  Q   Right.

5  A   I believe I was in -- I know I was in traffic heading

6       south bound out of the Carrs parking lot to exit on

7       Huffman, and what number back I don't know.

8  Q   Okay.  Do you know where Officer Dutton was at that

9       time?

10  A   I believe he was either directly in front of me or one

11       or two cars.  He was in front of me in some position.

12  Q   Were you right behind him?

13  A   I don't recall that.  All I know is he was in front of

14       me.

15  Q   Okay.  And directing your attention to -- well, do you

16       remember an incident involving the woman seated to my

17       right?

18  A   I do.

19  Q   Okay.  What do you remember about that?

20  A   It's quite extensive.

21  Q   Okay.

22  A   Do you want the full narrative of this or.....

23  Q   Please.  Just as best you recollec- -- recall it.

24  A   Okay.  I recall that we were leaving, it was late.

25       Started hearing a lot of long duration horn blowings.

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 7

*see 6.0.cutic (bor) sheet*

1    It caught my attention.  It was *not* a normal beep, beep,

2    get someone's attention.  Something was going on.

3    Somebody was having some kind of difficulty behind us.

4    I recall Officer Dutton doing a left-hand U-turn coming

5    alongside my car and driver to driver window, say he's

6    going to go back.  I turned around and followed him.

7    However due to the fact I'm in an undercover car we try

8    not to park right next to people so that the car is

9    what we call burned.  Seen by a citizen.

10  Q   Well, did he say something to you that you remember?

11  A   He said something to the effect I'm going to go back

12     and investigate whatever this horn blowing situation

13     is.

14  Q   Did he say it over the radio or.....

15  A   No.  We were side by side.  He had done a U-turn that

16     would have brought his driver's window along -- in the

17     vicinity of mine.

18  Q   Okay.

19  A   I turned and followed him briefly and then would have

20     turned what would be west, went down a ways, found a

21     parking spot and parked my car.  As I was -- I -- I

22     don't recall but in my report I mention that I did see

23     him stop by a grey car and he was talking with a -- a

24     female.  And it appeared to be somewhat animated.  I

25     lost contact for quite a while while I was parked.

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 8

1   When I reapproached the cars, this would be an east

2   bound track, I saw Ms. Berman and Officer Dutton in a

3   conversation. . It was very animated.  It was loud.  I

4   couldn't exactly hear what was happening.  I was

5   walking.  There was no physical contact or any kind of

6   disturbance.

7 Q Well -- and let me stop you here.  When you heard the

8   horn sounding did you hear anything else?

9 A I don't recall that.  I just.....

10 Q Okay.

11 A .....recall hearing the horn.

12 Q All right.

13 A When I approached the building Ms. Berman, I believe,

14   headed into the foyer.  To describe, there's a set of

15   doors -- if I'm remembering this correctly, there's a

16   foyer where.....

17 Q Actually can you draw it?  I don't have a blank piece

18   of paper here actually.

19 A And none of this is going to be to scale or encompass

20   all details.

21 Q That's fine.

22 A And briefly I'm going to demonstrate doors.  They're

23   sliding doors.  I'm going to draw just a symbol here

24   for a door.  But all doors are sliding.  This being the

25   store interior and this being the sidewalk out here.

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982  **Exhibit C**
         **Page 9**
ANCHORAGE, ALASKA  99501

1    What I observed was the two -- Ms. Berman leave into

2    the foyer.

3  Q   Why don't you like draw an arrow or something?

4  A   Okay.  Well, both of them entered in this

5    direction.....

6  Q   Okay.  All right.

7  A   .....Berman and Dutton.  They both then came back out

8    and at this point in time I arrived.  There was a bit

9    of a tussle.  Ms. Berman I believe went back inside

10   again and that's when I started running because now

11   Officer Dutton was charging after her and he grabbed

12   her by the arm in what we call a sleeve guide.  And I

13   arrived, they were back out I believe towards the door

14   of the store when I got there.

15 Q   Okay.

16 A   And it appeared to me that Ms. Berman was attempting to

17   leave Officer Dutton and he was attempting to detain

18   her.

19 Q   Did you see any occupants of another vehicle that might

20   have been involved in this?

21 A   No, I did not.

22 Q   So the first time you saw Ms. Berman she was outside

23   her vehicle?

24 A   No, she was -- oh, yes, she was outside her vehicle.  I

25   -- her vehicle was somewhere down in this general area.

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 10**

1    Where I observed her was on the sidewalk with Officer

2    Dutton proba- -- approximately in this general area

3    here from the door heading in this direction.

4  Q    Okay.  All right.  And he had her in a sleeve guide.

5    What happened next?

6  A    They went in, they came out, they went back in and at

7    this point in time he had her in a sleeve guide, they

8    walked back to the door.  I now arrived and there's --

9    he lets go of her and there's a conversation.  And Ms.

10    Berman's very upset and there are -- you know, I don't

11    remember all the things she said.....

12  Q    Um-hum.

13  A    .....but he was asking for her driver's license and she

14    was telling him that she did not need to give it to

15    him, that she was a lawyer, that she was an American

16    citizen, and she wasn't going to give it to him.  Then

17    at some point in time, I forget exactly what was said,

18    but he pulled out his wallet and goes here's my ID

19    card, now you show me yours.  At this point there's

20    some more conversation.  I think I pitched in.  I've

21    listened enough to know what the problem is now because

22    I didn't observe everything but I'm -- I'm picking up

23    from the two conversations an understanding of what's

24    going on.

25  Q    What did you think the problem was?

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 11

1  A    The problem was that Officer Dutton had -- had a reason
2       to ask for her identification and she was refusing.
3  Q    Okay.  Was he asking for identification or.....
4  A    For her driver's license.
5  Q    Well, was he asking for a driver's license or
6       identification?
7  A    I'm not sure.  I think he probably used the words
8       both -- or used both terms.
9  Q    Okay.  All right.  So you.....
10 A    But I -- I'm not absolutely sure.
11 Q    Okay.  You ran up to them and what happened then?
12 A    Well, from what I -- I recall, I also pitched in, I
13      think.  Usually one of our techniques is if a second
14      officer shows up and the first one's having an
15      uncooperative individual, usually that's person's angry
16      at that officer and the second officer will be able to
17      get this person calmed down a little bit.  I made
18      attempts with Ms. Berman.  I don't recall what I said.
19      Probably please just show us your license, I don't
20      know.  Something to that effect.  And we didn't get --
21      I didn't get any more result than Officer Dutton did.
22      (Indiscernible) Berman had a purse of some sort I think
23      on her left arm.  And she made the comment I'm going to
24      write your names down.
25      She reached in her purse, or pocketbook, and brought

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 12

1    out her wallet.  It was a long rectangular object I

2    believe.  She held it in her hands and I made the

3    comment well, as long as you've got that out why don't

4    you get your driver's license out.  She hesitated, she

5    was standing directly in front of Officer Dutton.

6    I'm -- I -- well, she's at an angle.  If you'd be

7    Officer Dutton, the window would be me.  She made the

8    comment I'm an American citizen, I don't have to do

9    this.  And she executed a clockwise right-hand spinning

10    turn, similar to what you see on a basketball court

11    when the player goes around the block.  We reacted

12    immediately -- sorry -- matter of fact, as long as

13    we're doing that I made a cardinal error and did not

14    turn off my cell phone.  I will do that at this time. I

15    seen -- somehow we restrained her by taking -- grasping

16    her arms.  I believe the way it worked out I was -- I

17    had her left arm.  I'm not a hundred percent sure.

18    At that point her -- her mood, in my mind, passed from

19    what we call passive defense, where a person is just

20    not complying, to more of an active defense where she's

21    trying to get away from us.  The purse was in the hand

22    I believe that I had.  I grabbed the purse -- or the

23    wallet, I'm sorry.  Grabbed the wallet out of her hand.

24    I don't know what happened to the actual pocketbook.

25    It may have hit the floor, I'm not sure.  At that point

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 13

1    the struggle got significant and into what we call

2    aggressive resistance.  Ms. Berman was trying to break

3    free of us.  We put her hands behind her back and we

4    handcuffed her.

5    At that point she calmed down physically, however she

6    was still pretty -- during this whole time there's a

7    verbal diatribe of we're violating her rights, she's an

8    American citizen, this is all wrong, something to those

9    -- I don't recall the exact wording.  But she was

10   vocalizing her displeasure with what was happening.  At

11   that point I had her -- her wallet in her (sic) hand --

12   in my hand.  I opened the wallet, removed her license.

13   I believe I put the wallet back in her pocket -- jacket

14   pocket and I kept the license.  I -- once we got the

15   situation under control, I'm not sure whether I -- I

16   checked her driver's license status before or after we

17   put her in the police car.  I don't recall that.  But I

18   do recall her license came back as expired.  From there

19   Rob and I had a bit of discussion as to how we're going

20   to proceed from here.  I believe he talked to the -- to

21   some other folks that were there.  I did not.  We

22   elected to issue a cite and release on the charge of

23   resisting and we took Ms. Berman out of the car,

24   unhooked her and let her go on her way.

25   Q    Okay.  Were you in radio contact with Officer Dutton

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 14**

1    during this incident?

2  A  No.

3  Q  Was Officer Dutton's car blocking traffic?

4  A  I don't know.  I believe his position behind her car,

5    and her car was parked in front of the store, but

6    whether it was blocking traffic I don't know.

7  Q  Have you seen any photos showing bruises on both of

8    Berman's upper arms?

9  A  Have I seen photos?

10  Q  Correct.  Um-hum.

11  A  I have seen a photocopy of what appears to be a

12    photograph.  And it appears to be Ms. Berman and there

13    are two black dots on her arms.  Correct.

14  Q  Did she tell you that she needed -- you needed to let

15    go of her arm so she could show you her ID?

16  A  No.

17  Q  Let's see.  Your report says you decided to take her

18    out of the store.  Do you remember you deciding to take

19    her out of the store?

20  A  I think a couple times because of the way we were

21    positioned in here, and there were people walking back

22    and forth, we tried to get this back out on the

23    sidewalk.  They had had continually flowed back in.  I

24    think at one point it got as far as this point

25    here.....

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 15**

1  Q    Um-hum.

2  A    .....just inside these doors and I think that's where

3       actually handcuffs were placed on.....

4  Q    Can you mark that with an A where you just -- okay.

5  A    Okay.

6  Q    That's fine.

7  A    And again, I -- you know, for the record, I'm not a

8       hundred percent sure.  I recall that -- the spinning

9       action.  This is only a few feet, and that we were

10      attempting to get back out here on to the sidewalk.

11 Q    The point -- now this is the point where you were and

12      then you.....

13 A    No.  This is the point where I saw them.

14 Q    All right.

15 A    The two of them are here.

16 Q    Okay.

17 A    I join right here.

18 Q    Can you mark the first point with a B and then the

19      other point with a C?  That's where you were, was C,

20      and that's where they were, was B?

21 A    Correct.  This was a constant dynamic environment.

22 Q    Um-hum.

23 A    We were -- we were not for any amount of time ever

24      standing in one spot.

25 Q    Okay.

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 16**

1  A    It would look more like the layouts of a dance.  We

2       were all over the place.

3  Q    Did she take her wallet out of her purse?

4  A    Yes, she did.

5  Q    Was that -- do you know if that was for the purpose of

6       retrieving her ID?

7  A    No.  She reached in her purse -- her pocketbook with

8       the right hand, placed the wallet in her left hand, had

9       her right hand back in her purse and was saying I'm

10      going to write your names down.  So I -- I assume from

11      what I observed is that there must have been a note pad

12      or something available that she was going to write on.

13  Q   What was the purpose of Officer Dutton asking for her

14      ID?

15  A   Well, from -- from the conversation that I gleaned

16      between the two of them, her behavior of honking the

17      horn and apparently arguing with people was broaching

18      on disorderly conduct and there was a traffic

19      violation.  Something about a U-turn, is what I picked

20      up when I subsequently read the report.  But at the

21      time standing there, that is the two topics I heard, is

22      the traffic violation and a disorderly conduct

23      investigation.

24  Q   Okay.  You took her wallet without her permission?

25  A   Correct.  I removed it from her hand.

1    Q    Okay.  Have you described everything about the struggle

2        that you recall?

3    A    Yes.

4    Q    You looked through her wallet and removed her ID

5        without permission?

6    A    Correct.

7    Q    Did you and Davis (sic) agree to -- no, you and Officer

8        Dutton agree to do a cite and release before placing

9        her in your vehicle?

10    A    I thought she was in the police car before we made that

11       decision.

12    Q    And after Officer Dutton placed Berman in his vehicle

13       you left the scene?

14    A    I think I was still there when he unhandcuffed her.

15    Q    Okay.  Are you aware of the outcome of the case?

16    A    Yes.

17    Q    Okay.  Declined prosecution, right?

18    A    That's my understanding.

19    Q    Okay.  Did you talk to the people named Chen at all?

20    A    I did not.

21    Q    Prior to the incident with Ms. Berman we just covered,

22       did you arrest anyone else that night?  You don't have

23       to name them.

24         MS. PINKEL:  Objection, relevance.  Also you're

25 asking about her police investigations and that violates

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 18

1  AMC 3.90.040(c).

2              MR. PHARR:  Are you instructing the witness not

3  to answer?

4              MS. PINKEL:  He can answer if he made any other

5  arrests that night but I still object as to relevancy.

6              MR. PHARR:  Okay.

7  A      And obviously I don't know -- I don't recall.

8  Q      Your mission was to watch for underage or intoxicated

9         persons.  Did you see any?

10             MS. PINKEL:  Objection, relevance.  Also

11 confidential law enforcement techniques and confidential police

12 records.

13             MR. PHARR:  Are you instructing the witness not

14 to answer?

15             MS. PINKEL:  I'm registering an objection.  I

16 think he can answer the question.

17 A      Could you restate the question?

18 Q      Did you see any underage or intoxicated persons that

19        night?

20 A      Four years ago, I don't recall.

21 Q      Do you remember any arguments or disputes with anyone

22        else that night?

23             MS. PINKEL:  Objection, Anchorage Municipal

24 Code 3.90.040(c).

25 Q      In your report it says you saw her waving her arms

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 19**

1    around?

2  A   Yes.

3  Q   Can you kind of -- can you like demonstrate what you

4      mean?

5  A   I don't think I can.

6  Q   Okay.

7  A   Not at this point.

8  Q   All right.  Did she have her hands above shoulder

9      level, do you know?

10 A   I don't recall.

11 Q   Okay.  Says she appeared to be yelling.  Did she appear

12     to be yelling?

13 A   I could hear voices but I don't think I could tell

14     exactly what they were saying at this point.  I was a

15     goodly way away.  Could get echo off the building, but

16     not articulation.

17 Q   You saw Officer Dutton chase after her?

18 A   Yes.  And -- you know, to be -- put this in context,

19     these chases, five, six, seven feet, were short little

20     bursts.  This wasn't a foot pursuit down the -- the

21     path.

22 Q   Did you hear her say this is the United States of

23     America?

24 A   Numerous times.

25 Q   Did you hear her say I don't have to give my ID to you?

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit C
Page 20

1  A    Yes.

2  Q    Did she seem to be disturbing the store?

3  A    I believe so, yes.  That's the reason we tried to get

4       her back out on to the sidewalk.

5  Q    Did you hear her say anything about the location of her

6       ID?

7  A    She indicated that it was in the wallet, but I don't

8       remember exact words that were spoken.

9  Q    Did she say she wouldn't open it?

10  A    No.  She just refused to give us the ID.

11  Q    Did she say anything about suing you?

12  A    Absolutely.

13  Q    What did she say about that?

14  A    I remember -- at two points in time I remember hearing

15       I'm a lawyer and I'm going to sue you.

16  Q    Okay.  Your report says you took her purse away from

17       her, or wallet away from her?

18  A    Yes.  I removed the wallet from her hand.

19  Q    Okay.  She struggled?

20  A    Yes.

21  Q    Okay.  And we handcuffed her?

22  A    Yes.  What's in my report, yes.

23       MR. PHARR:  Okay.  Let's go off record for a

24  second.

25       (Off record)

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 21

1                        **(Deposition Exhibit 1 marked)**

2            (On record)

3                 COURT REPORTER:  We're back on record and I

4    have marked this sketch by Officer Davis as Exhibit 1.

5    Q      Okay.  Officer Davis, I just want to make sure I have

6           the sequence correctly.  Your police report says we

7           indicated that -- she indicated that her ID was in it,

8           i.e., her wallet, but would not open it.  I took it

9           away from her, she struggled and we handcuffed her.  So

10          the sequence was you took her wallet away from her and

11          then you struggled?

12   A      Well, it's -- again, like I.....

13               MS. PINKEL:  I'm going to object because I

14   think you're mischaracterizing what he's testified to as to

15   what occurred before.

16               MR. PHARR:  Well, then he can straighten it

17   out.

18               MS. PINKEL:  Okay.

19   A      Okay.  What I was saying earlier is this thing was a

20          breathing entity.  It's constantly in motion.  What I

21          recall is her purse on her arm, her wallet in her left

22          hand, her right hand digging for something to write.

23          Her having refused to produce the ID that I just asked

24          again for.  Her wanting to write our names down.  When

25          she suddenly stops and says I'm an American citizen, I

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 22**

```
 1              don't have to do this, executes the clockwise spin and
 2              starts to go around Officer Dutton and into the store.
 3              We go after her, we take her by the arms.  At this
 4              point in time I pull the wallet out of her hand because
 5              I believe I have her left hand -- left arm and that's
 6              where the wallet was.  Then she starts struggling a
 7              lot.  Before it was passive resistance.  She's just not
 8              moving.  She's going to walk -- she went into defense
 9              in an approaching aggressive resistance when she
10              started flailing.  At that point in time we handcuffed
11              her.  My report is a synopsis, not a verbatim blow by
12              blow of the events that happened.
13   Q          Okay.  Now the -- are you sure there was a foyer there?
14   A          From what I recall there was.  I haven't gone by the
15              store to check.
16   Q          Okay.  I'm given to understand that the store was
17              remodeled since 2002 and there was no foyer there at
18              that time?
19   A          Best of my recollection there was an entryway of some
20              sort there.
21   Q          Okay.  And can you again describe -- it says in your
22              report disturbing the store so we decided to take her
23              outside the store.  Can you go through that again?
24                   MS. PINKEL:  Why are you asking him to -- he's
25   already testified to this.....
```

R & R  COURT  REPORTERS

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 23

1               MR. PHARR:   I know.

2               MS. PINKEL:   .....sequence of events.

3               MR. PHARR:   And I'm asking him to.....

4               MS. PINKEL:   Asked and answered.

5               MR. PHARR:   With all due respect, counsel, you

6 asked the same question at least six to 10 different ways

7 yesterday.   So I think that I can ask him to go through it

8 again.

9               MS. PINKEL:   Well, that was a different matter.

10 That was the issue of the fact that your client is not claiming

11 any physical, mental or emotional damages in the case.   This

12 is.....

13               MR. PHARR:   I know.   We spent an hour beating

14 that into the ground so I.....

15               MS. PINKEL:   No.

16               MR. PHARR:   .....think I can ask him to.....

17               MS. PINKEL:   He's already answered.....

18               MR. PHARR:   Okay.

19               MS. PINKEL:   .....this question.

20 Q     Let me ask you this.   Did they -- did you drag them out

21       of the store?   Did you drag her out of the store?

22 A     No, we didn't drag.   Well, define drag.

23 Q     How.....

24               MS. BERMAN:   Can we just go off record for a

25 moment, please?

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 24

1          COURT REPORTER:  Counsel has to ask, I guess.

2          MR. PHARR:  Okay.  Let's go off record.

3      (Off record)

4      (On record)

5  Q    Okay.  Can you describe how you removed her from the

6         store?

7          MS. PINKEL:  Object.  I believe he already

8  answered this question.

9  Q    I'd just ask you to go through it again.  How did you

10        take her out of the store?

11 A    With the sleeve guide.  We had our arms -- I think it

12        was probably demonstrated to you.  You know, part of

13        the arm and we were walking her -- we're pushing a

14        little bit gently and she's walking.

15 Q    Okay.

16         MS. PINKEL:  I'm going to close the door.

17 Excuse me.

18         COURT REPORTER:  Thank you.

19         MR. PHARR:  It don't really close, Mary.  So

20 I -- I'm almost done here.  So.....

21 Q    Okay.  It says nothing in your report about spinning.

22        Can you explain that?

23 A    Just omitted it.  I believe I covered the elements of

24        the crime which she was arrested for.

25 Q    Okay.  So when it says I took it away from her, she

R & R  C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit C
Page 25

1      struggled and we handcuffed her, that was meant to --

2      you were describing a process -- you described as kind

3      of a fluid process?

4  A   It's a summation.  You know, there's consistent verbal,

5      there's consistent physical.  Her trying to leave, us

6      restraining her.  The aspect of her needing to be

7      handcuffed was the result of the fact of I took the

8      wallet from her, she struggled, we handcuffed her.

9      It's just a summation.  It's not a narrative of exact

10     events.

11         MR. PHARR:  Okay.  Thank you.  No further

12  questions.

13         MS. PINKEL:  Okay.  I just have a few, just to

14  follow up on for clarification.

15                    **CROSS EXAMINATION**

16  **BY MS. PINKEL:**

17  Q   I just want to clarify something with you, Officer

18      Davis.  At the time you removed Ms. Berman's wallet,

19      was it your understanding that you had already detained

20      her, is that correct?

21  A   Yes.

22  Q   Okay.  Now, you -- your report says that you ran her ID

23      and her license had expired, is that correct?

24  A   Yes, that's correct.

25  Q   And what did you tell her to do based on the fact that

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 26**

1          her license had expired, if you remember?

2    A     I don't specifically recall.

3    Q     Okay.  Do you think that the fact that ms. Berman had

4          an expired license played a role in her resistance to

5          producing her identification to you and Officer Dutton?

6                MR. PHARR:  Objection, calls for speculation.

7    Q     You can answer the question.

8    A     Okay.  Yes, I -- yes, I do.

9    Q     Okay.  Have you been -- how long have you been a police

10         officer?

11   A     Just past 11 years now.

12   Q     Have you ever had any contact with lawyers in your work

13         as a police officer?

14   A     Yes, I have.

15   Q     Were you surprised when you found out Ms. Berman was a

16         lawyer?

17   A     Shocked.

18   Q     And why were you shocked?

19   A     Normally I find attorneys very professional, very

20         knowledgeable of the law.  And while they may not agree

21         with what we're doing they have a strong sense of

22         working with us and working through the problem as

23         opposed to bluntly opposing us.

24   Q     Okay.  And in this instance was it your impression,

25         based on this incident, that she was bluntly opposed to

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 27

1           what you and Officer Dutton were there to do?

2  A     Yes.

3  Q     Okay.  Now, Officer Dutton cited her for resisting an

4           officer?

5  A     Yes.

6  Q     Okay.  Did you agree with that citation?

7  A     At the time, yes.

8  Q     Okay.  And did you believe she had intentionally,

9           knowingly or recklessly delayed or obstructed Officer

10          Dutton's active investigation of a crime?

11  A     Yes.

12  Q     Okay.

13               MS. PINKEL:  I have no further questions.

14  Okay.  I'm done.

15               MR. PHARR:  Wait, wait.

16              **REDIRECT EXAMINATION**

17  **BY MR. PHARR:**

18  Q     Did you tell her she was under arrest before you took

19           her wallet?

20  A     No.

21  Q     Did you ever tell her that if she didn't show ID she

22           would be arrested?

23  A     I don't -- I know I didn't say that.

24  Q     Did you hear Dutton say it?

25  A     I don't recall that.  It may have been said but I don't

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 28

1        recall it specifically.

2                MR. PHARR:  Okay.  Thank you.

3                COURT REPORTER:  All right.  We'll go off

4  record?

5                MS. PINKEL:  One other question just to follow

6  upon what John just asked you.

7                      **RECROSS EXAMINATION**

8  **BY MS. PINKEL:**

9  Q        In your training is it true you don't have to tell

10          someone they're under arrest.....

11  A        That's correct.

12  Q        .....to -- for them to be under arrest?

13  A        That's correct.

14  Q        Okay.  Thank you.

15                MR. PHARR:  Okay.  That's it.

16          (Off record)

17                      **(END OF PROCEEDINGS)**

18

19

20

21

22

23

24

25

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

**Exhibit C**
**Page 29**

1                           **S I G N A T U R E**

2    UNITED STATES OF AMERICA)
                              )ss.
3    STATE OF ALASKA          )

4            I, **SGT. GILBERT M. DAVIS**, having read the

5    foregoing deposition testimony, do hereby certify it to be true

6    and accurate, subject to corrections, if any, as indicated on

7    the attached errata sheet.

8                                    _____
                                     SGT. GILBERT M. DAVIS
9
                                     DATE:_____
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

R & R   C O U R T   R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982

ANCHORAGE, ALASKA  99501

Exhibit C
Page 30

1                          C E R T I F I C A T E

2   STATE OF ALASKA                    )
                                       ) ss.
3   THIRD JUDICIAL DISTRICT            )

4          I, Wanda Ventres, Notary Public in and for the State of
    Alaska, and court reporter for R & R Court Reporters,
5   Incorporated, do hereby certify:

6          THAT the annexed and foregoing deposition transcript of
    **SGT. GILBERT M. DAVIS** was taken before Wanda Ventres, on behalf
7   of the plaintiff at the offices of John C. Pharr, 733 West 4th
    Avenue, Suite 308, Anchorage, Alaska, on the 14th day of
8   December, 2005 commencing at the hour of 2:13 o'clock p.m.

9          THAT the above-named Witness, before examination, was
    duly sworn under oath to testify to the truth, the whole truth,
10  and nothing but the truth.

11         THAT this Deposition, as heretofore annexed, is a true
    and correct transcription of the testimony of said Witness,
12  taken by Wanda Ventres and thereafter transcribed by Wanda
    Ventres.
13
           THAT the Original DEPOSITION transcript will be lodged
14  in a sealed envelope with the attorney requesting transcription
    of same, that attorney being:  MS. MARY B. PINKEL, Assistant
15  Municipal Attorney, 632 West 6th Avenue, Suite 730, Anchorage,
    Alaska 99510-6650.
16
           THAT I am not a relative, employee or attorney of any
17  of the parties, nor am I financially interested in this action.

18         IN WITNESS WHEREOF, I have hereunto set my hand and
    affixed my seal this 19th day of December, 2005.
19

20                          _Wanda Ventres_

21                          Wanda Ventres
                            Notary Public in and for Alaska
22                          My commission expires: 09/20/07

23

24

25

R & R  C O U R T  R E P O R T E R S

810 N STREET
(907) 277-0572/Fax 274-8982
ANCHORAGE, ALASKA  99501

Exhibit C
Page 31

ERRATA SHEET

MUNICIPAL ATTO
06 MAY -9 AM IC
HD

WITNESS NAME: _Gil Davis_

CASE TITLE: _____

CASE NUMBER: _____

| PAGE # | LINE # | SHOULD BE | TYPED |
|--------|--------|-----------|-------|
| 4 | 23 | detail, a special . . . | |
| 8 | 1 | It was NOT a normal .. | |
| 12 | 21 | more results than ... | |

COPY

Exhibit C
Page 32