Mary B. Pinkel
Assistant Municipal Attorney
Municipality of Anchorage Department of Law
Civil Division
P.O. Box 196650
Anchorage, Alaska 99519-6650
(907) 343-4545 (phone)
(907) 343-4550 (fax)
uslit@muni.org

Attorney for Defendants Anchorage
Police Department, Officer Robert Dutton,
And Sergeant Gil Davis

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JUDY L. BERMAN, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| ANCHORAGE POLICE DEPARTMENT, OFFICER ROBERT DUTTON, and SGT. GIL DAVIS, | ) ) ) ) |
| Defendants. | ) ) |

U.S. District Court Case No. 3:04-cv-227-TMB

### AFFIDAVIT OF JOHN DAILY

John Daily being duly sworn upon oath deposes and states as follows:

1. I am employed by the Anchorage Police Department ("A.P.D.") as a senior patrol officer. I have been a patrol officer with the A.P.D. for over 25 years. The bulk of my career has been on the Swing Shift patrol, which is from 3:00 p.m. to 1:00 a.m.

2. My duties as a senior patrol officer consist of performing a wide range of

police services and a variety of tasks, including taking appropriate action when observing or being informed of matters requiring police attention. Anchorage Police Officers maintain order, enforce codes and ordinances, and protect life and property within the Municipality of Anchorage. My specific duties include investigations; report writing; radio communication; traffic enforcement; patrolling and security.

3.   In addition to serving as a senior patrol officer, I have also served as a Major Crime Scene Team Leader where I supervise a five person team. I also serve on the A.P.D. SWAT Team. I am currently a team leader ("T.L.") over a 12 man unit.

4.   I am also the Lead Instructor for the Officer Survival Teaching Cadre. I supervise a unit of 19 instructors. I have been a member of this cadre since 1982. As the lead instructor, I teach officer survival skills to police officers and police officer trainees. I have also served as a field training officer ("F.T.O.") on the duties of patrol officers since 1982

5.   I have been asked by Assistant Municipal Attorney Mary Pinkel to review the pleadings and discovery documents in this case, the police reports, the depositions to date of Judy Berman, Robert Dutton and Gil Davis, to interview Ms. Sharon Chen and to review the affidavits signed by Chih and Sharon Chen, and to render an expert opinion as to the reasonableness of the officer's behavior. Them on March 1, 2006.

6.   In my opinion, based upon my training and experience as a senior patrol officer and on all of the information I have reviewed to date, Officers Dutton and Davis behaved competently and reasonably in regard to the situation they encountered with

Affidavit of John Daily in Support of Motion for Summary Judgment
Case No. 3:04-cv-227-TMB
Page 2 of 9

Judy Berman on April 6, 2002. Had they not responded otherwise, they would have been remiss in their duties. In the classes I teach officers and recruits, I continually stress the importance of the role of police officers to protect the public from potentially violent situations. In my 25 years as a patrol officer, I have learned that officers must be continually vigilant and must watch for signs of potential violence to others. In the situation that they encountered with Judy Berman, these officers were required to respond in the way that they did.

7.   First, when Officer Dutton heard the horn honking repeatedly in the parking lot at Carrs Huffman grocery store ("Carrs" or "Carrs Huffman"), he initially thought that it might have been a car alarm and had reasonable suspicion that a crime was occurring and had a duty to investigate further.

8.   Second, when Officer Dutton returned to the parking lot and observed Ms. Berman's behavior in honking and screaming at the Chens, he had reasonable suspicion that she had created a disturbance or that she had engaged in disorderly conduct, in violation of the Anchorage Municipal Code. Officers Dutton and Davis then had a duty to investigate Ms. Berman's behavior further. It is important to consider the issue of safety from the viewpoint of a patrol officer in this situation. We train officers to be alert for signs of road rage, domestic violence, or weaponry. In a situation like the one the officers encountered with Ms. Berman, all of these thoughts would have and should have likely crossed the officers' minds.

9.   Officer Dutton parked his marked patrol car behind Ms. Berman, taking the

first step to detention. Ms. Berman was not free to back up her vehicle and leave until his investigation of the incident was complete. He stepped out in full uniform and made contact with her. He asked her why she was creating the disturbance. Ms. Berman's explanation that the couple had parked in her spot confirmed his suspicion that her conduct was neither reasonable nor legal. At this point, Officer Dutton had the authority to take one of several actions, ranging from a verbal warning to a physical arrest and transport before a magistrate for a bail hearing. The action taken by the officer can depend on numerous factors, such as the defendant's history, demeanor, level of cooperation, severity of the incident, input from victims, etc.

10. Ms. Berman then started to walk away from Officer Dutton; he told her she needed to show identification. Ms. Berman then told Officer Dutton that she did not have any identification, and that she was not going to show it to him anyway. She continued to walk away from him. Officer Dutton told her that she was required to show identification and he physically got in front of her. She refused to produce identification, so he placed her in a "sleeve guide" (holding near the elbow with some upward pressure) and took physical detention of her. He again told her that she was required to identify herself as he was investigating a disturbance that she had created and that she was required (as a suspect) to identify herself to him.

11. By this point, Ms. Berman's behavior had opened several doors. First, she had violated a traffic law in regard to horn honking, AMC 9.36.360A, and was seen driving by the officer. Under Anchorage Municipal Code 9.12.030 and under Alaska

statutes, she was required to produce her driver's license at the demand of a police officer or judge. Officer Dutton had more than probable cause to believe that a crime had been committed: disorderly conduct, in violation of AMC 8.30.120 A (2). He indicated to Ms. Berman that he was not done talking to her, yet she had continued to walk away, in violation of AMC 8.30.010 A. 4 ("did intentionally, recklessly, or knowingly delay or obstruct a police officer's active investigation of a crime after having been told to stop"). Fleeing does not mean that a person has to run or drive away at a high rate of speed.

12. Despite the fact that Officer Dutton was traveling in a marked car, was in full uniform and wearing a badge, Ms. Berman demanded to see his identification. When Officer Davis ordered her to produce her identification, since she had her wallet out, she then tried to pull away, and in the officers' words, started to "spin" away. At this time, both officers took hold of Ms. Berman, placed her arms behind her back and placed her in handcuffs, taking the detention to a physical arrest. Officer Davis then grabbed Ms. Berman's wallet, opened it and removed her identification.

13. In my opinion, Officer Dutton was more than reasonable with Ms. Berman in the situation he encountered with her. In my opinion, he was not required to show her his identification before she showed him hers. However, he went to the extra step of showing her his identification. At the time Ms. Berman pulled away from the officers, the officers made the decision to handcuff her, which was appropriate under the circumstances. At that point, Berman was under arrest, was uncooperative for

unknown reasons, and there was a large unknown factor of whether she had weapons, and whether she would use them. In fact, it would have been appropriate for the officer to handcuff her earlier when she first began to walk away from him against his orders.

14.  The process the officers used in the handcuffing ("cuffing") Ms. Berman was also appropriate, in that they both took one arm and held it to her back and placed the cuffs on her. At the time she spun around on the officers, they would have also been justified in taking her to the ground or pinning her against the wall to prevent further movement until she was cuffed. I have reviewed Ms. Berman's deposition testimony, the photos produced by Ms. Berman, and the testimony of the officers. In my opinion the level of force used was entirely appropriate.

15.  Sergeant Davis's act of removing Ms. Berman's driver's license from her wallet was also appropriate. There is quite a bit of case law that supports an officer going into areas where identification might be stored (such as a wallet) with the express purpose of identifying the person under arrest. When Officer Davis did examine the wallet, he discovered that Berman's license was expired. Driving with an expired license is a class A misdemeanor under Alaska state law and is also a traffic offense under municipal law, which may have been a reason that she refused to produce it. (I would note that when asked at her deposition if the expired license had been a factor in her refusal to produce the license to Officer Dutton, that Ms. Berman had refused to answer the question.) This expired license could have formed the basis

for another charge, which the Officers generously chose not to pursue.

16. It was entirely appropriate for Officer Dutton to place Ms. Berman in the patrol car while he reviewed the applicable codes, and researched her driving history and criminal record. It was also appropriate that he issued her "cite and release" -- a summons to appear which is based on the defendant's signed promise that she would do so. The officer then appropriately told Ms. Berman that someone would need to pick her up from the parking lot because she was not entitled to drive.

17. It is therefore my opinion, based on my training and experience and review of all of the information provided, that Officers Dutton and Davis showed great restraint and professionalism in this situation. What is especially impressive to me is what these officers could have done, but refrained from doing. With a defendant who exhibits behavior of the type Ms. Berman exhibited, it is very tempting for a police officer to "throw the book" at such a person. However, these officers refrained from doing so. Their professionalism and restraint in dealing with Ms. Berman's behaviors

should therefore be applauded.

Dated this 9 day of March, 2006.

By: _____
John Daily

SUBSCRIBED AND SWORN to before me this 9th day of March, 2006.

_____
Notary Public in and for Alaska
My commission expires: 2-21-09

