Mary B. Pinkel
Assistant Municipal Attorney
Municipal Attorney's Office
P.O. Box 196650
Anchorage, Alaska 99519-6650
E-mail: pinkelmb@muni.org
(907) 343-4545
Facsimile: 343-4550

Attorney for Defendants Anchorage
Police Department; Ofc. R. Dutton;
And Sgt. Gil Davis

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JUDY L. BERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ANCHORAGE POLICE DEPARTMENT, | ) |
| OFC. R. DUTTON, and SGT. G. DAVIS, | ) |
| | ) |
| Defendants. | ) |

U.S. District Court Case No. A04-227 CIV (JKS)

### EXPERT DISCLOSURE

Defendants Municipality of Anchorage, Officer R. Dutton and Sgt. G. Davis, ("The Municipality"), through its counsel, the Municipal Attorney, discloses the following expert witness in this matter.

1. Officer John Daily
   c/o the Municipal Attorney's Office
   P.O. Box 196650
   Anchorage, Alaska 99519-6650
   (907) 343-4545

MUNICIPALITY
OF
ANCHORAGE

OFFICE OF THE
MUNICIPAL ATTORNEY

P.O. Box 196650
Anchorage, Alaska
99519-6650

Telephone: 343-4545
Facsimile: 343-4550

Officer Daily is a senior patrol officer with the Anchorage Police Department and serves on swing shift patrol. He is currently a team leader ("TL") over a 12 person unit. Officer Daily is also Lead Instructor for the Officer Survival Teaching Cadre. He has been active as a field training officer since 1982. He has also served as a Major Crime Scene Team Leader since 1985, and has served on the APD SWAT team since 1987. Officer Daily is prepared to testify as an expert on the issue of the conduct of Officers Davis and Dutton and how it comported with proper APD procedures and training. Officer Daily has not authored any publications. Officer Daily is not being compensated for his expert assistance on this matter, other than his salary. A copy of Officer Daily's report and his resume are being provided to the Plaintiff with this expert disclosure.

Respectfully submitted this 18th day of November, 2005.

FREDERICK H. BONESS
Municipal Attorney

By: _____
Mary B. Pinkel
Assistant Municipal Attorney
Alaska Bar No. 8505030

I hereby certify that I caused to be hand-delivered a true and correct copy of this foregoing document to John Pharr on November 18, 2005.

_____

MUNICIPALITY
OF
ANCHORAGE

OFFICE OF THE
MUNICIPAL ATTORNEY

P.O. Box 196650
Anchorage, Alaska
99519-6650

Telephone: 343-4545
Facsimile: 343-4550

Expert Disclosure
Berman v. Anchorage Police Department
Case No. A04-227CIV (JKS)
Page 2 of 2

Exhibit A  Page 2 of 11

# RESUME

Senior Officer John F. Daily
Anchorage Police Department

## LAW ENFORCEMENT HISTORY

1978-1980
Safety and Security Specialist
Army and Air Force Exchange Service
Elmendorf AFB, Alaska

1980 – Present (25 yrs.)
Senior Police Officer
Anchorage Police Department
Anchorage, Alaska

## CURRENTLY
Senior Patrol Officer, APD, Swing Shift(25 yrs.)
Special Weapons and Tactics(SWAT),(18 yrs.) Assistant Team Leader (11 yrs.)
Major Crime Response Team,(20 yrs.) Team Leader(17 yrs.)
Officer Survival Instructing Cadre (23 yrs.)Lead Instructor(17 yrs.)
Firearms Instructor(14 yrs.) Lead Swing Shift Instructor(10 yrs)
Certified Police Instructor(23 yrs.)
Other Instruction Certifications
   Crime Scene
   Police Baton
   PPCT Defensive Tactics
   PPCT Spontaneous Knife Defense
   PPCT Tactical Close Quarters Countermeasures
   Urban Rifle
   Submachine Gun
   Swat Tactics
   Accident Investigation
   Less Lethal
   Critical Incident Response
   Tactical Lead Climber

## TRAINING

Basic Police
Anchorage Police Academy, 9-29/12-12-80,
400hrs
Breath Test Operator Recertification 3-31-83,
4hrs.

Field Training Officer, 4-15/4-18-83
40hrs
Intoximeter 3000, 4-83,
8hrs
Dangerous Motorcycle Gangs, 7-29-85,
8hrs
Rights of Law Enforcement Officers, 4-27-90,
8hrs
Hazardous Materials, 3-29-90,
8hrs
Inservice Training(CPR, Hazmat, Def. Tactics,Ofc. Survival, Search Warrants, Liability) Spring 1993,         36hrs
DWI Detection & Standardized Field Sobriety Testing, 4-2/4-3-93,
16hrs
Emergency Trauma Training & CPR 10-18/10-22-93,
40hrs
Police Officer Response to Domestic Violence, 12-8-94,
8hrs
Drug Interdiction, 11-12/11-14-96,
24hrs

Crime Scene
Uniformed Investigators School, 12-6-82,
40hrs
Traffic Accident Investigation, 9-27/10-8-82
80hrs
Technical Accident Investigation, Summer 1983
120hrs
Photography Workshop, 1-30-84         8hrs
Sexual Exploitation of Children, 7-23/7-27-84
40hrs
Bloodstain and Physical Evidence, 4-21/5-2-86
80hrs
Homicide Investigation Seminar, 3-14/3-25-88
87hrs
Medicolegal Death Investigation Course, 4-25/4-29-94
40hrs
Forensic Pathology Seminar, 2-23-95
8hrs
Bloodstain Pattern Interpretation, 6-26/6-30-95
40hrs
Masters Conference in Death Investigation, 7-31/8-3-95
40hrs
Law Enforcement Video Class and Workshop, 11-4/11-8-96
40hrs

Forensic Mapping (Total Station), 4-7/4-11-97
40hrs

Instructing
Instructor Development Seminar, 5-5/5-9-83
40hrs
Police Officer Survival Tactics Seminar, 3-17/3-18-86
16hrs
Police Baton Instructor Development, 1-15/1-16-87
16hrs
Crisis Management for Law Enforcement, 8-26/8-28-91
24hrs
PPCT Defensive Tactics System Instructor School, 10-26/11-6-92
80hrs
PPCT Spontaneous Knife Defense System Instructor School 5-21/5-25-93
40hrs
Law Enforcement Handgun Instructor, 3-18/3-27-92
50hrs
Inservice CPR, Hazmat, Handgun, Defensive Tactics, Officer Survival, Search Warrants, Police Liability. nSpring 1994
27hrs.
Calibre Press, Street Survival, 2-26/2-28-96
24hrs
Training Design and Development, 3-24/3-28-97
40hrs
ASLET Conference 4-97
40hrs
APOA Crime Conference 5-99
40hrs
Special Weapons and Tactics
Basic SWAT School 7-25/7-29-88
40hrs
Advanced Special Weapons and Tactics, 10-29/11-9-90
80hrs
Dignitary Protection School, 8-7/8-10-90
40hrs
SWAT Supervisors Tactics and Management, 9-12/9-16-93
40hrs
Terrorism, Managing the Consequences, 12-11/12-14-95
40hrs
Less Lethal Weapons Instructor, 5-13/5-17-96
40hrs
Submachine Gun Instructors School, 6-17/6-21-96
40hrs
Hostage Negotiations, 3-10/3-14-97
40hrs

SWAT1: Basic Tactical Operations and High Risk Warrant Service, 11-1/11-5-99
40hrs
SWAT2: Advanced Tactical and Hostage Rescue Operations, 11-8/11-12-99
40hrs
Tactical Lead Climbers School, 6-24/6-28 2002
40 hrs.
SWAT Tactical Incident Resolution, 11-19/22-02
36hrs
PPCT Tactical Team Close Quarter Countermeasures Instructor Course, 3-1/4-04
40hrs
Crowd Management and Mobile Field Force Tactics, 4-19/23-04
40hrs
Special Weapons and Tactics Academy, 6-6 thru 7-14-05
240hrs

Teaching Experience
Officer Survival- I have taught in every APD academy since 1982, usually one and sometimes two academies per year, with an average of 100 hrs of instruction per academy. The Ofc Survival Teaching Cadre currently consists of 10 instructors. I also do Inservice instruction and have taught Police Reserves, Explorer Scouts, State and Federal Park Rangers, IRS Criminal Investigation Agents, Department of Corrections Probation and Parole Officers, Juvenile Probations, DOC Corrections Officers, Alaska State Troopers, store and hotel security officers, and Statewide Emergency Medical Personnel. I have instructed for the Santa Barbara, Costa Rica Police Department and have taught at the Costa Rica National Police Academy for a week in Feb.2001. I teach firearms to SWAT and regular patrol to include pistol and shotgun with rifle and sub-gun included for SWAT along with SWAT tactics. I teach Critical Incident Response to all of APD (concerning active shooters), State Troopers, and other Police Agencies.

I have been declared an expert in court three times as a crime scene and trajectory expert, and have done the primary crime scene on approximately 130+ homicides along with hundreds of shootings, stabbings, suicides, assaults, accidents, etc

Commendations
APD Police Officer of the Year - 1986
APD Police Officer of the Year - 1996
Swat Officer of the Year- 2004
Nomination for Top Cop Award, Washington DC - 2000
Medal Of Valor 1999
Medal Of Valor 2003
Distinguished Achievement 1998
Life Saving Award 2000 and 2004
Numerous letters of Commendation and Appreciation

# REVIEW OF APD 02-16925 BY SENIOR PATROL OFFICER JOHN DAILY

On 11-1-05, I was contacted by the Anchorage Municipal Attorneys office and asked to review reports and documentation reference APD case #02-16925 and to also interview one of the participants of that event, Sharon Chen. After the review and interview I was asked to render an opinion on the event from the standpoint of whether it was in keeping with proper APD police procedures and training and if the actions appeared reasonable from my vantage as a senior patrol officer.

My background is as follows:
I have been an officer for the Anchorage Police Department for over 25 yrs. I worked a short time on day shift and mid shift and in the detective division in Homicide/ Assaults. The bulk of my career has been on Swing Shift patrol which is currently 3:00 pm to 1:00 am. For approximately 15 years, I have had additional duties as a Major Crime Scene Team Leader where I supervise a five person team. I have been on the team since it's inception in 1985. I am also on the APD SWAT team and have been so since 1987. I am currently a TL (team leader) over a 12 man unit. Another additional duty is that of Lead Instructor for the Officer Survival Teaching Cadre and there I supervise a unit of 19 instructors. I have been a member of that cadre since 1982. I am lead firearms instructor for swing shift and also teach Defensive Tactics and Crime Scene Processing. I have also been active as a Field Training Officer since 1982.

As stated earlier, the bulk of my career has been working the "street", so to speak, and I reviewed this case on that basis.

The primary report I reviewed was done by Ofc. R. Dutton with a supplementary report done by Sgt. G. Davis. Ofc. Dutton stated in his report that he first heard a horn honking repeatedly in the parking lot of Carrs grocery store on 4-6-2002 at approximately 2220 hrs. He initially thought it was a car alarm and advised his back-up, Sgt. Davis. He went back into the parking lot from the exit at Huffman Rd. and Sgt. Davis responded to assist. At this point he had a reasonable suspicion that a crime was occurring and had a duty to investigate further. A car alarm is meant to let people know that the car is being broken into.

Ofc. Dutton pulled back into the parking lot and went n/b along the front of the Carrs store. He then saw a female in a car, a 1986 Chevy Nova, and saw that she was still honking her horn. The female was later identified as Judy Berman. She then made a ¾ U-turn to pull into the angled parking in front of the store, next to a van with two people getting out of the van. He saw Ms. Berman continue to honk the horn at them and also yell and scream at them as they walked away into the store. He did not note in his report that they were doing anything to elicit this kind of action from Ms. Berman. When I spoke to the female involved, Sharon Chen, she stated that she and her husband were simply going into the store and saw an available parking space angled in the direction they were coming from. She said they weren't aware of any problem until the woman started honking her horn a lot and then pulled up next to them as they left the van and started screaming at them. She did not recall the exact words she used at the time, but the tone was very angry and she was very worried about whether the woman was going to

SENIOR PATROL OFFICER JOHN DAILY DSN 572                                                    1

## REVIEW OF APD 02-16925 BY SENIOR PATROL OFFICER JOHN DAILY

come towards them or do damage to their car. She said she was very relieved when she saw the police officer make contact with the woman.

Now the texture of the situation has changed on a couple of levels. On a traffic code level the indications are that the woman in the Nova, Judy Berman, violated AMC 9.36.360 A, the basics of which are that the car's horn can only be used as a tool to assure safe operation and not otherwise. It is not a tool to be used to vent anger or frustration in a public parking lot. On the criminal level, with the honking, yelling and screaming in the public parking lot at Carrs, there is sufficient reasonable suspicion to believe that she violated AMC 8.30.120.A2, Disorderly Conduct "did knowingly generate loud noises in a public place with the intent to disturb others or with reckless disregard for the peace and privacy of others." Ofc. Dutton and Sgt. Davis then had the duty to investigate further, and by their observations, the authority to take action, up to and including arrest.

An important aspect to be considered here is officer safety. The things that are normally going through an officer's mind are "why" is this person acting this way? Was there something that was done by the people in the van that would cause a reasonable person to act this way. Is this an issue of road rage, is there some kind of ongoing history such as a domestic violence situation? Obviously the person is angry, but are there also mental health issues that are involved. And very importantly, are there weapons accessible although not obviously involved at the moment

Ofc. Dutton parked his marked patrol vehicle behind the grey Nova and took the first step to detention. Ms. Berman was not free to back her vehicle up and leave until his investigation of the incident was complete. He stepped out in full uniform and made contact with her by tapping on her window. She exited her vehicle and he asked her why she was creating the disturbance and she stated that the people had parked in her spot. This confirmed his suspicion that the act was neither reasonable nor legal.

At this point the officers had the authority and discretion to take one of several actions, ranging from a verbal warning to a physical arrest and transport before a magistrate for a bail hearing. The action taken can depend on numerous factors, such as the defendant's history, their demeanor, level of cooperation, severity of the incident, input from victims, etc.

Ms. Berman started to walk away from the officers and was told that she needed to show her identification. She told them that she didn't have any I.D. and was not going to show it to them anyway. Ofc. Dutton told her that she drove into the lot and was required to produce an O.L. and he physically got in front of her as she walked away and told her again to produce the drivers license and she refused again and tried to walk away again. At this time he physically took hold of her in a sleeve guide(holding near the elbow with some upward pressure) and took physical detention of her. He told her that he was investigating a disturbance and as a suspect she was required to identify herself.

These actions on her part open another set of doors. She violated a traffic law and was seen driving by the officer and per AMC 9.12.030 A, she is required to produce her

SENIOR PATROL OFFICER JOHN DAILY DSN 572                                              2

# REVIEW OF APD 02-16925 BY SENIOR PATROL OFFICER JOHN DAILY

license at the demand of a police officer or judge. The officer also had more than sufficient probable cause to believe that a crime was committed and told Ms. Berman to stop and she continued to walk away, at least twice, in violation of AMC 8.30.010.A4 "did intentionally, recklessly, or knowingly delay or obstruct a police officer's active investigation of a crime by fleeing after having been told to stop." Fleeing doesn't mean that a person has to be running or driving away at a high rate of speed.

At this time she demanded to see identification from the officers in addition to their marked car, uniform and badges and they obliged with their municipal I.D. She pulled out her wallet from her purse and Sgt. Davis told her to produce her identification and she refused even though she had told them that it was in the wallet. Sgt. Davis says in his report that he took her purse from her then to get her I.D./O.L. and she then tried to pull away from Ofc. Dutton. At this time both officers took hold of her, placed her arms behind her back and placed her in cuffs, taking the detention by their presence to a physical arrest, once again based on more than sufficient probable cause. Ofc. Dutton says in his report that Sgt. Davis picked up her wallet when it was dropped during her resistance and then got the I.D./O.L.. Sgt. Davis also says that he had her watch as he got her I.D./O.L. out and that he put her purse in her pocket after he got the I.D./O.L.. It was at this time that her identity was established and they found out that her O.L. was expired.

The fact that Ofc. Dutton perceives Sgt. Davis getting the I.D./O.L. out after the cuffing as opposed to taking the wallet from her hands before the cuffing is not unusual. When things get heated and dynamic minor differences in perceptions such as this happen. As any officer or lawyer knows, 10 witnesses to an event will have ten versions, all basically the same but with differences in perception. Regardless of whether he took it from her hands or the floor though, he had the right to do so in either case. I believe that semantics play a part here also as I think that Sgt. Davis is interchanging purse and wallet. I don't believe that he put her purse into her pocket after he got the I.D./O.L..

Officers are required to identify themselves when needed, but a reasonable person, seeing the marked car, uniform and badges, would have satisfactory identification. Ofc. Dutton went to great lengths to show proof and allay her arguments. At the time she pulled away, the officers made the decision to handcuff her which was very appropriate for the circumstances. She was under arrest, she was definitely uncooperative for unknown reasons, and there was a large unknown factor of what weapons she may have had in her possession and if she was of the mind to use one. In fact, cuffing would have been appropriate at an earlier time when she had first started walking away against the officers orders. The process they used in cuffing her was also appropriate in that they both took an arm and held it to her back and placed the cuffs on her. At the time she spun around on the officers it would also have been justified in taking her to the ground or pinning her against a wall to prevent further movement until she was cuffed.

Sgt. Davis looked into the wallet for her identification and, in fact, there is quite a bit of case law that supports an officer going into common areas of the storage of identification (like a wallet) with the express purpose of identifying the subject under arrest. This also opened up the fact that the now identified defendant, Judy A. Berman, had an expired

SENIOR PATROL OFFICER JOHN DAILY DSN 572                                                   3

Exhibit A  Page 9 of 11

# REVIEW OF APD 02-16925 BY SENIOR PATROL OFFICER JOHN DAILY

Operators License, which under state law is a class A misdemeanor, giving her good reason, along with all the others, not to let the officers see her O.L.. This also gave the officers further legal basis to charge her with yet another criminal offense if they had wished.

Ofc. Dutton then placed her in his patrol car and told her that if she had no criminal history that he would "cite and release" her which is in fact a summons to appear in court on the signed promise that the defendant would do so. He wrote the summons out and then took her out of the car and out of the cuffs and had her sign the summons and gave her a warning not to drive her car and to have someone else pick it up for her.

The fact that Ofc. Dutton placed her in his car and stayed at the location of the offense is not at all unusual and is much better than standing out on the sidewalk with her in cuffs and him trying to look up the statutes and write up the summons. The time used appears to be a factor in this suit, but I would say that by the time you get the information sorted out, interface with dispatch on criminal/ driving history, look for the appropriate statute numbers, and put the appropriate information on the arrest sheet and ATN, you have used up a fairly large chunk of time.

The issue of excessive force that was raised is, I believe, totally unsubstantiated. The officers gave her more than sufficient opportunity to cooperate and appropriately used the force continuum. They started with officer presence and voice commands when she went to leave and then moved in front of her and again told her not to leave. They then graduated to soft empty hand control with the sleeve guide and then placed her arms behind her back and cuffed her when she physically resisted. The officers in fact showed restraint in not graduating to a pain compliance or pinning technique which could have been an appropriate reaction to her pulling and trying to spin away.

I reviewed the photos of the bruises on the back side of Berman's arms and although they are grainy photos I do have some observations about them. I, of course, don't know if Ms. Berman bruises easily or not, nor do I know when these photos were taken in relation to the event, but with her resisting and the officers having to physically place her hands behind her back, I would not be surprised at all to see some bruising such as an apparent fingertip type bruise. I am surprised to some extent to see two almost identically shaped bruises in the same location on both arms and nothing else. I have been involved in the investigation of thousands of assaults from very minor to homicides and this is unusual to me.

Perhaps the best indication that Officer Dutton and Sgt. Davis showed great restraint and acted very professionally in this situation is what they didn't do. With a defendant that is acting the way that Judy Berman was it is very tempting to throw the book at them and put a lot of charges on them and to physically put them in jail. They didn't do that. Both of these officers are very intelligent and have a good grasp of the applicable laws. Although this is not a situation that we see all the time, it would have been very easy for them to pile on the charges, of which there were several they could have. I would say from reading their reports and from personal experience that they would have been happy

SENIOR PATROL OFFICER JOHN DAILY DSN 572                                                                                      4

Exhibit A  Page 10 of 11

## REVIEW OF APD 02-16925 BY SENIOR PATROL OFFICER JOHN DAILY

to just have her admit her mistake and promise not to do it again, which would have been in their discretion to do. Judy Berman's actions predicated the outcome of this event and the officers acted appropriately based on her conduct.

11-17-2005
John Daily

*/s/ John Daily*